UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN GOLDSTEIN individually and on behalf of CONGREGATION BNEI MATISYAHU, and MEIR ORNSTEIN, <br><br> *Plaintiffs*, <br><br> -against- <br><br> KATHY HOCHUL, in her official capacity as Governor of the State of New York; LETITIA JAMES, in her official capacity as Attorney General of the State of New York; KEECHANT SEWELL, in her official capacity as Commissioner of the New York City Police Department; LOUIS FALCO, III, in his official capacity as Rockland County Sheriff; ERIC GONZALEZ, in his official capacity as the District Attorney of Kings County; and THOMAS WALSH, II, in his official capacity as the District Attorney of Rockland County, <br><br> *Defendants*. | Index No.:  22-CV-8300 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

For the reasons set forth in the attached Memorandum of Law, Plaintiffs Steven Goldstein, Meir Ornstein and Congregation Bnei Matisyahu, by and through their attorneys, hereby request that this Honorable Court issue a temporary restraining order and preliminary injunction enjoining Defendants from enforcing New York Penal Law § 265.01-e(2)(c), the statute that designates all "places of worship or religious observation" as "sensitive locations" in which the possession of a firearm is forbidden and punishable by arrest and felony prosecution.

Dated:          New York, New York
                September 28, 2022

                        Yours, etc.,

                        BENNO & ASSOCIATES P.C.

By: _____

    AMEER BENNO, Esq. (AB-1130)
30 Wall Street, 8th Floor
New York, New York 10005
Tel.:  (212) 227-9300
Email: abenno@bennolaw.com

Cory H. Morris, Esq.
THE LAW OFFICES OF CORY H. MORRIS
135 Pinelawn Road
Suite 250s
Melville, NY 11747
Tel.: (631) 450-2515
Email: coryhmorris@gmail.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............... ..…………………………………………………………...ii

PRELIMINARY STATEMENT ............…………………………………………………...1

STATEMENT OF FACTS ............…………………………………………………………...1

    Supreme Court Decisions ............………………………………………………………1

    Enactment of the CCIA................................................................................................2

    Recent Violence Against Jews....................................................................................3

    Plaintiffs Steven Goldstein and Congregation Bnei Matisyahu ...........................5

    Plaintiff Meir Ornstein ...............................................................................................7

ARGUMENT. …………………………………………………………….…………………9

POINT........... …………………………………………………………….…………………9

    A. STANDING .........................................................................................................10

        1. Plaintiffs Steven Goldstein and Congregation Bnei Matisyahu ...........................10

        2. Plaintiff Meir Ornstein.......................................................................................12

        3. Analysis.............................................................................................................14

    B. LIKELIHOOD OF SUCCESS.............…………………………………………18

        1. Second Amendment ..........................................................................................19

        2. First Amendment...............................................................................................22

        3. Fourteenth Amendment – Vagueness ................................................................24

        4. Fourteenth Amendment – Equal Protection.......................................................26

    C. IRREPARABLE HARM .............…………………………………………………26

    D. BALANCE OF HARMS / PUBLIC INTEREST ....…………………………………28

i

CONCLUSION.............………………………………………………...……………………………..…29

# TABLE OF AUTHORITIES

Page

## U.S. Supreme Court Cases

*Butler v. State of Michigan*,
   352 U.S. 380 (1957)..................................................................................... 24

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016)...................................................................................... 1

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940)..................................................................................... 22

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)................................................................................ 22 , 23

*City of Chicago v. Morales*,
   527 U.S. 41 (1999)....................................................................................... 25

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
   473 U.S. 432 (1985)..................................................................................... 26

*Connick v. Thompson*,
   563 U.S. 51 (2011)....................................................................................... 19

*Cty. Court of Ulster Cty., N. Y. v. Allen*,
   442 U.S. 140 (1979)..................................................................................... 14

*DeShaney v. Winnebago County Dept. of Social Servs.*,
   489 U.S. 189 (1989)..................................................................................... 28

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)......................................................................... 1, 19, 20, 21

*Doe v. Bulton*,
   410 U.S. 179 (1973)..................................................................................... 15

*Downes v. Bidwell*,
   182 U. S. 244 (1901)..................................................................................... 29

*Dumbrowski v. Pfister*,
   380 U.S. 479 (1965)..................................................................................... 17

*Elrod v. Burns,*
    427 U.S. 347 (1976)..................................................................................... 27

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
    494 U. S. 872 (1990)....................................................................... 22, 23 26

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975)..................................................................................... 24

*Forsyth v. County, Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992)..................................................................................... 17

*Friends of the Earth v. Laidlaw,*
    528 U.S. 167 (2000)............................................................................... 14, 18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)..................................................................................... 18

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021)................................................................................ 24

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)..................................................................................... 25

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)..................................................................................... 17

*Heck v. Humphrey,*
    512 U.S. 477 (1994)..................................................................................... 18

*Hill v. Colorado,*
    530 U.S. 703 (2000)..................................................................................... 25

*Kolender v. Lawson,*
    461 U.S. 352 (1983)..................................................................................... 25

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..................................................................................... 10

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018)........................................................................... 22, 23

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)....................................................................................... 1

iv

*Monell v. Dep't of Soc. Servs*,
   436 U.S. 658 (1978)......................................................................................... 18

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993).................................................................................. 15, 24

*New York State Rifle & Pistol Association Inc. v. Bruen*,
   142 S.Ct. 2111 (2022)............................................................................. *passim*

*Reno v. ACLU*,
   521 U.S. 844 (1997)......................................................................................... 25

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020)........................................................................................ 23

*Steffel v. Thompson*,
   415 U.S. 452 (1974)......................................................................................... 15

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)......................................................................................... 16

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017).................................................................................... 10

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988).................................................................................. 21, 25

*Warth v. Seldin*,
   422 U.S. 490 (1975)......................................................................................... 17

**Federal and State  Cases**

*Am. Civil Liberties Union v. Ashcroft*,
   322 F.3d 240 (3d Cir. 2003)............................................................................ 29

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003)............................................................................ 14

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015)............................................................................ 10

*Cayuga Nation v. Tanner*,
   824 F.3d 321 (2d Cir. 2016)............................................................................ 16

*Cent. Rabbinical Cong. of the United States v. New York City Dep't of Health & Mental
   Hygiene*, 763 F.3d 183 (2d Cir. 2014) ........................................................... 23

v

*Chatin v. Coombe,*
   186 F.3d 82 (2d Cir. 1999)..................................................................................... 25

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y.
   2019) ........................................................................................................................ 15

*Connecticut Dept. of Environmental Protection v. O.S.H.A.,*
   356 F.3d 226 (2d Cir. 2004)............................................................................. 22, 27

*Copeland v. Vance,*
   893 F.3d 101 (2d Cir. 2018)................................................................................... 25

*Coronel v. Decker,*
   449 F. Supp. 3d 274 (S.D.N.Y. 2020).................................................................... 28

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006)................................................................................... 10

*Farid v. Ellen,*
   593 F.3d 233 (2d Cir. 2010)................................................................................... 25

*Farrell v. Burke,*
   449 F.3d 470 (2d Cir. 2006)................................................................................... 24

*GeorgiaCarry.Org, Inc v. Georgia,*
   687 F.3d 1244 (11th Cir. 2012) ............................................................................. 16

*Innovative Health Systems, Inc. v. City of White Plains,*
   117 F.3d 37 (2d Cir. 1997)..................................................................................... 28

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,*
   596 F.2d 70 (2d Cir 1979)...................................................................................... 27

*Jolly v. Coughlin,*
   76 F.3d 468 (2d Cir. 1996)..................................................................................... 27

*Jones v. Town of E. Haven,*
   691 F.3d 72 (2d Cir. 2012)..................................................................................... 18

*Kiryas Joel All. v. Vill. of Kiryas Joel,*
   495 Fed. Appx. 183 (2d Cir. 2012)........................................................................ 10

*Knife Rights, Inc. v. Vance,*
   802 F.3d 377 (2d Cir. 2015)................................................................................... 15

*Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n*,
   965 F.2d 1224 (2d Cir. 1992)....................................................................... 9

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012)....................................................................... 17

*New York Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013)....................................................................... 28

*New York State Citizens' Coalition for Children v. Velez*,
   629 Fed. Appx. 92 (2d Cir. 2015)............................................................... 18

*New York v. U.S. Dep't of Agric.*,
   454 F. Supp. 3d 297 (S.D.N.Y. 2020)........................................................ 10

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011)....................................................................... 17

*Picard v. Magliano*,
   42 F.4th 89 (2d Cir. 2022) .................................................................... 16, 28

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*,
   337 F. Supp. 3d 308 (S.D.N.Y. 2018)........................................................ 28

*Ragin v. Harry Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993)........................................................................... 18

*Shapiro v. Cadman Towers, Inc.*,
   51 F.3d 328 (2d Cir. 1995)......................................................................... 28

*Statharos v. New York City Taxi & Limousine Comm'n*,
   198 F.3d 317 (2d Cir. 1999)....................................................................... 27

*U.S. v. Lamb*,
   945 F.Supp. 441 (N.D.N.Y. 1996)............................................................. 24

## Statutes

Penal Law § 265.01-d .................................................................................... 26

Penal Law § 265.01-e(2)(c) ..................................................................... *passim*

Penal Law § 400.0(2)(f) .................................................................................. 2

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................ *passim*

U.S. Const. amend. II ........................................................................................... *passim*

U.S. Const. amend. XIV ....................................................................................... *passim*

**Other Authorities**

11 C. Wright & A. Miller, *Federal Practice and Procedure* ........................................ 11

## PRELIMINARY STATEMENT

Plaintiffs bring this action under the U.S. Constitution, the New York State Constitution, and 42 U.S.C. § 1983 to declare unconstitutional and to immediately and permanently enjoin the enforcement of New York Penal Law § 265.01-e(2)(c) ("the statute"). The statute essentially prohibits the possession of a firearm in "any place of worship or religious observation." It is respectfully submitted that the statute is vague and facially overbroad, and that it violates the guarantees of the First, Second and Fourteenth Amendments of the U.S. Constitution both facially and as applied to plaintiffs.

## STATEMENT OF FACTS[1]

### Supreme Court Decisions

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment right to keep and bear arms is a right held by private American citizens, including in one's home. In dicta, however, the *Heller* Court noted that its opinion "should not be taken" to cast doubt on laws "forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626. The Supreme Court reiterated that view two years later in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"; also holding that the scope of the private right to bear arms for self-defense applies to States and cities). In *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016), the Court reaffirmed its holding in *Heller,* and clarified that the Second Amendment extends "to all instruments that

---

[1] Unless otherwise indicated, parenthetical references preceded by "Exh." are to the corresponding exhibit annexed to the Declaration of Ameer Benno, dated September 28, 2022 ("Benno Decl."), filed in support of this motion.

constitute bearable arms, even those that were not in existence at the time of the founding …" and that the Second Amendment right "is fully applicable to the States."

On June 23, 2022, the Supreme Court held that N.Y. Penal Law § 400.00(2)(f), which conditioned the issuance in New York State of an unrestricted license to carry a handgun in public on the existence of "proper cause," violated the Second and Fourteenth Amendments by impermissibly granting a licensing official the discretion to deny a license to a law-abiding, responsible citizens absent a showing of a special, heightened, need for self-protection distinguishable from that of the general community.  *New York State Rifle & Pistol Association Inc. v. Bruen*, 142 S.Ct. 2111 (2022). The *Bruen* Court explicitly rejected New York's formulation that "sensitive places" where the government may lawfully disarm law-abiding citizens includes "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 2133-34.  The Supreme Court declared that "expanding the category of 'sensitive places' ... to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" and "eviscerate[s] the general right to publicly carry arms for self-defense." *Id*. at 2134.

### The Enactment of the CCIA

New York Governor Kathy Hochul responded to the *Bruen* decision by stating that "the Supreme Court is sending us backwards in our efforts to protect families and prevent gun violence." Tim Hains, *Gov. Kathy Hochul Responds To Supreme Court Gun Ruling: New York Fights Back*, Real Clear Politics (June 23, 2022), https://bit.ly/3TUv5W9.  Gov. Hochul vowed to "fight back" to counteract the effect of *Bruen*, *id*., and called a special session of the state legislature in order rapidly to enact a new statutory scheme to take the place of the regimen struck down by *Bruen*.

New York State then promptly passed the Concealed Carry Improvement Act ("CCIA") on July 1, 2022, which went into effect statewide on September 1, 2022. The bill was rushed through the legislative process and voted on without comment or debate.  The CCIA imposes multiple new and, plaintiffs respectfully submit, blatantly unconstitutional impediments to New Yorkers in their attempt to exercise their constitutional right to armed self-defense outside the home.  Among these impediments, the CCIA replaced the "proper cause" standard with, among other things, an expansive list of "sensitive locations" where carrying and possessing firearms, which are defined to include "any pistol or revolver," is prohibited.  The list of "sensitive locations" under the CCIA includes, *inter alia*, "any place of worship or religious observation." Penal Law § 265.01-e(2)(c).

### Recent Violence Against Jews

Houses of worship have long been targeted for violent crime.  This is emphatically the case for Jewish houses of worship. A recent report from the Anti-Defamation League released data showing that in 2021, New York led the nation in total reported anti-Semitic incidents and that the number of such incidents surpassed the number of reported incidents in 2020 by 24% (Exh. 2); *see* https://nynj.adl.org/news/2021-audit-ny/.  Indeed, violent attacks on Jewish places of worship are all too common.  To cite just a few examples:

- On January 15, 2022, Malik Akram, a 44-year-old British Pakistani armed with a pistol, took four people hostage in the Congregation Beth Israel synagogue in Colleyville, Texas;

- On May 19, 2021, an assailant in Brooklyn viciously attacked a Chasidic Jew on the street in Brooklyn and set fire to a Brooklyn yeshiva and synagogue;

- On the night of December 28, 2019, the seventh night of the Jewish holiday of Hanukkah, a masked man wielding a large knife invaded the home of a Chasidic rabbi in Monsey, Rockland County, New York, where a Hanukkah party was underway, and began stabbing the guests;

- On December 10, 2019, two assailants motivated by anti-Jewish hatred entered a Kosher grocery store in Jersey City, New Jersey and shot and killed the store owner, a store employee and a customer;

- On July 28, 2019, a member of a synagogue in Miami Beach, Florida was shot in the legs as he was unlocking the front doors of the synagogue prior to a religious service;

- On April 27, 2019, a gunman entered the Chabad of Poway synagogue on the last day of Passover, and began shooting at the worshippers, killing one and wounding several others;

- In 2019, a would-be assassin attempted to bomb Temple Emanuel Synagogue in Pueblo, Colorado and tried to poison the water supply at the synagogue with arsenic;

- In November 2018, a man in a rented vehicle attempted to run over two Jewish men who were exiting their Los Angeles synagogue;

- On October 27, 2018, a man armed with an AR-15 rifle entered the Tree of Life synagogue outside Pittsburgh, Pennsylvania and began shooting at the congregants, killing 11 and wounding six;

- On April 13, 2014, three people were shot and killed at a Jewish Community Center and a Jewish retirement home in Overland Park, Kansas by a gunman who was targeting Jews.

These incidents, and many others, have created a real and warranted fear among the Jewish community, including plaintiffs herein, that they and their houses of worship could be the targets of violent attacks by hate-filled extremists. And, even outside of houses of worship, violent attacks against Jews have surged dramatically over the last few years. In 2021, the New York City Police Department ("NYPD") admitted that such "hate crimes increased by 37% compared to 2020," *see* https://cnn.it/3ByiiBi, while other news sources reported as much as a 300% increase in anti-Semitic attacks in New York City. *See* https://fxn.ws/3qtNA6d.

Further, the news has also been replete in recent years with accounts of violent attacks on other places of worship, including mosques and churches. To cite but one example, in December of 2019, a man entered the West Freeway Church of Christ in Fort Worth, Texas, pulled out a shotgun from beneath his coat, and aimed it at people inside the church. He was

able to discharge a single shot from the gun before a lawfully armed member of the church returned fire, preventing a mass casualty event.  Were a similar event to take place in New York State, the church members would have been rendered defenseless by Kathy Hochul's CCIA, and nothing would have stopped the gunman from committing mass murder.  Plainly, that gunman was not deterred by laws already in force prohibiting assault and murder; nor was that gunman deterred by the fact that his crime would likely end in his own arrest or death.  Nor would a law such as the CCIA have prevented that gunman's crime by virtue of the fact that law enforcement would be allowed to apprehend a man seen carrying a gun into a church, for the simple reason that his shotgun was concealed.[2]  However, the CCIA would have disarmed the good Samaritan who put an end to the attempted murder spree.  In this way, the New York law at issue here perversely renders "sensitive locations" all the more sensitive: these are locations where would-be killers may fairly assume that people within have been turned into sitting ducks.

### Plaintiffs Steven Goldstein and Congregation Bnei Matisyahu

In his declaration, plaintiff Goldstein attests that he is the president of Congregation Bnei Matisyahu, a modern orthodox Jewish congregation located in the Midwood section of Brooklyn, and that for several years he has been licensed by the City of New York to possess a firearm on the premises of Bnei Matisyahu's synagogue (Exh. 3 at ¶¶ 3-5). Prior to the enactment of the CCIA, Goldstein habitually carried a firearm when he was at the shul due to his concern that he, his family and his congregation could be targeted for acts of violence because of their Jewish

---

[2] Ignorant or indifferent to the simple fact that in the vast majority of gun crimes similar to the Fort Worth church attack the shooter will conceal his weapon until the moment he chooses to begin his slaughter, Kathy Hochul's assertion, made upon announcing the CCIA, that "these new conceal and carry laws will help ... ensur[e] that ... firearms are not carried into sensitive locations," see https://www.governor.ny.gov/news/governor-hochul-announces-new-concealed-carry-laws-passed-response-reckless-supreme-court, is entirely unmoored from reality.

faith. After all, the synagogue is conspicuously marked as a Jewish house of worship (Exh. 3 at ¶¶ 4, 6-7).

Further, Goldstein's fear of anti-Semitic attack is shared by members of the Bnei Matisyahu congregation (Exh. 3 at ¶ 9).  But, because Bnei Matisyahu, like many synagogues, is a small congregation, it does not have the financial ability to hire an outside security service (Exh. 3 at ¶ 11).  The members of the shul knew that Goldstein carried a concealed handgun while on the premises of Bnei Matisyahu, and they approved of him doing so – in fact, several members told him that if he did *not* carry the handgun, they would not attend religious services there because they would not feel safe given the reality of anti-Jewish hate crime (Exh. 3 at ¶¶ 8-10, 14).

Despite the fact that Goldstein possesses a valid license to possess a handgun on the premises of Bnei Matisyahu, the CCIA prohibits him from doing so.  Under the CCIA, Goldstein is prohibited from carrying a firearm in any "sensitive location," and the CCIA defines "sensitive locations" to include "places of worship or religious observation" (Exh. 3 at ¶¶ 15-16). Since Bnei Matisyahu is a place of worship as well as a place of religious observation, Goldstein – who falls into none of the categories of persons exempt from the CCIA's sensitive location ban – is forbidden from carrying his firearm on the premises of the shul, despite the fact that he has a preexisting license to do so (Exh. 3 at ¶¶ 17, 19).

This has resulted in Goldstein and other members of Bnei Matisyahu suffering fear and apprehension for their physical safety and the safety of others while at the shul (Exh. 3 at ¶ 20). As a direct consequence, both Goldstein and other members of Bnei Matisyahu have reduced the frequency of their attendance at the shul since the CCIA went into effect, resulting in some members foregoing their participation in Jewish communal life there (Exh. 3 at ¶ 21).  Moreover,

some individuals have ceased being members of Bnei Matisyahu altogether due to safety concerns, directly resulting in a financial loss to the congregation (Exh. 3 at ¶¶ 22-23).

If the ban on possessing handguns in places of worship or religious observation were lifted, Bnei Matisyahu would immediately allow Goldstein to resume carrying a concealed firearm there (Exh. 3 at ¶ 24).

### **Plaintiff Meir Ornstein**

Plaintiff Meir Ornstein also is suffering "injury in fact" from Penal Law § 265.01-e(2)(c). Ornstein is duly-licensed by the State of New York to carry a concealed handgun, and he has held that license for several years (Exh. 4 at ¶ 3).  Before September 1, 2022 – the date the CCIA went into effect – Ornstein, who is Jewish and from Rockland County, would always carry a concealed firearm with him out of concern for his safety, given the high incidence of anti-Jewish hate crime (Exh. 4 at ¶¶ 2, 4). Ornstein's daily routine included attending religious prayer services at a Chasidic synagogue called Congregation Zemach David of Dinev ("Zemach David") in Airmont (Exh. 4 at ¶ 5).  The shul is geographically close to where the location where, less than three years ago, a man wielding a large knife invaded the home of a Chasidic rabbi in Monsey during a Chanukah party and began stabbing the guests, critically injuring several and killing one (Exh. 4 at ¶ 7).

The staff and members of Zemach David knew that Ornstein carried his concealed handgun when he came to the shul to pray, and they approved of it – in fact, they expressed to Ornstein their appreciation for the protection that his firearm provided "because we all understood the reality that we were targets for acts of violence by anti-Semitic extremists" (Exh. 4 at ¶¶ 6, 8).  Despite his active concealed carry license, Ornstein was prohibited by law from carrying his handgun in Zemach David once the CCIA went into effect because the shul is a "place of worship or religious observation" and therefore a "sensitive location" under Penal Law

§ 265.01-e(2)(c), and Ornstein falls into none of the categories of individuals exempted from the "sensitive location" ban (Exh. 4 at ¶¶ 9-10). Congregation Zemach David has unequivocally stated that if the statutory prohibition against possessing firearms in places of worship or religious observation did not exist, Zemach David would allow Ornstein to resume carrying his concealed handgun on its property (Exh. 5 at ¶ 12).

Ornstein has averred that, as a result of Penal Law § 265.01-e(2)(c), he is "apprehensive and fearful of attack by anti-Jewish extremists, and as a direct consequence of the new statutory prohibition on possessing firearms in places of worship or religious observation, [he] no longer attend[s] Zemach David or any other shul with as much frequency as [he] did before the law went into effect" (Exh. 4 at ¶ 13).  This has directly impaired his ability to participate in synagogue life and important religious observances. Indeed, Ornstein avers that "because I cannot under any circumstances possess a firearm at a shul, and because I am fearful of attending services at a shul without having the ability to defend myself against violent attacks, I have had to substantially restrict my synagogue attendance" (Exh. 4 at ¶ 20).

But beyond the government's restraint on his attending synagogue, Ornstein is also injured by the statutory ban because it applies to all places of "religious observation" (Exh. 4 at ¶ 14). As Ornstein poignantly notes in his declaration, "the new ban on carrying a weapon in places of 'religious observation,' has resulted in great uncertainty" about where he is allowed to carry a weapon and where he is not (Exh. 4 at ¶ 14):

> "As an observant Jew, nearly every location is a place of religious observation.  I wear a *kippah* and *tzitzit* everyday, everywhere I go. I say prayers before and after meals at restaurants and at home. On Rosh Hashanah, I observe the ceremony of *tashlich* where we cast bread crumbs into a flowing body of water – often performed at a public park. On Sukkot, we eat and pray in outdoor, open air structures.

> "And, in addition to prayer at synagogue on weekends, we are required by Judaic law to pray with ten congregants three times a

day. Morning, afternoon and night. The afternoon prayers often fall out in the middle of the workday, so we regularly organize prayer services in the workplace.  Under the ban, '*mincha minyanim*' would be places of worship or religious observation even though they take place in all variety of 'Secular' locations outside of the shul.

"As a result, it is unclear what the boundaries are to the statutory proscription on possessing a weapon in a 'place of religious observation.'  Because of my confusion, I do not know where it is permitted for me to possess a firearm and where is it forbidden.

"Consequently, I either have to forego carrying my firearm (which violates my right to self-defense under the Second Amendment) or forego practicing my faith (in violation if my right to free exercise under the First Amendment).

(Exh. 4 at ¶¶ 15-18).  Ornstein further attests that "[s]ince September 1, 2022, when I am carrying a concealed weapon, I have significantly curtailed my religious practice in an effort to comply with the new state law" (Exh. 4 at ¶ 19).

## ARGUMENT

## POINT

### PLAINTIFFS SATISFY ALL THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n,* 965 F.2d 1224, 1228 (2d Cir. 1992) (the "standards which govern consideration of an application for a temporary restraining order ... are the same standards as those which govern a preliminary injunction"). To obtain a preliminary injunction, a plaintiff must establish: (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) that the balance of hardships "tips in the plaintiff's favor"; and (4) that the

injunction is not adverse to the public interest. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotations omitted). It is respectfully submitted that Plaintiffs amply demonstrate these factors here.

### A.  Standing

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 Fed. Appx. 183, 188 (2d Cir. 2012).  To demonstrate Article III standing, an individual plaintiff must show that: (1) he is suffering an "injury in fact" that is "distinct and palpable"; (2) his injury is "fairly traceable to the challenged action"; and (3) his injury is "redressable by a favorable decision." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Where, as here, a case involves "multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward." *New York v. U.S. Dep't of Agric.*, 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020) (citing *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017)).   These standards have been amply met here, and all plaintiffs in this action have standing.

### 1.  Plaintiffs Steven Goldstein and Congregation Bnei Matisyahu

Here, plaintiff Goldstein is suffering "injury in fact" from Penal Law § 2650.01-e(2)(c). In his declaration, plaintiff Goldstein attests that he is the president of Congregation Bnei Matisyahu, a modern orthodox Jewish congregation located in the Midwood section of Brooklyn, and that for several years he has been licensed by the City of New York to possess a firearm on the premises of Bnei Matisyahu's synagogue (Exh. 3 at ¶¶ 3-5). Prior to the enactment of the CCIA, Goldstein would always carry a firearm when he was at the shul due to fear that he, his family and his congregation would be targeted for acts of violence because of their Jewish faith.

After all, the synagogue is conspicuously marked as a Jewish house of worship (Exh. 3 at ¶¶ 4, 6-7).

Further, Goldstein's fear of anti-Semitic attack is shared by members of the Bnei Matisyahu congregation (Exh. 3 at ¶ 9). But because Bnei Matisyahu, like many synagogues, is a small congregation, it does not have the financial wherewithal to hire an outside security service (Exh. 3 at ¶ 11).  The members of the shul knew that Goldstein carried a concealed handgun while on the premises of Bnei Matisyahu, and they approved of him doing so – in fact, several members told him that if he did *not* carry the handgun, they would not attend religious services there because they would not feel safe given the reality of anti-Jewish hate crime (Exh. 3 at ¶¶ 8-10, 14).

Despite the fact that Goldstein possesses a valid license to possess a handgun on the premises of Bnei Matisyahu, the CCIA prohibits him from doing so.  Under the CCIA, Goldstein is prohibited from carrying a firearm in any "sensitive location," defined to include "places of worship or religious observation" (Exh. 3 at ¶¶ 15-16).  Since Bnei Matisyahu is a place of worship as well as a place of religious observation, Goldstein – who falls into none of the categories of persons exempt from the CCIA's sensitive location ban – is forbidden from carrying his firearm on the premises of the shul, despite the fact that he has a preexisting license to do so (Exh. 3 at ¶¶ 17, 19).

This has resulted in Goldstein and other members of Bnei Matisyahu suffering fear and apprehension for their physical safety and the safety of others while at the shul (Exh. 3 at ¶ 20). As a direct consequence, both Goldstein and other members of Bnei Matisyahu have reduced the frequency of their attendance at the shul since the CCIA went into effect, and have been compelled to forego participating in Jewish communal life there (Exh. 3 at ¶ 21).  Moreover,

some individuals have ceased being members of Bnei Matisyahu due to safety concerns, and that has directly resulted in a financial loss to the congregation (Exh. 3 at ¶¶ 22-23).

If the ban on possessing handguns in places of worship or religious observation were lifted, Bnei Matisyahu would immediately allow Goldstein to resume carrying a concealed firearm there (Exh. 3 at ¶ 24).

### 2.  **Plaintiff Meir Ornstein**

Plaintiff Meir Ornstein also is suffering "injury in fact" from Penal Law § 265.01-e(2)(c). Ornstein is duly-licensed by the State of New York to carry a concealed handgun, and he has held that license for several years (Exh. 4 at ¶ 3).  Before September 1, 2022 – the date the CCIA went into effect – Ornstein, who is Jewish and from Rockland County, would always carry a concealed firearm with him out of concern for his safety, given the high incidence of anti-Jewish hate crime (Exh. 4 at ¶¶ 2, 4). Ornstein's daily routine included attending religious prayer services at a Chasidic synagogue called Congregation Zemach David of Dinev ("Zemach David") in Airmont (Exh. 4 at ¶ 5).  The shul is geographically close to where the location where, less than three years ago, a man wielding a large knife invaded the home of a Chasidic rabbi in Monsey during a Chanukah party and began stabbing the guests, critically injuring several and killing one (Exh. 4 at ¶ 7).

The staff and members of Zemach David knew that Ornstein carried his concealed handgun when he came to the shul to pray, and they approved of it – in fact, they expressed to Ornstein their appreciation for the protection that his firearm provided "because we all understood the reality that we were targets for acts of violence by anti-Semitic extremists" (Exh. 4 at ¶¶ 6, 8).  Despite his active concealed carry license, Ornstein was prohibited by law from carrying his handgun in Zemach David once the CCIA went into effect because the shul is a "place of worship or religious observation" and therefore a "sensitive location" under Penal Law

§ 265.01-e(2)(c), and Ornstein falls into none of the categories of individuals exempted from the "sensitive location" ban (Exh. 4 at ¶¶ 9-10). Congregation Zemach David has unequivocally stated that if the statutory prohibition against possessing firearms in places of worship or religious observation did not exist, Zemach David would allow Ornstein to resume carrying his concealed handgun on its property (Exh. 4 at ¶ 12).

Ornstein has averred that, as a result of Penal Law § 265.01-e(2)(c), his is "apprehensive and fearful of attack by anti-Jewish extremists, and as a direct consequence of the new statutory prohibition on possessing firearms in places of worship or religious observation, [he] no longer attend[s] Zemach David or any other shul with as much frequency as [he] did before the law went into effect" (Exh. 4 at ¶ 13).   This has directly impaired his ability to participate in synagogue life and important religious observances. Indeed, Ornstein declares that "because I cannot under any circumstances possess a firearm at a shul, and because I am fearful of attending services at a shul without having the ability to defend myself against violent attacks, I have had to substantially restrict my synagogue attendance" (Exh. 4 at ¶ 20).

But beyond the government's restraint on his attending synagogue, Ornstein is also injured by the statutory ban because it applies to all places of "religious observation" (Exh. 4 at ¶ 14).   As Ornstein poignantly notes in his declaration, "the new ban on carrying a weapon in places of 'religious observation,' has resulted in great uncertainty" about where he is allowed to carry a weapon and where he is not (Exh. 4 at ¶ 14):

> "As an observant Jew, nearly every location is a place of religious observation.  I wear a *kippah* and *tzitzit* everyday, everywhere I go. I say prayers before and after meals at restaurants and at home. On Rosh Hashanah, I observe the ceremony of *tashlich* where we cast bread crumbs into a flowing body of water – often performed at a public park. On Sukkot, we eat and pray in outdoor, open air structures.
>
> "And, in addition to prayer at synagogue on weekends, we are required by Judaic law to pray with ten congregants three times a

day. Morning, afternoon and night. The afternoon prayers often fall out in the middle of the workday, so we regularly organize prayer services in the workplace.  Under the ban, '*mincha minyanim*' would be places of worship or religious observation even though they take place in all variety of 'Secular' locations outside of the shul.

"As a result, it is unclear what the boundaries are to the statutory proscription on possessing a weapon in a 'place of religious observation.'  Because of my confusion, I do not know where it is permitted for me to possess a firearm and where is it forbidden.

"Consequently, I either have to forego carrying my firearm (which violates my right to self-defense under the Second Amendment) or forego practicing my faith (in violation if my right to free exercise under the First Amendment).

(Exh. 4 at ¶¶ 15-18).  Ornstein further attests that "[s]ince September 1, 2022, when I am carrying a concealed weapon, I have significantly curtailed my religious practice in an effort to comply with the new state law" (Exh. 4 at ¶ 19).

### 3.  <u>Analysis</u>

Plaintiffs here clearly have standing.  To begin, since Penal Law § 265.01-e(2)(c) has proscribed plaintiffs from exercising their fundamental Second Amendment right to self-defense, it has caused plaintiffs to suffer "injury in fact." *Cty. Court of Ulster Cty., N. Y. v. Allen*, 442 U.S. 140, 155 (1979) (litigants in federal court have standing to challenge the constitutionality of a statute "insofar as it has an adverse impact on his own rights"). "Injury in fact" also exists because the prohibition on possessing a firearm in a "place of worship or religious observation" impacts nearly every aspect of their daily lives and has directly restricted plaintiffs from the full and robust exercise of their religious faith in violation of the First Amendment.[3] *Id*.  Further,

---

[3] The fact that plaintiffs fortunately have not yet been the direct victims of an anti-Semitic attack is irrelevant for purposes of assessing standing for purposes of plaintiffs First Amendment claim, since an increased risk of future physical injury confers standing in an action challenging government action. *See*, *e.g.*, *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000); *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003).  Thus, Plaintiffs need not wait to be violently attacked before they (or their estates) can effectively challenge the State's unconstitutional statute.

insofar as Penal Law § 265.01-e(2)(c) attaches the "sensitive location" label to private property where religious observation takes place but not to similar private property where no religious observation occurs, the very imposition of such a barrier establishes "injury in fact." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (standing conferred not merely by a showing that injury would occur but for the challenged action, but by a showing that the action caused "lack of fair opportunity" to avoid injury); *accord Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 273 (S.D.N.Y. 2019).

Plaintiffs also have standing to challenge the vagueness of the statute under the Fourteenth Amendment.  When challenging the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists some credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bulton*, 410 U.S. 179, 188 (1973).  Here, acts of religious observance permeate every aspect and every moment of plaintiffs' daily lives.  Thus, their daily conduct is affected by a constitutional "due process interest in having notice of conduct curtailed by criminal statutes" and "avoiding vague criminal prohibitions." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 n.4 (2d Cir. 2015).  Indeed, plaintiff Ornstein has candidly attested in his declaration that he intends to continue carrying his concealed handgun while he engages in his daily acts of religious observance outside of his shul, and that he fears being arrested and prosecuted for violating the CCIA as a result (Exh. 4 at ¶¶ 23, 26).  This is more than adequate to establish standing. *See Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 157-58 (2014); *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (plaintiffs adequately established standing where they alleged "that they intend[ed] to conduct bingo games, which [wa]s clearly prohibited by the [challenged] Ordinance and the Village ha[d] announced its intention to enforce the Ordinance"); *GeorgiaCarry.Org, Inc v. Georgia*, 687 F.3d 1244, 1252 (11th Cir. 2012) (plaintiffs had standing to bring a pre-enforcement challenge to a Georgia law barring the unrestricted carrying of weapons in "places of worship").

Here, the Hochul administration has clearly expressed its intent to enforce all aspects of the CCIA, including the ban on possessing firearms in places of worship and religious observation. Hochul called the *Bruen* decision a "senseless" and "reprehensible" decision that "sends us backwards," and stated that by designating places of worship and religious observation as sensitive places, New York State was "sen[ding] a message to the rest of the country that we will not stand idly by and let the Supreme Court reverse years of sensible gun regulations." *See* https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions. Because the State has evinced its intention to vigorously enforce Penal Law § 265.01-e(2)(c), the plaintiffs' expression of intent to continue to engage in conduct that likely runs afoul of that law establishes standing. *Tanner*, 824 F.3d at 331. Indeed, "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022). That is the case here.

Furthermore, when, as here, a statute is alleged to have an overbroad sweep that chills the exercise of First Amendment rights, courts employ a relaxed benchmark regarding standing. This exception exists "because of the … 'danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. If the rule were otherwise, the contours of regulation would have to be hammered out case by case

– and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation.'" *Dumbrowski v. Pfister*, 380 U.S. 479, 486-87 (1965); *see, e.g.*, *Forsyth v. County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.").

Plaintiff Bnei Matisyahu also has suffered "injury in fact" traceable to the challenged statute. The Second Circuit has held that an organization can only sue on its own behalf under Section 1983, not on behalf of its members. *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).[4] To establish direct standing, an organization must "meet[ ] the same test that applies to individuals." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). An organization may establish "injury in fact" by showing that the challenged conduct causes a "perceptible impairment" of the organization's activities. *Nnebe*, 644 F.3d at 157. A "perceptible impairment" exists where the organization diverts resources from its other activities as a result of the challenged conduct. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (a "drain on the organization's resources" establishes "injury in fact" sufficient for Article III standing).

Here, Bnei Matisyahu's members have reduced or ceased participating in communal Jewish life out of fear for their personal safety. The congregation has lost members as a result of the statutory ban, and therefore has sustained direct financial harm because of it. This constitutes

---

[4] Plaintiffs maintains that *Nnebe* is wrongly decided insofar as it contradicts the Supreme Court's earlier holdings in *Warth v. Seldin*, 422 U.S. 490 (1975) and *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977). In *Warth*, the Supreme Court held that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members" in a Section 1983 action. *Warth*, 422 U.S. at 511. In *Hunt*, the Supreme Court, citing *Warth*, held that an organization can sue on behalf of its members. *Hunt*, 432 U.S. at 343. Plaintiffs submit that the Supreme Court's formulation in *Warth* and *Hunt* is correct and binding here and that Congregation Bnei Matisyahu has associational standing under the test set forth in *Hunt*. Nevertheless, even under the approach followed by the Second Circuit, plaintiffs have established Congregation Bnei Matisyahu's Article III standing.

a cognizable "injury in fact" that is directly traceable to statute being challenged in this lawsuit. Such injuries are redressable by a favorable decision in this action since the prohibition on the otherwise lawful possession of a firearm in a place of worship or religious observation is ongoing, and will continue into the future if undeterred. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000).  Accordingly, plaintiff Bnei Matisyahu has direct standing for all of its claims. *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993); *see also New York State Citizens' Coalition for Children v. Velez*, 629 Fed. Appx. 92, 94 (2d Cir. 2015).

Since plaintiffs plainly have alleged "injury in fact" traceable to the challenged statute, it is also beyond cavil that their injury is redressable by the enjoinment of the enforcement of that law. *See Friends of the Earth, Inc.*, 528 U.S. at 185-86 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress").

### B.  Likelihood of Success

Section 1983 creates "a species of tort liability" for, among other things, certain violations of constitutional rights.  *Heck v. Humphrey*, 512 U.S. 477, 483 (1994).  Section 1983 prohibits conduct which, "under color of [state law] . . . subjects [a person], or causes [a person] to be subjected . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.  Under *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 694 (1978), local governments and their agencies can be sued as "persons" under Section 1983 and held liable where a government policy causes a constitutional deprivation. *See also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  Official municipal policy "includes the decisions of a government's lawmakers, the acts of its

policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Here, Plaintiffs are likely to succeed on their Section 1983 claim that Penal Law § 265.01-e(2)(c) violates the First, Second and Fourteenth Amendments of the U.S. Constitution[5] and their analogs under the New York State Constitution.

## 1.  <u>Second Amendment</u>

By designating all "places of worship and religious observation" as "sensitive locations" where possession of a firearm is forbidden and subject to felony criminal penalties, the statute infringes on the Second Amendment right to bear arms. The Second Amendment to the United States Constitution provides:

> "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

U.S. Const. amend. II.

In <u>Heller</u> itself, the Supreme Court dispensed with the fatigued and sophistic argument that the right to bear arms applies only to militias.  *Heller*, 554 U.S. at 581.  In fact, the *Heller* Court explained that the Second Amendment recognizes and guarantees to individual citizens the right to keep and carry arms for self-defense. *Id*. at 592.  And, in *Bruen*, the Supreme Court made clear that the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the fundamental right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by

---

[5]  With respect to Plaintiffs' Section 1983 claim against Defendants Hochul and James, the 11th Amendment does not bar suits against state officials in their official capacities where, as here, the suit seeks prospective injunctive or declaratory relief for violations of federal law. *Ex parte Young*, 209 U.S. 123, 159-60 (1908).

either federal or state governments.  *Bruen*, 142 S. Ct. at 2122.  The *Bruen* Court pronounced the rule by which challenges to regulations impinging on that right must be analyzed:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Id*. at 2126.

Here, the plaintiffs' desired conduct – to possess their duly-licensed handguns for purposes of self-defense while in a "place of worship or religious observation" is undeniably encompassed by the plain text of the Second Amendment. *See Heller*, 554 U.S. 570, 576-91. The individual plaintiffs here – as well as the members of the Congregation Bnei Matisyahu – are "people" within the meaning of the Second Amendment, as they are law-abiding, responsible, adult citizens with ordinary self-defense needs, who cannot be dispossessed of their right to bear arms in public for self-defense. *See Bruen*, 142 S.Ct. at 2134; *Heller* at 580 ("in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset").

The weapons in questions – handguns – are "arms" within the meaning of the Second Amendment because they are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625-27.  Indeed, the *Heller* Court aptly noted that "the American people have considered the handgun to be the quintessential self-defense weapon." *Id*. at 629; *see also Bruen*, 142 S.Ct. at 2134 ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense").

Further, the regulated conduct here categorically falls within the coverage of the phrase "keep and bear." *Heller*, 554 U.S. at 584 ("bear arms" means to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."). And, lest there be any lingering doubt, the *Bruen* Court explicitly held that the plain text of the Second Amendment "protects ... carrying handguns publicly for self-defense." *Bruen*, 142 S.Ct. at 2134.

Because possessing a firearm in a house of worship for self-defense is protected by the plain text of the Second Amendment, New York State would have to demonstrate that its prohibition of that conduct is consistent with this nation's historical tradition of firearm regulation. This it cannot do. In fact, during the colonial and Founding periods of our nation, laws typically required that arms be brought to churches and public meetings. At least one court has held that the CCIA's list of "sensitive locations" – including "places of worship or religious observation" – "is not deeply rooted in the Nation's historical tradition of firearm regulation." *Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874, at \*94 (N.D.N.Y. 2022). This makes sense. After all, a 1632 Virginia statute provided that (sic): "ALL men that are fittinge to beare armes, shall bringe their pieces to the church," and a 1643 Virginia statute provided that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott." *Id*. at n. 43 (citing 1 William Waller Hening, *The Statutes at Large: Being a Collection of all the Laws of Virginia, from the First Session of the Legislature* 126, 173, 263 (1808)).

And, a 1770 Georgia statute imposed fines on militiamen who went to church unarmed. *See Heller*, 554 U.S. at 601 ("Many colonial statutes required individual arms bearing for public-safety reasons – such as the 1770 Georgia law that 'for the security and defence of this province from internal dangers and insurrections' required those men who qualified for militia duty

individually 'to carry fire arms' 'to places of public worship.'") (internal citation omitted). In 1791, when the Second Amendment was ratified, and also in 1868, when the Fourteenth Amendment was ratified, the "vast majority of the other states ... did not have statutes restricting firearms" at houses of worship, and "some of the states even had contrary statutes" mandating carrying weapons in places of worship. *Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874, at *93-94. As there is no historical analogue for deeming all "places of worship or religious observation" as "sensitive places," that portion of the CCIA violates the Second Amendment. Penal Law § 265.01-e(2)(c) is therefore unconstitutional on its face and as applied to plaintiffs herein.

### 2.  **First Amendment**

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I.  The Free Exercise Clause of the First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296 (1940).

The protections afforded by the Free Exercise Clause prevent the government from discriminating against the exercise of religious beliefs or conduct motivated by religious beliefs. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  Thus, the Free Exercise Clause protects the right to live out religious beliefs publicly in "the performance of (or abstention from) physical acts." *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872, 877 (1990). Under the Free Exercise Clause, government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018); *see also Smith*, 494 U. S., at 877–78. Consequently, government actions burdening religious practice

should be "set aside" if there is even "slight suspicion" that those actions "stem from animosity to religion or distrust of its practices." *Masterpiece*, 138 S. Ct. at 1731.

The Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Smith*, 494 U.S. at 879. Neutral and generally applicable laws are subject only to rational-basis review. *Cent. Rabbinical Cong. of the United States v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014). Laws and government policies that are either non-neutral or not generally applicable, however, are subject to "strict scrutiny," meaning that they must be "narrowly tailored" to serve a "compelling" state interest. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

A law is not neutral if it is "specifically directed at [a] religious practice." *Smith*, 494 U.S. at 878. A law is not "generally applicable" if it allows the government to "impose burdens" in a "selective manner" only on "conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Here, the statute in question specifically imposes restrictions on "places of worship or religious observation" regardless of the size of the location, the number of people present or any other factual circumstance. By imposing a wholesale prohibition on the possession of a firearm in a given location *because of* the location's religious character and *because* the location hosts religious activity, the statute, by its very terms, is not neutral.

Further, by dictating that individuals who otherwise have a license to carry a firearm will be committing a felony if they engage in acts of religious observation while doing so, the statute imposes burdens in a selective manner on religious conduct and therefore is not generally applicable. *Lukumi*, 520 U.S. at 543 (government actions are underinclusive, and thus not generally applicable, when, though intended to advance legitimate interests, they result in

disparate treatment of religious activity by failing "to prohibit nonreligious conduct that endangers these interests in a similar or greater degree").

Because such a religious distinction does not advance *any* legitimate government interest, the statute fails both strict and rational basis scrutiny. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) ("A government policy can survive strict scrutiny under the First Amendment's Free Exercise Clause only if it advances interests of the highest order and is narrowly tailored to achieve those interests.").

In addition, whenever a statute aimed at advancing governmental interests affects protected First Amendment activity, the courts must ensure that it does not "burn the house to roast the pig." *Butler v. State of Michigan*, 352 U.S. 380, 383 (1957). An overbroad statute deters the legitimate exercise of First Amendment rights. When First Amendment freedoms are at stake, precision of drafting and clarity of purpose of regulating legislation are essential. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217-18 (1975). A statute is overbroad under the First Amendment when, in addition to proscribing activities which may properly be forbidden, it also sweeps within its coverage activity protected by First Amendment. *U.S. v. Lamb*, 945 F.Supp. 441, 447 (N.D.N.Y. 1996); *Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006). That is the situation here. By threatening substantial criminal penalties against those who engage in acts of religious observance anywhere while possessing an otherwise lawful firearm, Penal Law § 265.01-e(2)(c) haphazardly sweeps innumerable forms of protected First Amendment activity within its ambit.

### 3.  Fourteenth Amendment – Vagueness

The "void-for-vagueness doctrine," which is a "component of the Due Process Clause," requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage

arbitrary and discriminatory enforcement." *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). To succeed on their claim that the Penal Law § 265.01-e(2)(c) is unconstitutionally vague, plaintiffs must show that it "'either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "In other words, in order to survive a vagueness challenge, a rule must both provide adequate notice to those who are governed by it *and* adequately cabin the discretion of those who apply it." *Farid v. Ellen*, 593 F.3d 233 (2d Cir. 2010) (emphasis in original).

A statute that reaches "a substantial amount of innocent conduct" confers an impermissible degree of discretion on law enforcement authorities to determine who is subject to the law. *City of Chicago v. Morales*, 527 U.S. 41, 60-61 (1999); *see Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999) ("[a]n enactment fails to provide sufficiently explicit standards for those who apply it when it `impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis'") (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). "Vagueness is particularly problematic when it 'abuts upon sensitive areas of basic First Amendment freedoms.'" *Chatin*, 186 F.3d at 86 (quoting *Grayned*, 408 U.S. at 109). Courts may not "rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *Reno v. ACLU*, 521 U.S. 844, 884-85 (1997).

The text of Penal Law § 265.01-e(2)(c) is so vague that it potentially applies to any location where someone engages in a religious observance, however slight. For the reasons explained above, the poorly written "religious observation" language of the statute fails to provide people of ordinary intelligence a reasonable opportunity to understand what the statute

prohibits or where it is a felony to carry an otherwise lawfully possessed handgun. This, in turn, authorizes and encourages arbitrary and discriminatory enforcement by the police who are given the authority to interpret its terms as they see fit.

### 4. <u>Fourteenth Amendment – Equal Protection</u>

The Equal Protection Clause states that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  Here, by targeting locations where religious activity takes place, Penal Law § 265.01-e(2)(c) singles out for different treatment persons engaging in religious activity from those who are not.  Unless a person falls within one of the narrow exemptions from the "sensitive location" ban, one who possesses a valid concealed carry license cannot lawfully possess a firearm in a "place or worship or religious observation" under any circumstances.  Penal Law § 265.01-e(2)(c). On almost all other private property, however, a person who holds such a license can possess a firearm as long as the property owner has posted signage stating as much.  Penal Law § 265.01-d(1). The Supreme Court has made clear that laws that target religious character are "doubtless . . . unconstitutional." *Smith*, 494 U. S. at 877–878.

### C. <u>Irreparable Harm</u>

The enforcement of Penal Law § 265.01-e(2)(c) poses immediate and actual irreparable injury to plaintiffs' constitutional rights. By rendering "any place of worship or religious observation" a "sensitive location" in which plaintiffs and others similarly situated will be disarmed, or risk arrest and prosecution, plaintiffs will either be deterred from exercising their First Amendment right to worship freely or, should they choose to comply with the law and surrender their means of self-defense, be rendered more vulnerable to violent attack than a

lawfully armed citizen in a non-"sensitive location."  This choice compels plaintiffs to choose between two rights that were recognized as fundamental by the Founders and enshrined in the very first two Amendments to the Constitution.

In general, where a complaint alleges the denial of a constitutional right, irreparable harm will be presumed. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").  That is certainly the case here, where the challenged statute is deprives plaintiffs of their rights under the First, Second and Fourteenth Amendments of the U.S. Constitution. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the deprivation of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable harm"); *Connecticut Dept. of Environmental Protection v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury."); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary). Further, the stigma, loss of liberty and collateral consequences that would result from arrest and criminal prosecution under Penal Law § 265.01-e(2)(c) are injuries that cannot adequately be recompensed with monetary damages after the fact. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 73 (2d Cir 1979) (an irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate).

Given that Penal Law § 265.01-e(2)(c) has gone into effect and that the government has been vocal about its intention to enforce all of the CCIA's provisions, the harms sought to be

prevented by this motion are hardly remote or speculative – they are sufficiently real and immediate. *Picard*, 42 F.4th at 98 ("[C]ourts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund").

### D.  Balance of Harms and Public Interest

Where, as here, the government is the opposing party, the final two factors in the temporary restraining order analysis – the balance of the harms and the public interest – merge. *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).  As to the balance of harms, the likelihood of real and immediate irreparable harm to plaintiffs from the failure to grant them interim relief clearly outweighs the likelihood of any harm to defendants from granting such relief. After all, "securing [Constitutional] rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) ("[T]he public interest is best served by ensuring the constitutional rights of persons within the United States are upheld") (citation omitted). And, the risk to plaintiffs' physical safety and welfare posed by disarming them in "places of worship and religious observation" in a climate of skyrocketing anti-Jewish attacks is a substantial harm against which defendants have no countervailing interest. *See*, *e.g.*, *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 43-44 (2d Cir. 1997) (finding irreparable harm where the government action would pose serious risk of harm to plaintiffs, including "death, illness or disability"); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332-33 (2d Cir. 1995) (upholding District Court's irreparable harm finding based on the "risk of injury, infection, and humiliation").[6]

---

[6] Indeed, federal courts have held that the government actors generally cannot be held accountable to private individuals for failing to act. *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189 (1989).  Because the statute being challenged here takes away plaintiffs' means of self-defense, plaintiffs would have no legal recourse for government inaction that leads to injury or death. In its brief in the *Bruen* case, New York urged that a characteristic of "sensitive locations" was that law

Indeed, defendants cannot show that enjoining this policy will adversely impact them at all. First, "the Government does not have an interest in the enforcement of an unconstitutional law." *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003). Next, the injunction sought by plaintiffs will still allow defendants to enforce the other portions of the CCIA that are not being challenged here. Nor should defendants be permitted to avail themselves of the platitude that legal restrictions on guns are, in general, for "public safety," and thus that they have a countervailing interest.  In the real world, laws such as the one at issue merely disarm law abiding citizens, while doing nothing to disarm those who have no regard for the law in the first place. Accordingly, the balance of harms and the public interest weigh in favor of granting plaintiffs' motion for a temporary restraining order and preliminary injunction.

## **CONCLUSION**

For the foregoing reasons, this Court should grant plaintiffs' motion to preliminarily enjoin the enforcement of Penal Law § 265.01-e(2)(c). Regardless of the events that precipitated the enactment of the CCIA, it is worth heeding Justice Harlan's admonishment that "the Constitution is not to be obeyed or disobeyed as the circumstances of a particular crisis . . . may suggest." *Downes v. Bidwell*, 182 U. S. 244, 384 (1901) (Harlan, J., dissenting).  Accordingly. a temporary restraining order is requested pending a final determination on the preliminary injunction motion to prevent irreparable harm to plaintiffs while these issues are under consideration.

---

enforcement was "presumptively available" in those places – a view the majority rejected.  *Bruen* at 27. The limitations implicit in that definition have now been jettisoned by New York, in the CCIA, in favor of a far more expansive rendering of "sensitive locations."  However, insofar as New York feels comfortable disarming its citizens because police officers are here to protect us, that view is inconsistent with the reality that police officers cannot anticipate the vast majority of violent acts; and, moreover, when events intervene to demonstrate the naivete of that view, a victim of violence is barred by *DeShaney* and its unfortunate progeny from seeking redress against a State which failed to protect them.  Plaintiffs respectfully submit that the State cannot have its cake and eat it too.

Dated:        New York, New York
              September 28, 2022

                              Respectfully submitted,

                              Ameer Benno, Esq.
                              Richard Sullivan, Esq., *Of Counsel*
                              BENNO & ASSOCIATES P.C.
                              30 Wall Street, 8th Floor
                              New York, NY 10005
                              Tel.: (212) 227-9300
                              Email: abenno@bennolaw.com

                              Cory H. Morris, Esq.
                              THE LAW OFFICES OF CORY H. MORRIS
                              135 Pinelawn Road
                              Suite 250s
                              Melville, NY 11747
                              Tel.: (631) 450-2515
                              Email: coryhmorris@gmail.com

                              *Attorneys for Plaintiffs*