UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN GOLDSTEIN individually and on behalf of CONGREGATION BNEI MATISYAHU, and MEIR ORNSTEIN, <br><br> *Plaintiffs*, <br><br> vs. <br><br> KATHY HOCHUL, in her official capacity as Governor of the State of New York; LETITIA JAMES, in her official capacity as Attorney General of the State of New York; KEECHANT SEWELL, in her official capacity as Commissioner of the New York City Police Department; LOUIS FALCO, III, in his official capacity as Rockland County Sheriff; ERIC GONZALEZ, in his official capacity as the District Attorney of Kings County; and THOMAS WALSH, II, in his official capacity as the District Attorney of Rockland County, <br><br> *Defendants*. | Case No.: <br><br><br> VERIFIED COMPLAINT <br><br> JURY TRIAL DEMANDED |

**"And the priest gave the officers of the hundreds, the spears and the shields that had belonged to King David, which were in the house of the Lord. And the couriers stood, each one with his weapons in his hand, from the right end of the house to the left end of the house, before the altar and the house, surrounding the king."**

**- Melachim II, 11:10-11**

Plaintiffs, by and through their undersigned attorneys, allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action under the U.S. Constitution, the New York State Constitution, and 42 U.S.C. § 1983 to permanently enjoin and declare unconstitutional the New York Penal Law § 265.01-e(2)(c) ("the Statute" or "statutory ban" or "challenged statute"), a statute prohibiting the possession of a firearm, rifle or shotgun in "any place of worship or

religious observation." Penal Law § 265.01-e(2)(c) is unconstitutionally vague and facially overbroad and violates the guarantees of the First, Second and Fourteenth Amendments of the U.S. Constitution.

## JURISDICTION

2.      This Court has jurisdiction over Plaintiffs' federal law claims under 28 U.S.C §§ 1331, 1343(a), (3), and (4).  This Court has supplemental jurisdiction over Plaintiffs' New York State Constitutional claim under 28 USC § 1367, because that claim arises from the same facts and circumstances as the federal law claims.

## VENUE

3.      Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## JURY TRIAL DEMANDED

4.      Plaintiffs demand a trial by jury of all issues properly triable thereby.

## THE PARTIES

5.      Plaintiff Steven Goldstein ("Goldstein") is a U.S. citizen who resides in Kings County in the State of New York.

6.      Goldstein is the president of Congregation Bnei Matisyahu ("Bnei Matisyahu"), which is a modern orthodox Jewish congregation that is incorporated under the laws of the State of New York.

7.       Bnei Matisyahu's members meet regularly in a synagogue that is a "place of worship or religious observation."

8.      Bnei Matisyahu's synagogue is located in in the Midwood section of Brooklyn, within the City and State of New York.

9.      Plaintiff Meir Ornstein ("Ornstein") is a U.S. citizen who resides in Rockland County in the State of New York.

10.     Defendant Kathy Hochul is the current governor of New York State, a sovereign, independent state of the United States of America. She is responsible for the execution and administration of the laws of the State of New York, and is responsible for the implementation and enforcement of the policies of the executive branch of the State of New York. She is responsible for execution of Penal Law § 265.01-e(2)(c), the statute challenged in this case, and has violated Plaintiffs' rights by the execution and implementation of that law. She is sued in her official capacity pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

11.     Defendant Letitia James is the Attorney General of New York State, and as such is the authorized legal representative for the State of New York and is responsible for the enforcement of laws and prosecution of crimes throughout the State. She is sued in her official capacity pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

12.     The City of New York ("defendant City") was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

13.     The City operates, controls and maintains a police force known as the New York City Police Department ("NYPD").

14.     The NYPD is the primary municipal law enforcement agency within the City of New York, and its headquarters are located at 1 Police Plaza in Lower Manhattan, New York County, within the City and State of New York.

15.     Defendant Keechant Sewell is the Commissioner of the NYPD.  As such, she is ultimately responsible for enforcing the penal laws of the State of New York, including Penal Law § 265.01-e(2)(c), within the City of New York.  She is sued in her official capacity.

16.     The County of Rockland was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

17.     Defendant Louis Falco, III is the Sheriff of Rockland County.  As sheriff, he operates, controls and maintains a police force known as the Rockland County Sheriff's Department. The Rockland County Sheriff's Department is the primary municipal law enforcement agency within the County of Rockland. As Sheriff, defendant Falco is ultimately responsible for enforcing the penal laws of the State of New York, including Penal Law § 265.01-e(2)(c), within Rockland County.  Defendant Louis Falco, III is sued in his official capacity.

18.     Defendant Eric Gonzalez is the District Attorney for Kings County.  He is responsible for initiating and maintaining criminal prosecutions in Kings County, including prosecutions under Penal Law § 265.01-e(2)(c). He is sued in his official capacity.

19.     Defendant Thomas Walsh, II  is the District Attorney for Rockland County.  He is responsible for initiating and maintaining criminal prosecutions in Kings County, including prosecutions under Penal Law § 265.01-e(2)(c). He is sued in his official capacity.

# FACTUAL BACKGROUND

## Supreme Court Decisions

20.     In *District of Columbia v. Heller*, 554 U.S. 570, 626 n.26 (2008), the Supreme Court recognized that the Second and Fourteenth Amendments  to the United States Constitution protect an individual right to keep and bear arms for self-defense.  In dicta, the

*Heller* Court stated that its opinion "should not be taken to cast doubt on longstanding ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626. The Supreme Court reiterated that view two years later in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings").

21.     On June 23, 2022, the United States Supreme Court issued its decision in *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  In that decision, the Supreme Court held that New York Penal Law § 400.00(2)(f), which conditioned the issuance of an unrestricted license to carry a handgun in public on a showing of "proper cause," violated the Second and Fourteenth Amendment by impermissibly granting a licensing official the discretion to deny a license to law-abiding, responsible New York State citizen based on  a perceived lack of a special need for self-protection distinguishable from that of the general community.

22.     The *Bruen* Court explicitly rejected New York's formulation that "sensitive places" where the government may lawfully disarm law-abiding citizens include "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Bruen*, 142 S. Ct. at 2133-34.  The Supreme Court declared that "expanding the category of 'sensitive places' ... to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" and "eviscerate[s] the general right to publicly carry arms for self-defense." *Id.* at 2134.

## **The Enactment of the CCIA**

23.      In response to the *Bruen* decision, the Governor of New York, Kathy Hochul,

called a special session of the state legislature in order to enact a new statutory scheme to take

the place of the regimen that *Bruen* struck down.

24.      New York State passed the Concealed Carry Improvement Act ("CCIA") on July

1, 2022.  It was rushed through the legislative process and voted on without comment or debate.

25.      The CCIA imposes multiple new and blatantly unconstitutional impediments to

New Yorkers in their attempt to exercise their constitutional right to armed self-defense outside

the home.

26.      One of these impediments was that the CCIA replaced the "proper cause"

standard with, among other things, an expansive list of "sensitive locations" where carrying and

possessing firearms, which are defined to include "any pistol or revolver," is prohibited.  *See*

Penal Law § 265.00(3).

27.      The list of "sensitive locations" includes "any place of worship or religious

observation." *See* Penal Law § 265.01-e(2)(c).

28.      The CCIA is a statewide law that went into effect on September 1, 2022.

## **Recent Violence Against Jews**

29.      Houses of worship have long been targeted for violent crime.  This is

emphatically the case for Jewish houses of worship.

30.      An April 26, 2022 report from the Anti-Defamation League released data

showing that in 2021, New York led the nation in total reported anti-Semitic incidents and that

the number of incidents surpassed the number of reported incidents in 2020 by 24%.  *See*

https://nynj.adl.org/news/2021-audit-ny/.

31.     Violent attacks on Jewish places of worship are all too common. On January 15, 2022, Malik Akram, a 44-year-old British Pakistani armed with a pistol, took four people hostage in the Congregation Beth Israel synagogue in Colleyville, Texas.

32.     On May 19, 2021, an assailant in Brooklyn viciously attacked a Hasidic Jew on the street in Brooklyn and set fire to a Brooklyn yeshiva and synagogue.

33.     On the night of December 28, 2019, the seventh night of the Jewish holiday of Hanukkah, a masked man wielding a large knife invaded the home of a Hasidic rabbi in Monsey, Rockland County, New York, where a Hanukkah party was underway, and began stabbing the guests.

34.     On December 10, 2019, two assailants motivated by anti-Jewish hatred entered a Kosher grocery store in Jersey City, New Jersey and shot and killed the store owner, a store employee and a customer.

35.     On July 28, 2019, a member of a synagogue in Miami Beach, Florida was shot in the legs as he was unlocking the front doors of the synagogue prior to a religious service.

36.     On April 27, 2019, a gunman entered the Chabad of Poway synagogue on the last day of Passover, and began shooting at the worshippers, killing one and wounding several others.

37.     In 2019, a would-be assassin attempted to bomb Temple Emanuel Synagogue in Pueblo, Colorado and tried to poison the water supply at the synagogue with arsenic.

38.     In November 2018, a man in a rented vehicle attempted to run over two Jewish men who were exiting their Los Angeles synagogue.

39.     On October 27, 2018, a man armed with an AR-15 rifle entered the Tree of Life synagogue outside Pittsburgh, Pennsylvania and began shooting at the congregants, killing 11 and wounding six.

40.     On April 13, 2014, three people were shot and killed at a Jewish Community Center and a Jewish retirement home in Overland Park, Kansas by a gunman who was targeting Jews.

41.     These incidents, and many others, have created a very real fear among the Jewish community, including plaintiffs herein, that they and their houses of worship will be the targets of violent attacks by hate-filled extremists.

42.     The news has also been replete in recent years with accounts of violent attacks on other places of worship, including mosques and churches.  To cite but one example, in December of 2019, a man entered the West Freeway Church of Christ in Fort Worth, Texas, pulled a shotgun out from beneath his coat, and aimed it at people inside the church.  He was able to discharge a single shot from the gun before a lawfully armed member of the church returned fire, preventing a mass casualty event.  Were a similar event to take place in New York State, the church members would have been rendered defenseless by Kathy Hochul's CCIA, and nothing would have stopped the gunman from committing mass murder.  In this way, the law perversely renders "sensitive locations" more sensitive: these are locations where, would-be killers may fairly assume, people have been made defenseless.

## The Plaintiffs

### Steven Goldstein and Congregation Bnei Matisyahu

43.     Congregation Bnei Matisyahu is a membership-based Jewish congregation composed of approximately 25 families and whose existence depends on its members' financial support.

44.     Goldstein is the president of Congregation Bnei Matisyahu, and prior to September 1, 2022 – the date that the statutory ban went into effect – he attended religious services regularly at Bnei Matisyahu's synagogue.

45.     For several years, Goldstein has been licensed by the City of New York to carry a concealed firearm on Bnei Matisyahu's premises.

46.     Since originally obtaining that permit, Goldstein has always carried a concealed firearm within the premises of Bnei Matisyahu's synagogue.

47.     He did this because of the high incidence of anti-Jewish hate crime throughout the City of New York, including within the Midwood section of Brooklyn, and throughout the state and country.

48.     Goldstein is apprehensive that he, his family and his congregation will be targeted for acts of violence because of their Jewish faith, and therefore he desired and continues to desire to carry a handgun while at his synagogue for the defense of himself, his family and his congregation.

49.     Bnei Matisyahu's synagogue is conspicuously marked with a plaque that identifies it as such.  Further, Bnei Matisyahu's members and congregants wear attire, such as the *kippah* (head coverings), *tzitzit* (fringes) and the *tallit* (prayer shawl), which conspicuously identifies them as members of the Jewish faith.

50.    For as long as Goldstein has carried a concealed firearm at Bnei Matisyahu, the members and congregants of Bnei Matisyahu have been aware that he was doing so and have approved of him doing so.

51.    Those members expressed to Goldstein that they were and are fearful that Bnei Matisyahu will be the target of anti-Jewish hate, and they are apprehensive that without Goldstein's armed protection at the synagogue, they will be the victims of violent physical attacks. Goldstein shares that fear.

52.    Those members told Goldstein that if he did not carry the concealed handgun at Bnei Matisyahu, they would be too fearful to attend religious services, they would stop being members of Bnei Matisyahu, and they would end their financial support to the congregation.

53.    Goldstein currently desires to carry a handgun at Bnei Matisyahu for self-defense and the defense of his family and his congregation, but he fears arrest and felony prosecution under the CCIA – specifically under Penal Law § 265.01-e(2)(c), which designates all "places of worship or religious observation" as "sensitive locations" where possession of a firearm is forbidden – if he does so.

54.    But for the current statutory ban under the CCIA, Congregation Bnei Matisyahu would allow Goldstein to carry concealed on its property.

55.    Since the statutory ban went into effect Goldstein has limited his attendance at Bnei Matisyahu's synagogue, and has limited his participation in the religious activities there, because of his fear that, without armed protection, the synagogue will be a target of anti-Jewish attack.

56.    Goldstein falls within none of the categories of persons exempt from the statutory ban under the CCIA.

**Meir Ornstein**

57.     Meir Ornstein lives and works in Rockland County, in the State of New York.

58.     Ornstein is the holder of a valid New York State concealed carry pistol license, and he has held this license for several years.

59.     Ornstein is an Orthodox Jew, and for the past several years he has regularly attended daily prayer services at a synagogue called Congregation Zemach David of Dinev ("Zemach David"), located in Airmont, New York, which is within Rockland County.

60.     Until September 1, 2022 – the date that the statutory ban went into effect – Ornstein would carry his concealed handgun at all times, including each time he attended religious services at Zemach David, which is a "place of worship or religious observation" under Penal Law § 265.01-e(2)(c).He did this for self-defense. Like Plaintiff Goldstein, he recognized – and still does – that as a practicing Jew whose is readily identifiable as such by his wearing of a *kippah*, *tzizit* and *tallit*, he is a target for extremists who are motivated by anti-Jewish animus, and he wishes to carry a concealed handgun for his protection.

61.     Since September 1, 2022 – the date that the statutory ban went into effect – Ornstein no longer participates as much in religious life at Zemach David's synagogue.  This is because he is afraid that, without armed protection, the synagogue will be a target of anti-Jewish attack.

62.     Additionally, like people of all faiths, Ornstein's religious observance is not confined to the walls of his synagogue.  Whether he is walking to *shul* on Shabbat, saying a blessings over food or grace after meals at a restaurant, reciting the *Shema* in his home, casting bread crumbs into a body of water in a public park in observance of the *tashlich* ceremony of the High Holy Days, eating a meal in a *sukkah* or enjoying an outdoor barbecue on *Lag*

*B'Omer*, nearly every location is a "place of worship or religious observation" for him. The same is true for the other individual plaintiffs, as it is for millions of people of faith in this country.

63.     At all of these locations, prior to the enactment of the CCIA, Ornstein would have been able to carry his concealed firearm for self-defense. He can do so at none of them now. Under this law, non-sensitive locations are instantly transformed into sensitive ones based on nothing other than a momentary religious activity. It is a wretched alchemy that cannot be harmonized with the Constitution.

64.     Given the high incidence of anti-Jewish hate crime throughout the state and the country, Ornstein wishes to carry a concealed handgun for his own protection, but he fears arrest and felony prosecution under the CCIA – specifically under Penal Law § 265.01-e(2)(c), which designates all "places of worship or religious observation" as "sensitive locations" where possession of a firearm is forbidden – if he does so.

65.     Because Ornstein cannot carry his firearm if he attends prayer services at Zemach David, he has been deterred from attending those services and also from engaging in important acts of religious observance outside of his synagogue.

66.     But for the current statutory ban under the CCIA, Congregation Zemach David would allow Ornstein to carry concealed on its property.

67.     Ornstein falls within none of the categories of persons exempt from the statutory ban under the CCIA.

## FIRST CLAIM

## <u>VIOLATION OF THE SECOND AMENDMENT UNDER 42 U.S.C § 1983</u>

68.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

69.     By designating all "places of worship and religious observation" as "sensitive locations" where possession of a firearm, rifle or shotgun is forbidden and subject to felony criminal penalties, the Statute infringes on the Second Amendment right to bear arms.

70.     The Second Amendment to the United States Constitution provides:

> "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

71.     In *Bruen*, the Supreme Court made clear that the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Bruen*, 142 S. Ct. at 2122.

72.     The *Bruen* Court pronounced the rule by which challenges to regulations impinging on that right must be analyzed:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 142 S.Ct. at 2126

73.     Here, plaintiff's desired conduct undeniably is encompassed by the plain text of the Second Amendment. *See Heller*, 554 U.S. 570, 576-91.

74.     The individual Plaintiffs here – as well as the members of the plaintiff congregations – are "people" within the meaning of the Second Amendment, as they are law-

abiding, responsible, adult citizens with ordinary self-defense needs, who cannot be dispossessed of their right to bear arms in public for self-defense. *See Bruen*, 142 S.Ct. at 2134.

75.     The weapons in questions – handguns – are "arms" within the meaning of the Second Amendment because they are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625-27.   Indeed, the *Heller* Court aptly noted that "the American people have considered the handgun to be the quintessential self-defense weapon." *Id.* at 629; *see also Bruen*, 142 S.Ct. at 2134 ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense").

76.     Further, the regulated conduct here categorically falls within the coverage of the phrase "keep and bear." *Heller*, 554 U.S. at 584 ("bear arms" means to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.").

77.     And, lest there be any lingering doubt, the *Bruen* Court explicitly held that the plain text of the Second Amendment "protects ... carrying handguns publicly for self-defense." *Bruen*, 142 S.Ct. at 2134.

78.     Because possessing a firearm in a house of worship for self-defense is protected by the plain text of the Second Amendment, New York State would have to demonstrate that its prohibition of that conduct is consistent with this nation's historical tradition of firearm regulation. This it cannot do.

79.     In fact, during the colonial and Founding periods of our nation, laws typically *required* that arms be brought to churches and public meetings.

80.     A 1632 Virginia statute provided that (sic): "ALL men that are fittinge to beare armes, shall bringe their pieces to the church," and a 1643 Virginia statute provided that

"masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott."

81.     A 1770 Georgia statute imposed fines on militiamen who went to church unarmed. *See Heller*, 554 U.S. at 601 ("Many colonial statutes required individual arms bearing for public-safety reasons – such as the 1770 Georgia law that 'for the security and defence of this province from internal dangers and insurrections' required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.'") (internal citation omitted).

82.     In 1791, when the Second Amendment was ratified, and also in 1868, when the Fourteenth Amendment was ratified, the "vast majority of the other states ... did not have statutes restricting firearms" at houses of worship, and "some of the states even had contrary statutes" mandating carrying weapons in places of worship.  *Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874, at *93-94.

83.     At least one court has held that the CCIA's list of "sensitive locations" – including "places of worship or religious observation" – "is not deeply rooted in the Nation's historical tradition of firearm regulation."  *Antonyuk*, 2022 U.S. Dist. LEXIS 157874, at *94.

84.     As there is no historical analogue for deeming all "places of worship or religious observation" as "sensitive places," that portion of the CCIA violates the Second Amendment.

85.     Penal Law § 265.01-e(2)(c) is therefore unconstitutional on its face and as applied to plaintiffs herein.

86.     Plaintiffs are being irreparably harmed by Defendants' denial of their rights under the Second Amendment, and they will continue to be irreparably harmed unless and until Defendants' enforcement of the unconstitutional law is enjoined.

87.     Plaintiffs have no adequate remedy at law.

## SECOND CLAIM

### VIOLATION OF THE FIRST AMENDMENT UNDER 42 U.S.C. § 1983

88.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

89.     The Free Exercise Clause of the First Amendment, applied against the States by incorporation into the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

90.     The free exercise of religion means the right to believe and profess whatever religious doctrine one desires, and religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

91.     Penal Law § 265.01-2(2)(c) discriminates  against religious beliefs and regulates and prohibits conduct because it is undertaken for religious reasons.

92.     The Statute makes it more dangerous to attend a "sensitive location" than it would be had that law not been enacted, because it strips away the ability for people in that sensitive location to defend themselves.  The Statute singles out religious locations for this elevated, state-sanctioned, danger.  This acts as a deterrent for law-abiding people to enter such "sensitive locations," including places of worship.

93.     By designating "places of worship and religious observation" as "sensitive locations," Penal Law § 265.01-e(2)(c) creates an irreconcilable conflict between two fundamental constitutional rights, presenting individuals with a Catch-22: exercising their right to self-defense under the Second Amendment by foregoing their First Amendment right to worship freely; or foregoing their right to self-defense under the Second Amendment in order to

practice their right to free exercise of religion under the First Amendment. The CCIA necessarily entails a forfeiture by the individual plaintiffs, and by countless other New Yorkers, of a Constitutional right.

94. By singling out places of worship and religious observation for reduced Second Amendment rights, the Statute constitutes a religious gerrymander.

95. Penal Law § 265.01-e(2)(c) is not a neutral law of general applicability – it is neither neutral towards religion nor generally applicable.

96. In enacting and enforcing Penal Law § 265.01-e(2)(c), defendants are proceeding in a manner intolerant of religious beliefs and are effectively punishing individuals for engaging in practices that are religious in nature.

97. By declaring that all locations where a person "observes" his or her religious faith as a gun-free zone, the Statute transforms that person's exercise of his or her fundamental constitutional right to bear arms into a felony for no reason other than the person's religious activity.

98. The Statute targets religious conduct for distinctive and punitive treatment.

99. Thus, the Statute subjects religious observers to unequal treatment and imposes special disabilities on the basis of religious status.

100. The statute is not narrowly tailored and is not justified by any compelling government interest.

101. Penal Law § 265.01-e(2)(c) is therefore unconstitutional on its face and as applied to plaintiffs herein.

102.    This right to the free exercise of religion also encompasses a right to associate with others in the pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

103.    By deterring individuals from engaging in the free exercise of religion, the statutory ban also infringes on plaintiffs' First Amendment right to association.

104.    Further, Penal Law § 265.01-e(2)(c) is unconstitutionally overbroad because it infringes on an unacceptable level of activity privileged under the First Amendment.

105.    Plaintiffs are being irreparably harmed by Defendants' denial of their First Amendment rights, and they will continue to be irreparably harmed unless and until Defendants' enforcement of the unconstitutional law is enjoined.

106.    Plaintiffs have no adequate remedy at law.

### THIRD CLAIM

### VIOLATION OF FOURTEENTH AMENDMENT UNDER 42 U.S.C. § 1983

### (VAGUENESS)

107.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

108.    The Statute makes it a felony for law abiding individuals who are licensed to possess a firearm, rifle or shotgun to do so in a location that is used, to any degree, for "worship" or for "religious observation" – utterly vague phrases that provide no standards by which law enforcement officers must abide in granting exceptions, leaving open the possibility of purely arbitrary decision making.

109.    The ambiguity of the terms mentioned in the prior paragraph also means that those who are subject to the statute will not be on notice of what conduct on their part will render them liable to its penalties.

110.     Many, or most, religious observers do not consider their religion a separate and distinct activity in which they engage only in a specific place, for a designated time, such as one hour per week on a Sunday. Rather, religious observance permeates every facet of many people's lives, and informs every social interaction. The statute is overbroad because there is no clear limit on its application.

111.     As observant Jews, nearly every location is a place of religious observation for plaintiffs Goldstein and Ornstein. For example, they wear a *kippah* and *tzitzit* everyday and say prayers before and after meals at restaurants and at home. On Rosh Hashanah, they observe the ceremony of *tashlich* where they cast bread into a flowing body of water – often performed at a public park. On Sukkot, they eat and pray in outdoor, open air structures.

112.     And, in addition to prayer at synagogue on weekends, they are required by Judaic law to pray with ten congregants three times a day. The afternoon prayers often fall out in the middle of the workday, so they regularly organize prayer services in the workplace. Under the ban, such "*mincha minyanim*" would be places of worship or religious observation even though they take place in all variety of "secular" locations outside of the shul.

113.     As a result, it is utterly and completely unclear what the boundaries are to the statutory proscription on possessing a weapon in a "place of religious observation." The very phrase engenders confusion – which seems to be the point. Those who are subject to the severe criminal penalties for transgressing the statute do not know where it is permitted for them to possess a firearm and where is it forbidden.

114.     And, because the violation of this prohibition is a class E felony, one of those penalties is the loss of Second Amendment rights for the lifetime of a person convicted under the statute.

115. The essential phrase "place of worship or religious observation" is undefined and not definable, and therefore is unclear and wide open to arbitrary interpretation.

116. Accordingly, ordinary people cannot understand what conduct is prohibited and the vagueness of the statute encourages arbitrary and discriminatory enforcement and unpredictable prosecution.

117. Further, the only way for a person to avoid arrest and prosecution under Penal Law § 265.01-e(2)(c) is to never publicly carry a firearm, even if permitted to do so.

118. Since each plaintiff has been, or will imminently be, subject to irreparable injury by this constitutional violation, and since there is a realistic danger that under Penal Law § 265.01-e(2)(c) will significantly compromise recognized federal and state constitutional protections of parties not before the Court, plaintiffs are entitled to declaratory and injunctive relief.

119. The Statute is therefore unconstitutional on its face and as applied to plaintiffs herein.

120. Plaintiffs are being irreparably harmed by this unconstitutional Statute, and they will continue to be irreparably harmed unless Defendants' enforcement of the unconstitutional law is enjoined.

121. Plaintiffs have no adequate remedy at law.

## FOURTH CLAIM

## VIOLATION OF FOURTEENTH AMENDMENT UNDER 42 U.S.C. § 1983

## (EQUAL PROTECTION)

122. Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

123. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs' right to equal protection under the law.

124. The Statute, on its face and as applied, is an unconstitutional abridgment of Plaintiffs' right to equal protection, is not neutral.

125. The Statute is animated by an impermissible, anti-religious value judgment by the State.

126. The Statute targets and invidiously discriminates against individuals, like Plaintiffs, whose sincerely-held religious beliefs and faith-based observances and practices place them at an exponentially higher risk of criminal prosecution and punishment for exercising their Second Amendment right than other individuals.

127. The Statute, on its face and as applied, is an unconstitutional abridgement of Plaintiffs' right to equal protection because it permits the State to treat Plaintiffs and religious organizations differently from similarly situated non-religious individuals and secular organizations solely on the basis of Plaintiffs' religious complexion.

128. The Statute, on its face and as applied, singles out Plaintiffs for selective treatment based upon their acts of religious faith and devotion without any rational, legitimate, or compelling interest.

129. Indeed, Penal Law § 265.01-e(2) specifically singles out for different treatment those locations where religious activity takes place from other private property. Unless a person falls within one of the narrow exemptions from the "sensitive location" ban, a person who possesses a valid concealed carry license cannot lawfully possess a firearm in a "place or worship or religious observation" under any circumstances. However, on almost all other private property, a person who holds such a license can possess a concealed firearm as long as the property owner has posted a sign stating as much.

130.     Moreover, even if New York State is allowed to define "sensitive locations" in the way it urged the *Bruen* court to construe that term – i.e., any place with the "presumptiv[e] availabil[ity]" of "law-enforcement and other public-safety professionals," *Bruen* at 27 – the statute here would be overbroad because, among other reasons, it applies to places of religious observation and worship without regard to whether such locations are large enough, or profitable enough, to employ private security personnel.  In this way, a megachurch for example may be capable of providing for the security of its members without any members running afoul of the statute, while a small prayer group or synagogue may not.

131.     The Statute is a "status-based enactment divorced from any factual context" and "a classification of persons undertaken for its own sake," which "the Equal Protection Clause does not permit." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

132.     Penal Law § 265.01-e(2)(c) is therefore unconstitutional on its face and as applied to plaintiffs herein.

133.     Plaintiffs are being irreparably harmed by Defendants' denial of their Fourteenth Amendment right to equal protection, and they will continue to be irreparably harmed unless and until Defendants' enforcement of the unconstitutional law is enjoined.

134.     Plaintiffs have no adequate remedy at law.

## FIFTH CLAIM

### VIOLATION OF THE NEW YORK STATE CONSTITUTION

135.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

136.    Article I, § 3 of the New York State Constitution provides in relevant part that "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind."

137.    Article I, § 6 of the New York State Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law."

138.    Article I, § 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

139.    That by enforcing Penal Law § 265.01-e(2)(c), Defendants have violated and are violating the rights of Plaintiffs under the New York State Constitution to the free exercise of religion, to due process of law, and to equal protection of the laws and to be free of religious discrimination.

140.    Plaintiffs are being irreparably harmed by the flagrantly unconstitutional statute, and they will continue to be irreparably harmed unless Defendants' enforcement of said law is enjoined.

141.    Plaintiffs have no adequate remedy at law.

*      *      *

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a Judgment:

a.  Declaring that Penal Law § 265.01-e(2)(c) violates the Second Amendment of the U.S. Constitution, on its face and as applied to plaintiffs;

b.  Declaring that Penal Law § 265.01-e(2)(c) violates the Free Exercise Clause of the First Amendment of the U.S. Constitution, on its face and as applied to plaintiffs;

c.  Declaring that Penal Law § 265.01-e(2)(c) is unconstitutionally overbroad under the First Amendment of the U.S. Constitution;

d.  Declaring that Penal Law § 265.01-e(2)(c) is void for vagueness under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, on its face and as applied to plaintiffs;

e.  Declaring that Penal Law § 265.01-e(2)(c) violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, on its face and as applied to plaintiffs;

f.  Declaring that Penal Law § 265.01-e(2)(c) violates Article I, §§ 3, 6 and 11 of the New York State Constitution, on its face and as applied to plaintiffs;

g.  Permanently enjoining Defendants from enforcing Penal Law § 265.01-e(2)(c);

h.  Awarding Plaintiffs attorneys' fees and other litigation costs reasonably incurred in this action pursuant to 42 U.S.C. § 1988;

i.  Granting Plaintiffs such other relief as this Court deems just and proper.

Dated this 23th day of September, 2022

_____
Ameer Benno, Esq.
Richard L. Sullivan, Esq., O*f Counsel*
BENNO & ASSOCIATES P.C.
30 Wall Street, 8th Floor
New York, NY 10005

Tel.: (212) 227-9300
abenno@BennoLaw.com

Cory H. Morris, Esq.
THE LAW OFFICES OF CORY H. MORRIS
135 Pinelawn Road
Suite 250s
Melville, NY 11747
Tel.: (631) 450-2515
coryhmorris@gmail.com

## VERIFICATION

**STATE OF NEW YORK**   )
                                            )ss.:
**COUNTY OF** _Kings_    )

Pursuant to 28 U.S. Code § 1746, _Steven Gooster_ being duly sworn, deposes and says that deponent is a Plaintiff in the within action; that he has read the foregoing Verified Complaint and knows the contents thereof; that same is true to deponent's own knowledge; except as to the matters therein stated to be alleged on information and belief; and that as to those matters deponent believes to be true.

I declare under penalty of perjury that the foregoing, Verified Complaint and my Declaration is true and correct. If called upon to testify as to its truthfulness, I would and could do so competently. I declare under penalties of perjury and under the laws of the United States that the foregoing statements are true and correct.

Executed on September 24, 2022

_____

Sworn to before me this
24th day of September, 2022

_____
Notary Public

**MICHAEL J. TAUBENBLAT**
NOTARY PUBLIC, State of New York
No. 02TA6049834
Qualified in Kings County
Commission Expires Oct. 23 2022

## VERIFICATION

**STATE OF NEW YORK** )
                        )ss.:
**COUNTY OF** Rockland )

      Pursuant to 28 U.S. Code § 1746, _Melh oasstel_ being duly sworn, deposes and says that deponent is a Plaintiff in the within action; that he has read the foregoing Verified Complaint and knows the contents thereof; that same is true to deponent's own knowledge; except as to the matters therein stated to be alleged on information and belief; and that as to those matters deponent believes to be true.

      I declare under penalty of perjury that the foregoing, Verified Complaint and my Declaration is true and correct. If called upon to testify as to its truthfulness, I would and could do so competently. I declare under penalties of perjury and under the laws of the United States that the foregoing statements are true and correct.

Executed on September 23, 2022

Sworn to before me this
  23 th day of September, 2022
ISAAC MAYER
NOTARY PUBLIC, State of New York
No. 01MA5022570
Qualified in Rockland County
Commission Expires Jan. 18, 20_26

Notary Public      9.23.22