**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Steven Goldstein, *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> Kathleen Hochul, *et al.*, <br><br> Defendants. | Index No. 22-CV-8300 |

## DECLARATION OF PATRICK J. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Patrick J. Charles, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2.      I have been retained by the Office of the Attorney General for New York as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3.      In the wake of the Supreme Court's June 2022 decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022), New York is currently defending multiple lawsuits challenging its firearms regulations, including this one, *Goldstein v. Hochul et al*, a challenge to New York's restriction on carrying firearms into places of worship and religious observation. I have read the Supreme Court's decision in *Bruen* and the Plaintiff's memorandum of law for a temporary restraining order and preliminary injunction in *Goldstein*.

4.      New York has asked me to expound on why I believe its designation of "places of worship or religious observation" as a sensitive location is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

5.      Virtually all the information contained in this declaration is from research conducted prior to having been retained by the Office of the Attorney General for New York on September 17, 2022. Beginning on that date, I have been compensated for my work on this declaration at a rate of $50 per hour.

<u>Background and Qualifications</u>

6.      I am a historian, legal scholar, and author of dozens of articles and books on the Constitution, legal history, and standards of review. I received my L.L.M. in Legal Theory and History with distinction from Queen Mary University of London in 2014, J.D. from Cleveland-Marshall College of Law in 2009, and B.A. in History and International Affairs with honors from George Washington University in 2005. My writings on the history of the law have been cited by the Supreme Court of the United States, federal Circuit Courts of Appeal, federal District Courts, and State supreme courts. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

7.      For the past 11 years I have served as a historian for the United States Air Force (USAF) in several capacities, including deploying 5 times with Special Operations Forces (SOF) for contingency operations in Afghanistan and the Middle East. I currently serve as the Research Division Supervisor for the Air Force Historical Research Agency (AFHRA) located at Maxwell Air Force Base, Alabama, where I oversee all historical information requests and archival research for the USAF.

8.      This declaration was compiled and completed outside my official duties for the USAF. Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of the USAF, AFHRA, Department of Defense, or the federal government.

**The History of Places of Worship or Religious Observation as a Sensitive Place**

**I.     Preliminary Notes on History, Tradition, and Methodology**

9.     *Bruen* is clear in noting that "text, history, and tradition" must serve as the
jurisprudential guide for lowers courts in evaluating whether a respective firearms or weapons
regulation is consistent with the Second Amendment, particularly whether the regulation is in
accord with this "Nation's historical tradition of firearms regulation." 142 S. Ct. at 2126. What is
less clear, however, is how the lower courts are to marshal, select, and analyze the historical
evidence in an honest, objective, and even keeled way.

10.     What makes this task particularly difficult are the evidentiary problems in
evaluating much of our early history and tradition. Consider the fact that from the ratification of
the Constitution in 1789 through the mid-nineteenth century, most state and local legislative
debates and deliberations have been lost to time. In other words, other than knowing whether a
respective law was voted upon favorably and the legislative text contained within,[1] historians
generally know very little about the legislative history of most early laws.

11.     The same must be said regarding any law's enforcement from the Constitution's
ratification through the turn of the twentieth century. The reality is that most instances of legal
enforcement were done at the local level, and, as a result, the records of said enforcement have
been lost to time. *See* Patrick J. Charles, *A Historian's Assessment of the Anti-Immigrant
Narrative in* NYSPRA v. Bruen, DUKE SECOND THOUGHTS BLOG, August 4, 2021,
https://firearmslaw.duke.edu/2021/08/a-historians-assessment-of-the-anti-immigrant-narrative-
in-nysrpa-v-bruen/ (noting the historical problems with compiling early Sullivan Law

---

[1] It is worth noting that there are many cases where a law was not voted upon favorably and
therefore the legislative text of that defeated law has been lost to time.

enforcement records). And those records of enforcement that have miraculously survived often require time consuming, archival research, not ad hoc, keyword digital searches. *See, e.g.,* Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

12.     The point to be made is that we, living in the present, can only ask so much from the past. *See, e.g.,* GORDON S. WOOD, THE PURPOSE OF THE PAST: REFLECTIONS ON THE USE OF HISTORY 11 (2008); HERBERT BUTTERFIELD, THE WHIG INTERPRETATION OF HISTORY 16 (1950). Therefore, the best that can be done when utilizing history and tradition to adjudicate the Second Amendment questions of today is to analogize how, if at all, the past is relevant for the present, and then apply whatever past legal, constitutional, and social principles that can be historically marshalled in a way that is holistic, predictable, and reliable.  *See* PATRICK J. CHARLES, HISTORICISM, ORIGINALISM, AND THE CONSTITUTION: THE USE AND ABUSE OF THE PAST IN AMERICAN JURISPRUDENCE 5-28, 87-98 (2014).

13.     So far, in the wake of *Bruen*, it appears that most lower courts are utilizing history and tradition in this fashion—that is broadly analogizing past legal, constitutional, and social principles to modern firearms regulations. *See, e.g., United States v. Seiwart*, 2022 U.S. Dist. LEXIS 175417, at 4-5 (N.D. Ill. 2022); *United States v. Coombes*, 2022 U.S. Dist. LEXIS 170323, at 12-26 (N.D. Okla. 2022); *United States v. Kays*, 2022 U.S. Dist. LEXIS 153929, at 5-11 (W.D. Okla. 2022); *United States v. Jackson*, 2022 U.S. Dist. LEXIS 16404, at 4-7 (D. Minn. 2022); *see also United States v. Charles*, 2022 U.S. Dist LEXIS 180375, at 17-18, 27-28 (W.D. Tex. 2022) (noting that *Bruen* does not create an "inflexible" test for the courts in analogizing history and tradition). This court should do the same in this case based on the following history

on the right to arms and sensitive places from the founding era through the close of the nineteenth century.

II.     **A History of the Sensitive Places Doctrine, Including at Churches and Places of Worship, Through the Nineteenth Century**

14.     Historically speaking, for nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a so-called "sensitive place" in which arms bearing could be prohibited was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated or conducted commerce. The text "fairs" and "markets" language contained within the 1328 Statute of Northampton makes this abundantly clear. 2 Edw. 3, c. 3 (1328) (Eng.). So too do several other English legal sources. For instance, in 1351, Edward III issued a proclamation declaring it was unlawful to "go armed" with dangerous weapons "within the City of London, or within the Suburbs, or any other places between the said city and the Palace of Westminster…except the officers of the King…" "Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster," MEMORIALS OF LONDON AND LIFE 268-69, 273 (H.T. Riley ed., 1868). Similarly, in John Carpenter's 1419 treatise *Liber Albus*, it stipulates that "no one, of whatever condition he be, go armed in the said *city [of London] or in the suburbs*, or carry arms, by day or by night, except the va[]lets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and maintaining the said peace; under the penalty aforesaid, and the loss of their arms and armour." JOHN CARPENTER, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON (Henry

Thomas Riley ed., 1861); *see also id*. at 229, 555, 556, 558, 560, 580 (providing other examples denoting that going armed in densely populated public places was unlawful).

15.     As it pertains particularly to churches or places of religious worship, two English laws are noteworthy. As early as 1403 it was established that "no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people…" 4 Hen 4, c. 29 (1403). A little more than a century later, the prohibition was extended to Wales, making it unlawful to bring dangerous weapons before any town, church, fair, market, or other congregation, except it be upon a hue or outcry made of any felony robbery done or perpetrated, nor in the highways in affray of the King's peace or the King's liege people…" 26 Hen. 8, c. 6, § 3 (1534).

16.     The extent in which this English understanding of what constituted a "sensitive place"—that is where arms bearing could be prohibited—traveled across the Atlantic is unknown.  As touched upon in Part I, local enforcement records did not survive for historical posterity, and therefore it is impossible for historians or anyone to reconstruct exactly how often, when, and where armed carriage restrictions were enforced. What the historical record does unequivocally inform is that armed carriage restrictions and the English common law against 'going armed' indeed made their way into the American Colonies and subsequent United States. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 31-32 (2012). Additionally, historians can state with certainty that state and local governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies were deemed the militia or not. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 GEO. J.L. &

PUB. POL'Y 323, 326,-27, 374-90 (2011); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES, AND THE EVIL CONSEQUENCES THEREOF, SEPTEMBER SESSION, CHAPTER VIII (Mass. 1786); AN ACT FOR THE MORE SPEEDY AND EFFECTUAL SUPPRESSION OF TUMULTS AND INSURRECTIONS IN THE COMMONWEALTH, SEPTEMBER SESSION, CHAPTER IX (Mass. 1787); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES (N.J. 1797); AN ACT TO PREVENT HUNTING WITH FIRE-ARMS IN THE CITY OF NEW-YORK, AND THE LIBERTIES THEREOF (NY 1763); AN ACT AGAINST RIOTS AND RIOTERS (Pa. 1705); *see also* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 126 (2d ed., 1829) (noting that the Second Amendment "ought not…in any government…be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose"). This is because it had long been understood that any armed assemblage required the consent of government officials.[2]

17.     It is not until the mid to late nineteenth century that we begin to see state and local governments in the United States enact location specific armed carriage restrictions.[3]  Indeed, several towns outright prohibited armed carriage altogether within their confined corporate or

---

[2] This understanding of the law goes all the way back to the 1328 Statute of Northampton. *See* 2 Edw. 3, c. 3 (1328) (Eng.); *see also* 3 CALENDAR OF CLOSE ROLLS, RICHARD II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914); 1 CALENDAR OF CLOSE ROLLS, RICHARD II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914).

[3] Prior to this point in history, two types of armed carriage laws the statute and ordinance books—concealed carry prohibitions and surety laws. Although the two types of laws regulated armed carriage quite differently, both underline two undisputed historical facts. First, by the turn of the nineteenth century, armed carriage was subject to reasonable regulation to protect the health, safety, and welfare of the community. *Bruen*, 142 S. Ct. at 2150. Second, early to mid-nineteenth century armed carriage laws were deeply rooted in regional (and sometimes local) conceptions of morality.

commercial limits.[4] However, several states and localities were specific in defining sensitive

locations where arms bearing was prohibited, such as the North Carolina religious camp grounds

of Stanley Creek and Rock Spring; both of which had obtained the consent of the North Carolina

Assembly to prohibit "the carrying of guns or pistols within the incorporate limits of the Camp

---

[4] *See, e.g.,* THE REVISED ORDINANCES OF PROVO CITY, UTAH 96 (1893) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the city limits of this city is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF PAYSON CITY, UTAH 84 (1893) ("Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the limits of this city is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF TOOELE CITY, UTAH 87 (1893) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon, is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both such fine and imprisonment."); Ex. B, *An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying Deadly Weapons, the Use of Obscene Language, the Discharge of Fire-Arms, and to Close Places of Amusement on Sunday in the City of Wallace*, Kansas, Jan. 31, 1889, *reprinted in* WALLACE COUNTY REGISTER (KS), Feb. 9, 1889, at 2 ("Any person who shall be found carrying on his person a pistol, bowie knife, dirk or other deadly weapon shall upon conviction be fined in any sum not exceeding $25 or by imprisonment in the city jail not exceeding 30 days; Provided however that this section shall not apply to any peace officer of the state, counties or cities of this state and provided further that if it shall appear to the court trying the offense that the accused was engaged in any legitimate business or calling that would necessitate the carrying of any such weapons, such persons shall be acquitted."); Ex. C., *Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons*, May 17, 1882, *reprinted in* BURLINGTON DEMOCRAT (KS), May 26, 1882, at 2 ("That is shall be unlawful for any person hereafter to carry on his or her person a pistol, bowie-knife, dirk or other deadly weapon, concealed or otherwise, within the corporate limits of sad City of Burlington, *Provided*: This Section shall not apply to any person carrying a deadly weapon while in the performance of his or her legitimate business, wherein the law commands such person to carry a deadly weapon."); Ex. D, *Miscellaneous Ordinance*, Jun. 24, 1871, *reprinted in* ABILENE WEEKLY CHRONICLE (KS), Jun. 29, 1871, at 3 ("That any person who shall carry within the corporate limits of the city of Abilene or commons, a pistol, revolver, gun, musket, dirk, bowie knife, or other dangerous weapon upon his person, either openly or concealed, except to bring the same and forthwith [to] deposit it or them at their house, store room, or residence, shall be fined seventy-five dollars.").

Ground" when people were "assembled for public worship...." Ex. E, *Stanley Creek Camp Ground, Gaston County, N.C.—Laws and Regulations*, *reprinted in* SOUTHERN HOME (Charlotte, NC), Sep. 22, 1873, at 2; Ex. F, *Rock Spring Camp Ground, Lincoln Co., N.C.: Laws and Regulations*, *reprinted in* CHARLOTTE DEMOCRAT (NC), July 30, 1872, at 2. Then there was the town of Columbia, Missouri, which in accord with Missouri state law,[5] passed an ordinance prohibiting the carrying of dangerous weapons "into any *church, or place where people have assembled for religious worship*; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose…" *Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890, *reprinted in* GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890) (emphasis added); *see also* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-EIGHTH GENERAL ASSEMBLY 158, 166 (1877), *available at* https://catalog.hathitrust.org/Record/000534559 (1877 Missouri state law empowering city and town councils, such as Columbia, with the authority to "prohibit and punish the carrying of

---

[5] The ordinance mirrored an 1874 Missouri state law titled "An Act to Prevent the Carrying of Weapons in Public Assemblies of the People." *See* ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF MISSOURI 43 (1874), *available at* https://catalog.hathitrust.org/Record/000534559 (prohibiting persons from "go[ing] into any church or place where people have assembled for religious worship" with "any kind of fire-arms" or "deadly weapon"); LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-EIGHTH GENERAL ASSEMBLY 50-51 (1875), *available at* https://catalog.hathitrust.org/Record/000534559 (same). In 1883, the Missouri state law was amended to increase the fine. *See* LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL ASSEMBLY 76 (1883), Ex. J; *State v. Reando* (Mo. 1878) (Missouri Supreme Court decision upholding 1874 law as constitutional, describing the law as "nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make."), Ex. N.

firearms and other deadly weapons, concealed or otherwise").[6] Similarly, the city of Stockton, Kansas passed an ordinance prohibiting the carrying of dangerous weapons "*into any church or place where the people have assembled for public worship*, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…" Ex. G, *Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *reprinted in* STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1 (emphasis added).

18.      As for state "sensitive places" laws, in 1869 Tennessee prohibited the carrying of dangerous weapons into "any election…fair, race course, or *other public assembly of the people*." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, at 108 (James H. Shankland ed., 1871) (emphasis added). Not long thereafter, Texas prohibited the carrying of dangerous weapons "into any *church or religious assembly*, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly…" *An Act Regulating the Right to Keep and Bear Arms*, Aug. 12, 1870, *reprinted in* 2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH

---

[6] Like Columbia, Webb City, Missouri enacted a similar law. *See Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB CITY, MISSOURI, 1905, at 99, 100 (1905), *available at* https://catalog.hathitrust.org/Record/008604358.

RIGHTS REST FROM 1864 TO 1872, at 1322 (1873) (emphasis added); Ex. H. That same year,

Georgia provided that "no person in said State of Georgia be permitted or allowed to carry about

his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any . . . *place of*

*public worship*[.]" Ex I, 1870 Ga. Laws 421 (emphasis added). By 1877, Virginia had prohibited

persons from both "habitually carry[ing] about his person, hid from common observation, any

pistol . . . or any weapon on the like kind," 1877 Va. Acts 301, and more specifically from

"carrying any gun, pistol, . . . or other dangerous weapon, *to any place of worship while a*

*meeting for religious purposes is being held at such place*[.]" Ex. K, 1877 Va. Acts 305

(emphasis added). Arizona followed suit in 1889, providing that "[i]f any person shall go into

any *church or religious assembly* . . . and shall have or carry about his person a pistol or other

firearm . . . he shall be punished by a fine not less than fifty nor more than five hundred dollars,

and shall forfeit to the County the weapon or weapons so found on his person." Ex. L, 1889 Ariz.

Sess. Laws 16 (emphasis added). Then there was the state of Oklahoma, which by 1890 had

prohibited the carrying of dangerous weapons "into any *church or religious assembly*, any school

room or other place where persons are assembled for public worship, for amusement, or for

educational or scientific purposes, or into any circus, show or public exhibition of any kind, or

into any ball room, or to any social party or social gathering, or to any election, or to any place

where intoxicating liquors are sold, or to any political convention, or to any other public

assembly…" *Article 47: Concealed Weapons*, undated, STATUTES OF OKLAHOMA 1890, at 495-

96 (Will T. Little, L.G. Pitman, & R.J. Barker eds., 1891) (emphasis added), Ex M.

      19.     If one examines these local and state "sensitive places" laws from a macro level,

historically speaking it is safe to say that come the mid-to-late nineteenth century state and local

governments maintained the authority to prohibit the carrying of dangerous weapons in a variety

of categories of sensitive places where people were known to congregate. Such categories included 1) *churches and places of worship*; 2) places where large public assemblies generally took place, *i.e.*, parks, town squares, and the like; 3) polling places and other buildings where political activity generally took place; 4) schools and institutions of higher learning; 5) places where events of amusement took place, *i.e.*, places where people congregate for large planned events; and 6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed.

20.     What historically buttresses that each of these categories were generally understood to be sensitive places is the fact that there is no substantiated historical evidence that informs otherwise. As far as I am aware, not one nineteenth century court of law found any of these sensitive places categories to be unconstitutional. The same is true for nineteenth century legal commentary—not one calls these sensitive places categories into constitutional question. This is rather important because *Bruen* denotes that when it comes to the "sensitive places" doctrine a *lack* of historical evidence disputing their lawfulness *presumes* their constitutionality. 142 S. Ct. at 2133.

## III.    Plaintiffs' Reliance on 'Bring Arms to Church' Laws is Historically Misplaced

21.     From the mid-seventeenth through the late eighteenth century, it is indeed true, as Plaintiffs point out, that several American Colonies enacted laws requiring church parishioners to bring their arms to church. *See* Memo in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction at 21. However, in proffering this historical evidence to the court, Plaintiffs do not present it in proper historical context. First and foremost, it must be noted that many 'bring your arms to church' laws are antecedents of slavery and were principally intended to quell potential slave revolt. *See, e.g.,* 7 The Statutes of Large of

SOUTH CAROLINA 417-19 (1840) (reprint of a 1743 South Carolina law requiring white persons to bring arms to church for the "better ordering and government negroes and other slaves"); *see also* SALLY E. HADDEN, SLAVE PATROLS: LAW AND VIOLENCE IN VIRGINIA AND THE CAROLINAS 140-41 (2001). To be clear, these laws are inherently racist and should not be given the imprimatur of this or any other court. The legislative history of the 1770 Georgia law cited by Plaintiffs weighs this out. The 1770 law required white persons to bring arms to church to quell "internal dangers and insurrections." 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA (pt. 1) 137-38 (1911). The law was an updated version of a 1757 Georgia law of a similar name that also required white persons to bring arms to church to quell "domestick insurrections." 1 THE EARLIEST PRINTED LAWS OF THE PROVINCE OF GEORGIA, 1755-1770, at 15 (1978).

22.     Secondly, all other 'bring your gun to church' laws—that is laws that were not intended to quell slave revolts or subjugate people of color—were enacted with the express purpose of training government sponsored "well regulated" militias. *See, e.g.,* 6 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 534 (1819) (1755 Virginia law declaring it will be lawful for militia officers to require all militiamen "to go armed to their respective parish churches" for training). To be clear, 'bring your gun to church' militia laws were not 'right to carry to church' laws. Rather, they were *compulsory* laws enacted within the constitutional confines of state plenary power to call forth and muster the militia for training or internal security. *See* Charles, *1792 National Militia Act*, *supra*, at 344-46, 374-90 (outlining the history of this state plenary power over the militia); *see also Presser v. Illinois*, 116 U.S. 252 (1886) (affirming state plenary power to muster, assemble, and train the militia); *District of Columbia v. Heller*, 554 U.S. 570, 620-21 (2008) (noting that nothing in *Heller* seeks to upend

*Presser*'s holding of forbidding bodies of men from marching or assembling with arms). The point to be made is that the historical evidence, when placed in total context, informs the very opposite of what Plaintiffs are trying to legally assert—this being that compulsory arms bearing laws, such as 'bring your guns to church' militia laws prove that colonial and later state governments had sufficient leeway to enact time, place, and manner restrictions when it came to public arms-bearing and armed assemblage. To interpret these 'bring your guns to church' militia laws as Plaintiffs suggest is to break the bounds of historical elasticity. It would ultimately mean that any eighteenth century law that legally compelled persons to do a particular behavior or act makes said behavior or act forever a constitutional right, and any modern law that restricts or prohibits said behavior is ipso facto unconstitutional. And such a utilization of history for law would create a dangerous precedent that would ultimately upend many state police powers.

23.     I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on   14 October 2022

PATRICK J. CHARLES