# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN GOLDSTEIN, individually and on behalf of CONGREGATION BNEI MATISYAHU, and MEIR ORNSTEIN,<br><br>      *Plaintiffs*,<br><br>  v.<br><br>KATHY HOCHUL, in her official capacity as Governor of the State of New York; LETITIA JAMES, in her official capacity as Attorney General of the State of New York; KEECHANT SEWELL, in her official capacity as Commissioner of the New York City Police Department; LOUIS FALCO, III, in his official capacity as Rockland County Sheriff; ERIC GONZALEZ, in his official capacity as the District Attorney of Kings County; and THOMAS WALSH, II, in his official capacity as the District Attorney of Rockland County,<br><br>      *Defendants*. | Civil Action No.<br>1:22-cv-08300-VSB |

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND
OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215
*Counsel for Amicus Curiae
Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ..................................................................................................................................3

    I.      The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ...........3

    II.     This Court Should Reject Any Effort to Dismiss the State's Historical
            Analogues as "Outliers" ..........................................................................................9

CONCLUSION .............................................................................................................................11

## TABLE OF AUTHORITIES

*Cases*

*Antonyuk v. Hochul*,
  No. 1:22-cv-00986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ...................................... 13, 14

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ................................................................................................. 5

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007) ............................................................................................................ 15

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ......................................................................................................... 6, 12

*Drummond v. Robinson Township*,
  9 F.4th 217 (3d Cir. 2021) .................................................................................................... 7

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ............................................................................................ 7, 11

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ........................................................................................... 14, 15

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ................................................................................................. 7

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ..................................................................................................... 7, 11, 14

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) ................................................................................................... passim

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) .......................................................................................................... 6

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004,
  2022 WL 2382319 (9th Cir. June 28, 2022) ........................................................................ 5

*Teter v. Connors*,
  460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir.
  May 19, 2020) ....................................................................................................................... 5

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ................................................................................................. 7

*Statutes*

N.Y. Penal Law § 265.01-e(2)(c) ...................................................................................................6

*Other Authorities*

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..................................6

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol
    Ass'n v. Bruen*, No. 20-843 (U.S.) .....................................................................................7, 10

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
    13 Charleston L. Rev. 205 (2018) .....................................................................................7, 10

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*
    (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .......................6

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*,
    97 Ind. L.J. 1439 (2022) .............................................................................................................5

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*,
    No. 20-843 (U.S.) ........................................................................................................................8

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 650,000 in New York. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 40 cities, towns, and other localities in New York are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 50 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal*

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

*docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210-11, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs challenge the restriction on carrying firearms in "places of worship or religious observation" in New York's Concealed Carry Improvement Act. *See* N.Y. Penal Law § 265.01-e(2)(c) (the "Place of Worship Provision"). That restriction is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons stated in the State Defendants' Memorandum of Law in Response to Order to Show Cause ("State's Br."), Dkt. 38, and the City Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("City's Br."), Dkt. 37.[2] Everytown submits this amicus brief to expand on two points. *First*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). *Second*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated here, given the

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claims. The Court should decline to issue a preliminary injunction, as to all defendants, for the reasons the State and City set out. *See* State's Br. at 38; City's Br. at 37.

2

State's robust and extensive historical record, we highlight that point in case the Court chooses to address the issue.

## ARGUMENT

**I.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791**

In analyzing whether the Place of Worship Provision is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, this Court should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits reached this conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[3] *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

---

[3] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because the public understanding "for all relevant purposes" in the case before it was the same in both 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Bruen*, 142 S. Ct. at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the State's and City's briefs, this Court can uphold the Place of Worship Provision under a historical analysis without deciding whether it should focus that analysis on the period around 1791 or the period around 1868. *See, e.g.*, State's Br. at 12 n.4 (explaining that laws similar to Reconstruction-era regulations on firearms in places of worship "have existed for centuries"); *id.* at 14 (explaining that laws Plaintiffs cite, requiring certain people to carry firearms in houses of worship, "demonstrate that, from the earliest days of settlement of what would become the United States, it was considered within the government's power to regulate the usage of firearms in religious institutions"); City's Br. at 13-15 (explaining that houses of worship are analogous to sensitive places *Heller* and *Bruen* specified in their non-exhaustive lists, for the "ideals that they represent and the activities conducted therein," and for their connection to other constitutional rights).[4] But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the correct focus.

---

[4] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's and City's evidence), it should rely on 19th-century (and even 20th-century) history to clarify that meaning. *See infra* pp. 8-9.

4

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government.").

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should

5

primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[5] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868.

---

[5] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

*See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the Founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[6]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

---

[6] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Here, state and local laws from the second half of the 19th century and early 20th century establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of New York's law. *See, e.g.*, State's Br. at 11-14; City's Br. at 15-17. And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if the Court is uncertain that the State's earlier evidence establishes the constitutionality of the Place of Worship Provision, it

8

should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for New York's regulation.

The foregoing points are in accord with the approach taken most recently by the only court so far to have ruled on the Place of Worship Provision. The district court in *Antonyuk v. Hochul* (*Antonyuk II*), No. 1:22-cv-00986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022), held that "it is permissible for New York State to *generally* restrict concealed carry in 'any place of worship or religious observation.'" *Id.* at *15.[7] In reaching that conclusion, the court relied on laws from 1870 through 1890. *See id.* at *15 n.25.[8] Such Reconstruction-era laws amply establish that New York's law is consistent with this nation's tradition of firearms regulation.

## II. This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as "Outliers"

Challengers in recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to establish a historical tradition under *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers"). No such argument is remotely tenable in this case, given the State and City's robust and extensive record of historical laws. But to the extent this Court chooses to address the issue here, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

---

[7] The court stated that this "general[]" principle should be limited by an exception for "persons who have been tasked with the duty to keep the peace at the place of worship," *Antonyuk II*, 2022 WL 5239895, at *15, which the State explains largely tracks the existing exception for registered security guards and others, *see* State's Br. at 11 n.2.

[8] Like the State, Everytown disagrees with many other aspects of the decision. *See* State's Br. at 11 n.2.

9

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations—legislative assemblies, polling places, and courthouses—were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843). Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. *Cf. Antonyuk II*, 2022 WL 5239895 at \*9 (looking to "three or more historical analogues from states" as constituting a tradition).[9]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic

---

[9] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight—as *Antonyuk II* implicitly recognized—given the Supreme Court's discussion of sensitive places.

10

where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: October 18, 2022

Respectfully submitted,

/s/ William J. Taylor, Jr.
William J. Taylor, Jr. (Bar No. WT6920)
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

11