

October 20, 2022

<u>VIA ECF</u>
The Honorable Vernon S. Broderick
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     *Goldstein, et al. v. Hochul, et al.,* 22-CV-8300 (VSB)

Your Honor:

  I am co-counsel for Plaintiffs in this matter. I write to inform the Court of decision that was handed down today by Hon. John Sinatra, United States District Judge for the Western District of New York, on issues pertinent to this action. That case is *Hardaway, et al. v. Nigrelli, et al.*, 22-CV-771 (JLS) (WDNY).

  In *Hardaway*, the plaintiffs moved for a TRO and a preliminary injunction to enjoin the enforcement of Penal Law § 265.01-e(2)(c) (the ban on guns in "places of worship or religious observation") on the basis that it violates the Second Amendment.  Judge Sinatra found that the plaintiffs had demonstrated a likelihood of success on the merits, granted their motion and issued the TRO.

  A copy of the Decision and Order is attached hereto.


        Respectfully submitted,



        Ameer Benno



Encl.

cc:  All counsel by ECF

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JIMMIE HARDAWAY, JR.,
LARRY A. BOYD,
FIREARMS POLICY COALITION,
INC., and
SECOND AMENDMENT
FOUNDATION,

        Plaintiffs,

    v.

STEVEN A. NIGRELLI,
BRIAN D. SEAMAN, and
JOHN J. FLYNN,

        Defendants.

22-CV-771 (JLS)

---

## DECISION AND ORDER

Eight days after the Supreme Court struck down New York's

unconstitutional "proper cause" requirement for conceal-carry licenses, the State

responded with even more restrictive legislation, barring all conceal-carry license

holders from vast swaths of the State. The complaint and motion in this case focus

solely on one aspect of the new legislation, namely, the portion making it a felony

for such a license holder to possess a firearm at "any place of worship or religious

observation."

Ample Supreme Court precedent addressing the individual's right to keep

and bear arms—from *Heller* and *McDonald* to its June 2022 decision in *Bruen*—

dictates that New York's new place of worship restriction is equally

unconstitutional.  In *Bruen*, the Court made the Second Amendment test crystal clear:  regulation in this area is permissible *only if* the government demonstrates that the regulation is consistent with the Nation's historical tradition of sufficiently analogous regulations.  As set forth below, New York fails that test.  The State's exclusion is, instead, *inconsistent* with the Nation's historical traditions, impermissibly infringing on the right to keep and bear arms in public for self-defense.

Thus, and for the further reasons set forth below, Plaintiffs' motion for a temporary restraining order enjoining Defendants' enforcement of this place of worship restriction is granted.[1]

## BACKGROUND

Reverend Dr. Jimmie Hardaway, Jr. and Bishop Larry A. Boyd filed this lawsuit on October 13, 2022, and are joined by institutional plaintiffs, Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF").  Dkt. 1. Plaintiffs allege claims against three Defendants in their official capacities, namely, the superintendent of the New York State Police, the Niagara County District Attorney, and the Erie County District Attorney.  *See id.*  Hardaway and Boyd, leaders of their respective churches, "wish to exercise their fundamental, individual right to bear arms in public for self-defense by carrying concealed firearms on church property in case of confrontation to both themselves and their congregants."

---

[1] Under Fed. R. Civ. P. 25(d), Acting Superintendent Steven A. Nigrelli is substituted in place of Kevin P. Bruen, whose resignation was effective yesterday.

Dkt. 1, ¶ 2. They allege that, as "leaders of their churches, they would be authorized to carry on church premises to keep the peace, and would do so, but for Defendants' enforcement of the unconstitutional laws, regulations, policies, practices, and customs at issue in this case." *Id.* In particular, they seek to prevent the enforcement of New York's new law that makes it a felony to carry firearms at all places of worship and religious observation.

The relevant portion of the new statute adds to the Penal Law, as relevant here:

> § 265.01-e Criminal possession of a firearm, rifle or shotgun in a sensitive location. 1. A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location. 2. For the purposes of this section, a sensitive location shall mean: . . . (c) any place of worship or religious observation . . . .[2]

On October 14, 2022, Plaintiffs[3] moved for a preliminary injunction and a temporary restraining order seeking to enjoin Defendants from enforcing the places

---

[2] Section § 265.01-e(3) provides that the restrictions set forth in § 265.01-e(1)-(2) do not apply to, among others, "law enforcement who qualify to carry under the federal law enforcement officers safety act," persons who are "police officers" as defined in the criminal procedure law, persons who are "designated peace officers," as well as "security guards" and "active-duty military personnel." *See* § 265.01-e(3).

[3] FPC and SAF recognize that it is "the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983." Dkt. 1, ¶ 12 (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)). FPC and SAF "contend that this circuit precedent is erroneous and should be overruled by a court competent to do so." Dkt. 1, ¶ 12. As such, this Decision and Order focuses solely on the individual Plaintiffs.

3

of worship and religious observation exclusion. *See* Dkt. 9. Plaintiffs allege that New York's "place of worship ban is unconstitutional." *Id.* at 1.[4]

Hardaway, who is the pastor of Trinity Baptist Church of Niagara Falls, New York, states that he is "currently licensed to carry a handgun pursuant to New York Law with a license issued by Niagara County." Dkt. 9-4, ¶ 6. Prior to the enactment of the place of worship ban, he would "consistently carry a firearm on Trinity Baptist Church's premises. . . ." *Id.* ¶ 8. He intended "to keep carrying for self-defense," but now "cannot because of the enactment and enforcement" of the ban. *Id.* Prior to the enactment of the places of worship exclusion, Hardaway "encouraged [his] parishioners to carry a firearm if they were licensed to do so." *Id.* ¶ 11. He would "continue to permit them to carry on church property, but for the enactment and enforcement of the Places of Worship Ban." *Id.* Because of the ban, Hardaway has had to "disarm before coming to Trinity Baptist Church." *Id.* ¶ 12. He has been "stripped of the ability to keep the peace" and is "suffering diminished personal safety every time" he goes to church. *Id.*

Boyd, who is the founding Pastor and Teacher of the Open Praise Full Gospel Baptist Church, states that he is "currently licensed to carry a handgun pursuant to New York Law with a license issued by Erie County." Dkt. 9-5, ¶ 6. Prior to the enactment of the places of worship exclusion, Boyd "would consistently carry a firearm on Open Praise's premises for self-defense and to keep the peace." *Id.* ¶ 8.

---

[4] Unless noted otherwise, page references refer to the number in the footer of each page of the document.

He established a "policy at Open Praise in which duly licensed congregants could carry" and would have intended "to keep carrying" and continue the policy, but now "cannot because of the enactment and enforcement" of the ban. *Id.* Open Praise is a "small congregation," but Boyd nevertheless "will not always know who will walk in the door for services" and "will not know if these strangers come with violent plans." *Id.* ¶ 9. He is "particularly worried about this because of the crime, violence, and gang-related incidents that occur in the Broadway Fillmore neighborhood of Buffalo, where Open Praise is located." *Id.* He now must "disarm in order to comply with the Place of Worship ban." *Id.* ¶ 12.

The Court received submissions from the parties,[5] and heard argument on this motion.

## ANALYSIS

## I.   STANDING

The State argues that Plaintiffs lack standing. Standing relates to a court's constitutional power to hear and decide a case and, therefore, implicates subject-

---

[5] Defendant Flynn submitted an Affidavit in Response to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction on October 19, 2022 (Dkt. 25) where he stated that he "leave[s] to the State-related co-defendant the defense" of the litigation from Plaintiffs' challenge.  Defendant Seaman submitted a Response to Plaintiffs' Motion for Temporary Restraining Order (Dkt. 27) where he, through attorney Crosby, stated that he "does not oppose entry of a temporary restraining order for the purpose of furthering a judicial determination as to the constitutionality of New York Penal Law § 265.01-e(2)(c)(places of worship)." Dkt. 27 at 2.  Seaman included an affidavit from Claude A Joerg, Esq., Niagara County Attorney, which stated that Seaman "does not object to issuance of a temporary restraining order" because "the Niagara County Legislature passed a resolution on September 13, 2022 in opposition to the actions taken by the State of New York restricting Second Amendment rights."  Dkt. 27-1, at ¶¶ 5-6.  *See also* Dkt. 27-2.

matter jurisdiction.  *See Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016).  To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)).

Only the first element of the test, *i.e.,* whether Plaintiffs have suffered an injury-in-fact, bears discussion here (though all elements are met).  An injury-in-fact exists where a plaintiff "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo,* 578 U.S. at 336 (quoting *Lujan,* 504 U.S. at 555).  A particularized injury "affect[s] the plaintiff in a personal and individual way."  *Id.* (internal quotations and citation omitted).  To be sure, the plaintiff's injury must be direct, and a plaintiff "may not raise the rights of a third-party. . . ."  *See N.Y. State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1347 (2d Cir. 1989).

Pre-enforcement challenges to criminal statutes are "cognizable under Article III."  *Cayuga Nation v. Tanner,* 824 F.3d 321, 331 (2d Cir. 2016).  The Supreme Court has made it clear that a plaintiff suffers an injury-in-fact sufficient to establish standing when he or she faces "threatened enforcement of a law" that is "sufficiently imminent."  *Susan B. Anthony List,* 573 U.S. at 158-59.  When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct

6

arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297 (1979)).

A Plaintiff need not first "expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)). *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.").

The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact "necessarily depends on the particular circumstances at issue." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (quoting *Cayuga Nation*, 824 F.3d at 331)). Indeed, the standard articulated by the Supreme Court "'sets a low threshold and is quite forgiving to plaintiffs seeking such pre[-]enforcement review,' as courts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331).

Here, Hardaway and Boyd have established that they suffered an injury-in-fact. New York Governor Kathy Hochul explained, in a July 1, 2022, press statement, that individuals "who carry concealed weapons in sensitive locations . . .

7

will face criminal penalties." *See* Dkt. 1 (citing NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited Oct. 20, 2022). On the eve of the law's enactment, Hochul criticized the Supreme Court's decision in *Bruen* as an attempt to "strip away the rights of a governor to protect her citizens from gun violence." BUFFALO NEWS, *Hochul: Last-Minute Pistol Permit Seekers May be too Late to Avoid NY's New Gun Requirements*, Aug 31, 2022 updated Oct 9, 2022, available at https://buffalonews.com/news/local/crime-and-courts/hochul-last-minute-pistol-permit-seekers-may-be-too-late-to-avoid-nys-new-gun/article_ad5100a0-2943-11ed-af06-cbe41e631955.html (last visited Oct. 20, 2022).

In addition, First Deputy State Police Superintendent Steven Nigrelli (now Acting Superintendent and the substituted Defendant) warned that, if "you violate this law, you will be arrested. Simple as that." *See Antonyuk v. Hochul*, No. 22-CV-0986, 2022 WL 4367410, at ¶ 9 n.1 (N.D.N.Y.) (quoting statement by First Deputy Superintendent of the State Police Steven Nigrelli, "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40)). Nigrelli explained that, in New York State, troopers "are standing ready" to ensure that "all laws are enforced." *Id.* He emphasized that the troopers will have "zero tolerance," and it is an "easy message" that he does not need to "spell it out more than this." *Id.*

These public statements show that New York residents—including Hardaway and Boyd—face "threatened enforcement of a law" that is "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 158-59. *See also Cayuga Nation*, 824 F.3d at 331 (credible threat of prosecution exists when Defendant has "announced its intention to enforce the [law] against the [plaintiffs]"). Further, given the recency of the law—and lack of any indication that it will be repealed—the Court is and should be "willing to presume that the government will enforce" it. *See Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331).

Indeed, Hardaway and Boyd have changed their behavior in the wake of the State's messaging. According to Hardaway, he would "consistently carry a firearm" at his church and "would intend" to keep doing so, but now "cannot because of the enactment and enforcement of the Place of Worship Ban." Dkt. 9-4, ¶ 8. Prior to the enactment of the restriction, he also "encouraged" his "parishioners to carry a firearm if they were licensed to do so" and he would have continued to do so "but for the enactment" of the restriction. *Id.* ¶ 11. Boyd, similarly, would "consistently carry a firearm" at his church prior to the enactment of the restriction and "established a policy" allowing "duly licensed congregants" to "carry as well." Dkt. 9-5, ¶ 8. Now, however, he "cannot because of the enactment and enforcement" of the restriction." *Id.* Instead, he has "stopped carrying and so" have his parishioners. *Id.* On these facts, Hardaway and Boyd have standing.

## II.   PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

### A.   TRO/Preliminary Injunction Standard

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions.  In the Second Circuit, the standard is the same as to both.  *Martin v. Warren*, 482 F. Supp. 3d 51, 68 (W.D.N.Y. 2020); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction.").

Generally, a party seeking preliminary injunctive relief "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  Where the preliminary injunction "would stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party "must satisfy the more rigorous prong of 'likelihood of success'" at step two.  *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

The standard may be further heightened if "(i) an injunction would alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).  If either scenario applies, a plaintiff

must show "a clear or substantial likelihood of success on the merits" at step two. *See N. Am. Soccer League*, 883 F.3d at 37 (internal quotations and citation omitted); *Tom Doherty Assocs.*, 60 F.3d at 35.

When deciding whether an injunction is mandatory and would alter the status quo, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)) (internal quotations omitted). The court also considers whether the injunction would "command[] some positive act"—rather than prohibit some act—by the defendant. *Mastrovincenzo*, 435 F.3d at 89 (quoting *Tom Doherty Assocs.*, 60 F.3d at 34). An injunction that enjoins a defendant from enforcing a regulation "clearly prohibits, rather than compels, government action by enjoining the future enforcement." *Id.* at 90.

Moreover, the heightened standard does not apply to "any [request for an] injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." *Tom Doherty Assocs.*, 60 F.3d at 34. Instead, the heightened standard applies when the injunction "will render a trial on the merits largely or partly meaningless, either because of temporal concerns"—like a case involving a live, televised event scheduled for the day the court granted preliminary relief—"or because of the nature of the subject of the litigation"—like a case involving disclosure of confidential information. *Id.* at 35. If a preliminary injunction "will make it difficult or impossible to render a meaningful remedy to a

11

defendant who prevails on the merits at trial," then the heightened standard applies; "[o]therwise, there is no reason to impose a higher standard." *Id.*

Here, Plaintiffs request that this Court "vindicate that the Second Amendment is not a 'second-class right' by temporarily restraining and then preliminarily enjoining enforcement of the Place of Worship Ban." Dkt. 9-1 at 16. This request seeks to prohibit Defendants from enforcing the new places of worship exclusion; it does not seek an order requiring Defendants to act. In other words, Plaintiffs seek to restore the status that existed before implementation of the places of worship exclusion. They therefore seek a prohibitory—not a mandatory— injunction. Moreover, the Constitution and the Bill of Rights are the status quo— not 2022 legislation on the books for seven weeks. For all of history until now, the right to carry for self defense encompassed New York places of worship.[6]

And relief remains available to Defendants if they prevail at trial on the merits. If Defendants prevail, the Court could vacate any injunctive relief and allow them again to enforce the places of worship ban.

Thus, the standard remains that Plaintiffs must demonstrate: (1) irreparable harm; (2) a likelihood of success on the merits; and (3) that a preliminary injunction is in the public interest. *See N. Am. Soccer League*, 883 F.3d at 37; *Bronx Household of Faith*, 331 F.3d at 349.

---

[6] The Court recognizes that courts should not lightly enjoin enforcement of laws; the law at issue here, however, is at odds with higher law, namely—the Constitution. The Court notes here too that Plaintiffs would meet the heightened standard in any event—even if it applied.

B.    **Likelihood of Success on the Merits**

Plaintiffs are likely to succeed on the merits of their Second and Fourteenth

Amendment claim.[7]  As set forth below, on this historical record, New York's new

place of worship or religious observation exclusion violates the right of individuals

to keep and bear arms in public for self-defense.

That right was enshrined in the Second Amendment to the Constitution,

ratified in 1791: "A well regulated Militia, being necessary to the security of a free

State, the right of the people to keep and bear Arms, shall not be infringed."  U.S.

Const. amend. II.  And on three recent occasions, the Supreme Court explored this

right and supplied the framework that resolves this issue on this motion.  A

thorough understanding of the Court's opinions is essential, so they are addressed

at length here.

1. Heller

In *Heller*, the Supreme Court held that the District of Columbia's ban on

handgun possession in the home, and its prohibition against rendering any lawful

---

[7] The State argues that a facial challenge must fail because "it is difficult to demonstrate that mere enactment of a piece of legislation violates the [plaintiffs'] constitutional rights." *See* Dkt. 28 at 9 (citing *Cranley v. Nat'l Life Ins. Co. of Vermont*, 318 F.3d 105, 110 (2d Cir. 2003)).  The argument fails.  Plaintiffs have shown, at a minimum, that the places of worship restriction lacks a "plainly legitimate sweep" in that it forces individuals to give up their rights to armed self-defense outside the home.  *See United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (to prevail on a facial challenge, a plaintiff "would need to show that no set of circumstances exists under which the statute would be valid, *i.e.*, that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep") (internal citation omitted).

home firearm operable for the purpose of immediate self-defense, both violated the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

The Court methodically analyzed the issue. First, the Court noted that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.' When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* at 584 (citations omitted). The Second Amendment, therefore, "guarantee[s] the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Id.* at 592 (emphasis in original). The Court continued, "[t]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."[8] *Id.* at 595.

After addressing the history related to the Second Amendment's prefatory clause, the Court concluded that, "[t]hat history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the

---

[8] The Court noted that, "[o]f course the right was not unlimited, just as the First Amendment's right of free speech was not . . . . Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *Id.* at 595 (citation omitted) (emphasis in original).

militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights." *Id.* at 598.

Indeed, founding-era debate with respect to the right to keep and bear arms, "as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution." *Id.* It was understood "across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* at 599.[9]

Like most rights, "the right secured by the Second Amendment is not unlimited . . . . [the right is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626 (citations omitted). And although the Court indicated that it was not then undertaking "an exhaustive historical analysis" of the full scope of the Second Amendment, nothing in the

---

[9] The Court continued, "[i]t is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution. Justice BREYER's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . (dissenting opinion), is profoundly mistaken. He bases that assertion solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." *Id.* (internal citation omitted) (emphasis in original).

Court's "opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 626-27, 627 n. 26.[10]

Striking down the handgun ban, and cementing the notion that the Second Amendment exists as a bulwark against attempts by governments to erode the right to self-defense, the Court concluded that, "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628-29 (footnote, citation, and internal quotations omitted).

The Court also addressed D.C.'s additional requirement "that firearms in the home be rendered and kept inoperable at all times. This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.[11]

---

[10] The Court also recognized another important limitation on the right, namely, that "the sorts of weapons protected were those 'in common use at the time.' We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citations omitted).

[11] The Court spoke to the very importance of the right when it rejected Justice Breyer's dissenting criticism of the Court's "declining to establish a level of scrutiny for evaluating Second Amendment restrictions. [Justice Breyer] proposes . . . a judge-empowering 'interest-balancing inquiry' that 'asks whether the statute

And finally, acknowledging the problem of handgun violence in the country, the Court concluded that, "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns . . . . *But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.* These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct." *Id.* at 636 (internal citations omitted) (emphasis added).

　　2. McDonald

Two years later, in *McDonald*, the Court ruled that the Second Amendment applies as well to state governments by operation of the Fourteenth Amendment's Due Process Clause. *McDonald v. City of Chicago*, 561 U.S. 742, 750, 754, 791

---

burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 634. In response, the Court wrote, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35. The Second Amendment "is the very product of an interest balancing by the people—which Justice BREYER would now conduct for them anew." *Id.* at 635.

(2010).  There, the Court noted *Heller's* holding "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense."  *Id.* at 749-750.

To answer the next question whether "the Second Amendment right to keep and bear arms is incorporated in the concept of due process[, the Court analyzed] whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty or . . . whether this right is deeply rooted in this Nation's history and tradition."  *Id.* at 767 (emphasis in original) (internal quotation marks and citations omitted).  Without hesitation, the Court answered the question in the affirmative: "*Heller* points unmistakably to the answer.  *Self-defense is a basic right*, recognized by many legal systems from ancient times to the present day, and in *Heller*, we held that individual self-defense is 'the *central component*' of the Second Amendment right."  *Id.* (citations and footnote omitted) (initial emphasis added and second emphasis in original).

The Court continued, "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'"  *Id.* (alteration in original) (quoting *Heller* at 630).  And "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."  *Id.* at 778.  The Court rejected any attempt "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ."  *Id.* at 780.

18

Public safety concerns are no reason to alter the Constitutional analysis. The *McDonald* Court made it clear that, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *Id.* at 783.

     3. New York State Rifle & Pistol Assoc., Inc. v. Bruen ("Bruen")

The Supreme Court returned to the Second Amendment in June of this year, invalidating the "proper cause" requirement in New York's conceal-carry licensing regime. *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, __ U.S. __, 142 S.Ct. 2111 (2022). Starting where it left off in *Heller* and *McDonald*, the Court recognized that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Id.* at 2122.

Next, the Court held that the Second and Fourteenth Amendments also "protect an individual's right to carry a handgun for self-defense *outside the home*." *Id.* (emphasis added).

The issue remaining, then, was whether New York's licensing regime respected that right. The Court concluded that it did not. *Id.* Specifically, "[b]ecause the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, [the Court] conclude[d] that the State's licensing regime violates the Constitution." *Id.*

Because *Bruen's* detailed analysis offers much to the disposition of this motion, a close examination is necessary, and follows.

In the years since *Heller* and *McDonald*, the Courts of Appeals had developed a "two-step" framework for analyzing Second Amendment cases, which combined history with a means-end scrutiny. *Id.* at 2125. *Bruen* expressly rejected that approach at the outset. *Id.* at 2125-26.

Instead, the Court set forth the proper test: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, *the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.* Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2126 (citation and internal quotation omitted) (emphasis added). In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.[12]

---

[12] The Court acknowledged that, "'[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.' *McDonald*, 561 U.S. at 803–804, 130 S.Ct. 3020 (Scalia, J., concurring). But reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right— is, in our view, more legitimate, and more administrable, than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions, especially given their lack [of] expertise in the field." *Id.* at 2130

Highlighting the importance of the right, the Court stated that, "[i]f the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—*it is not deference that the Constitution demands here*." *Id.* at 2131 (emphasis added). The Second Amendment, the Court continued, "'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.* (citation omitted) (emphasis in original).

After setting this high bar, the Court supplied additional guidance. The applicable test "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Likewise, "if earlier generations addressed the

---

(internal quotation marks and citation omitted) (emphasis and alteration in original).

societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

Addressing the case before it, the Court noted that "New York's proper-cause requirement concerns the same alleged societal problem addressed in *Heller*: 'handgun violence,' primarily in 'urban area[s].' Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation. And, as we explain below, we find no such tradition in the historical materials that respondents and their *amici* have brought to bear on that question." *Id.* 2131-32 (internal citations to *Heller* omitted).[13]

The Court next considered the "sensitive places" doctrine, which addresses areas where weapons have historically been prohibited. The Court first referenced

---

[13] The Court acknowledged that, while the "historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* The Court continued, "[f]ortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

*Heller's* "discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id.* (citation omitted). The Court noted that, "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, The 'Sensitive Places' Doctrine, 13 CHARLESTON L. REV. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

Rejecting New York's broad "sensitive places" argument, the Court went on to state that, "[a]lthough we have no occasion to comprehensively define 'sensitive places' in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a 'sensitive-place' law. In their view, 'sensitive places' where the government may lawfully disarm law-abiding citizens include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.' It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law

23

enforcement professionals are usually presumptively available in those locations. But expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below." *Id.* at 2133-34 (internal citations omitted).

With the rules and analytical tools articulated, the Court applied them to New York's proper-cause requirement, noting that the petitioners were two ordinary, law-abiding adult citizens and, as such, were part of "the people" whom the Second Amendment protects. *Id.* at 2134. Neither party disputed that handguns are weapons in common use today for self-defense. *Id.* As such, the Court turned to whether the plain text of the Second Amendment protects the individuals' proposed course of conduct, namely, "carrying handguns publicly for self-defense." *Id.* at 2134. The Court had "little difficulty concluding that it does," noting that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment guarantees the individual right to possess and carry weapons in case of confrontation. *Id.* (citing *Heller*). And the right to "bear arms" refers to the right to carry for self-defense. *Id.* (citing *Heller*).

The Court then reasoned that the right to "bear" naturally encompasses public carry. *Id.* "Most gun owners do not wear a holstered pistol at their hip in

their bedroom or while sitting at the dinner table.  Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation.  To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections."  *Id.* at 2134-35.

The Court continued, "[m]oreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'"  *Id.* (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783).  *See also McDonald*, 561 U.S. at 767, 130 S.Ct. 3020.  After all, "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' *Heller*, 554 U.S. at 592, 128 S.Ct. 2783, and confrontation can surely take place outside the home."  *Id.* at 2135.  "*Many Americans hazard greater danger outside the home than in it.  The text of the Second Amendment reflects that reality.* The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense."  *Id.* (citation omitted) (emphasis added).

With that resolved, the Court next evaluated whether the State met its burden to show that its proper-cause requirement is consistent with the Nation's historical tradition of firearm regulation.  Only "if [the State] carr[ies] that burden can [it] show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct."  *Id.*

Rejecting the State's historical arguments, the Court reasoned that, "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions [evaluated at length in the opinion] governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by [the State] *does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense.*" *Id.* at 2138 (emphasis added).

Nor is there any such historical tradition "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense . . . . We conclude that [the State has] *failed to meet [its] burden to identify an American tradition justifying New York's proper-cause requirement.* Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.* (emphasis added). The Court later noted that "the history reveals a consensus that States could *not* ban public carry altogether." *Id.* at 2147 (emphasis in original).

The Court's analysis of one part of the historical record is noteworthy. "To summarize: The historical evidence from antebellum America does demonstrate that the that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms

26

carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.  None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 2150.

Moving to another historical period, the Court noted that, even "during Reconstruction the right to keep and bear arms had limits.  But those limits were consistent with a right of the public to peaceably carry handguns for self-defense." *Id.* at 2152.  Rejecting the relevance of an outlier law and state-court decisions, the Court stated that it "will not give disproportionate weight to a single state statute and a pair of state-court decisions.  As in *Heller*, we will not 'stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public." *Id.* at 2153 (citation omitted).

In conclusion, the Court reiterated that the Second Amendment is not a second-class right subject to lesser rules. *Id.* at 2156.  The Court indicated that it knew of "no other constitutional right that an individual may exercise only after demonstrating to government officers some special need.  That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion.  It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him.  And it is not how the Second Amendment works when it comes to public carry for self-defense." *Id.*  In sum,

27

then, "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.*

    4. Application of the *Bruen* Test in this Case

The State argues that the place of worship exclusion complies with *Bruen*. The State cites to 1870-1890 enactments by four states (Texas, Georgia, Missouri, and Virginia) and the territories of Arizona and Oklahoma that contained place of worship firearm restrictions. This does not carry the State's burden, as explained below.[14]

At the outset, as the Supreme Court has made clear, individuals have the right to carry handguns publicly for self-defense. New York's exclusion is valid only if the State "affirmatively prove[s]" that the restriction is part of the Nation's historical tradition of firearm regulation. *Bruen,* 142 S.Ct. at 2127. The test is rigorous because the Second Amendment is the very product of an interest balancing, already conducted by "the People," which "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id.* at 2131 (citing *Heller,* 554 U.S. at 635). That balance, struck by the traditions of the American people, "demands" unqualified deference. *Id.*

Indeed, New York's new exclusion is in direct tension with the principle that, "confining the right to bear arms to the home would make little sense given that

---

[14] "The State" and the State Defendant Nigrelli are used here interchangeably, as the Attorney General's submission functionally does as well.

self-defense is the central component of the Second Amendment right itself. After all, the Second Amendment guarantees an individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home" and at places of worship. *Id.* at 2135 (internal quotations, citations, and brackets omitted). As *Bruen* stated, many "Americans hazard greater danger outside the home than in it. The text of the Second Amendment reflects that reality." *Id.*

Hardaway and Boyd are ordinary, law-abiding citizens to which the Second Amendment applies. *Id.* at 2134. As it did for the petitioners in *Bruen,* the Second Amendment's plain text thus presumptively guarantees Plaintiffs' right to "bear" arms in public for self-defense—and it does so as well at places of worship, which are open to all comers. *Id.* at 2135 (citation omitted). The next question is whether the State has met its historical burden. It has not.

When a "challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. New York's law here concerns the same alleged societal problem addressed in Heller: "handgun violence," primarily in "urban area[s]." And, as in *Bruen*, there is no such tradition in the historical materials that the State has "brought to bear on that question." *Id.* at 2132.

29

Moreover, New York's restriction finds no analog in any recognized "sensitive place." In *Bruen*, the Court noted: "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions . . . . And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

In particular, places of worship or religious observation are unsecured, spiritual places that members of the public frequent as often as daily as part of day-to-day life, and encounter vast numbers of other people there—as they do anywhere in public. In contrast, legislative assemblies, polling places, and courthouses are civic locations sporadically visited in general, where a bad-intentioned armed person could disrupt key functions of democracy. Legislative assemblies and courthouses, further, are typically secured locations, where uniform lack of firearms is generally a condition of entry. The State's argument that places of worship are analogous because the exclusion supposedly also minimizes the chance of violence between those with opposing views is undeveloped and, in any event, belies the non-confrontational purpose drawing people to houses of worship in the first place. The argument would apply nearly everywhere in public. The places of worship and

30

religious observation exclusion thus finds no analogy in *Bruen*'s recognized sensitive places.

Nor is there an American tradition supporting the challenged law here. As in *Bruen*—where, "apart from a handful of late-19th-century jurisdictions, the historical record compiled by [the State] does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense," *id.* at 2138—the State does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense at all places of worship or religious observation across the state.

Nevertheless, the State relies on a few laws from the late-1800s to insist that a relevant tradition exists. *Bruen* anticipates this argument. Rejecting the relevance of an outlier analogous law and state-court decisions, the Court stated that it would "not give disproportionate weight to a single state statute and a pair of state-court decisions. As in *Heller*,[15] we will not 'stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public." *Id.* at 2153 (citation omitted); *see also id.* at 2142 (doubting that three colonial regulations could suffice).

The Court noted that, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they

---

[15] The *Heller* Court likewise rejected a dissenting argument addressing a handful of founding-era laws that were either outliers or inapposite. *Heller*, 554 U.S. at 631-33.

were understood to have *when the people adopted them.*'" *Bruen*, 142 S.Ct. at 2136 (citing *Heller*, emphasis in original). Courts "must also guard against giving postenactment history more weight than it can rightly bear." *Id.* at 2136.

In other words, *Bruen* recognized that, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id.* at 2137 (internal citation omitted). And "to the extent later history contradicts what the text says, the text controls." *Id.*

Indeed, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (internal citation omitted). Because "post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* And although it is the Fourteenth Amendment that requires New York to respect the right addressed by the Second Amendment, the Court has "made clear that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* And the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*

As the Court surveyed a few additional restrictions appearing randomly in the late 19th-Century, the Court noted that, similarly, "we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence." *Id.* at 2154-55 (internal citations omitted). As to certain territorial restrictions, "they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of *an enduring American tradition of state regulation.*" *Id.* at 2155 (emphasis added). Especially noteworthy here is the Court's search for "*an enduring American tradition of state regulation.*"[16]

The Court concluded its search for such an enduring tradition in clear terms relevant just as much here: "At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. Those restrictions, for example, limited the intent for which one could

---

[16] *Bruen* itself invalidated a century-old New York proper-cause requirement similarly in effect in five other states as well as the District of Columbia. That seven jurisdictions enacted similar restrictions was *insufficient* to meet the State's burden when weighed against a much broader and much older public-carry tradition. If such was a failure of analogs in *Bruen*, the State's argument must also fail here.

carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials.  Apart from a few late-19[th]-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense.  Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public."  *Id.* at 2156 (internal citations omitted).

Here, the State cites to a handful of enactments[17] in an attempt to meet its "burden" to demonstrate a *tradition* of accepted prohibitions of firearms in places of worship or religious observation.  *Bruen*, at 2135, 2138, 2150, 2156.  The notion of a "tradition" is the opposite of one-offs, outliers, or novel enactments.  Rather, "tradition" requires "continuity."  *See generally Bruen*, 142 S.Ct. at 2135-56; *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997); *Tradition*, The American Heritage Dictionary of the English Language (5th ed. 2011).

These enactments are of unknown duration,[18] and the State has not met is burden to show *endurance over time.*[19]  As a result, the Court is left with a handful

---

[17] A few additional municipal enactments of similar vintage do not alter the result.

[18] As *Bruen* noted, courts are "not obliged to sift the historical materials for evidence to sustain" the challenged statute; "that is [the State's] burden.  *Bruen,* at 2150.

[19] As to Georgia and Missouri, the enactments apparently evolved in any event, to allow church leaders to decide the issue for their own churches. 8 LIBERTY UNIV. L.

of seemingly spasmodic enactments involving a small minority of jurisdictions governing a small minority of population. And they were passed nearly a century after the Second Amendment's ratification in 1791.[20] These outlier enactments also contrast with colonial-era enactments that, in fact, *mandated* such carry at places of worship. *See generally* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy,* 8 LIBERTY UNIV. L. REV. 653, 699 (2014). These enactments are far too remote, far too anachronistic, and very much outliers— insufficient, then, in the search for an American tradition.

As stated in Justice Alito's concurrence in *Bruen,* "because many people face a serious risk of lethal violence when they venture outside their homes, the Second Amendment was understood at the time of adoption to apply under those circumstances . . . . [As such,] a State may not enforce a law . . . that effectively prevents its law-abiding residents from carrying a gun for this purpose." *Bruen.* 142 S.Ct. at 2157 (Alito, J., concurring). The same is true in this case.

In sum, the Nation's history does not countenance such an incursion into the right to keep and bear arms across all places of worship across the state. The right to self-defense is no less important and no less recognized at these places. The Constitution *requires* that individuals be permitted to use handguns for the core lawful purpose of self-defense. *McDonald*, 561 U.S. at 767. And it protects that

---

REV., at 656, 656 n.17, 658-69.

[20] In fact, the State points to no such American law that existed between the founding and 1870.

right *outside the home and in public*. *Bruen*, 142 S. Ct. at 2021. Nothing in the

Nation's history or traditions presumptively closes the door on that right *across*

*every place of worship or religious observation*. As in *Bruen*, where the Court stated

that, "[n]othing in the Second Amendment's text draws a home/public distinction

with respect to the right to keep and bear arms," *id.* at 14, nothing there casts

outside of its protection places of worship or religious observation. New York's

exclusion violates "the general right to publicly carry arms for self-defense." *Id.* It,

too, is one of the policy choices taken "off the table" by the Second Amendment.

*Heller*, 554 U.S. at 636.

Because the State has failed to meet its burden to identify an American

tradition justifying New York's place of worship or religious observation exclusion,

the exclusion "violates the Fourteenth Amendment in that it prevents law-abiding

citizens with ordinary self-defense needs from exercising their right to keep and

bear arms." *Bruen*, 142 S.Ct. at 2156. For these reasons, on this record, Plaintiffs

are likely to succeed on the merits of their Constitutional claim.

### C.  Irreparable Harm Absent Preliminary Injunctive Relief

Irreparable harm is "certain and imminent harm for which a monetary award

does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing*

*Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for

the grant of equitable relief, there is a substantial chance that upon final resolution

of the action the parties cannot be returned to the positions they previously

occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.
1999).

Here, absent a TRO, Plaintiffs' constitutional rights are being violated. Law-
abiding citizens are forced to forgo their Second Amendment rights to exercise their
First Amendment rights to free exercise of religion, or vice versa. And they are
forced to give up their rights to armed self-defense outside the home, being left to
the mercy of opportunistic, lawless individuals who might prey on them and have no
concern about the place of worship exclusion.[22]

The Supreme Court has held that the loss of "First Amendment freedoms, for
even minimal periods of time, unquestionably constitutes irreparable injury."
*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod
v. Burns*, 427 U.S. 347, 373 (1976)). If only "10 people are admitted to each service,
the great majority of those who wish to attend Mass on Sunday or services in a

---

[22] Justice Alito queried, "Will a person bent on carrying out a mass
shooting be stopped if he knows that it is illegal to carry a handgun outside the
home?" *Bruen*, 142 S.Ct. at 2157. He continued: "And while the dissent seemingly
thinks that the ubiquity of guns and our country's high level of gun violence provide
reasons for sustaining the New York law, the dissent appears not to understand
that it is these very facts that cause law-abiding citizens to feel the need to carry a
gun for self-defense." *Id.* at 2158. Finally, he noted that "[t]he police cannot disarm
every person who acquires a gun for use in criminal activity; nor can they provide
bodyguard protection for the State's nearly 20 million residents . . . . Some of these
people live in high-crime neighborhoods. Some must traverse dark and dangerous
streets in order to reach their homes after work or other evening activities. Some
are members of groups whose members feel especially vulnerable. And some of
these people reasonably believe that unless they can brandish or, if necessary, use a
handgun in the case of attack, they may be murdered, raped, or suffer some other
serious injury." *Id.* Indeed, "[o]rdinary citizens frequently use firearms to protect
themselves from criminal attack. According to survey data, defensive firearm use
occurs up to 2.5 million times per year." *Id.* (citation omitted).

synagogue on Shabbat will be barred.  And while those who are shut out may in some instances be able to watch services on television, such remote viewing is not the same as personal attendance.  Catholics who watch a Mass at home cannot receive communion, and there are important religious traditions in the Orthodox Jewish faith that require personal attendance."  *Id.*  Here as well, there "can be no question that the challenged restrictions, if enforced, will cause irreparable harm."  *See id.*  Plaintiffs satisfy the irreparable harm element.[23]

### D.    Public Interest

Finally, the Court must consider whether a TRO is in the public interest.  *See Bronx Household of Faith*, 331 F.3d at 349.  The State argues that broad legal carrying in dense congregate settings can result in spontaneous violence or accidental shootings.  But the State does not claim or show that the carrying of firearms at places of worship has resulted in an increase in handgun violence, or that public safety would be impaired if the places of worship restriction is enjoined.

A TRO would, however, serve the public interest of fostering self-defense at places of worship across the state.  The public has a significant interest in the "strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun."  *Antonyuk v. Bruen*, No. 22-CV-0734, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022).

---

[23] The Court is aware of, and respectfully disagrees with, the conclusion on this issue in *Goldstein v. Hochul*, No. 22-CV-8300 (S.D.N.Y. Sept. 30, 2022), and its relevance here.

Absent a TRO, the challenged law creates a vulnerable population of attendees at places of worship left to the whims of potential armed wrongdoers who are uninterested in following the law in any event. A TRO would therefore be in the public interest.

### E.    Security

Federal Rule of Civil Procedure 65(c) requires the Court to consider whether it should require Plaintiffs to post security and, if so, in what amount. *See Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement [in certain situations].").

On these facts, the Court will not require Plaintiffs to post security because a bond requirement does not fit the fact-pattern and interests involved in this case. *See Dr.'s Assocs.*, 107 F.3d at 135-36 (affirming district court's decision not to require security where the district court "found that [defendants] would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"). *See also Clarkson Co. v. Shaheen,* 544 F.2d 624, 632 (2d Cir. 1976) (Because no request for a bond was ever made in the district court, and because, under Fed. R. Civ. P. 65, "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court.")

### CONCLUSION

For the above reasons, the Court grants Plaintiffs' motion for a temporary restraining order as follows: it is

ORDERED that Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this temporary restraining order, are enjoined, effective immediately, from enforcing all of N.Y. Pen. L. § 265.01e(2)(c) (places of worship or religious observation), and their regulations, policies, and practices implementing it;[24]

ORDERED that this TRO will remain in effect through the disposition of Plaintiffs' motion for preliminary injunction;

ORDERED that no bond shall be required; and

ORDERED that Defendants' opposition papers on the preliminary injunction application are due October 28, 2022, at 12:00 pm.  Reply papers, if any, are due by November 2, 2022, at 12:00 pm.  The parties shall appear for a hearing on the preliminary injunction application on November 3, 2022, at 2:00 pm in the Chautauqua Courtroom, 8th Floor East, 2 Niagara Square, Buffalo, New York.

SO ORDERED.

Dated:      October 20, 2022
            Buffalo, New York

                              JOHN L. SINATRA, JR.
                              UNITED STATES DISTRICT JUDGE

---

[24] The State's request to limit any TRO to the individual Plaintiffs is denied as untenable.  Either the exclusion applies or it does not.

40