UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN GOLDSTEIN individually and on behalf of CONGREGATION BNEI MATISYAHU, and MEIR ORNSTEIN,<br><br>            *Plaintiffs*,<br><br>  -against-<br><br>KATHY HOCHUL, in her official capacity as Governor of the State of New York; LETITIA JAMES, in her official capacity as Attorney General of the State of New York; KEECHANT SEWELL, in her official capacity as Commissioner of the New York City Police Department; LOUIS FALCO, III, in his official capacity as Rockland County Sheriff; ERIC GONZALEZ, in his official capacity as the District Attorney of Kings County; and THOMAS WALSH, II, in his official capacity as the District Attorney of Rockland County,<br><br>            *Defendants*. | Index No.:  22-CV-8300 |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

For the reasons set forth in the attached Memorandum of Law, Plaintiffs Steven Goldstein, Meir Ornstein and Congregation Bnei Matisyahu, by and through their attorneys, hereby further request that this Honorable Court issue a preliminary injunction enjoining Defendants from enforcing New York Penal Law § 265.01-e(2)(c).

Dated:      New York, New York
           October 24, 2022

                    Yours, etc.,

                    BENNO & ASSOCIATES P.C.

                    By: _____
                      AMEER BENNO, Esq.
                    30 Wall Street, 8th Floor
                    New York, New York 10005

Tel.:  (212) 227-9300
Email: abenno@bennolaw.com

Cory H. Morris, Esq.
THE LAW OFFICES OF CORY H. MORRIS
135 Pinelawn Road
Suite 250s
Melville, NY 11747
Tel.: (631) 450-2515
Email: coryhmorris@gmail.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .............. ..……………………………….……………….....ii

POINT I: GOV. HOCHUL AND AG JAMES ARE PROPER DEFENDANTS……………..…….1

POINT II: PLAINTIFFS HAVE STANDING ....................................................…………..…2

POINT III: THE STATUTE VIOLATES THE SECOND AMENDMENT...........…………..……4

POINT IV: THE STATUTE VIOLATES THE FIRST AMENDMENT...............…………..…….8

POINT V: THE STATUTE VIOLATES EQUAL PROTECTION ....................…………..……11

POINT VI: THE STATUTE IS UNCONSTITUTIONALLY VAGUE................…………..……12

POINT VII: IRREPARABLE HARM......................................................………….……14

POINT VIII: BALANCE OF HARMS / PUBLIC INTEREST ......................…………..……14

CONCLUSION.........………………………………………..……………………....….15

## **TABLE OF AUTHORITIES**

Page

### **U.S. Supreme Court Cases**

*Babbitt v. UFW Nat'l Union*,
442 U.S. 289 (1979)...................................................................................................... 3

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993).................................................................................................... 12

*City of Chi. v. Morales*,
527 U.S. 41 (1999).................................................................................................. 12, 13

*Cty. Court of Ulster Cty., N. Y. v. Allen*,
442 U.S. 140 (1979)...................................................................................................... 4

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................................................ 10, 15

*Ex parte Young*,
209 U.S. 123 (1908)...................................................................................................... 1

*FCC v. Pacifica Foundation*,
438 U.S. 726 (1978).................................................................................................... 13

*Gentile v. State Bar of Nev.*,
501 U.S. 1030 (1991).................................................................................................. 13

*Green v. Mansour*,
474 U.S. 64 (1985)........................................................................................................ 1

*New Orleans v. Dukes*,
427 U.S. 297 (1976).................................................................................................... 11

*Plyler v. Doe*,
457 U.S. 202 (1982).................................................................................................... 12

*Reno v. ACLU*,
521 U.S. 844 (1997).................................................................................................... 13

*Roman Cath. Diocese v. Cuomo*,
141 S. Ct. 63 (2020)................................................................................................. 4, 14

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)................................................................................................... 2

*United States v. Salerno*,
  481 U.S. 739 (1987)........................................................................................... 12, 13

*United States v. Williams*,
  533 U.S. 285 (2008)................................................................................................. 13

*United States v. Woods*,
  571 U.S. 31 (2013)................................................................................................... 13

*Younger v. Harris*,
  401 U.S. 37 (1971)..................................................................................................... 3

## Federal and State Cases

*A.M. v. French*,
  431 F. Supp. 3d 432 (D. Vt. 2019)........................................................................... 11

*Agudath Isr. of Am. v. Cuomo*,
  980 F.3d 222 (2d Cir. 2020)....................................................................................... 9

*Am. Charities for Reasonable Fundraising Reg., Inc. v. Pinellas Cnty.*,
  221 F.3d 1211 (11th Cir. 2000) ................................................................................. 4

*Am. Civil Liberties Union v. Ashcroft*,
  322 F.3d 240 (3d Cir. 2003)..................................................................................... 14

*Antonyuk v. Bruen*,
  2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 21, 2022) ...................................... 5

*Antonyuk v. Hochul*,
  Docket 22-2379-CV (2d Cir.)..................................................................................... 2

*Antonyuk v. Hochul*,
  Index No. 22-CV-986 (GTS) (NDNY)....................................................................... 2

*Ass'n of Am. Med. Colleges v. Carey*,
  482 F. Supp. 1358 (N.D.N.Y. 1980)........................................................................... 1

*Cath. Charities of Diocese of Albany v. Serio*,
  7 N.Y.3d 510 (2006) ................................................................................................... 9

*Chabad of Nova, Inc. v. City of Cooper City*,
  575 F. Supp. 2d 1280 (S.D. Fl. 2008) ..................................................................... 12

*Copeland v. Vance*,
    893 F.3d 101 (2d Cir. 2018)............................................................................ 13

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) ............................................................ 3, 4, 9, 10

*Hardaway, et al. v. Nigrelli, et al.*,
    Index No. 22-CV-771, ECF. No. 35 (JLS) (W.D.N.Y. Oct. 20, 2022) ............................ *passim*

*In re Dairy Mart Convenience Stores, Inc.*,
    411 F.3d 367 (2d Cir. 2005)............................................................................. 1

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)............................................................................. 14

*Love Church v. City of Evanston*,
    671 F. Supp. 515 (N.D. Ill. 1987) ..................................................................... 12

*Miller v. Smith*,
    2022 U.S. Dist. LEXIS 44490 (C.D. Ill. Mar. 14, 2022) ............................................. 2

*New York v. U.S. Dep't of Agric.*,
    454 F. Supp. 3d 297 (S.D.N.Y. 2020).................................................................. 4

*Orthodox Jewish Coal. of Chestnut Ridge v. Vill of. Chestnut Ridge*,
    2021 U.S. Dist. LEXIS 152892 (S.D.N.Y. Aug. 3, 2021) ............................................. 12

*Phillips v. Girdich*,
    408 F.3d 124 (2d Cir. 2005)............................................................................ 11

*Picard v. Magliano*,
    42 F.4th 89 (2d Cir. 2022) ............................................................................. 3

*Statharos v. New York City Taxi & Limousine Comm'n*,
    198 F.3d 317 (2d Cir. 1999)............................................................................ 14

*United States v. Rybicki*,
    354 F.3d 124 (2d Cir. 2003)............................................................................ 13

## Statutes

Penal Law § 265.01-e(2)(c) .................................................................... *passim*

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................................................... *passim*

U.S. Const. amend. II........................................................................................................... *passim*

## POINT I: GOV. HOCHUL AND AG JAMES ARE PROPER DEFENDANTS[1]

Under the *Ex parte Young* exception to state sovereign immunity, state officials may be subject to actions seeking prospective injunctive relief to prevent a continuing violation of federal law. *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). The Eleventh Amendment does not bar private parties from suing individual state officials who have "some connection with the enforcement" of an allegedly unconstitutional state statute for the purpose of enjoining that enforcement. *Ex parte Young*, 209 U.S. 123, 157 (1908).

Here, plaintiffs clearly seek prospective injunctive relief.  There is also no debate that defendant Hochul has had at least "some connection" with the enforcement of the Penal Law § 265.01-e(2)(c).  The New York State Constitution charges her with the duty to "take care that the laws are faithfully executed." New York State Const. Art. IV, § 3.  Several courts have found that this duty satisfies *Young*'s "some connection" requirement. *See Ass'n of Am. Med. Colleges v. Carey*, 482 F. Supp. 1358, 1363 (N.D.N.Y. 1980) (collecting cases).[2]  Further, Hochul summoned an extraordinary session of the Legislature specifically to pass the Concealed Carry Improvement Act ("CCIA"), and she then signed that legislation into law.[3]  She also publicly declared that "individuals who carry concealed weapons in sensitive locations will face criminal

---

[1]  References preceded by "SDM" are to the New York State Defendants' ("State defendants") memorandum of law, while those preceded by "CDM" are to the New York City Defendants' ("City defendants") memorandum of law. References to exhibits are to those exhibits annexed to the Supplemental Declaration of Ameer Benno dated October 24, 2022 ("Benno Supp. Decl.").

[2]  In *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), the court held that, in an action seeking to declare a state criminal statute unconstitutional, the state's governor is a proper defendant if the state's constitution endows the governor with "law enforcement authority." *Id.* at 1254 n. 18.

[3]  Because the statute at issue is unconstitutional, no immunity doctrine (either 11th Amendment or Legislative) attaches: "The theory of Young was that an unconstitutional statute is void, and therefore does not impart to [the state official] any immunity from responsibility to the supreme authority of the United States." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (emphasis added). Immunity doctrines "do[ ] not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law" and thereby "vindicat[ing] the federal interest in assuring the supremacy" of the Constitution. *Id.*

penalties." *Hardaway, et al. v. Nigrelli, et al.*, ECF. No. 35 at 7-8, Index No. 22-CV-771 (JLS) (W.D.N.Y. Oct. 20, 2022) (annexed as Exh. 2 to the Benno Supp. Decl.).

Defendant James is not entitled to immunity either. *Young*'s "some connection" requirement is satisfied where the Attorney General has the power to enforce the challenged statute, even if the Attorney General "ha[s] never prosecuted anyone for violating the statute and share[s] the power to enforce the statute with" the various district attorneys throughout the state. *Miller v. Smith*, 2022 U.S. Dist. LEXIS 44490 (C.D. Ill. Mar. 14, 2022) (state attorney general is a proper defendant to a challenge to a restriction on carrying handguns in child care facilities). Here, the New York State Attorney General has concurrent authority with the states' district attorneys to investigate and prosecute violations of New York State's penal law. Exec. L. § 63(3).[4] Finally, both Hochul and James have expressed through counsel on multiple occasions that they wish to enforce every aspect of the CCIA, including the provision that bans guns in "places of worship or religious observation," and they have pursued legal proceedings to do so. *See Antonyuk v. Hochul*, Index No. 22-CV-986 (GTS) (NDNY) (ECF Nos. 18 and 48); *Antonyuk v. Hochul*, Docket 22-2379-CV (2d Cir.) (ECF Nos. 16 and 45).

## POINT II:  PLAINTIFFS HAVE STANDING

The state defendants argue that plaintiffs cannot demonstrate the "injury" prong of the standing analysis because they "do not allege that they have ... been subject to" a credible threat of prosecution under the statute (SDM: 7-8). This assertion is not only meritless, but it improperly shifts the burden. "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). A credible threat of prosecution exists when the challenged statute prohibits conduct that the plaintiff wishes to engage in, and "the State has not disavowed any intention of invoking the

---

[4] For the same reasons, there is no merit to the state defendants' claim that plaintiffs' injuries are not "fairly traceable" to any conduct by defendants Hochul or James, and therefore that plaintiffs cannot demonstrate the "causation" prong of the standing triad (SDM: 7).

criminal penalty provision" against the plaintiff. *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979). Nothing in defendants' papers suggests that they will not enforce the challenged statute. *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1252 (plaintiffs have standing where they are "interested in engaging in conduct arguably prohibited by the Carry Law and that could give rise to prosecution by state authorities" and because "[n]othing in the defendants' answers suggests that the Carry Law will not be vigorously enforced"); *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) ("courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund"). Further, Steven Nigrelli, the First Deputy Superintendent of the New York State Police, recently stated at a press conference: "For those who choose to violate this law … [w]*e'll have zero tolerance*. If you violate this law, you will be arrested. Simple as that."[5] Here, the New York State Police, a law-enforcement entity with statewide jurisdiction and officers stationed across New York, has expressed its clear intent to enforce all aspects of the CCIA, without exception, through arrest and prosecution, in every instance where it is violated.[6] *See Younger v. Harris*, 401 U.S. 37, 42 (1971) (if a plaintiff alleges that a criminal prosecution is even "remotely possible," the dispute is "susceptible to resolution by a federal court"). The Western District, in *Hardaway*, found that these facts established injury for purposes of Article III standing (Exh. 2: 8) ("These public statements show that New York residents ... face threatened enforcement of a law that is sufficiently imminent") (internal quotation marks and citation omitted).

Plaintiffs also have standing because they "changed their behavior in the wake of the State's messaging" about its intention to enforce Penal Law § 265.01-e(2)(c) (Exh. 2: 9) (because the plaintiffs stopped carrying a firearm at church because of the enactment and enforcement of

---

[5] *See* https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40.

[6] Further, the Bill Sponsor's Memo "purpose" section explicitly provides that "[i]ndividuals who carry concealed weapons in sensitive locations ... *will* face criminal penalties" (Exh. 1) (emphasis added).

Penal Law § 265.01-e(2)(c), they have standing to bring a pre-enforcement challenge to that law). Plaintiffs' desire to comply with the new law has caused them to *forego* participating in conduct that they have an undeniable constitutional right to engage in: they do not carry their firearms for self-defense when they are practicing their religion, and they refrain from exercising their religion when they are carrying their firearms. These sacrifices are real, concrete constitutional harms. *Roman Cath. Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Cty. Court of Ulster Cty., N. Y. v. Allen*, 442 U.S. 140, 155 (1979) (litigants in federal court have standing to challenge the constitutionality of a statute "insofar as it has an adverse impact on his own rights").

Finally, defendants ignore the fact that Congregation Bnei Matisyahu has suffered "injury in fact" traceable to the challenged statute. Where, as here, a case involves multiple plaintiffs, "only one plaintiff need possess the requisite standing for a suit to go forward." *New York v. U.S. Dep't of Agric.*, 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020) (citation omitted).

## POINT III: THE STATUTE VIOLATES THE SECOND AMENDMENT[7]

Under *Bruen,* the burden falls on the government to establish a national historical tradition of designating "places of worship or religious observation" as "sensitive places." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2135 (2022). Defendants here have failed to carry that burden. **First**, defendants have proffered very few statutes or cases, and none are from the Founding era; most are not even from the years immediately surrounding the ratification of the Fourteenth Amendment. *Bruen*, however, was explicit that a paucity of laws are insufficient

---

[7] Plaintiffs have brought facial and as-applied challenges on all of their claims. Although this is a pre-enforcement challenge, an as-applied challenge can still be brought because "the factual context of the challenge is so clear ...there is no question as to how the statute will be applied." *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1255 n. 20; *Am. Charities for Reasonable Fundraising Reg., Inc. v. Pinellas Cnty.*, 221 F.3d 1211, 1214 (11th Cir. 2000) (plaintiffs can bring an as-applied constitutional challenge in a pre-enforcement lawsuit to enjoin the enforcement of a county ordinance).

to establish an American tradition of firearms regulation." *Id.* at 2138 (a historical record comprised of "a handful of late-19th-century jurisdictions" is insufficient "to demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense"); *see also Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 21, 2022) (the "vast majority" of states in 1868 "did not have statutes restricting firearms" at places of worship).

**Second**, the few laws cited by defendants are either from the Middle Ages or the late-19th Century. But *Bruen* cautioned that "[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*, not as they existed in the Middle Ages." *Id*. at 2139 (emphasis added). Similarly, "because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources," either. *Id*. at 2137.[8]  Indeed, the *Bruen* Court stated that the scope of the Second Amendment "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. at 2136. As Justice Barrett pointedly stated, "Reconstruction-era history ... is simply too late." *Id*. at 2163 (Barrett, J., concurring). And, there was no prohibition on carrying a firearm in places of worship around the time of the ratification of the Second Amendment. Instead, persons often were required by law to bring a firearm to church. The only statutes to the contrary prohibited carrying a firearm in a manner to terrify the people, "in affray of the peace" (*see* Declaration of Joyce Lee Malcolm, annexed as Exh. 3 to the Benno Supp. Decl.: ¶ 14). Simply put, no laws, cases, statutes or ordinances existed close to 1791 that simply banned firearms in churches or other places of worship (Exh. 3: ¶ 24).

---

[8] Moreover, the Supreme Court was explicit in *Bruen* that it "will not stake [its] interpretation [of the Second Amendment] on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and [that] contradict[s] the overwhelming weight of other, more contemporaneous historical evidence."*Bruen*, 142 S. Ct. at 2155 (internal quotation marks, brackets and citation omitted). Defendants here have offered just "outliers" – "a handful of seemingly spasmodic enactments involving a small minority of jurisdictions governing a small minority of population" (Exh. 2: 34-35).

**Third**, all of defendants' examples are from former Confederate states or territories during the Reconstruction era, and therefore served a *unique* purpose – to combat efforts to deprive freedmen of their constitutional rights and to prevent violence between the races. Defendants' citations therefore cannot be relied on to establish a national historical tradition (Exh. 3: ¶ 26). **Fourth**, during Reconstruction, these former Confederate states and territories were under martial law, not the customary common law governance. Thus, the statutes and cases cited by defendants are not emblematic of a national historical tradition (*Id*.). **Fifth**, Exhibits J, K and M to the Declaration of Patrick Charles and the Montana and Missouri laws referred to by the City defendants) refer to firearms carried *concealed*. In the nineteenth century, unlike today, concealed carry was disfavored, open carry was not. Since none of those statutes prohibited the *open* carry of firearms in places of worship, they do not support a finding that there was a historical tradition of such a ban (*Id*.). **Sixth**, some of the laws relied on by defendants did not prohibit guns at church *generally* but only insofar as they were possessed "in affray of the peace," or to terrorize others (*see*, *e.g.*, CDB: 16 n. 12, 17 n. 13) (Exh. 3: ¶ 34). That's not the case here. **Seventh**, to the extent the laws cited by defendants prohibited the carriage of firearms in church, they only did so *while a public assembly was taking place*. None of them defined the church building itself as a location where, even if empty, guns were categorically forbidden. **Eighth**, to the extent these laws banned guns in church because it was a place of public congregation, *Bruen* has explicitly rejected that as a basis for declaring a location "sensitive." *Id*. at 2134 (classifying a location as "sensitive" merely because it is a "place[ ] of public congregation ... defines the category of sensitive places far too broadly .... and would eviscerate the general right to publicly carry arms for self-defense"). **Ninth**, but perhaps most importantly, defendants have failed to identify a single statute or case from *any* historical era purporting to regulate firearms – as the Concealed Carry Improvement Act does – in places of "religious

observation," as distinguished from "places of worship." This is because no such regulation has ever existed at any time in our Nation's history (Exh. 3: ¶ 36).

According to *Bruen*, the "sensitive places" where weapons historically were "altogether prohibited" were limited to "legislative assemblies, polling places, and courthouses." *Id*. at 2133. Such locations of civic business are not at all analogous to private "places of worship or religious observation." *Id*. ("Courts can use analogies to those historical regulations of 'sensitive places' to determine [if] modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible").[9] After surveying the sensitive place laws throughout English and American history, one scholar opined that the factors that make a place "sensitive" are: (1) "if most persons therein are minors," such as "K-12 schools"; (2) if the location is one that "concentrate[s] adversarial conflict and can generate passionately angry emotions" such as "courthouses, legislatures, [and] polling places"; or (3) government buildings containing officials who are at "acute personal risk of being targets of assassination." Kopel & Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev at 235 at 289-90. "Places of worship or religious observation" are none of these (Exh. 2: 35-36) (there is no American historical tradition of banning guns in places of worship or religious observation, and such a prohibition has no analog in any recognized "sensitive place").[10]

---

[9] The City defendants contend that "places of worship or religious observation" are properly classified as "sensitive places" along with legislative assemblies, polling places, and courthouses because people go to those locations to exercise their constitutional rights (CDM: 14). But that sort of analogical reasoning is exactly the sort of "regulatory blank check" that the *Bruen* Court forbade. *Bruen*, 142 S. Ct. at 2133 ("courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted").

[10] As to the second factor, the City defendants actually assert that, far from being a place of adversarial conflict and angry emotions, synagogues are "place[s] of peace and a sanctuary from the world" (CDB: 14).

Finally, defendants concede that several American Colonies enacted laws requiring church parishioners to bring their arms to church,"[11] but argue that because those laws were "principally intended to quell potential slave revolt[s]," they were "inherently racist" and should not be considered in an historical analysis (Charles Decl.: ¶ 21; SDM: 12-13).[12] But insofar as those laws originated out of concern that native tribes and enslaved people would attack defenseless worshippers, plaintiffs today feel similarly imperiled by anti-Jewish attacks while they are engaged in acts of religious observance. Thus, if historical analogues are to be considered, laws that *required* guns to be brought to church are the appropriate ones (Exh. 2: ¶ 22).

## POINT IV: THE STATUTE VIOLATES THE FIRST AMENDMENT

Defendants argue that the statute does not burden religion because "carrying a firearm is [not] an element of their religious practice" (SDM: 15-16; CDM: 5).[13] This misses the point. Plaintiffs wish to practice their religion while exercising their fundamental right to carry a

---

[11] These included: **Georgia** ("An act for the better security of the inhabitants by obliging the male white persons to carry fire arms to places of public worship") (Exh. 4); **Maryland** ("Noe man able to bear arms to goe to church or Chappell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott") (Exh. 5); **Massachusetts** ("come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12d. for every default") (Exh. 6); **South Carolina** (any white male who fails to carry a gun and ammunition to church "shall forfeit and pay the sum of twenty shillings") (Exh. 7); **Virginia** (requireing everyone to attend church on the Sabbath, "and all suche as beare armes shall bring their pieces, swords, pouder and shotte") (Exh. 8); **New Haven Colony** (imposing fines on several men "for not bringing ther armes to the meeting [church] on day when it was their turne") (Exh. 9); and **Plymouth Colony** (ordering one-fourth of the militia "carry theire armes" – defined as "some serviceable peece and sword and three charges of powder and bullets" to church every Sunday, or be fined "2 shillings and six pence") (Exh. 10).

[12] Ironically, the New York law that *Bruen* struck down and that the CCIA replaced was utterly racist and xenophobic. The law was enacted of fear about the wave of immigrants from eastern and southern Europe coming to New York and was designed to disarm them. Therefore, if any laws governing carrying arms in places of worship or religious observation are racist, they are those that restrict that right (Exh. 3 at ¶ 23).

[13] The City defendants' argue that "while plaintiffs fear attending shul without the ability to carry concealed, other New Yorkers may be scared to frequent places of worship if firearms are permitted to be carried concealed therein by any member of the congregation of the public at large" (CDM: 2). Besides engaging in rank speculation, City defendants overlook the fact that synagogues and other places of worship are private entities, and therefore have the ability to prohibit firearms on their property if they so desire.

firearm, but the new law criminalizes such conduct. As Judge Sinatra correctly notes in *Hardaway*, this law forces law-abiding citizens to forgo their First Amendment rights to free exercise of religion in order to exercise their Second Amendment rights, and vice versa (Exh. 2: 37).

Equally risible is the State defendants' claim that Penal Law § 265.01-e(2)(c) is "a neutral law of general applicability" under *Employment Division v. Smith*, 494 U.S. 872 (1990) – and therefore subject only to rational basis scrutiny – because the CCIA also affixes the "sensitive place" label to a variety of "secular" locations (SDM: 16).[14] Because Penal Law § 265.01-e(2)(c) explicitly targets "places of worship or religious observation" – and *only* those religious settings – for special burdens, it is neither neutral nor generally applicable. *Agudath Isr. of Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020).  What different  statutory provisions say about other locations is irrelevant.

The City defendants' reliance on *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1244, is similarly misguided (CDM: 6). There, the court upheld a Georgia statute that made it a misdemeanor for individuals to carry weapons into "places of worship" unless the place of worship permitted such carrying. Conversely, Penal Law § 265.01-e(2)(c) is a *categorical* ban – with felony consequences – with no permissive exceptions. Unlike the Georgia statute, New York's law is farther-reaching – it not only prohibits gun in "places of worship," but also wherever acts of

---

[14] Notably, defendants have entirely ignored plaintiffs' claims under the New York State Constitution. In analyzing free exercise claims under the New York Constitution, the Court of Appeals has rejected the test formulated by the Supreme Court in *Smith* in favor of a test that balances the competing interests – a test that the court has stated is more "protective of religious exercise than the rule of *Smith*." *Cath. Charities of Diocese of Albany v. Serio*, 7 N.Y.3d 510, 525 (2006). Under that balancing test, Penal Law § 265.01-e(2)(c) presents an "unreasonable interference" with plaintiffs' religious freedom. *Id*. The enforcement of that statute therefore should be enjoined.

"religious observation" occur. More than that, while the plaintiffs in *GeorgiaCarry.Org* did not allege that the Carry Law burdened any sincerely held religious beliefs,[15] plaintiffs here did.

Finally, the challenged statute flunks strict scrutiny. Defendants claim that New York State has a compelling interest in protecting its citizens from "spontaneous violence and accidental injuries and deaths inevitably resulting from ubiquitous weapons possession" and that declaring "places of worship or religious observation" to be gun-free zones is a narrowly-tailored means to advance that interest (SDM: 17 n. 7). This assertion is specious. Defendants have adduced no evidence whatsoever to demonstrate that responsible, law-abiding citizens who qualified for a state-issued license to carry a firearm (and have done so for years without issue) somehow present a greater danger of spontaneous violence, accidental injury and death when they possess a gun in places where religious observation occurs than they do in "secular" settings.

The City defendants' argument that synagogues "could contract for armed guards to ease the safety concerns of their worshippers" is irrelevant to the strict scrutiny analysis (CDM: 6 n. 4). Setting aside that the Second Amendment guarantees all law-abiding citizens an individual right to bear arms, *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008), plaintiff Goldstein has averred that Congregation Bnei Matisyahu – like many small houses of worship – lacks the resources to hire outside security. And even if that were not the case, plaintiffs should not have to depend on others for their protection. To paraphrase Justice Alito's concurrence in *Bruen*, security guards "cannot disarm every person who acquires a gun for use in criminal activity; nor can they provide bodyguard protection for" everyone – "some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be

---

[15] The *GeorgiaCarry.Org* plaintiffs merely asserted that the Georgia law interfered with "the free exercise of religion by Plaintiffs by prohibiting them from engaging in activities in a place of worship when those activities are generally permitted throughout the state." *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1255.

murdered, raped, or suffer some other serious injury." *Bruen*, 142 S. Ct. at 2158 (Alito, J., concurring).

## POINT V: THE STATUTE VIOLATES EQUAL PROTECTION

Defendants argue that an equal protection claim is unavailable because "'persons engaging in religious activity' is not an identity-based class" (SDM: 19-20; CDM: 22). But equal protection claims are not limited to challenges based on suspect classifications. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (to state an equal protection violation, a plaintiff must merely allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination").[16] Here, those who engage in acts of "religious observation" while armed are felons, while similarly situated people who refrain from religious exercise or from carrying firearms are not.

Defendants further contend that because the challenged statute "applies to *all* people" in places of worship or religious observation, it does not target the conduct of those who are engaged in religious activity because of their religious activity (SDM: 19) (emphasis in original). This argument is dubious. The statute renders any location where a person performs an act of "religious observation" sensitive *because* of the act of religious observation. Attaching the "sensitive place" label to any location where "religious observation" occurs plainly targets individuals who engage in faith-based conduct because of that conduct. Perhaps realizing as much, defendants argue that even if the statute targets religious activity, it does not make "distinctions *between* religions" and therefore does not violate the Equal Protection Clause (SDM: 19) (emphasis in original). That defendants criminalized *all* types of religious observations while armed, however, does not make this any less of an equal protection violation. *See*, *e.g.*, *A.M. v. French*, 431 F. Supp. 3d 432 (D. Vt. 2019) (state's distinction between private

---

[16] Where, as here, a statute's treatment of different classes implicates fundamental rights, the statute carries no presumption of constitutionality. *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

religious schools and private secular schools allows for a plausible equal protection claim); *Chabad of Nova, Inc. v. City of Cooper City*, 575 F. Supp. 2d 1280 (S.D. Fl. 2008) (equal protection claim sufficient where ordinance "distinguishe[d] between religious assembly uses and non-religious assembly uses"); *Love Church v. City of Evanston*, 671 F. Supp. 515, 517-19 (N.D. Ill. 1987) (same).

Defendants next erroneously assert that even if an equal protection claim exists, it would only be subject to rational basis review (SDM: 20; CDM: 22). However, because the statute imposes classifications that impinge upon the exercise of fundamental rights, the applicable standard is strict scrutiny. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) (in equal protection cases, "we have treated as presumptively invidious those classifications that disadvantage a suspect class, *or that impinge upon the exercise of a fundamental right*") (emphasis added); *Orthodox Jewish Coal. of Chestnut Ridge v. Vill of. Chestnut Ridge*, 2021 U.S. Dist. LEXIS 152892, at *10 (S.D.N.Y. Aug. 3, 2021) ("The standard for assessing Equal Protection Clause claims hinges on whether the challenged law *interferes with fundamental rights* or disadvantages a suspect class. If it does, the law is reviewed under the strict scrutiny standard.") (emphasis added). And, it cannot survive that rigorous standard. *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993) ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases.").

## POINT VI: THE STATUTE IS UNCONSTITUTIONALLY VAGUE

Plaintiffs' claims include both as-applied and facial challenges to Penal Law § 265.01-e(2)(c). With respect to plaintiffs' facial vagueness challenge, plaintiffs submit that the standard that applies in the Second Circuit is not the "no set of circumstances" standard articulated in *United States v. Salerno*, 481 U.S. 739, 745 (1987), but the "permeability" standard set forth by the Supreme Court in *City of Chi. v. Morales*, 527 U.S. 41 (1999). *See United States v. Rybicki*,

354 F.3d 124, 131-32 (2d Cir. 2003) (en banc) (expressing doubt regarding the "no set of facts" language required by *Salerno* and suggesting that Morales' permeability standard applies). Under the permeability standard, "[w]hen vagueness permeates the text of ... a [criminal] law, it is subject to facial attack." *Morales*, 527 U.S. at 55. That is the case here. Similarly, the Second Circuit recognizes prospective, as-applied vagueness challenges. *Copeland v. Vance*, 893 F.3d 101, 112 (2d Cir. 2018) ("a prospective as-applied challenge seeks to prove that a statute cannot constitutionally be applied to a specific course of conduct that the challenger intends to follow").

Defendants, ignoring that it made "religious observation" while armed a felony for these plaintiffs, argue that the vagueness challenge must fail because the phrase "place of worship" "unambiguously includes synagogues" (SDM: 21-22; CDM: 20). But, under the statute, a location is labeled as "sensitive" if it is *either* a place of worship *or* "religious observation." Where statutory terms "are written in the disjunctive," each "has a separate meaning." *FCC v. Pacifica Foundation*, 438 U.S. 726, 739-40 (1978); *United States v. Woods*, 571 U.S. 31, 45 (2013) (the word "or" is "almost always disjunctive [and] the words it connects are to be given separate meanings") (internal quotation marks omitted).[17] Regardless of whether "place of worship" may be interpreted to include synagogues, the phrase "religious observation" is utterly unclear, leaving citizens to "guess at its contours." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991).[18] Such indeterminacy renders the statute unconstitutionally vague. *United States v. Williams*, 533 U.S. 285, 306 (2008).

---

[17] Defendants' suggestion that the two phrases cannot be disaggregated for purposes of a vagueness challenge is meritless (SDM: 23). *See, e.g., Reno v. ACLU*, 521 U.S. 844, 883 (1997).

[18] For example, a restaurant could vacillate between being a place of "religious observation" and not depending on whether a customer is saying a prayer over food. A market could be a place of "religious observation" because a customer purchases kosher food there. The list is endless. Such ambiguous statutory language makes the "sensitive place" label a moving target, impossible to pin down.

## POINT VII: IRREPARABLE HARM

Where a complaint alleges the denial of a constitutional right, irreparable harm is presumed. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (same). Defendants have not rebutted this presumption of irreparable harm.

Moreover, as described above, plaintiffs' desire to comply with the new statute has caused them to forego participating in conduct that they have an constitutional right to engage in: they do not carry their firearms for self-defense when they are practicing their religion and they refrain from exercising their religion when they are carrying their firearms. Thus, the harms being inflicted on plaintiffs by this statute are neither speculative nor theoretical, as defendants claim (SDM: 24; CDM: 23-24). *See*, *e.g.*, *Roman Cath. Diocese*, 141 S. Ct. at 67 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). It is therefore unsurprising that, on a nearly identical set of facts, the *Hardaway* Court declared that the Penal Law § 265.01-e(2)(c) causes irreparable harm (Exh. 2: 38) ("Law-abiding citizens are forced to forgo their Second Amendment rights to exercise their First Amendment rights to free exercise of religion, or vice versa. And they are forced to give up their rights to armed self-defense outside the home, being left to the mercy of opportunistic, lawless individuals who might prey on them and have no concern about the place of worship exclusion .... Plaintiffs satisfy the irreparable harm element.").

## POINT VIII: BALANCE OF HARMS / PUBLIC INTEREST

Not only does the government lack any interest in the enforcement of an unconstitutional law, *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003), but the State has not demonstrated beyond its own *ipse dixit* that that law-abiding citizens who qualified for a

14

state-issued license to carry a firearm somehow present a greater danger of violence, injury and death when they are in places where religious acts take place. Nor has it shown that such a risk, if it exists, outweighs the danger to plaintiffs' physical safety and welfare posed by disarming them in "places of worship and religious observation" in a climate of skyrocketing anti-Jewish attacks. [19] In actuality, as *Hardaway* noted, laws such as the one at issue merely disarm law-abiding citizens, while doing nothing to disarm those who have no regard for the law in the first place (Exh. 2: 37); *accord Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home? And how does the dissent account for the fact that one of the mass shootings near the top of its list took place in Buffalo? The New York law at issue in this case obviously did not stop that perpetrator.").

## CONCLUSION

While handgun violence in the country may be a problem, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. Banning guns in places of worship and religious observation is one of them. For the foregoing reasons, this Court should grant plaintiffs' motion to preliminarily enjoin the enforcement of Penal Law § 265.01-e(2)(c).

Dated:      New York, New York
             October 24, 2022

                                    Respectfully submitted,

                                      Ameer Benno, Esq.
                                      BENNO & ASSOCIATES P.C.
                                      30 Wall Street, 8th Floor

---

[19] Defendants' claim that an injunction here would result in "unregulated private carry" is false. Individuals who wish to carry a concealed firearm would still have to satisfy the CCIA's other regulatory requirements. What's more, since synagogues are private entities, they are free to prohibit the possession of weapons on their premises if they choose.

15

New York, NY 10005
Tel.: (212) 227-9300
Email: abenno@bennolaw.com

Cory H. Morris, Esq.
THE LAW OFFICES OF CORY H. MORRIS
135 Pinelawn Road
Suite 250s
Melville, NY 11747
Tel.: (631) 450-2515
Email: coryhmorris@gmail.com