UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

IVAN ANTONYUK; COREY JOHNSON; ALFRED
TERRILLE; JOSEPH MANN; LESLIE LEMAN; and          1:22-CV-0986
LAWRENCE SLOANE,                                  (GTS/CFH)

                          Plaintiffs,

v.

KATHLEEN HOCHUL, in her Official Capacity as
Governor of the State of New York; STEVEN A. NIGRELLI,
in his Official Capacity as Acting Superintendent of the New
York State Police; JUDGE MATTHEW J. DORAN, in
His Official Capacity as Licensing-Official of Onondaga
County; WILLIAM FITZPATRICK, in His Official
Capacity as the Onondaga County District Attorney;
EUGENE CONWAY, in his Official Capacity as the
Sheriff of Onondaga County; JOSEPH CECILE, in his
Official Capacity as the Chief of Police of Syracuse;
P. DAVID SOARES, in his Official Capacity as the
District Attorney of Albany County; GREGORY
OAKES, in his Official Capacity as the District Attorney
of Oswego County; DON HILTON, in his Official
Capacity as the Sheriff of Oswego County; and JOSEPH
STANZIONE, in his Official Capacity as the District
Attorney of Greene County,

                          Defendants.
_____

APPEARANCES:                              OF COUNSEL:

STAMBOULIEH LAW, PLLC                     STEPHEN D. STAMBOULIEH, ESQ.
    Counsel for Plaintiffs
P.O. Box 428
Olive Branch, MS 38654

WILLIAM J. OLSON, P.C.                    ROBERT J. OLSON, ESQ.
    Co-Counsel for Plaintiffs
370 Maple Avenue W, Suite 4
Vienna, VA 22180

HON. LETITIA A. JAMES  
Attorney General for the State of New York  
  Counsel for the State Defendants  
The Capitol  
Albany, NY 12224

MICHAEL G. McCARTIN, ESQ.  
JAMES M. THOMPSON, ESQ.  
Assistants Attorney General  
ALEXANDRIA TWINEM, ESQ.  
Assistant Solicitor General

BARCLAY DAMON LLP  
  Counsel for Oswego County Defendants  
Barclay Damon Tower  
125 East Jefferson Street  
Syracuse, NY 13202

EDWARD G. MELVIN, ESQ.  
JOHN JOSEPH PELLIGRA, ESQ.

HON. SUSAN R. KATZOFF  
Corporation Counsel for the City of Syracuse  
  Counsel for City of Syracuse Defendants  
233 East Washington Street  
300 City Hall  
Syracuse, NY 13202

TODD M. LONG, ESQ.  
DANIELLE R. SMITH, ESQ.  
DARIENN BALIN, ESQ.  
Assistants Corporation Counsel

ONONDAGA COUNTY DEPT. OF LAW  
  Counsel for Onondaga County Defendants  
John H. Mulroy Civic Center, 10th Floor  
421 Montgomery Street  
Syracuse, NY 13202

JOHN E. HEISLER, JR.  
Deputy County Attorney

HON. EDWARD I. KAPLAN  
Greene County Attorney  
  Counsel for Defendant Stanzione  
411 Main Street, Suite 443  
Catskill, NY 12414

EDWARD I. HAPLAN, ESQ.

HON. EUGENIA K. CONDON  
Albany County Attorney  
  Counsel for Defendant Soares  
112 State Street, Room 600  
Albany, NY 12207

JOSEPH A. COTICCHIO, ESQ.  
Assistant County Attorney

GLENN T. SUDDABY, United States District Judge

## DECISION and PRELIMINARY INJUNCTION

Currently before the Court, in this civil rights action by the six above-captioned

individuals ("Plaintiffs") against the ten above-captioned employees of the State of New York or

one of its counties or cities ("Defendants"), is Plaintiffs' motion for a Preliminary Injunction.

(Dkt. No. 6.) For the reasons set forth below, Plaintiffs' motion is granted in part and denied in

part.

<u>TABLE OF CONTENTS</u>

I.    RELEVANT BACKGROUND……………………………………………………...5
II.   GENERAL LEGAL STANDARDS…………………………………………………...7
      A.    Procedural Standard Governing Plaintiffs' Motion………………………….7
      B.    Substantive Standard Governing Plaintiffs' Second Amendment Claims……….12
III.  ANALYSIS………………………………………………………………………16
      A.    Extent to Which Plaintiffs Have Standing and Defendants Are Proper………....16
            1.    Standing to Challenge License-Application Requirements…………….. 18
            2.    Standing to Challenge Prohibition in "Sensitive Locations"…………….24
                  a.    "[A]ny place … under the control of federal, state or local
                        government, for the purpose of government administration"……24
                  b.    "[A]ny location providing health, behavioral health, or chemical
                        dependance care or services"…………………………………….25
                  c.    "[A]ny place of worship or religious observation"……………….33
                  d.    "[L]ibraries, public playgrounds, public parks, and zoos"……...34
                  e.    "[T]he location of any program … that provides services to
                        children, youth, … any legally exempt childcare provider"……..45
                  f.    "[N]ursery schools, preschools, and summer camps"…………..47
                  g.    "[T]he location of any program … regulated, … operated,
                        or funded by the office for people with developmental
                        disabilities"……………………………………………………….50
                  h.    "[T]he location of any program … regulated, … operated, or
                        funded by [the] office of addiction services and supports"…..…...50
                  i.    "[T]he location of any program … regulated, … operated, or
                        funded by the office of mental health"………………………….51
                  j.    "[T]he location of any program … regulated, … operated, or
                        funded by the office of temporary and disability assistance"……52
                  k.    "[H]omeless shelters, … family shelters, … domestic violence
                        shelters, and emergency shelters"……………………………….53
                  l.    "[R]esidential settings licensed, certified, regulated, funded, or
                        operated by the department of health"…………………………….55
                  m.    "[A]ny building or grounds .. of any educational institutions,
                        colleges[,] … school districts … private schools"…..………….55
                  n.    "[A]ny place, conveyance, or vehicle used for public
                        transportation or public transit"……………………………….57
                  o.    "[A]ny establishment issued a license …where alcohol is
                        consumed"…….………………………………………………….63

3

p.    "[A]ny place used for the performance, art entertainment, gaming, or sporting events"…………………………………………68

q.    "[A]ny location being used as a polling place"………………74

r.    "[A]ny public sidewalk or other public area restricted from general public access … by a governmental entity"……………74

s.    "[A]ny gathering of individuals to collectively express their constitutional rights to protest or assemble"……………………75

t.    "[T]he area commonly known as Times Square"………………80

3.    Standing to Challenge Restricted Locations………………………81

4.    Propriety of Defendant Hochul as a Party………………………85

B.    Substantial Likelihood of Success on the Merits…………………87

1.    Application Requirements……………………………………..…90

a.    "Good Moral Character"……………………………………92

b.    List of Four Character References……………………..…103

c.    List of Family Members and Cohabitants…………………106

d.    List Social Media Accounts for Past Three Years…………..…109

e.    "Such Other Information Required by the Licensing Officer"……………………………………………..………115

f.    Eighteen Hours of Firearm Training……………………117

g.    In-Person Meeting…………………………………………120

2.    Prohibition in "Sensitive Locations"……………………..………123

a.    "[A]ny location providing … behavioral health, or chemical dependance care or services"………………123

b.    "[A]ny place of worship or religious observation"……………129

c.    "[P]ublic playgrounds, public parks, and zoos"………………135

d.    "[N]ursery schools [and]preschools"……………………………144

e.    "[A]viation transportation," "airports" and "buses" ……………146

f.    "[A]ny establishment issued a license …where alcohol is consumed"………………………………………………..……151

g.    "[T]heaters," "conference centers," and "banquet halls"…..……155

h.    "[A]ny gathering of individuals to collectively express their constitutional rights to protest or assemble"……………..…159

3.    Prohibition in "Restricted Locations"……………………………..…166

a.    Second Amendment Analysis……………………………167

b.    First Amendment Analysis…………………………………173

C.    Strong Showing of Irreparable Harm……………………………..………180

D.    Balance of Equities and Service of Public Interest………………………180

E.    Security………………………………………………………..………180

F.    Scope and Stay…..………………………………………………………181

# I.    RELEVANT BACKGROUND

On June 23, 2022, the Supreme Court held that N.Y. Penal Law § 400.00(2)(f), which conditioned the issuance of an unrestricted license to carry a handgun in public on the existence of "proper cause," violated the Second and Fourteenth Amendments by impermissibly granting a licensing officer the discretion to deny a license to a law-abiding, responsible New York State citizen based on a perceived lack of a special need for self-protection distinguishable from that of the general community.  *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022) ("*NYSRPA*").

On July 1, 2022, New York State passed the Concealed Carry Improvement Act ("CCIA"), which generally replaced the "proper cause" standard with (1) a definition of the "good moral character" that is required to complete the license application or renewal process, (2) the requirement that the applicant provide a list of current and past social-media accounts, the names and contact information of family members, cohabitants, and at least four character references, and "such other information required by the licensing officer," (3) a requirement that the applicant attend an in-person interview, (4) the requirement of 18 hours of in-person and "live-fire" firearm training in order to complete the license application or renewal process, and (5) a list of "sensitive locations" and "restricted locations" where carrying arms is prohibited. 2022 N.Y. Sess. Laws ch. 371.

The current action is the second attempt by Plaintiff Antonyuk to challenge certain provisions of the CCIA.  The first attempt, made by him alone against then-Superintendent Kevin Bruen alone, resulted in a dismissal without prejudice for lack of standing.  *See Antonyuk v. Bruen*, 22-CV-0734, 2022 WL 3999791, at *15-16 (N.D.N.Y. Aug. 31, 2022) (hereinafter

referred to as "*Antonyuk I*"). In his second attempt, Plaintiff Antonyuk stands with five similarly situated individuals, and asserts essentially the same claims as in *Antonyuk I* but against nine additional Defendants. (Dkt. No. 1.) *Cf. Antonyuk I*, 22-CV-0732, Complaint (N.D.N.Y. filed July 11, 2022).

Generally, in their Complaint, Plaintiffs assert three claims against Defendants: (1) a claim for violating the Second Amendment (as applied to the states through the Fourteenth Amendment), pursuant to 42 U.S.C. § 1983; (2) a claim for violating the First Amendment pursuant to 42 U.S.C. § 1983; and (3) a claim for violating the Fifth Amendment pursuant to 42 U.S.C. § 1983. (*Id.*) Each of these claims challenge one or more of the following nine aspects in the revised law: (a) its definition of "good moral character"; (b) its requirement that the applicant disclose a list of his or her "former and current social media accounts . . . from the past three years to confirm the information regarding applicant's character and conduct as required [above]"; (c) its requirement that the applicant list the names and contact information of family members and cohabitants; (d) its requirement that the applicant list at least four "character references" who can attest to the applicant's "good moral character"; (e) its requirement that the applicant provide "such other information required by the licensing officer"; (f) its requirement that the applicant attend an in-person interview by the licensing officer; (g) its requirement that the applicant receive a minimum of 16-hours of in-person firearm training and two-hours of "live-fire" firearm training, at his or her own expense (which they estimate to be "around $400"); (h) its definition of "sensitive locations"; and (i) its definition of "restricted locations." (*Id.*)[1]

---

[1]    Because of the similarity between *Antonyuk* I and this case, the Court accepted the assignment of this case as being "related" to *Antonyuk* I under General Order 12 of this District. The Court rejects the State Defendants' argument that it erred by accepting the assignment of

On September 22, 2022, Plaintiffs filed the current motion for a Preliminary Injunction. (Dkt. No. 6.)  On October 11, 2022, Defendants Fitzpatrick and Conway filed a notice advising the Court that they do not intend to oppose Plaintiffs' motion.  (Dkt. No. 36.)  On October 13, 2022, Defendants Hilton and Oakes also filed a notice advising the Court that they do not intend to oppose Plaintiffs' motion.  (Dkt. No. 45.)  On October 13, 2022, the remaining Defendants (i.e., Defendant Cecile and State Defendants) filed their oppositions to Plaintiffs' motion (except for Defendants Soares and Stanzione, who filed no such oppositions).  (Dkt. Nos. 47-50.)  On October 22, 2022, Plaintiffs filed their replies to Defendants' oppositions.  (Dkt. Nos. 68-69.)  On October 25, 2022, the Court conducted a hearing on Plaintiffs' motion.  At the end of that hearing, the Court reserved decision and stated that a decision would follow.  This is that decision.

## II.    GENERAL LEGAL STANDARDS

### A.    Procedural Standard Governing Plaintiffs' Motion

---

this case. (Dkt. No. 18, at 10.) In support of their argument, the State Defendants cite only the portion of the governing standard. (Dkt. No. 18, at 10, citing N.D.N.Y. Gen. Ord. 12(G)(3) for the language, "A civil case shall not be deemed related to another civil case merely because the civil case: (a) involves similar legal issues, or (b) involves the same parties."].) The omitted portion of the governing standard states as follows: "A civil case is 'related' to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transaction or events, a substantial saving of judicial resources is likely to result from assigning the case to the same Judge and Magistrate Judge."  N.D.N.Y. Gen. Ord. 12(G)(3). Here, the two cases at issue involve more than "similar legal issues" or "the same parties." They involve almost entirely the *same* legal issues (the second case asserting the same claims as the first case under the First, Second, and Fourteenth Amendments, along with a recharacterized claim under the Fifth Amendment). They also involve two of the same parties and many of the same factual issues, arising from largely the same transaction or events (the most important of which is the passage of the CCIA). All of these facts have resulted in a substantial saving of judicial resources to the Court during the two-week period since Plaintiffs' motion was filed.

Rule 65 of the Federal Rules of Civil Procedure governs preliminary injunctions. Fed. Rule Civ. P. 65(a), (b). Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" chance of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013); *Jones v. Nat'l Conf. of Bar*

*Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011); *Smithkline Beecham Consumer Healthcare,*

*L.P. v. Watson Pharm., Inc.,* 99-CV-9214, 1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13,

1999); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968);

*Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y. 1967).

    With regard to the second part of the first element, "[a] sufficiently serious question as to

the merits of the case to make it a fair ground for litigation" means a question that is so

"substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton*

*Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc.*

*v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).  "A balance of hardships tipping

decidedly toward the party requesting a preliminary injunction" means that, as compared to the

hardship suffered by the other party if the preliminary injunction is granted, the hardship suffered

by the moving party if the preliminary injunction is denied will be so much greater that it may be

characterized as a "real hardship," such as being "driven out of business . . . before a trial could

be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, I7nc.*, 601 F.2d 48, 58 (2d Cir.

1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also*

*Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped

decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it

would have been forced out of business as a Ford distributor).[2]

---

[2]    The Court notes that, under the Second Circuit's formulation of this standard, the
requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is apparently
added only to the second part of the first element (i.e., the existence of a sufficiently serious
question as to the merits of the case to make it a fair ground for litigation), and not also to the
first part of the first element (i.e., the existence of a likelihood of success on the merits), which
(again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's
favor. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." *Black's Law Dictionary* at 1350 (9th ed. 2009).

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less-rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id.* (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff

---

only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken

in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks

omitted).  This is because "governmental policies implemented through legislation or regulations

developed through presumptively reasoned democratic processes are entitled to a higher degree

of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of

success and a "strong" showing of irreparable harm"–is required when the requested injunction

(1) would provide the movant with all the relief that is sought and (2) could not be undone by a

judgment favorable to the non-movant on the merits at trial.  *Citigroup Global Markets, Inc.*, 598

F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New*

*York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the

movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and*

make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the

preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some

positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*.

*Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban*

*Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[3]  As for the point in time that serves as the *status quo*, the

Second Circuit has defined this point in time as "the last actual, peaceable uncontested status

---

[3]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success"
requirement may be dispensed with if the movant shows that "extreme or very serious damage
will result from a denial of preliminary relief."  *Citigroup Global Markets, Inc.*, 598 F.3d at 35,
n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2d Cir. 1994); *accord, Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014); *Actavis PLC*, 787 F.3d at 650.

### B. Legal Standard Governing Plaintiffs' Second Amendment Claims

The Second Amendment (which is made applicable through the Fourteenth Amendment) protects an individual's right to "keep and bear arms for self-defense." *NYSRPA*, 142 S. Ct. at 2125 (citing *D.C. v. Heller*, 128 S. Ct. 2783 [2008] and *McDonald v. City of Chicago*, 130 S. Ct. 3020 [2010]). "[The] definition of 'bear' naturally encompasses public carry." *Id.* at 2134.

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126, 2129-30. "To justify its [firearm] regulation, the government may not simply posit that the regulation promotes an important interest." *Id*. at 2126. Rather, Defendants must demonstrate that the firearm "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126, 2130-31.

"[T]his historical inquiry . . . will often involve reasoning by analogy . . . ." *NYSRPA*, 142 S. Ct. at 2132. Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2133. On the other hand, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted.'" *Id*. at 2133 (internal quotation marks omitted).

12

Regarding what and how many historical analogues constitute part of this Nation's historical tradition of firearm regulation, such an inquiry must begin by observing the principle that, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id*. at 2137; *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring). Where it has not, however, the inquiry must acknowledge that, although all historical statutes may have some value in interpreting the words "keep and bear arms" in 1791 and 1868, "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *NYSRPA*, 142 S. Ct. at 2136 (internal quotation marks omitted).

In accordance with *NYSRPA*, generally, more weight is given to historical laws whose origins immediately "predate[] or postdate[] either [1791 or 1868]," because they shed less light on "the scope of the right" to "keep and bear arms." *See NYSRPA*, 142 S. Ct. at 2136 ("Historical evidence that long predates or postdates either [1791 or 1868] may not illuminate the scope of the right.").[4] This is especially the case with regard to such laws that are not

---

[4]     The Court understands this focus on the years immediately before and after 1791 and 1868 to result from, in part, the fact that the decades immediately before and after 1791 and 1868 are the approximate periods in which there lived the state and federal legislators who ratified the Second and Fourteenth Amendments by a three-fourths majority as well as the people who chose those legislators, and thus the laws from those time periods tend to shed more light on the public understanding of the plain meaning of the words "keep and bear arms" in 1791 and 1868. *See* Clayne Pope, "Adult Mortality in America Before 1900: A View from Family Histories," *Strategic Factors in Nineteenth Century American Economic History: A Volume to Honor Robert W. Fogel* at 267, 280 (Claudia Goldin & Hugh Rockoff 1992) (showing that, for birth periods 1760 through 1799, the average life expectancy at age twenty was 43.5 years for men, and that, for the time period from 1800 through 1819, the average life expectancy was 43.4 years for men).

"transitory" but are "enduring." *See NYSRPA*, 142 S. Ct. at 2155 ("[T]hese territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived. . . . [T]hey appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation.").

More weight is also generally given to historical laws that are from a greater number of States and/or Colonies. *See* NYSRPA, 142 S. Ct. at 2142 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public-carry regulation."). As the Supreme Court has explained, "We . . . will not stake our interpretation of the Second Amendment upon a law in effect in single State . . . that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense." *Id*. at 2154 (internal quotation marks omitted).[5]

More weight is also generally given to historical laws governing a larger percentage of the Nation's population at the time, according to the nearest decennial census.[6] For example,

---

[5]    In this regard, the Court refines its general "three or more . . . analogues" interpretation of *NYSRPA* that was expressed in its Decision and Temporary Restraining Order of October 6, 2022. *See Antonyuk II*, 2022 WL 5239895, at *9. In so doing, the Court construes the number of States and/or Colonies having such laws (or how "widespread" the laws were) as being relevant to *NYSRPA*'s requirement that a historical analogue be "well-established," which appears different that it being "representative" (presumably of the Nation's population). *See NYSRPA*, 142 S. Ct. at 2133 ("[A]nalogical reasoning requires only that the government identify a *well-established* and *representative* historical analogue, not a historical twin.") (emphasis added). The Court finds this construction of a distinction between the *number* of States and the *population* of States (a sort of Connecticut Compromise) to be consistent not just with *NYSRPA* but with the State Defendants' request that the Court not "do[] a disservice to federalism." (Dkt. No. 72, at 50 [Prelim. Inj. Hrg. Tr.].)

[6]    *See NYSRPA*, 142 S. Ct. at 2154-56 (relying on the 1890 census to measure the population percentages of Western Territories and cities).

14

less weight is generally given to laws from Western Territories because of, in part,[7] the smaller "territorial populations who would have lived under them." *NYSRPA*, 142 S. Ct. at 2154-56 ("The exceptional nature of these western restrictions is all the more apparent when one considers the miniscule territorial populations who would have lived under them. . . . [W]e will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also contradict the overwhelming weight of other, more contemporaneous historical evidence.") (internal quotation marks omitted). Similarly, less weight is generally given to "bare . . . localized restrictions" (or city laws unaccompanied by similar laws from states), because they "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *NYSRPA*, 142 S. Ct. at 2154 ("We . . . will not stake our interpretation of the Second Amendment upon a law in effect in . . . a single *city*[] that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense."). (emphasis added and internal quotation marks omitted).

To "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, they must use at least "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *NYSRPA*, 142 S. Ct. at 2132-33. More specifically, courts must consider the following: (1) "whether modern and historical regulations impose a comparable burden on the

---

[7] Other reasons to generally give less weight to the laws of Western Territories include the fact that those law were "temporary" (due to the "transitional . . . character of the American [territorial] system") and the fact that they were "rarely subject to judicial scrutiny" (causing us to "not know the basis of their perceived legality"). *NYSRPA*, 142 S. Ct. at 2155-56.

right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id.* at 2133.

Granted, in some cases, this inquiry "will be fairly straightforward." *NYSRPA*, 142 S. Ct. at 2131. For example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* "And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

However, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *NYSRPA*, 142 S. Ct. at 2132. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

## III.  ANALYSIS

### A.  Extent to Which Plaintiffs Have Standing and Defendants Are Proper

As indicated above, before even pursuing the analytical inquiry set forth in *NYRPA*, the Court needs to address two threshold issues: (1) the extent to which Plaintiffs have standing; and

(2) the extent to which the Defendants are proper parties. Although the Court set forth these legal standards in more detail in its Decision and Order *in Antonyuk I*, it will repeat the most-salient points of law here, usually without supporting legal citations (for the purpose of brevity). *Antonyuk I*, 2022 WL 3999791, at *10-11, 15-16.

A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought. However, only one plaintiff must have standing to seek each form of relief requested in the complaint. To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. The injury-in-fact requirement helps to ensure that the plaintiff has a personal stake in the outcome of the controversy. Accordingly, an injury sufficient to satisfy Article III must be concrete and particularized, and actual or imminent, not conjectural or hypothetical.

Where, as here, plaintiffs challenge a law not yet been applied to them, they need not show that they are subject to an actual arrest, prosecution, or other enforcement action as a prerequisite to challenging the law. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) ("When an individual is subject to such a threat [of enforcement], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."). Rather, a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of

17

prosecution or *enforcement* thereunder. *See Susan B. Anthony List*, 573 U.S. at 158-59 ("Instead, we have permitted pre-enforcement review under circumstances that render the *threatened enforcement* sufficiently imminent.") [emphasis added]. Granted, the plaintiffs are not required to confess that they will in fact violate the law. However, "someday" intentions—without any description of concrete plans, or indeed even any specification of when the "someday" will be— do not support a finding of the 'actual or imminent' injury that our cases require.

With regard proper-defendant status, the "case or controversy" limitation of Art. III of the Constitution still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court. A general enforcement duty is insufficient; there must be some "particular duty" to enforce the law.

### 1. Standing to Challenge License-Application Requirements

In pertinent part, the challenged paragraphs of the Section 1 of the CCIA provide as follows:

> No license shall be issued or renewed except for an applicant . . . of good moral character, which, for the purposes of this article, shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others . . . .
>
> [T]the applicant shall meet in person with the licensing officer for an interview and shall, in addition to any other information or forms required by the license application submit to the licensing officer the following information: (i) names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home; (ii) names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that

suggest they are likely to engage in conduct that would result in harm to themselves or others; (iii) certification of completion of the training required in subdivision nineteen of this section; (iv) a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants [sic]character and conduct as required in subparagraph (ii) of this paragraph; and (v) such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application. . . .

On September 19, 2022, Plaintiff Sloane swore as follows: (1) he lives in Onondaga County and is "a law-abiding person who does not currently possess a New York carry license"; (2) he has "always wanted to obtain a carry permit" but he never applied for one before the Supreme Court's decision in *NYSRPA*, because he did not believe he would be found to have a special need for self-protection distinguishable from that of the general community; (3) after *NSRPA* was issued, he "intended to apply for [his] carry license, and began looking into the process"; (4) he refuses to provide a list of four character references, a list of his cohabitants, a list of his social-media accounts for the past three years (which he does have), and other information required by the licensing officer (such as "information about [his] associates"); (5) he also refuses to complete 18 hours of firearm training (which would require "a minimum of two days, . . . cost [him] hundreds of dollars" and subject him to suicide-prevention training, to which he objects) or participate in an in-person meeting with the licensing officer; (6) as a result, he cannot complete the application; (7) because the CCIA states "No license shall be issued" without first providing the licensing official with all of the required information, and because the Onondaga Sheriff's website instructs that "[i]ncomplete applications will not be processed at the time of your appointment. Your entire application will be returned to you and you will be instructed to reschedule your appointment," he sincerely believes his incomplete application would be denied; (8) if the provisions he challenges were not in effect, he would "immediately

19

submit [his] application for a concealed carry license"; (9) in any event, even setting aside this fact that he has not yet applied for a license, and the fact that it would be denied if it was incomplete, if he were to apply, he is (as of September 19, 2022) unable to "even secure an appointment with the Onondaga Sheriff's Office [to simply submit his application to the Sheriff's Office so it will be processed] until October 24, 2023, or 58 weeks from now"; and (10) "'walk-in service' is not available [Sheriff's Office], so [he] must make an appointment to even submit [his] application."  (Dkt. No. 1, Attach. 4, at ¶¶ 3-5, 7, 8, 10, 15-17, 20-21, 23-24, 29-30 [Sloane Decl.].)  Because the State Defendants waved their right to cross-examine Plaintiff Sloane at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Sloane at his word. (Dkt. No. 58 [Stipulation].)

Defendant Conway admits he is both (1) the Sheriff of Onondaga County with jurisdiction to "enforce the laws of the state including CCIA," and (2) "the official to whom residents of Onondaga County submit applications for firearms licenses."  (Dkt. No. 1, at ¶ 13 [Plfs.' Compl.]; Dkt. No. 35, at ¶ 13 [Conway Answer].)  He admits his Office's Pistol License Unit "is responsible for maintaining pistol license files, issuing new pistol licenses, . . . [and] conducting criminal investigation of pistol licensees when warranted . . . ."  (*Id*.)  He admits he "requires an applicant for a license to schedule an appointment to turn in the required paperwork."  (*Id*.)  Moreover, he admits his Office's website states that "in order to proceed all four character reference forms must be completed and signed, and applicants must have attended and received a certificate from an approved handgun safety course certified instructor, an applicant is not to schedule an appointment until the application prerequisites have been met, and

incomplete applications will not be processed at the time of any appointment." (Id.)[8] As a result, the Court finds that Defendant Conway has been charged with the specific duty to enforce the CCIA while processing applications for a firearms license.

Defendant Doran admits he is a "'licensing officer' for Onondaga County described in N.Y. Penal Law § 265.00(10) and, as such, is responsible for the receipt and investigation of carry license applications, along with the issuance or denial of carry licenses." (Dkt. No. 1, at ¶ 11 [Plfs.' Compl.]; Dkt. No. 35, at ¶ 11 [Doran Answer].) More importantly, Defendant Doran admits he is "the proper party with respect to Plaintiffs' challenge to the CCIA's requirement and definition of 'good moral character,' along with its associated requirements of an in-person interview, disclosure of a list of friends and family, provision of four 'character references,' and provision of three years of social media history." (Id.)[9] The State Defendants concede that "redressability might be present with respect to [Defendant] Doran." (Dkt. No. 48, at 32-33.) They also agree that, if an incomplete application were submitted to him, he would act "in accordance with the law . . . ." (Dkt. No. 23, at 48 [Temp. Restrain. Order Hrg. Tr.].) As a result, the Court finds that Defendant Doran has been charged with the specific duty to enforce Section 1 of the CCIA and, specifically, to "issu[e] or den[y] . . . carry licenses" in accordance

---

[8]    The Court notes that Plaintiffs argue that Defendant Conway's delay in accepting license applications violates N.Y. Penal Law § 400(4-b), which requires that "[a]pplications for licenses shall be accepted for processing by the licensing officer at the time of presentment …." (Dkt. No. 6, Attach. 1, at 10, n.5.)

[9]    The Court also finds Defendant Doran to be the proper Defendant as to Plaintiff Sloane's challenge to the CCIA's requirement of "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application."

with it.  *Cf. NYSRPA*, 142 S. Ct. at 2125 (treating a licensing officer as a proper defendant in the context of an as-applied challenge).

Furthermore, Plaintiffs allege that the Superintendent of the State Police (who is now Defendant Nigrelli) "exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including prescribing the form for Handgun Carry License applications."  (Dkt. No. 1, at ¶ 10 [Plfs.' Compl.].)[10] In *Antonyuk I*, the Court had occasion to examine the "fairly traceable" involvement of the Superintendent of the State Police (then Kevin Bruen) in the challenge to Section 1 asserted here by Plaintiff Sloane (and asserted then by Plaintiff Antonyuk).  *Antonyuk I*, 2022 WL 3999791, at *12-13.  In pertinent part, the Court found the Superintendent's "fairly traceable" involvement resulted from two specific duties: (1) his duty to "promulgate policies and procedures with regard to standardization of the newly required 18 hours of firearms safety training (including the approval of course materials and promulgation of proficiency standards for live fire training) and create an appeals board for the purpose of hearing appeals"; and (2) his duty to "approve the curriculum for the 18-hour firearm training course that must be completed by an applicant prior to the issuance or renewal of a license application and promulgate rules and regulations determining

---

[10]     The Court has previously examined the statutory source of Plaintiffs' "prescribing the form" allegation (N.Y. Penal Law § 400.00[3]), and found the approval obligation conferred by that source of little if any relevance, because that the plaintiff in that case (Antonyuk) did "not appear to challenge the way [the] Superintendent [of the State Police] 'prescrib[es] the form for Handgun Carry License applications.'"  *Antonyuk I*, 2022 WL 3999791, at *12-13.  A comparison of the Complaint in *Antonyuk* I and the Complaint in *Antonyuk II* does not lead the Court to reconsider that finding.

22

the proficiency level for the live-fire range training." *Id.* Here, as previously stated, Plaintiff

Sloane objects to the 18-hour requirement and in particular the requirement of suicide-prevention

training. As a result, the Court finds that Defendant Nigrelli has been charged with the specific

duty to enforce the 18-hour requirement to which Plaintiff Sloane objects.

Moreover, the Court finds that the fact that Defendants Conway and Doran would not

even *process* an application from Plaintiff Sloane until October 24, 2023, due to a lack of

available appointments renders his application futile for the purpose of standing to sue, because

such a delay would effectively deny him his Second Amendment right for more than a year. *See

NYSRPA*, 142 S. Ct. at 2138, n.9 ("That said, because any permitting scheme can be put toward

abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for

example, lengthy wait times in processing license applications . . . deny ordinary citizens their

right to public carry.").[11]

In light of this evidence, the Court finds that Plaintiff Sloane has shown (1) an injury in

fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment

caused through the futility of an application for a concealed-carry license), (2) a sufficient causal

connection between the injury and the conduct complained of (i.e., the continued enforcement of

Section 1 of the CCIA by Defendants Conway, Doran and Nigrelli despite the futility of an

---

[11]     The Court notes that Plaintiffs persuasively argue that any delay by Defendant Conway's
Office in accepting and/or processing presented license applications appears to violate N.Y.
Penal Law § 400(4-b) itself, because it requires that (1) "[a]pplications for licenses shall be
accepted for processing by the licensing officer at the time of presentment," and (2) "[e]xcept
upon written notice to the applicant specifically stating the reasons for any delay, in each case
the licensing officer shall act upon any application for a license pursuant to this section within
six months of the date of presentment…."  (Dkt. No. 6, Attach. 1, at 10, n.5.)

application for a concealed-carry license), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by Defendants Conway, Doran and Nigrelli (who, again, each has the specific duty to enforce Section 1).

For these reasons, the Court finds that Plaintiff Sloane has standing to challenge this regulation, and that Defendants Conway, Doran and Nigrelli are proper Defendants to this challenge.

### 2. Standing to Challenge Prohibition in "Sensitive Locations"

#### a. "[A]ny place … under the control of federal, state or local government, for the purpose of government administration …"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations: "[A]ny place owned or under the control of federal, state or local government, for the purpose of government administration, including courts."

None of the six Plaintiffs has alleged or sworn a sufficiently concrete intention to carry concealed in any of the locations listed in this regulation in the immediate future. (*See generally* Dkt. No. 1 [Plfs.' Compl.]; Dkt. No. 1, Attach. 3 [Johnson Decl.]; Dkt. No. 1, Attach. 4 [Sloane Decl.]; Dkt. No. 1, Attach. 5 [Leman Decl.]; Dkt. No. 1, Attach. 8 [Antonyuk Decl.]; Dkt. No. 1, Attach. 9 [Mann Decl.]; Dkt. No. 1, Attach. 10 [Terrille Decl.].)

The only Plaintiff who comes close to alleging or asserting a concrete intention to carry concealed on government property or in a government building in the immediate future is Plaintiff Leman. More specifically, on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . government property and buildings." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, Plaintiff Leman does not swear that he

*intends* to carry concealed on government property or in government buildings in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter). (*Id.*) As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation.

As a result, the Court denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.[12]

> b.  "[A]ny location providing health, behavioral health, or chemical dependance care or services"

The only Plaintiffs who come close to alleging or asserting a concrete intention to carry concealed in one of the locations listed in this regulation in the immediate future are Plaintiffs Leman and Mann. More specifically, on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . medical facilities and offices." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, Plaintiff Leman does not swear that he *intends* to carry concealed in a particular medical facility or office in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter). (*Id.*) As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation. The Court reaches a different conclusion with regard to Plaintiff Mann.

---

[12]     To the extent this finding of lack of standing is in error, the Court would have concluded that the Supreme Court has already recognized the permissibility of this regulation. *See NYSRPA*, 142 S. Ct. 2133 ("[T]he historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited . . . [other than, for example, legislative assemblies, … and courthouses]."); *Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as . . . government buildings . . . .").

On September 19, 2022, Plaintiff Mann swore as follows: (1) he is "the pastor at

Fellowship Baptist Church," which is "a small ministry located in the rural upstate town of

Parish, New York" (in Oswego County); (2) he is also "a law-abiding person" who "currently

possesses and, since 2014, ha[s] maintained an New York carry permit"; (3) the church has

"morning and evening services every Sunday, together with an evening service every

Wednesday," and it "regularly ha[s] other gatherings and events at the church, not only for

church attendees but also the general public"; (4) "since [Fellowship Baptist Church is] a small

church, [it is] unable to afford to pay for private security who might be exempt from the CCIA";

(5) as a result, he is "unable to comply with . . . the CCIA", and thus [he] intend[s] to continue to

[carry his handgun concealed in the church]"; (6) "[i]In addition to the church ministry,

Fellowship Baptist Church provides and has provided counseling and assistance . . . to the

homeless, youth, in the domestic violence and abuse setting"; (7) the church's "RU Recovery"

program also currently provides "counsel[ing]" to "persons addicted to drugs"; (8) in the past, he

has carried his licensed concealed handgun when counseling such persons in the program both at

the church and at the homes of those persons (to which he has traveled "frequently"); and (9) he

"intend[s] to continue" to do so.  (Dkt. No. 1, Attach. 9, at ¶¶ 1, 3, 8, 10, 26, 28-29 [Mann

Decl.].)[13]  Because the State Defendants waved their right to cross-examine Plaintiff Mann at the

---

[13]     Under the circumstances asserted, the Court finds that, for purposes of Paragraph "(b)" of
Section 4 of the CCIA, the church's "RU Recovery program" is, at the same time, (1) a location
"providing . . . chemical dependance care or services," and (2) a location "providing . . .
behavioral health . . . care or services."  This is because, based on the nature of the asserted
counseling, "behavioral health . . . care or services" appears to be as much a part of his
counseling of persons "addicted to drugs" as does "chemical dependance care or services."
However, the Court finds that for purposes of Paragraph "(b)" of Section 4 of the CCIA, the
church's "RU Recovery program" has not been shown to be a location "providing health . . . care
or services."  Granted, the Court finds a certain appeal to the argument of Plaintiffs' counsel that

Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Mann (a pastor) at his word.  (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Mann has alleged he has frequently carried concealed while working in Fellowship Baptist Church's RU Recovery program and will do so again, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.  *See, e.g., Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1332-37 (11th Cir. 2013) (finding that "the alleged violations of [the plaintiff's] statutory rights under Title III may constitute an injury-in-fact, even though he is a mere tester of ADA compliance," and that the plaintiff had alleged particularized facts demonstrating that he "frequent[ly]" visited the area near defendant's property and would "likely" do so again).

---

the general term "health care or services" subsumes the more-specific terms "behavioral health care or services" and "chemical dependance care or services."  (Dkt. No. 72, at 25 [Prelim. Inj. Hrg. Tr.].)  However, Plaintiffs have not provided, and the Court has not found, any New York State or federal authority supporting a conclusion that the RU Recovery program provides "health . . . care or services."  Furthermore, Plaintiff Mann acknowledges that he counsels drug addicts to "*seek* help and voluntarily *enter* treatment" (i.e., he does not actually provide that treatment).  (Dkt. No. 1, Attach. 9, at ¶ 28 [Mann Decl.] [emphasis added].)

Moreover, based on the brazen nature of Plaintiff Mann's intended defiance,[14] the fact that at least one of his congregants is a member of local law enforcement,[15] and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[16] the Court finds that a sign of Plaintiff Mann's "concealed" handgun (whether it be a glimmer of steel or a bulge of a coat) is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[17]

With regard to which Defendants to this challenge are proper, granted, on July 20, 2022, Defendant Hilton, the Sheriff of Oswego County, stated in a Facebook post as follows: "I'll be clear, as long as I'm the Sheriff in this county . . . we're going to be very conservative in

---

[14]     (*See, e.g.,* Dkt. No. 1, Attach. 9, at ¶¶ 4, 11, 20, 25, 29-33 [Mann Decl., swearing, "I intend to continue various activities in violation of the CCIA … I intend to continue to possess and carry my firearm while on church property, in violation of the CCIA.…  I have no choice but to violate this immoral, unbiblical, and unconstitutional law, and intend to continue to possess my firearm in my church and in my home.… I intend this act of civil disobedience …. I intend to continue to operate as I always have with respect to possessing my firearms at the church.… I intend to continue to possess firearms on church property to protect our entire congregation, including our children.… I cannot comply with that restriction, and intend to continue to operate as I always have with respect to possessing firearms at the church …. I do not intend to comply…  I do not intend to comply."].)

[15]     (*See, e.g.,* Dkt. No. 1, Attach. 9, at ¶ 23 [Mann Decl., swearing that "at least one of the congregants in my church is in local law enforcement and, as part of the church, is aware of my inability to avoid violating the CCIA by keeping a firearm in my home on church property"].)

[16]     *See, e.g.,* "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," YouTube (Aug. 31, 2022), https://www.youtube.com/watch?v=gC1L2rrztQs (last visited Nov. 1, 2022).

[17]     *See Antonyuk I,* 2022 WL 3999791, at *17 n.16 ("This discovery might be as obvious as a passerby catching sight of a glimmer of steel as a permit holder is transferring his or her handgun to his trunk in a parking lot of a gas station … , or it might be as subtle as noticing a bulge under the coat of a permit holder, whether it be under the permit holder's arm, on his or her hip, or at the small of his or her back.").

28

enforcement of this law." (Dkt. No. 1, Attach. 9, at ¶ 24 [Mann Decl.].)  However, on July 20,

2022, Defendant Hilton stated in a Facebook post as follows: "Under the new law, taking a

legally licensed firearm into any sensitive area – such as a . . . church . . . is a felony punishable

by up to 1 1/3 to 4 years in prison." (*Id*.)  Similarly, on August 31, 2022, Defendant Hilton

stated in a Facebook post as follows: "If you own a firearm please be aware of these new laws as

they will effect [sic] all gun owners whether we agree with them or not." (*Id*.)  As a result, the

Court finds that Defendant Hilton has been charged with, and/or has assumed, the specific duty

to enforce the CCIA.  *Cf. NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) (reviewing disposition

of claims under the Secure Ammunition and Firearms Enforcement Act against, inter alia, the

Chief of Police for the Town of Lancaster, New York, without discussing the impropriety of him

being a defendant).

Moreover, Defendant Oakes serves as the District Attorney of Oswego County where the

Fellowship Baptist Church is located.  (Dkt. No. 1, at ¶ 16 [Plfs.' Compl.]; Dkt. No. 1, Attach. 9,

at ¶ 24 [Mann Decl.].)  Because of this capacity, and because of both the stated policy of

Defendant Hilton and the stated policy of the New York State Police,[18] the Court finds that

Defendant Oakes has been charged with the specific duty to enforce the CCIA.  *See, e.g.*,

---

[18]     On or August 31, 2022, Defendant Nigrelli stated as follows in a YouTube video:

> We ensured that the lawful, responsible gun owners have the tools now to
> remain compliant with the law. For those who choose to violate this law
> … Governor, it's an easy message. I don't have to spell it out more than
> this. We'll have zero tolerance. If you violate this law, you will be
> arrested. Simple as that. Because the New York State Troopers are
> standing ready to do our job to ensure ... all laws are enforced.

(Dkt. No. 1, Attach. 9, at ¶ 22, n.5 [Mann Decl.].)

*Maloney v. Cuomo*, 470 F. Supp.2d 205, 211 (E.D.N.Y. 2007) (finding district attorney to be proper defendant to statute prohibiting the in-home possession of nunchaku) (citing *Baez v. Hennessy*, 853 F.2d 73, 76 [2d Cir. 1988] for the point of law that "[i]t is well established in New York that the district attorney, and the district attorney alone, should decide when and in what manner to prosecute a suspected offender"), *vacated on other grounds, Maloney v. Cuomo,* 390 F. App'x 29 (2d Cir. 2010).

Furthermore, Defendant Nigrelli now serves as the Acting Superintendent of the New York State Police. Plaintiffs allege that the Superintendent of the State Police "exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public . . . ." (Dkt. No. 1, at ¶ 10 [Plfs.' Compl.].) In *Antonyuk I*, the Court found that the "fairly traceable" involvement of the Superintendent of the State Police (then Kevin Bruen) resulted from his duty to supervise (and direct) the "enforcement of the CCIA . . . performed by state police officers," particularly "the investigation, arrest, and charging of Plaintiffs (and their members) by state police officers." *Antonyuk I*, 2022 WL 3999791, at *13 (citing N.Y. Exec. Law § 223[1]). In so doing, the Court distinguished the four cases offered by the State Defendants in support of their argument to the contrary. *Id*. at 13 & n.9 (citing the four cases). The Court explained,

> [B]ecause the fact-specific rulings in those cases were rendered before the enactment of the CCIA (and often resulted from vague allegations by the plaintiffs), none of the cases involved (as this case involves) a pointed challenge to the enforcement of the state licensing laws' list of 'sensitive locations' and definition of 'restricted locations,' which can fairly be described as sweeping in scope.

*Id.*

In any event, unlike Superintendent Kevin Bruen in *Antonyuk I*, here Defendant Nigrelli

has been shown to have threatened a "zero tolerance" enforcement of the CCIA. On or August

31, 2022, Defendant Nigrelli stated as follows in a YouTube video:

> We ensured that the lawful, responsible gun owners have the tools now to
> remain compliant with the law. For those who choose to violate this law
> … Governor, it's an easy message. I don't have to spell it out more than
> this. We'll have zero tolerance. If you violate this law, you will be
> arrested. Simple as that. Because the New York State Troopers are
> standing ready to do our job to ensure ... all laws are enforced.

(Dkt. No. 1, Attach. 9, at ¶ 22, n.5 [Mann Decl.].) Of course, here, Defendant Nigrelli did not

*limit* his YouTube message to Plaintiffs, as the defendants did in *Cayuga Nation v. Tanner,* 824

F.3d 321, 331 (2d Cir. 2016).[19] However, five of the six Plaintiffs were members of the *specific*

group of citizens (concealed-carry license holders) in New York State that was orally and visibly

threatened by Defendant Nigrelli on August 31, 2022.[20] The fact that the oral and visible threat

---

[19]    *See Cayuga Nation v. Tanner,* 824 F.3d 321, 331 (2d Cir. 2016) (finding that the
plaintiffs had adequately alleged that they faced a credible threat of prosecution by alleging they
had received a written notice from a Village stating that "Mr. Halftown's group is in violation of
[a local anti-gambling ordinance]" and that Tanner "has served violation notices on Mr.
Halftown's group and will be proceeding in court to compel compliance").

[20]    Although the parties have not adduced evidence of the number of concealed-carry license
holders currently existing in New York State, the Court assumes it to be less than about 100,000.
Because five of the six Plaintiffs are members of this group (against whom the regulation
"directly operate[s]"), the Court finds that they have "assert[ed] a sufficiently direct threat of
personal detriment." *Doe v. Bolten*, 410 U.S. 179, 188 (1973) ("We conclude . . . that the
physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also
present a justiciable controversy and do have standing despite the fact that the record does not
disclose that any one of them has been prosecuted, or threatened with prosecution, for violation
of the State's abortion statutes. The physician is the one against whom these criminal statutes
directly operate in the event he procures an abortion that does not meet the statutory exceptions
and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal
detriment. They should not be required to await and undergo a criminal prosecution as the sole
means of seeking relief."), *abrogated on other grounds, Dobbs v. Jackson Women's Health
O*rganization, 142 S. Ct. 2228 (2022).

occurred by video rather than in person fails to serve as a material distinction here, in the Court's view. For example, the fact that Nigrelli did not personally know yet of Defendant Mann's existence (as he does now) appears of little consequence, given that Defendant Nigrelli's 3,500 State Troopers[21] were "standing ready" to investigate and discover the violators. Indeed, the fact that the threat occurred by video actually increases the potency of it, due to its ability to be replayed. And Plaintiff Mann *heard* the message. It is difficult to see how one could fairly say that Defendant Nigrelli did not expressly direct his threat, in part, at Plaintiff Mann. (Dkt. No. 1, Attach. 9, at ¶ 22, n.5 [Mann Decl.].)[22] In this way, Defendant Nigrelli's statement on August 31, 2022, was more than (as the State Defendants argue) a "generalized statement[] made . . . in the press." (Dkt. No. 48, at 34.) Rather, his statement specifically referenced arrest and was made in a YouTube video aimed specifically at license holders such as Plaintiff Mann who were considering violating Sections 4 or 5 of the CCIA.[23] As a result, the Court finds that Defendant Nigrelli has been charged with, and/or has assumed, the specific duty to enforce the CCIA.

---

[21]     *See* "Overview," New York State Police Website, https://troopers.ny.gov/troopers (last visited Nov. 1, 2022) ("The Uniform Force of the New York State Police is made up of more than 3,500 men and women.").

[22]     Moreover, the plaintiffs in *Cayuga Nation* had already violated the law. *Cayuga Nation*, 824 F.3d at 325. Here, of course, Plaintiff Mann need not violate the law, or even *confess* to future such violation, to acquire standing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2104) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.").

[23]     For this reason, the Court finds the four cases cited by the State Defendants to be distinguishable. *See, e.g., Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 706, 709 (2d Cir. 2022) (considering mere "'guidance letters' and a press statement issued by the New York State Governor's Office"); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (considering a mere "FAQ"); *Seegars v. Gonzalez*, 396 F.3d 1248, 1255 (D.C. Cir. 2005) (considering merely "the District's position in prior litigation"); *Frey v. Bruen*, 21-CV-05334,

Finally, the Court finds that these threats of arrest and prosecution, or even mere citation and/or seizure of his handgun, are enough to show that Plaintiff Mann faces a credible threat of enforcement of Section 4 of the CCIA, which is fairly traceable to Defendants Hilton, Oakes and Nigrelli. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) ("[W]e have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent.") [emphasis added].

In light of all of this evidence, the Court finds that Plaintiff Mann has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused through a credible threat of enforcement of this regulation), (2) a sufficient causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Hilton, Oakes and Nigrelli have sufficiently threatened to enforce Section 4 of the CCIA against Plaintiff Mann in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by Defendants Hilton, Oakes and Nigrelli (who, again, each has the specific duty to enforce Section 4).

For all of these reasons, the Court finds that Plaintiff Mann has standing to challenge this regulation as it regards "behavioral health . . . care or services" and "chemical dependance care or services," and that Defendants Hilton, Oakes and Nigrelli are proper Defendants to that challenge.

### c.    "[A]ny place of worship or religious observation"

---

2022 WL 522478, at *5 (S.D.N.Y. Feb. 22, 2022) ("Plaintiffs aver that a credible threat of prosecution exists as the Superintendent has not stated the criminal statutes will not be enforced against Plaintiffs.") (emphasis added).

As the Court stated above in Part III.A.2.b. of this Decision, in his declaration, Plaintiff Mann repeatedly swore that (1) in the past he has carried his licensed concealed handgun in the Fellowship Baptist Church, and (2) he intends to continue to do so. (Dkt. No. 1, Attach. 9, at ¶¶ 1, 3, 4, 10-11, 20, 25, 28-29, 39-33 [Mann Decl.].) He has also sworn that he has possessed his licensed handgun concealed in his home or "parsonage" (which is attached to the church) while he has held "Bible studies, meetings of elders, and other church gatherings" there. (*Id*. at ¶¶ 12-14.) As a result, and for the reasons stated above in Part III.A.2.b. of this Decision, the Court finds that Plaintiff Mann has standing to challenge this regulation, and that Defendants Hilton and Oakes are proper Defendants to this challenge

### d. "[L]ibraries, public playgrounds, public parks, and zoos"

To the extent that this regulation applies to "[l]ibraries," the Court finds, upon closer examination of the Complaint and declarations (and in the absence of Preliminary Injunction Hearing testimony), that none of the six Plaintiffs has alleged or sworn a sufficiently concrete intention to, in the immediate future, carry concealed there. (*See generally* Dkt. No. 1 [Plfs.' Compl.]; Dkt. No. 1, Attach. 3 [Johnson Decl.]; Dkt. No. 1, Attach. 4 [Sloane Decl.]; Dkt. No. 1, Attach. 5 [Leman Decl.]; Dkt. No. 1, Attach. 8 [Antonyuk Decl.]; Dkt. No. 1, Attach. 9 [Mann Decl.]; Dkt. No. 1, Attach. 10 [Terrille Decl.].) The Court notes that, although Plaintiff Leman has sworn that, as a volunteer firefighter, he has "responded to calls at . . . libraries" (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.]), he has not sworn that he *intends* to carry concealed in a library in the *immediate* future, or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter (*id*). As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation.

As a result, the Court reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to "libraries" for lack of standing.[24] However, the Court reaches a different conclusion with regard to this regulation as it regards "public playgrounds," "public parks," and "zoos."

With regard to "public playgrounds" and "public parks," on September 19, 2022, Plaintiff Terrille swore as follows: (1) he lives in Albany County, possesses a New York State concealed-carry license, and "routinely carr[ies] [his] handgun concealed when [he] leave[s] home" except in "courthouses, schools, government buildings, or the other obvious 'sensitive places'"; (2) his handgun "generally does not leave my side" except in "courthouses, schools, government buildings, or the other obvious 'sensitive places'"; (3) "in addition to being a father, [he is] now grandfather to 5 grandchildren," and "[i]n that role, it is [his] duty to protect [his] family"; (4)

---

[24]     To the extent this finding is in error, the Court states that it would have found that, based on a comparison of the burdensomeness of this regulation to the burdensomeness of its historical analogues, this regulation appears to be disproportionately burdensome. Granted, by 1883 (fifteen years after the ratification of the Fourteenth Amendment), two states had passed laws prohibiting firearms in places where persons are assembled for "educational" or "literary" purposes. However, the remaining 36 states had not. Furthermore, lending libraries and public libraries indeed existed in America the 19th century and the late-18th century (thanks in no small part to Benjamin Franklin and Andrew Carnegie). *See, e.g.,* Dept. of Interior, Compendium of Seventh Census: 1850, Table XLVI (1850) (counting 1,217 public libraries). However, the State Defendants do not cite (and the Court has been unable to locate) any laws from those time periods prohibiting firearms in "libraries." Moreover, the Court acknowledges the frequent presence and activities of children in libraries (and the general analogousness of this regulation to historical laws prohibiting firearms in schools). However, the regulation does not limit the ban to "school libraries" or the "children's sections of libraries;" and public libraries are also commonly patronized by adults. Finally, the burden on law-abiding responsible citizens who have obtained a license to carry concealed (after providing four character references, completing numerous hours of firearms training, and satisfied the demands of a licensing officer) appears even more unjustified when one considers that public libraries (which are often quite responsive to the needs of their patrons) are more than capable of instituting policies prohibiting concealed carry themselves.

"[a]s part of [his] activities with [his] grandchildren . . . [he] . . . routinely take[s] [his] grandkids to Thatcher State Park, in Albany County, where [they] utilize the … playground for children"; and (5) "[he] intend[s] to carry [his] firearm when [his] family visits the Park in the future, something that occurs and will continue to occur on at least a monthly basis."  (Dkt. No. 1, Attach. 10, at ¶¶ 1, 4, 7-8 [Terrille Decl.].)  Because the State Defendants waved their right to cross-examine Plaintiff Terrille at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Terrille at his word.  (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Terrille has alleged he has frequently carried concealed in public playgrounds and public parks and will do so again, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.  *See, e.g., Houston*, 733 F.3d at 1332-37 (finding that "the alleged violations of [the plaintiff's] statutory rights under Title III may constitute an injury-in-fact, even though he is a mere tester of ADA compliance," and that the plaintiff had alleged particularized facts demonstrating that he "frequent[ly]" visited the area near defendant's property and would "likely" do so again). Moreover, based on the brazen nature of Plaintiff Terrille's intended defiance, and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[25] the Court finds that a sign of Plaintiff Terrille's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[26]

---

[25]     *See, supra,* note 16 of this Decision.

[26]     *See, supra,* note 17 of this Decision.

With regard to the proper Defendants to this challenge, the Court finds that Defendant Soares is a proper Defendant to Plaintiff Terrille's challenge with regard to "public playgrounds" and "public parks" because Soares is the District Attorney of Albany County. (Dkt. No. 1, at ¶ 1 [Compl.].) Because of this capacity, and because of the stated policy of both the Governor and the New York State Police,[27] the Court finds that Defendant Soares has been charged with the specific duty to enforce the CCIA. *See, e.g., Maloney v. Cuomo*, 470 F. Supp.2d 205, 211 (E.D.N.Y. 2007) (finding district attorney to be proper defendant to statute prohibiting the in-home possession of nunchaku) (citing *Baez v. Hennessy*, 853 F.2d 73, 76 [2d Cir. 1988] for the point of law that "[i]t is well established in New York that the district attorney, and the district attorney alone, should decide when and in what manner to prosecute a suspected offender"), *vacated on other grounds, Maloney v. Cuomo,* 390 F. App'x 29 (2d Cir. 2010).

The Court also finds that Defendant Nigrelli is a proper Defendant to Plaintiff Terrille's challenge with regard to "public playgrounds" and "public parks" (particularly Thatcher State Park) for the same reasons as stated above in Part III.A.2.b. of this Decision.

Also with regard to "public playgrounds," on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . libraries." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, he has not sworn that he *intends* to carry concealed in a library in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter). (*Id*.) As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation as it regards "public playgrounds."

---

[27]     *See, supra,* note 18 of this Decision.

However, with regard to "public parks," Plaintiff Johnson swore as follows: (1) he lives in Onondaga County, possesses a New York State concealed-carry license, and "routinely carr[ies] [his] handgun concealed when [he] leave[s] home" except in "courthouses, schools, government buildings, or the other obvious 'sensitive places'"; (2) "[he] consider[s] [him]self to be an outdoorsman[] [and] an avid fisherman, and routinely go[es] on hiking and camping trips throughout the state, including in numerous parks covered by the CCIA . . . "; (3) "[f]or example, many times recently [he has] gone fishing in Mercer Park on the Seneca River in Baldwinsville, New York" (in Onondaga County); (5) "[he] intend[s] to continue to carry [his] firearm when [he] go[es] fishing in Mercer Park"; (6) "[a]lthough [he] cannot provide a definitive day and time that this will next occur, it is safe to say that [he] will go fishing within the next month, before the water gets too cold and the bass stop biting"; (7) "[i]n addition, [he] currently ha[s] plans with [his] wife to take a trip in October of 2022, to include a tour of several state parks within New York, where [they] will engage in various recreational activities such as fishing and sightseeing…"; (8) "[f]or example, as part of [their] trip, [they] plan to visit Bowman Lake State Park" (in Chenango County); (9) he "intend[s] to" carry his licensed concealed handgun "on this upcoming trip"; and (10) "[d]uring New York winters, [he and his wife] often take extended snowmobile trips throughout public parks . . . , often participating in . . . competitions where snowmobilers are required to follow a prescribed course and check in various locations along the way . . . ."  (Dkt. No. 1, Attach. 3, at ¶¶ 1, 4, 6-9, 12 [Johnson Decl.].) Because the State Defendants waved their right to cross-examine Plaintiff Johnson at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Johnson at his word.  (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Johnson has alleged he has frequently carried concealed in public parks and will do so again soon, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA. *See, e.g., Houston*, 733 F.3d at 1332-37. Moreover, based on the brazen nature of Plaintiff Johnson's intended defiance, and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[28] the Court finds that a sign of Plaintiff Johnson's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[29]

With regard to the proper Defendants to this challenge, the Court finds that Defendants Conway (the Sheriff of Onondaga County) has the "county-wide" duty "enforce the laws of the State of New York, including the CCIA." (Dkt. No. 1, at ¶ 13 [Compl.]; Dkt. No. 35, at ¶ 13 [Cnty. Defs.' Answer].) Similarly, the Court finds that Defendant Fitzpatrick (the District Attorney of Onondaga County) has "a duty to conduct prosecutions for crimes and offenses cognizable by the courts of Onondaga County." (Dkt. No. 1, at ¶ 12 [Compl.]; Dkt. No. 35, at ¶ 12 [Cnty. Defs.' Answer].)

The Court finds that Defendants Conway and Fitzpatrick are proper Defendants to Johnson's challenge with regard to "public parks" (and in particular Mercer Park in Baldwinsville) despite these Defendants' stated policy that violators of the CCIA will (1) "have their weapons confiscated while prosecutors investigate any other criminal activity," and (2) be "referred to the judge who granted them concealed-carry licenses in the first place, possibly leading to the revocation of their carry privileges." (*Id*.) This is because the Court finds it likely

---

[28]     *See, supra,* note 16 of this Decision.

[29]     *See, supra,* note 17 of this Decision.

that Plaintiff Johnson would be handed a legal document in exchange for his handgun by a member of Defendant Conway's Department (whether that document come in the form of a summons, a desk appearance ticket or a mere contraband receipt form).  And the authority for the exchange, according to the courteous Deputy Sherriff, would be paragraph "d" of Section 4 of the CCIA.  Standing may not be evaded by even the most reluctant of defendants in a CCIA case by saying that he or she is "only" going to enforce the CCIA to the limited extent of seizing the license holder's valuable personal property (purchased for self-defense), because such a seizure is pursuant to a criminal proceeding initiated under the CCIA, and the right in question is one enumerated in the Constitution.  Finally, the Court also finds that Defendant Nigrelli is a proper Defendant to Plaintiff Johnson's challenge with regard to "public parks" (particularly with regard to Bowman Lake State Park) for the same reasons as stated above in Part III.A.2.b. of this Decision.

Also with regard to "public parks," on September 19, 2022, Plaintiff Leman swore as follows: (1) he lives in the Town of Windham (in Greene County), where he has "routinely carried [his] handgun concealed when [he] leave[s] home"; (2) he is also "a volunteer firefighter in the Windham Fire District," where he is "on call 24 hours a day, 7 days a week" (without "any opportunity to go home, to change clothes or . . . disarm and stow [his] firearm," causing there to have been "times that [he has] responded to an emergency call while armed" both within the Fire District and outside of it (including at locations that are now deemed "sensitive"); (3) "the Catskills Park surrounds the town of Windham, New York," which "means that [he] cannot leave [his] small town with a firearm, without entering the park, and thus violating the CCIA"; and (4) "[l]eft with no reasonable choice, [he] intend[s] to bring [his] firearm when [he] leave[s] home to

40

travel outside of Windham, New York, which will take [him] through state parkland, in violation of the CCIA." (Dkt. No. 1, Attach. 5, at ¶¶ 1, 4-7, 32 [Leman Decl.].)  Again, because the State Defendants waved their right to cross-examine Plaintiff Leman at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Leman at his word.  (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Leman has sworn that he has frequently carried concealed in public parks and will do so again soon, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.  *See, e.g., Houston*, 733 F.3d at 1332-37.  Moreover, based on the brazen nature of Plaintiff Leman's intended defiance, and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[30] the Court finds that a sign of Plaintiff Leman's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[31]

With regard to the proper Defendants to this challenge, Defendant Stanzione serves the District Attorney of Greene County.  (Dkt. No. 1, at ¶ 18 [Plfs.' Compl.]; Dkt. No. 1, Attach. 44, at ¶ 18 [Mann Decl.].)  Because of this capacity, and because of the stated policy of both the Governor and the New York State Police,[32] the Court finds that Defendant Stanzione has been charged with the specific duty to enforce the CCIA.  *See, e.g., Maloney v. Cuomo*, 470 F. Supp.2d 205, 211 (E.D.N.Y. 2007) (finding district attorney to be proper defendant to statute prohibiting the in-home possession of nunchaku) (citing *Baez v. Hennessy*, 853 F.2d 73, 76 [2d

---

[30]      *See, supra,* note 16 of this Decision.

[31]      *See, supra,* note 17 of this Decision.

[32]      *See, supra,* note 18 of this Decision.

41

Cir. 1988] for the point of law that "[i]t is well established in New York that the district attorney, and the district attorney alone, should decide when and in what manner to prosecute a suspected offender"), *vacated on other grounds, Maloney v. Cuomo,* 390 F. App'x 29 (2d Cir. 2010).  The Court also finds that Defendant Nigrelli is a proper Defendant to Plaintiff Leman's challenge with regard to "public parks" (particularly the Catskills State Park) for the same reasons as stated above in Part III.A.2.b. of this Decision.

Finally, with regard to "zoos," on September 19, 2022, Plaintiff Johnson (whose other relevant declaration testimony was previously summarized in this part of the Court's Decision) swore as follows: (1) "[his] wife and [he] frequently visit the Rosamond Gifford Zoo in Syracuse, at least once or twice every fall, so that [his] wife can see the otters and wolves, which are her favorites"; (2) "[they] will visit the zoo this fall as well, at least once, within the next 90 days"; and (3) he "intend[s] to carry [his] firearm when [his] wife and [he] visit the Rosamond Gifford Zoo."  (Dkt. No. 1, Attach. 3, at ¶ 17 [Johnson Decl.].)  Again, because the State Defendants waved their right to cross-examine Plaintiff Johnson at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Johnson at his word.  (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Johnson has sworn that he has frequently carried concealed in zoos, and will do so again soon, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.  *See, e.g., Houston*, 733 F.3d at 1332-37.  Moreover, based on the brazen nature of Plaintiff Johnson's intended defiance, and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in

New York State,[33] the Court finds that a sign of Plaintiff Johnson's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[34]

With regard to the proper Defendants to Plaintiff Johnson's challenge, the Court finds that Defendants Conway, Fitzpatrick and Nigrelli are proper Defendants to Johnson's challenge with regard to zoos for the reasons stated above in this part of the Court's Decision. Similarly, the Court finds that Defendant Cecile is a proper Defendant to this challenge, because the Rosamond Gifford Zoo (although owned by Onondaga County and not the City of Syracuse) is located within the City, within a city park in fact (Burnet Park).

Granted, if Plaintiff Johnson were discovered by a protective mother to be carrying concealed in the zoo (and the Court finds that discovery likely, given Johnson's brazen intent to violate the law), some uncertainty appears to exist regarding whether her 911 call would result in the dispatching of a Syracuse Police Officer or a County Deputy Sherriff. (Dkt. No. 47, Attach. 8, at ¶ 8 [Decl. of Syracuse Parks Commissioner, swearing only that "I *understand* that the Zoo is owned, controlled, and operated by the County of Onondaga"] [emphasis added].) However, the Court has little doubt that, if there were a gun incident reported at the zoo, the Syracuse Police Department would promptly respond (in addition to any County Park Ranger available). (Dkt. No. 47, Attach. 9, at 9, n.8 [Def. Cecile's Memo. of Law, conceding, "With the Zoo being located within the City of Syracuse, Chief Cecile does not doubt that SPD has jurisdiction to make arrests, and would indeed respond to high priority calls or crimes in progress . . ."].)

---

[33]     *See, supra,* note 16 of this Decision.

[34]     *See, supra*, note 17 of this Decision.

43

The Court retains this confidence, regardless of whether Plaintiff Johnson were discovered to be in violation of this regulation while inside the zoo, in the zoo's parking lot, or walking to the zoo (through Burnet Park). Regardless of the precise location, the Court finds it likely that Plaintiff Johnson would be handed a summons, a desk appearance ticket or a contraband receipt form in exchange for his handgun by a member of the Syracuse Police Department, of which Defendant Cecile is the Chief. And the authority for the exchange, according to the courteous police officer, would be paragraph "d" of Section 4 of the CCIA. As the Court stated earlier, sanding may not be evaded by even the most reluctant of defendants in a CCIA case by saying that he or she is "only" going to enforce the CCIA to the limited extent of seizing the license holder's valuable personal property (purchased for self-defense), because such a seizure is pursuant to a criminal proceeding initiated under the CCIA, and the right in question is one enumerated in the Constitution.

In light of all of this evidence, the Court finds that each of these Plaintiffs (i.e., Terrille, Johnson and Leman) has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused through a credible threat of enforcement of this regulation), (2) a sufficient causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Soares, Nigrelli, Conway, Fitzpatrick, Stanzione, and Cecile have sufficiently threatened to enforce Section 4 of the CCIA against one or more of three Plaintiffs in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by these six Defendants (who, again, each has the specific duty to enforce Section 4).

44

For all of these reasons, the Court finds that Plaintiff Terrille has standing to challenge this regulation as it regards "public playgrounds" and "public parks," and that Defendants Soares and Nigrelli are proper Defendants to that challenge. Similarly, the Court finds that Plaintiff Johnson has standing to challenge this regulation as it regards "public parks," and that Defendants Conway, Fitzpatrick and Nigrelli are proper Defendants to that challenge. The Court also finds that Plaintiff Leman has standing to challenge this regulation as it regards "public parks," and that Defendants Stanzione and Nigrelli are proper Defendants to that challenge. Finally, the Court finds that Plaintiff Johnson has standing to challenge this regulation as it regards "zoos," and that Defendants Conway, Fitzpatrick, Nigrelli and Cecile are proper Defendants to that challenge.

> e. **"[T]he location of any program … that provides services to children, youth, … any legally exempt childcare provider …"**

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations:

> [T]he location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York …

The only Plaintiffs who come close to alleging or asserting a concrete intention to carry concealed in one of the locations listed in this regulation in the immediate future are Plaintiffs Leman and Mann. More specifically, on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . nurseries [and] daycares." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, Plaintiff Leman does not swear that he *intends* to

45

carry concealed in a particular nursery or daycare in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter).  (*Id.*)  As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation.  The Court reaches a similar conclusion with regard to Plaintiff Mann.

Granted, on September 19, 2022, Plaintiff Mann swore in his declaration that, in the immediate future, he intends to continue to carry his licensed handgun concealed in his church's "nursery" and "Sunday School," which "cater[s] to the younger members of our congregation," as well at the church's "local homeschool coop" where his "church at times operates as a school for the education of children."  (Dkt. No. 1, Attach. 9, at ¶¶ 30-31 [Mann Decl.].)  However, Plaintiff Mann does not expressly assert that his church's "nursery," "Sunday School" or "homeschool coop" are (1) "licensed, regulated, certified, funded, or approved by the office of children and family services," (2) a "legally exempt childcare provider," or (3) the recipient of "a permit to operate … by the department of health and mental hygiene pursuant to the health code of the city of New York."  (*Id.*)  This omission appears to have been intentional, given the specificity of this regulation and the otherwise detailed-nature of this portion Plaintiff Mann's Declaration.  (*See id.* [expressing referencing "subsection f" and "subsection m" of Section 4 of the CCIA].)

Based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint and declaration testimony with regard to this paragraph (and in the absence of elaborative testimony at the Preliminary Injunction Hearing), the Court finds that the State Defendants are correct: this testimony fails to meet the standard articulated and applied in

the Court's Decision and Order in *Antonyuk I*. *Antontuk I*, 2022 WL 3999791, at *10-23. As a result, the Court reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.

### f. "[N]ursery schools, preschools, and summer camps"

The Court begins its analysis of this regulation by observing that, with regard to the extent to which the regulation applies to "summer camps," Plaintiffs have alleged as follows in their Complaint:

> Likewise, the church has a nursey, Sunday School, and a Junior Church. The CCIA appears to separately prohibit the Pastor, church staff, and the church security from providing security to their children, as it bans firearms at "nursery schools, preschools, and summer camps" (subsection f). Pastor Mann intends to not comply with this restriction. Id. at ¶ 30.

(Dkt. No. 1, at ¶ 192 [Compl.].) However, Plaintiff Mann's declaration never swears that his church operates a "summer camp" or that its "Junior Church" attends a "summer camp." (Dkt. No. 1, at ¶ 30 [Mann Decl.].) Based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint testimony with regard to "summer camps" (and in the absence of elaborative testimony at the Preliminary Injunction Hearing), the Court finds the State Defendants are correct: this testimony fails to meet the standard articulated and applied in the Court's Decision and Order in *Antonyuk I*. *Antontuk I*, 2022 WL 3999791, at *10-23. As a result, the Court reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction

with regard to "summer camps" for lack of standing.[35] However, the Court reaches a different

conclusion with regard to this regulation as it regards "[n]ursery schools" and "preschools."

On September 19, 2022, Plaintiff Mann (whose other relevant declaration testimony is

summarized above in Part III.A.2.b. of the Court's Decision) swore as follows: (1) "Fellowship

Baptist Church has a nursery, a Sunday School, and a Junior Church, both of which cater to the

younger members of our congregation"; (2) it also has a "local homeschool coop" where his

"church at times operates as a school for the education of children"; and (3) Plaintiff Mann

"cannot comply with th[e] [CCIA's] restriction [with regard to 'nursery schools' and

'preschools'], and [he] intend[s] to continue to possess firearms on church property to protect

[his] entire congregation, including [his] children." (Dkt. No. 1, Attach. 9, at ¶¶ 30-31 [Mann

Decl.].) Again, because the State Defendants waved their right to cross-examine Plaintiff Mann

at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Mann at his

word. (Dkt. No. 58 [Stipulation].)

Although the Court acknowledges the inference that must be drawn that at least some

children in the "nursery" will receive schooling, and/or that at least some children under age five

patronize the "local homeschool coop," the Court finds those inferences to be reasonable based

---

[35]     The Court would add only that, even if this finding of lack of standing were incorrect, the
Court would, after more carefully considering the standard set forth in *NYSRPA*, and the apparent
justification for the numerous historical analogues prohibiting guns in schools, deny Plaintiffs'
motion to the extent it regards children's "summer camps": the burdensomeness of this
regulation (i.e., its burden versus its justification) appears proportionate to the burdensomeness
of its historical analogues. The Court cannot reach the same conclusion, however, with regard to
*adult* "summer camps," which this vague paragraph of Section 4 of the CCIA apparently covers
for some reason. To the extent that reason is because children are *sometimes* present in such
adult summer camps, the Court finds that reason to constitute an inadequate justification for this
prohibition, as compared to the relevant historical analogues currently before the Court.

on the nature of homeschooling and the circumstances asserted (including the small size and active nature of the congregation).

Based on the fact that Plaintiff Mann has sworn that he has frequently carried concealed in the "[n]ursery schools" and "preschool" set forth in this regulation, and will do so again soon, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA. *See, e.g., Houston*, 733 F.3d at 1332-37. Moreover, based on the brazen nature of Plaintiff Mann's intended defiance,[36] the fact that at least one of his congregants is a member of local law enforcement,[37] and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[38] the Court finds that a sign of Plaintiff Mann's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[39] With regard to the proper Defendants to Plaintiff Mann's challenge to this regulation, the Court finds that Defendants Hilton, Oakes and Nigrelli are proper Defendants to Mann's challenge for the reasons stated above in Part III.A.2.b. of this Decision.

In light of all of this evidence, the Court finds that Plaintiff Mann has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused through a credible threat of enforcement of this regulation), (2) a sufficient causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Hilton, Oakes and Nigrelli have sufficiently threatened to enforce Section 4 of the CCIA against

---

[36] *See, supra,* note 15 of this Decision.

[37] *See, supra,* note 16 of this Decision.

[38] *See, supra,* note 16 of this Decision.

[39] *See, supra,* note 17 of this Decision.

Plaintiff Mann in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by these three Defendants (who, again, each has the specific duty to enforce Section 4).

For all of these reasons, the Court finds that Plaintiff Mann has standing to challenge this regulation as it regards ""[n]ursery schools" and "preschools," and that Defendants Hilton, Oakes and Nigrelli are proper Defendants to that challenge.

### g. "[T]he location of any program … regulated, … operated, or funded by the office for people with developmental disabilities"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations: "[T]he location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities."

Based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint and testimony with regard to this paragraph (and in the absence of elaborative testimony at a Preliminary Injunction Hearing), the Court finds they are correct: none of the six Plaintiffs has alleged or sworn a sufficiently concrete intention to carry concealed in any of the locations listed in this regulation in the immediate future. (*See generally* Dkt. No. 1 [Plfs.' Compl.]; Dkt. No. 1, Attach. 3 [Johnson Decl.]; Dkt. No. 1, Attach. 4 [Sloane Decl.]; Dkt. No. 1, Attach. 5 [Leman Decl.]; Dkt. No. 1, Attach. 8 [Antonyuk Decl.]; Dkt. No. 1, Attach. 9 [Mann Decl.]; Dkt. No. 1, Attach. 10 [Terrille Decl.].) As a result, the Court reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.

### h. "[T]he location of any program … regulated, … operated, or funded by [the] office of addiction services and supports"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations: "[T]he location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports."

The only Plaintiff who comes close to alleging or asserting a concrete intention to carry concealed in one of the locations listed in this regulation in the immediate future is Plaintiff Mann, who swears in his declaration that, in the immediate future, he intends to continue to carry his licensed handgun concealed in his church's "RU Recovery program," including on church property, because drug users are often "high on drugs" and "unpredictable." (Dkt. No. 1, Attach. 9, at ¶¶ 28-29 [Mann Decl.].) However, Plaintiff Mann does not expressly assert that his church's "RU Recovery program" is "licensed, regulated, certified, operated, or funded by office of addiction services and supports." (*Id*.) This omission appears to have been intentional, given the specificity of this regulation and the otherwise detailed-nature of this portion of Plaintiff Mann's Declaration. (*See id.* at ¶ 29 [expressing referencing "subsection b" of Section 4 of the CCIA].)

Based on a careful consideration of State Defendants' continued challenge to the sufficiency of the Complaint and testimony with regard to this paragraph (and in the absence of elaborative testimony at a Preliminary Injunction Hearing), the Court reaches the same conclusion regarding this regulation as it reached with regard to the regulation "2(g)" for the reasons stated above in Part III.B.2.g. of this Decision. It therefore reconsiders that portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.

    i.    **"[T]he location of any program … regulated, … operated, or funded by the office of mental health"**

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations: "[T]he location of any program licensed, regulated, certified, operated, or funded by the office of mental health." Again, based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint and testimony with regard to this paragraph (and in the absence of elaborative testimony at a Preliminary Injunction Hearing), the Court reaches the same conclusion regarding this regulation as it reached with regard to the regulation "2(g)" for the reasons stated above in Part III.B.2.g. of this Decision.  It therefore reconsiders that portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.

> **j.** **"[T]he location of any program … regulated, … operated, or funded by the office of temporary and disability assistance"**

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations: "[T]he location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance." Again, based on a careful consideration of the States Defendants' continued challenge to the sufficiency of the Complaint and testimony with regard to this paragraph (and in the absence of elaborative testimony at a Preliminary Injunction Hearing), the Court reaches the same conclusion regarding this regulation as it reached with regard to the regulation "2(g)" for the reasons stated above in Part III.B.2.g. of this Decision.  It therefore reconsiders that portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.

### k. "[H]omeless shelters, … family shelters, … domestic violence shelters, and emergency shelters"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations: "homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence."

The only Plaintiffs who come close to alleging or asserting a concrete intention to carry concealed in one of the locations listed in this regulation in the immediate future are Plaintiffs Leman and Mann. More specifically, on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . shelters." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, Plaintiff Leman does not swear that he *intends* to carry concealed in a particular shelter in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter). (*Id.*) As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation as it regards "shelters." The Court reaches a similar conclusion with regard to Plaintiff Mann.

On September 19, 2022, Plaintiff Mann swore in his declaration as follows: (1) "[i]n addition to the church ministry, Fellowship Baptist Church provides and has provided counseling and assistance . . . to the homeless, youth, in the domestic violence and abuse setting, and others; (2) carrying a licensed concealed handgun in such locations is necessary for the "ability [of the church ministry] to provide security for those under [its] care"; and (3) "[i]ndeed, there has been more than one situation over my years as a pastor where the security of [Plaintiff Mann], [his] family, and the members of [his] church has been far from a guarantee," and "[i]n situations, [he

has] felt [it] necessary to be armed with my handgun, not in any way wishing to use it, but being prepared to defend [him]self and others if the need arose." (Dkt. No. 1, Attach. 9, at ¶¶ 26-27 [Mann Decl.].) However, Plaintiff Mann has not sufficiently sworn that he intends to visit such a shelter in the immediate future or that he would even carry his licensed concealed handgun there in violation of the CCIA. (*See generally* Dkt. No. 1, Attach. 9 [Mann Decl.].)

Again, based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint and testimony with regard to this paragraph (and in the upon closer examination of the Complaint and declarations (and in the absence of elaborative testimony at the Preliminary Injunction Hearing), the Court finds they are correct: this testimony fails to meet the standard articulated and applied in the Court's Decision and Order in *Antonyuk I*. *Antontuk I*, 2022 WL 3999791, at *10-23. As a result, the Court reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.[40]

---

[40] To the extent this finding is in error, the Court would have found that, based on a comparison of the burdensomeness of this regulation to the burdensomeness of its historical analogues, this regulation appears to be disproportionately burdensome. For the sake of brevity, the Court will not linger on the dearth of historical analogues prohibiting the carrying of arms in historical locations such "alms houses," because the State Defendants would likely (and incorrectly) object that such analogues would be "historical twin[s]" or "dead ringers" (which are not required under *NYSRPA*). More important is the fact that, even if the Court were to rely on the laws referenced in this Decision prohibiting firearms in churches and schools, the Court would find that the reasons for those laws (i.e., bringing peace to religious congregations especially during services, and protecting locations densely populated by children) are not sufficiently similar to the State Defendants' purported reason for this provision (to protect "vulnerable populations"). (Dkt. No. 48, at 83.) The Court notes, while it has little doubt that the types of shelters visited by Plaintiff Mann often contain children, the State Defendants adduce no evidence that those shelters are as densely populated by children as are schools. Moreover, the presence of adults in those locations would appear to increase the need of visiting volunteers for safety, as the pistol-packing-pastor Plaintiff Mann swears in his declaration. Finally, it bears remembering that the firearms in question would be carried (concealed) by

### l.  "[R]esidential settings licensed, certified, regulated, funded, or operated by the department of health"

Again, based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint and testimony with regard to this paragraph (and in the absence of elaborative testimony at a Preliminary Injunction Hearing), the Court reaches the same conclusion regarding this regulation as it reached with regard to the regulation "2(g)" for the reasons stated above in Part III.B.2.g. of this Decision.  It therefore reconsiders that portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.

### m.  "[A]ny building or grounds … of any educational institutions, colleges … , school districts … , private schools …"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations:

> [I]n or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools…

To the extent that this regulation regards specified locations other than "school districts," the Court finds that the only Plaintiffs have come close to alleging or swearing a sufficiently concrete intention to carry concealed in these places in the immediate future are Plaintiff Leman

---

individuals who have provided four character references, completed numerous hours of firearms training, and satisfied the demands of a licensing officer, and that (under the prior law) shelters were free to post a sign excluding license holders from carrying concealed there.

(with regard to "schools") and Plaintiff Man (with regard to "school districts."). (*See generally* Dkt. No. 1 [Plfs.' Compl.]; Dkt. No. 1, Attach. 3 [Johnson Decl.]; Dkt. No. 1, Attach. 4 [Sloane Decl.]; Dkt. No. 1, Attach. 5 [Leman Decl.]; Dkt. No. 1, Attach. 8 [Antonyuk Decl.]; Dkt. No. 1, Attach. 9 [Mann Decl.]; Dkt. No. 1, Attach. 10 [Terrille Decl.].)

More specifically, on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . schools." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, Plaintiff Leman does not swear that he *intends* to carry concealed in a particular school in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter). (*Id.*) As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation as it regards "schools." The Court reaches a similar conclusion with regard to Plaintiff Mann.

On September 19, 2022. Plaintiff Mann swore that (1) "Fellowship Baptist Church has a "local homeschool coop" where his "church at times operates as a school for the education of children," and (2) he "intend[s] to continue to possess firearms on church property to protect [his] entire congregation, including [his] children." (Dkt. No. 1, Attach. 9, at ¶¶ 30-31 [Mann Decl.].) Again, because the State Defendants waved their right to cross-examine Plaintiff Mann at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Mann at his word. (Dkt. No. 58 [Stipulation].)

Plaintiff Mann does not indicate whether his church's "local homeschool coop" (or his previously referenced "nursery" school) constitutes a "private school[] licensed under article one hundred one of the education law" under this regulation. Furthermore, the Court cannot find

that his school district is sufficiently involved in his challenge based merely on its role of

overseeing and approving homeschool curricula.  *See* N.Y. Educ. Law § 101(c)(5) (setting forth

the "[p]rocedures for development and review of an individualized home instruction plan

(IHIP)"); *Bradstreet v. Sobol*, 650 N.Y.S.2d 402, 403 (N.Y. App. Div., 3d Dep't 1996) ("That

the superintendent of the local school district oversees and approves the home-school instruction

provided by plaintiff (*see* 8 NYCRR 100.10[c][5]) does not make plaintiff's daughter a 'regularly

enrolled' student of the district.").  In any event, Plaintiff Mann's school district does not appear

to "own[] or lease[]" the "building or grounds" used by the church's local homeschool coop, for

purposes of this regulation.

As a result, upon closer examination, the Court finds  finding that Plaintiff Mann has not

established standing to challenge this regulation.  It therefore reconsiders that portion of its

Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for

a preliminary injunction with regard to this regulation for lack of standing.

### n. "[A]ny place, conveyance, or vehicle used for public transportation or public transit …"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed

carry of a handgun in the following locations:

> [A]ny place, conveyance, or vehicle used for public transportation or
> public transit, subway cars, train cars, buses, ferries, railroad, omnibus,
> marine or aviation transportation; or any facility used for or in connection
> with service in the transportation of passengers, airports, train stations,
> subway and rail stations, and bus terminals …

Based on a careful consideration of the State Defendants' continued challenge to the

sufficiency of the Complaint and declaration testimony with regard to this paragraph (and in the

absence of elaborative testimony at the Preliminary Injunction Hearing), the Court finds that the

57

only Plaintiffs who arguably allege or assert a concrete intention to carry concealed in one of the locations listed in this regulation in the immediate future are Plaintiff Leman regarding "vehicles used for public transit," Plaintiff Mann regarding "buses" (and vans), and Plaintiff Terrille regarding "aviation transportation" and "airports."

With regard to "vehicles used for public transit," on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . vehicles used for public transit." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, Plaintiff Leman does not swear that he *intends* to carry concealed in a particular vehicle used for public transit in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter). (*Id*.) As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation as it regards "vehicles used for public transit."

With regard to "buses" (and vans), on September 19, 2022, Plaintiff Mann (whose other relevant declaration testimony is summarized above in Part III.A.2.b. of the Court's Decision) swore as follows: (1) "[his] church . . . maintains both a church bus and a church van which [it] use[s] for church business to travel to various locations"; (2) "[they] routinely take [their] own church members, [their] youth, and members of the public with [them] when [they] travel"; and (3) "[t]o the extent that the CCIA applies to our church bus or van, I do not intend to comply." (Dkt. No. 1, Attach. 9, at ¶ 33 [Mann Decl.].) Because the State Defendants waved their right to cross-examine Plaintiff Mann at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Mann (a pastor) at his word. (Dkt. No. 58 [Stipulation].)

Granted, Plaintiff Mann does not *expressly* allege that he has routinely carried his licensed handgun concealed *while* riding on his church's bus in public.  (Dkt. No. 1, Attach. 9, at ¶ 33 [Mann Decl.].)  However, the Court finds that inference to be reasonable based on his other sworn assertions (including his assertion that he considers it his duty to "protect [his] congregation, including [its] children," and his assertion that he has "frequently have traveled to the homes of persons addicted to drugs" as part of his addiction-recovery ministry and has "carried [his] firearm" when doing so).  (*Id.* at ¶¶ 28, 30, 33.)

Based on the fact that Plaintiff Mann has alleged he has routinely carried his licensed handgun concealed while riding on his church's bus and van in public, and that he will do so again, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.  *See, e.g., Houston*, 733 F.3d at 1332-37.  Moreover, based on the brazen nature of Plaintiff Mann's intended defiance,[41] the fact that at least one of his congregants is a member of local law enforcement,[42] and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[43] the Court finds that a sign of Plaintiff Mann's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[44]

The State Defendants argue that Plaintiff Mann's church bus and van do not fall in the scope of this regulation because "the two vehicles clearly are not *public* transportation."  (Dkt.

---

[41]     *See, supra,* note 15 of this Decision.

[42]     *See, supra,* note 16 of this Decision.

[43]     *See, supra,* note 16 of this Decision.

[44]     *See, supra,* note 17 of this Decision.

No. 48, at 84 [emphasis in original].)  Of course, the regulation does not expressly require the vehicles to *be* "public transportation."  Rather, the regulation expressly requires them to be only "any . . . vehicle *used for* public transportation or public transit . . . ."  Moreover, the distinction between a vehicle's being used for "public transportation" and a vehicle's being used for transportation *in* public grows blurry when one considers that New York State's regulation of offenses against public order extends to all "public" locations.  *See New York v. Jackson*, 944 N.Y.S.2d 715, 719 (N.Y. 2012) (explaining that a "privately owned vehicle" can be a "public place," for purposes of New York's criminal law proscribing offenses against public order, if it "is in a location that qualifies under the statute as a public place").

In any event, the regulation lacks the words "such as" between the words "any . . . vehicle used for public transportation or public transit," and the words "subway cars, train cars, buses . . . ."  As a result, this regulation may be reasonably read as if to mean "any . . . vehicle used for public transportation" *or* "[any] . . . buses [regardless of whether it is used for public transportation]."  Ordinarily, the Court would be reluctant to render such an unlikely interpretation of a statute (especially a hastily cobbled-together one such as this, which contains several typographical errors).  However, this particular statute also contains numerous provisions that rather broadly regulate concealed carry on *private property* (i.e., the provisions contained in Sections 4 and 5 of the CCIA).  Moreover, the fact that *most* of the items in the list appear to exist only as public vehicles or conveyances gives the Court only momentary pause: some do *not* exist only as public vehicles or conveyances.  For example, there certainly exist private "buses," private "railroad" cars, and private modes of "marine or aviation transportation," including yachts and private planes.

Finally, Plaintiffs persuasively argue that the State treats Plaintiff Mann's church bus and van as vehicles used for public transportation by requiring them to register as a "school" bus and a "day care" van respectively.  *See* N.Y. Veh. & Traf. Law § 509-a ("[B]us shall mean every motor vehicle, owned, leased, rented or otherwise controlled by a motor carrier, which . . . has a seating capacity of more than ten adult passengers in addition to the driver and which is used for the transportation of persons under the age of twenty-one or persons of any age who are mentally or physically disabled to a place of vocational, academic or *religious instruction* or religious service including nursery *schools*, *day care* centers and camps . . . ."); "Article 19-A Guide for Motor Carriers," New York State Dept. of Motor Vehicles, at 4 (March 2021) https://dmv.ny.gov/forms/cdl15.pdf (last visited Nov. 4, 2022) ("Churches are required to enroll in 19-A if the vehicle has seating capacity to transport 11 or more adult passengers in addition to the driver, and it is used to transport persons under the age of 21 or persons of any age who are mentally or physically disabled to a place of religious instruction or service.").

For all of these reasons, the Court cannot accept the State Defendants' argument that this regulation does not apply to Plaintiff Mann's church bus and van.  (Dkt. No. 48, at 84-89.)  With regard to the proper Defendants to Plaintiff Mann's challenge to this regulation, the Court finds that Defendants Hilton, Oakes and Nigrelli are proper Defendants to Mann's challenge for the reasons stated above in Part III.A.2.b. of this Decision.

With regard to "aviation transportation" and "airports," on September 19, 2022, Plaintiff Terrille (whose other relevant declaration testimony is summarized above in Part III.A.2.d. of the Court's Decision) swore as follows:

> I have been planning and, within the next 60 days, I will take a trip to visit the state of Tennessee.   Since Tennessee is a constitutional carry state that

> respects the Second Amendment rights of all Americans to bear arms, I
> will bring my firearm with me. I have not yet booked a flight, but I plan to
> travel by airplane, departing via the Albany International Airport. . . . I
> will continue watching prices, and will purchase a ticket in the coming
> weeks, for travel within the next two months. . . . Since I intend to check
> my firearm with my luggage in accordance with TSA regulations, which
> requires declaring the firearm, I would be essentially telling authorities
> that I am in illegal possession of a firearm, opening myself to prosecution
> under the CCIA.

(Dkt. No. 1, Attach. 10, at ¶ 9 [Terrille Decl.].)  Because the State Defendants waved their right

to cross-examine Plaintiff Terrille at the Preliminary Injunction Hearing on October 25, 2022,

the Court takes Plaintiff Terrille at his word.  (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Terrille has sworn that he has frequently carried concealed

in airports (while complying with federal regulations) and will do so again soon, the Court finds

he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.

*See, e.g., Houston*, 733 F.3d at 1332-37.  Moreover, based on the brazen nature of Plaintiff

Terrille's intended defiance, and the fact of the recent publicization of the CCIA (including its

sensitive-location provision) in New York State,[45] the Court finds that a sign of Plaintiff

Terrille's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a

concerned citizen.[46]  With regard to the proper Defendants to Plaintiff Terrille's challenge to this

regulation, the Court finds that Defendants Soares and Nigrelli are proper Defendants to

Terrille's challenge for the reasons stated above in Part III.A.2.b. of this Decision.

---

[45]     *See, supra,* note 16 of this Decision.

[46]     *See, supra,* note 17 of this Decision.

In light of all of this evidence, the Court finds that each of these two Plaintiffs (Mann and Terrille) has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused through a credible threat of enforcement of this regulation), (2) a sufficient causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Hilton, Oakes, Nigrelli and Soares have sufficiently threatened to enforce Section 4 of the CCIA against one or both of these two Plaintiffs in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by these four Defendants (who, again, each has the specific duty to enforce Section 4).

As a result, the Court finds that, to the extent this regulation applies to "buses" (or vans), Plaintiff Mann has standing to challenge it, and that Defendants Hilton, Oakes and Nigrelli are proper Defendants to that challenge. Moreover, to the extent this regulation applies to "aviation transportation" and "airports," Plaintiff Terrille has standing to challenge it, and Defendants Soares and Nigrelli are proper Defendants to that challenge. Otherwise, the Court reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to the remainder of the locations set forth in this regulation for lack of standing.

### o. "[A]ny establishment issued a license …where alcohol is consumed …"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations:

> [A]ny establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage

63

control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption . . .

Based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint and declaration testimony with regard to this paragraph (and in the absence of elaborative testimony at the Preliminary Injunction Hearing), the Court finds that the State Defendants are correct: the only Plaintiffs who arguably allege or assert a concrete intention to carry concealed in any of the locations listed in this regulation in the immediate future are Plaintiffs Leman, Johnson and Terrille with regard to restaurants that serve alcohol. As a result, the Court reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to "any establishment licensed under article four of the cannabis law for on-premise consumption" for lack of standing.

However, with regard to restaurants that serve alcohol, on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . restaurants that serve alcohol." (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].) However, Plaintiff Leman does not swear that he *intends* to carry concealed in a particular restaurant that serves alcohol in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter). (*Id.*) Nor does he assert that his bed and breakfast has obtained a New York State wine and beer license. (*Id.* at ¶ 30.) As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation as it regards restaurants that serve alcohol. The Court reaches a different conclusion with regard to Plaintiff Johnson.

64

On September 19, 2022, Plaintiff Johnson (whose other relevant declaration testimony is summarized above in Part III.A.2.d. of the Court's Decision) swore as follows: (1) "[he] . . . routinely go[es] out to eat with [his] family, including at restaurants such as Longhorn Steakhouse" without "sitting at the bar or consuming any alcoholic beverage"; (2) "[he] intend[s] to continue to carry [his] firearm when [he] go[es] out to eat with [his] family, an event that will occur within the next month or so"; and (3) "[d]uring New York winters, [he and his wife] often take extended snowmobile trips throughout public parks … , often participating in . . . competitions where snowmobilers are required to follow a prescribed course and check in various locations along the way, with some of those locations being restaurants that serve alcohol." (Dkt. No. 1, Attach. 3, at ¶¶ 11-12 [Johnson Decl.].)  Because the State Defendants waved their right to cross-examine Plaintiff Johnson at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Johnson at his word. (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Johnson has sworn that he has frequently carried concealed in restaurants that serve alcohol and will do so again soon, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA. *See, e.g., Houston*, 733 F.3d at 1332-37.  Moreover, based on the brazen nature of Plaintiff Johnson's intended defiance, and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[47] the Court finds that a sign of Plaintiff Johnson's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[48]  With regard to the proper Defendants to Plaintiff Johnson's challenge to this

---

[47]     *See, supra,* note 16 of this Decision.

[48]     *See, supra,* note 17 of this Decision.

regulation, the Court finds that Defendants Conway, Fitzpatrick and Nigrelli are proper Defendants to Johnson's challenge with regard to restaurants that serve alcohol for the reasons stated above in Part III.A.2.d. of the Court's Decision.[49]

Similarly, on September 19, 2022, Plaintiff Terrille (whose other relevant declaration testimony is summarized above in Part III.A.2.d. of the Court's Decision) swore as follows: (1) "[he] . . . routinely go[es] out to eat with my grandkids, including at restaurants such as Applebee's and Mo's Southwest Grill" without "sitting at the bar or consuming any alcoholic beverage"; and (2) "[he] intend[s] to continue to carry [his] firearm when [he] go[es] out to eat with [his] grandkids, an event that will occur within the next 30 days." (Dkt. No. 1, Attach. 10, at ¶ 19 [Terrille Decl.].)  Because the State Defendants waved their right to cross-examine Plaintiff Johnson at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Johnson at his word. (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Terrille has sworn that he has frequently carried concealed in restaurants that serve alcohol and will do so again soon, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.  *See, e.g., Houston*, 733 F.3d at 1332-37.  Moreover, based on the brazen nature of Plaintiff Terrille's intended defiance, and the fact of the recent publicization of the CCIA (including its sensitive-

---

[49]     The Court notes that Defendant Cecile has persuaded the Court that (although Plaintiff Johnson lives in the City, of which Defendant Cecile is the Chief of Police) no Longhorn Steakhouses exist in the City.  (Dkt. No. 47, Attach. 9, at 14.)  The Court notes that Plaintiff Johnson does not specify any restaurant other than Longhorn Steakhouse.  (*See generally* Dkt. No. 1, Attach. 3 [Johnson Decl.].)

location provision) in New York State,[50] the Court finds that a sign of Plaintiff Terrille's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[51] With regard to the proper Defendants to Plaintiff Terrille's challenge to this regulation, the Court finds that Defendants Soares and Nigrelli are proper Defendants to Terrille's challenge as it regards restaurants that serve alcohol for the reasons stated above in Part III.A.2.b. of this Decision.

In light of all of this evidence, the Court finds that each of these two Plaintiffs (Johnson and Terrille) has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused through a credible threat of enforcement of this regulation), (2) a sufficient causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Conway, Fitzpatrick, Nigrelli, and Soares have sufficiently threatened to enforce Section 4 of the CCIA against one or both of these two Plaintiffs in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by these four Defendants (who, again, each has the specific duty to enforce Section 4).

For all of these reasons, the Court finds that Plaintiff Johnson has standing to challenge this regulation as it regards "any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed," and that Defendants Conway, Fitzpatrick and Nigrelli are proper Defendants to that challenge. Similarly, the Court finds that Plaintiff Terrille has standing to challenge the

---

[50]     *See, supra,* note 16 of this Decision.

[51]     *See, supra,* note 17 of this Decision.

same portion of this regulation, and that Defendants Soares and Nigrelli are proper Defendants to that challenge.

> **p.**    **"[A]ny place used for the performance, art entertainment, gaming, or sporting events …"**

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations:

> [A]ny place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission . . . .

The only Plaintiffs who arguably allege or assert a concrete intention to carry concealed in any of the locations listed in this regulation in the immediate future are Plaintiffs Leman (with regard to "movie theaters" and "sporting events"), Plaintiff Terrille (with regard to movie "theaters," "conference centers," and "banquet halls"), Plaintiff Mann (with Regard to "banquet halls," "performance venues" and "concerts"), and Plaintiff Johnson (with regard to places used for "performance, art entertainment, gaming, or sporting events").

More specifically, with regard to "movie theaters" and "sporting events," on September 19, 2022, Plaintiff Leman swore that, as a volunteer firefighter, he has "responded to calls at . . . theaters [and] sporting events."  (Dkt. No. 1, Attach. 5, at ¶ 6 [Leman Decl.].)  However, Plaintiff Johnson does not swear that he *intends* to carry concealed in a particular theater or sporting events in the *immediate* future (or even that, based on his prior experience, there is a reasonable chance that he will likely do so in the next 90 days as part of his job as a volunteer firefighter).  (*Id.*)  As a result, the Court cannot find that Plaintiff Leman has standing to challenge this regulation as it regards "movie theaters" and "sporting events."

Also with regard to movie "theaters," on September 19, 2022, Plaintiff Terrille (whose other relevant declaration testimony is summarized above in Part III.A.2.d. of the Court's Decision) swore as follows: (1) "[a]s part of [his] activities with [his] grandchildren, [they] routinely see movies, both at movie theaters and at drive-in locations within Albany County"; (2) "[t]his activity occurs repeatedly throughout the year, and [they] will see a movie again at some point within the next 60 days"; (3) "[i]n the past, [he has] carried [his] concealed firearm during such outings . . ."; and (4) "[he] intend[s] to continue to carry [his] firearm when [he] go[es] to movie theaters with [his] grandchildren, in violation of the CCIA."  (Dkt. No. 1, Attach. 10, at ¶ 7 [Terrille Decl.].)

Similarly, with regard to "conference centers," and "banquet halls," Plaintiff Terrille also swore (again, on September 19, 2022) as follows: (1) "[he] plan[s] to attend the upcoming NEACA Polish Community Center Gun Show, to occur on October 8-9, 2022, in Albany"; (2)"[t]he gun show is hosted by The Polish Community Center, which describes itself as 'a conference center, banquet hall & wedding venue in Albany, NY'"; and (3) "[he] intends to carry [his] firearm with [him] when [he attends the gun show], in violation of the CCIA . . . ."  (*Id*. at ¶ 16.)[52]  Because the State Defendants waved their right to cross-examine Plaintiff Terrille at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Terrille at his word.  (Dkt. No. 58 [Stipulation].)

---

[52]    Because Plaintiff Terrille was not called and cross-examined as a witness at the Preliminary Injunction Hearing on October 25, 2022, no evidence has been adduced regarding whether Plaintiff Terrille did in fact attend the Gun Show at the Polish Community Center in Albany on October 8 and 9, 2022, or even whether it even occurred.

Based on the fact that Plaintiff Terrille has sworn that he has frequently carried concealed in theaters, conference centers and banquet halls, and will do so again, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA. *See, e.g., Houston*, 733 F.3d at 1332-37. Moreover, based on the brazen nature of Plaintiff Terrille's intended defiance, and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[53] the Court finds that a sign of Plaintiff Terrille's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[54] With regard to the proper Defendants to Plaintiff Terrille's challenge to this regulation, the Court finds that Defendants Soares and Nigrelli are proper Defendants to this challenge for the reasons stated above in Part III.A.2.b. of this Decision.

As for "banquet halls," "performance venues" and "concerts," on September 19, 2022, Plaintiff Mann (whose other relevant declaration testimony is summarized above in Part III.A.2.b. of the Court's Decision) swore as follows: (1) his church has a "banquet hall," where its parishioners "often break bread together"; (2) "[his] church plays music before, during, and after worship services, and the CCIA bans firearms at a 'performance venue' or 'concert'"; (3) "since [Fellowship Baptist Church is] a small church, [it is] unable to afford to pay for private security who might be exempt from the CCIA"; and (4) as a result, he is "unable to comply with . . . the CCIA", and thus [he] intend[s] to continue to [carry his handgun concealed in the church]." (Dkt. No. 1, Attach. 9, at ¶¶ 10-11, 34 [Mann Decl.].) Because the State Defendants

---

[53]     *See, supra,* note 16 of this Decision.

[54]     *See, supra,* note 17 of this Decision.

waved their right to cross-examine Plaintiff Mann at the Preliminary Injunction Hearing on

October 25, 2022, the Court takes Plaintiff Mann at his word. (Dkt. No. 58 [Stipulation].)

While the Court has little doubt that the music there is both inspiring and entertaining, the

Court has trouble finding that pews of Plaintiff Mann's Fellowship Baptist Church in Parish,

New York, constitute a "performance venue" or "concert" venue under paragraph 2(p) of Section

4 of the CCIA when the Church is "play[ing] music before, during, and after worship services,"

because, in addition to appearing to be relatively brief, the performances appear to be *part of* the

worship services (although the Court does agree that these undefined terms in the regulation are

too vague).  As a result, as currently described by Plaintiff Mann, his church does not appear to

constitute a "performance venue" or "concert" venue.

However, with regard to his church's "banquet hall," based on the fact that Plaintiff

Mann has sufficiently sworn that he has carried concealed there and will do so again, the Court

finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the

CCIA.  *See, e.g., Houston*, 733 F.3d at 1332-37.  Moreover, based on the brazen nature of

Plaintiff Mann's intended defiance,[55] the fact that at least one of his congregants is a member of

---

[55]     (*See, e.g.,* Dkt. No. 1, Attach. 9, at ¶¶ 4, 11, 20, 25, 29-33 [Mann Decl., swearing, "I
intend to continue various activities in violation of the CCIA … I intend to continue to possess
and carry my firearm while on church property, in violation of the CCIA.…  I have no choice but
to violate this immoral, unbiblical, and unconstitutional law, and intend to continue to possess
my firearm in my church and in my home.… I intend this act of civil disobedience …. I intend to
continue to operate as I always have with respect to possessing my firearms at the church…. I
intend to continue to possess firearms on church property to protect our entire congregation,
including our children…. I cannot comply with that restriction, and intend to continue to operate
as I always have with respect to possessing firearms at the church …. I do not intend to
comply…  I do not intend to comply."].)

local law enforcement,[56] and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[57] the Court finds that a sign of Plaintiff Mann's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[58]  With regard to the proper Defendants to Plaintiff Mann's challenge to this regulation, the Court finds that Defendants Hilton, Oakes and Nigrelli are proper Defendants to this challenge for the reasons stated above in Part III.A.2.b. of this Decision.

Finally, "with regard to performance, art entertainment, gaming, or sporting event," on September 19, 2022, Plaintiff Johnson (whose other relevant declaration testimony is summarized above in Part III.A.2.d. of the Court's Decision) swore as follows: (1) "[he] routinely visit[s] various locations that are considered 'performance, art entertainment, gaming, or sporting events' such as 'at the New York State Fairgrounds'; and (2) "[f]or example, late last month [he] had fully intended to attend the state fair at the New York State Fairgrounds (a locations at which carry is also prohibited . . . , until [he] learned that the Fairgrounds had expressed its intent to adopt and enforce the provision of the CCIA." (Dkt. No. 1, Attach. 3, at ¶ 13 [Johnson Decl.].)  Because the State Defendants waved their right to cross-examine Plaintiff Johnson at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Johnson at his word.  (Dkt. No. 58 [Stipulation].)

The problem is that Plaintiff Johnson does not swear that he *intends* to carry concealed New York State Fairgrounds in the *immediate* future. (*See generally* Dkt. No. 1, Attach. 3

---

[56]     *See, supra,* note 16 of this Decision.

[57]     *See, supra,* note 16 of this Decision.

[58]     *See, supra,* note 17 of this Decision.

[Johnson Decl.].)  In fact, a bit like Plaintiff Antonyuk in *Antonyuk I*, Plaintiff Johnson appears to acknowledge that he does *not* intend to violate the CCIA by carry concealed inside the State Fairgrounds.   (Dkt. No. 1, Attach. 3, at ¶ 13 [Johnson Decl., swearing, "For example, late last month I had fully intended to attend the state fair at the New York State Fairgrounds (a locations at which carry is also prohibited under subsection (d)), until I learned that the Fairgrounds had expressed its intent to adopt and enforce the provision of the CCIA. . . . I did not attend the fair, believing there to be a significant risk that my concealed carry firearm would be discovered and I would be charged with a crime"].)  *See Antonyuk I*, 2022 WL 3999791, at *18 ("Simply stated, the Court does not find that Plaintiff Antonyuk intends to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the CCIA.") (internal quotation marks omitted).

In light of all of this evidence, the Court finds that each of these two Plaintiffs (Terrille and Mann) has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused through a credible threat of enforcement of this regulation), (2) a sufficient causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Soares, Nigrelli, Hilton, and Oakes have sufficiently threatened to enforce Section 4 of the CCIA against one or both of these two Plaintiffs in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by these four Defendants (who, again, each has the specific duty to enforce Section 4).

For all of these reasons, the Court finds that Plaintiffs have not alleged or sworn a sufficiently concrete intention to carry concealed in that location in the immediate future:

> [A]ny place used for the performance, art entertainment, gaming, or
> sporting events such as . . . stadiums, racetracks, museums, amusement
> parks, performance venues, concerts, exhibits, . . . and gaming facilities
> and video lottery terminal facilities as licensed by the gaming commission
> . . . .

As a result, the Court reconsiders its Decision and Temporary Restraining Order of October 6, 2022, and denies Plaintiffs' motion for a preliminary injunction with regard to those locations for lack of standing.

However, to the extent this regulation regards "theaters," "conference centers" and "banquet halls," the Court finds that Plaintiff Terrille has standing to challenge it, and that Defendants Soares and Nigrelli are proper Defendants to that challenge. Similarly, to the extent this regulation regards "banquet halls," the Court finds that Plaintiff Mann also has standing to challenge it, and that Defendants Hilton, Oakes and Nigrelli are proper Defendants to that challenge.

### q. "[A]ny location being used as a polling place"

The Court reaches the same conclusion regarding this regulation as it reached with regard it in its Decision and Temporary Restraining Order (i.e., that this regulation finds support in this Nation's historical tradition of firearm regulation). *See Antonyuk II*, 2022 WL 5239895, at *15.

### r. "[A]ny … public area restricted from general public access for a limited time … by a governmental entity"

In its entirety, this paragraph of Section 4 of the CCIA prohibits the licensed concealed carry of a handgun in the following locations:

> any public sidewalk or other public area restricted from general public
> access for a limited time or special event that has been issued a permit for
> such time or event by a governmental entity, or subject to specific,
> heightened law enforcement protection, or has otherwise had such access

74

restricted by a governmental entity, provided such location is identified as
such by clear and conspicuous signage . . . .

Again, the Court reaches the same conclusion regarding this regulation as it reached with

regard it in its Decision and Temporary Restraining Order (i.e., that this regulation finds support

in this Nation's historical tradition of firearm regulation).  *Antonyuk II*, 2022 WL 5239895, at

*15.

> s.      **"[A]ny gathering of individuals to collectively express their
> constitutional rights to protest or assemble"**

The only Plaintiffs who arguably allege or assert a concrete intention to carry concealed

in any of the locations listed in this regulation in the immediate future are Plaintiff Terrille (with

regard to gun shows and political rallies), Plaintiff Johnson (also with regard to political rallies),

and Plaintiff Mann (with regard to expressive religious assemblies).

More specifically, with regard to gun shows, on September 19, 2022, Plaintiff Terrille

(whose other relevant declaration testimony is summarized above in Part III.A.2.d. of the Court's

Decision) swore as follows: (1) "[he] plan[s] to attend the upcoming NEACA Polish Community

Center Gun Show, to occur on October 8-9, 2022, in Albany"; (2)"[t]he gun show is hosted by

The Polish Community Center, which describes itself as 'a conference center, banquet hall &

wedding venue in Albany, NY'"; (3) "one of [his] main reasons for attending, and a huge part of

any gun show, is the conversations with fellow gun owners, which invariably includes discussion

of New York State's tyrannical gun laws"; and (4) "[he] intends to carry [his] firearm with [him]

when [he attends the gun show], in violation of the CCIA . . . ."  (Dkt. No. 1, Attach. 10, at ¶ 16

[Terrille Decl.].)

With regard to political rallies, Plaintiff Terrille swore as follows: (1) "[i]n the past, [he has] attended pro-gun rallies, and done so while armed"; (2) "[f]or example, in 2013 and 2014, [he] attended more than one rally in Albany, before and after the New York SAFE Act was passed, which occurred on public sidewalks and streets"; and (3) "[he] do[es] not presently know of any upcoming pro-gun or pro-freedom rally currently scheduled in New York but, if there were one, [he] would jump at the opportunity to attend it to express [his] political views, and [he] would do so while carrying my firearm, in clear violation of the CCIA. (*Id.* at ¶ 18.) Because the State Defendants waved their right to cross-examine Plaintiff Terrille at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Terrille at his word. (Dkt. No. 58 [Stipulation].)

Granted, because Plaintiff Terrille does not assert a concrete intention to attend a "pro-gun" rally armed in the immediate future, his standing to challenge this regulation cannot find a basis in that violation of the CCIA. However, such standing does find a basis in Plaintiff Terrille's concrete intention to attend a gun show in the immediate future.

As stated above in note 54 of this Decision, it is not clear to the Court whether Plaintiff Terrille attended a Gun Show at the Polish Community Center in Albany on October 8 and 9, 2022. Granted, the current standing inquiry focuses on the imminence of the concrete injury claimed by Plaintiff Terrille (here, arrest and/or seizure of his handgun) both at the time of filing his Complaint and at the time of filing his motion for preliminary injunction.[59] And, at the time

---

[59]     *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (finding that a plaintiff seeking injunctive relief "cannot rely [only] on past injury to satisfy the injury requirement [to establish standing] but must [also] show a likelihood that he ... will be injured in the future"); *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp.2d 160, 167

of the preparation of this Decision, the gun show has either happened or not. But the reason the Court does not know if it happened is the State Defendants' *failure t*o cross-examine Plaintiff Terrille at the Preliminary Injunction Hearing (a choice the State Defendants made apparently in exchange for not having Defendants Hochul, Nigrelli and Doran subpoenaed as witnesses at the Hearing).[60] Plaintiff Terrille had no duty under Fed. R. Civ. P. 65 to move for leave to supplement his motion papers after October 9, 2022, and file a supplemental declaration swearing that the gun show had in fact occurred and he had in fact attended it while armed. He filed his motion on September 22, 2022, and it is hardly his fault that the Court has taken so long to prepare this Decision (the length of which has been necessitated less by the breadth the Complaint's claims as the unprecedented constitutional violations presented by the CCIA). Furthermore, imposing such a duty on Plaintiff Terrille would require him to essentially confess to a crime, something he is not required to do in order to establish standing.[61]

Because the limitations period has not yet expired on a criminal charge against Plaintiff Terrille for violating this provision of the CCIA on October 8 and 9, 2022, the Court finds that Defendants Soares and Nigrelli are proper Defendants to Terrille's challenge to this regulation as it regards gun shows for the reasons stated above in Part III.A.2.d. of this Decision.

---

(S.D.N.Y. 2006) ("To establish standing for an injunction, a plaintiff must not merely allege past injury, but also a risk of future harm.").

[60]    (*Compare* Dkt. Nos. 53-55 [Notices to Serve Subpoenas] *with* Dkt. No. 58 [Stipulation].)

[61]    *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2104) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.").

Also with regard to political rallies, on September 19, 2022, Plaintiff Johnson (whose other relevant declaration testimony is summarized above in Part III.A.2.d. of the Court's Decision) swore as follows: (1) "[i]n the past, [he has] attended pro-gun rallies, and done so while armed"; (2) "[f]or example, in August of 2020, [he] attended the 'Back the Blue' rally in Albany"; (3) "[he has] attended similar rallies in other states, such as the January 2020 VCDL Lobby Day that takes place annually in January in Richmond, Virginia"; (4) "[he] take[s] any realistic opportunity to exercise and advocate for [his] Second Amendment and other rights, preferably doing both at the same time"; and (5) "[he] do[es] not presently know of any upcoming pro-gun or pro-freedom rally currently scheduled but, when one is scheduled, [he] intend[s] to attend it, and to do so while carrying [his] firearm, in violation of the CCIA." (Dkt. No. 1, Attach. 3, at ¶¶ 14, 16 [Johnson Decl.].)  Because the State Defendants waved their right to cross-examine Plaintiff Johnson at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Johnson at his word. (Dkt. No. 58 [Stipulation].)

However, even doing so, the Court must find that Plaintiff Johnson has not established a concrete intention to attend a politically rally (whether "pro-gun" or "Back the Blue") while armed in the imminent future.  (*See generally* Dkt. No. 1, Attach. 3 [Johnson Decl.].)

Finally, with regard to expressive religious assemblies (which Plaintiff Mann asserts fall under this vague paragraph of Section 4 of the CCIA), on September 19, 2022, Plaintiff Mann (whose other relevant declaration testimony is summarized above in Part III.A.2.b. of the Court's Decision) swore as follows: (1) Fellowship Baptist Church has "morning and evening services every Sunday, together with an evening service every Wednesday," and it "regularly ha[s] other gatherings and events at the church, not only for church attendees but also the general public";

(2) "since [Fellowship Baptist Church is] a small church, [it is] unable to afford to pay for private security who might be exempt from the CCIA"; (3) as a result, he is "unable to comply with . . . the CCIA", and thus [he] intend[s] to continue to [carry his handgun concealed in the church]"; (4) by "plac[ing] off limits 'any gathering of individuals to collectively express their constitutional rights to . . . assemble," the CCIA "would seem to seem to cover a church service"; and (5) "[t]o the extent that this section covers [his] church activities, [he] do[es] not intend to comply." (Dkt. No. 1, Attach. 9, at ¶¶ 8-11, 32 [Mann Decl.].) Because the State Defendants waved their right to cross-examine Plaintiff Mann at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiff Mann (a pastor) at his word. (Dkt. No. 58 [Stipulation].)

Based on the fact that Plaintiff Mann has sworn that he has frequently carried concealed during expressive religious assemblies and will do so again, the Court finds he has asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA. *See, e.g., Houston*, 733 F.3d at 1332-37. Moreover, based on the brazen nature of Plaintiff Mann's intended defiance,[62] the fact that at least one of his congregants is a member of local law enforcement,[63] and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[64] the Court finds that a sign of Plaintiff Mann's "concealed" handgun is likely to both (1) occur and (2) result in a complaint from a concerned

---

[62]     *See, supra,* note 15 of this Decision.

[63]     *See, supra,* note 16 of this Decision.

[64]     *See, supra,* note 16 of this Decision.

citizen.[65]  With regard to the proper Defendants to Plaintiff Mann's challenge to this regulation, the Court finds that Defendants Hilton, Oakes and Nigrelli are proper Defendants to Mann's challenge for the reasons stated above in Part III.A.2.b. of this Decision.

In light of all of this evidence, the Court finds that each of these two Plaintiffs (Terrille and Mann) has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused through a credible threat of enforcement of this regulation), (2) a sufficient causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Soares, Nigrelli, Hilton, and Oakes have sufficiently threatened to enforce Section 4 of the CCIA against one or both of these two Plaintiffs in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by these four Defendants (who, again, each has the specific duty to enforce Section 4).

For all of these reasons, the Court finds that Plaintiff Terrille has standing to challenge this regulation, and that Defendants Soares and Nigrelli are proper Defendants to that challenge. Similarly, the Court finds that Plaintiff Mann also has standing to challenge this regulation, and that Defendants Hilton, Oakes and Nigrelli are proper Defendants to that challenge.

### t.    "[T]he area commonly known as Times Square"

Based on a careful consideration of the State Defendants' continued challenge to the sufficiency of the Complaint and testimony with regard to this paragraph (and in the absence of elaborative testimony at the Preliminary Injunction Hearing), the Court finds that State

---

[65]    *See, supra,* note 17 of this Decision.

Defendants are correct: Plaintiffs have not sufficiently alleged or expressed a concrete intention to carry concealed, in the immediate future, in the area commonly known as Times Square. The Court therefore reconsiders this portion of its Decision and Temporary Restraining Order of October 6, 2022,[66] and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation for lack of standing.

### 3.    Standing to Challenge Restricted Locations

---

[66]    To this analysis, the Court would add only that, if Plaintiffs had shown standing regarding this area, the Court would have likely found an American historical tradition of banning firearms in this unique regularly congested commercial area filled with expressive conduct. In doing so, the Court would not have relied on two of the (purportedly) three "more instances of laws involving fairs and markets" provided by the State Defendants (Dkt. No. 48, at 91), because they are from 1328 and 1534, and thus too remote from the relevant time period to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868. However, the Court would have relied on the third such law provided by the State Defendants (a Tennessee law from 1869-70). Together, there exist three historical state laws barring firearm possession in "fairs" or "markets" (although the first law was admittedly aimed at the brandishing of firearms, while the carrying of weapons is concealed today in New York). *See* 1786 Va. Laws 33, ch. 21, An Act Forbidding and Punishing Affrays ("[N]o man, great nor small, [shall] go nor ride armed by night nor by day, in fair or markets … in terror of the Country …."); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("[N]o man great nor small ... except the King's servants in his presence ... be so hardy to ... ride armed by night nor by day, in fairs [or] markets …."); 1869-70 Tenn. Pub. Acts 23-24 (providing that no person may carry a "deadly or dangerous weapon" when attending "any fair, race course, or other public assembly of the people."). In 1790, Virginia contained about 20.9 percent of the total American population (747,610 out of 3,569,100), and North Carolina contained about 11.0 percent (393,751 out of 3,569,100). *See Return of the Whole Number of Persons Within the Several Districts of the United States: 1790* (Philadelphia 1793). The fact that 31.9 percent of Americans in 1791 were governed by such laws regulating the carrying of firearms in "fairs" or "markets" (albeit one of which was limited to terroristic behavior) would appear to shed some light on the public meaning of the words "keep and bear arms" in Second Amendment when it was adopted. The Court notes that, in 1870, Tennessee contained about 3.3 percent of the total American population (1,258,520 out of 38,558,371). *See* Dept. of Interior, Compendium of Ninth Census: 1870 (1870). Assuming the Virginia and North Carolina laws were still in effect then, the three states would have contained about 9.2 percent of the American population, with Virginia contributing about 3.2 percent (1,225,163 out of 38,558,371) and North Carolina contributing about 2.8 percent (1,071,361 out of 38,558,371).

Section 5 of the CCIA bans the carry of firearms in what it calls "a restricted location," which is any

> private property where such [license holder] knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of [firearms] on their property is permitted or has otherwise given express consent.

Each Plaintiff has standing to challenge this regulation because each one alleges and/or swears he has in New York State a home, where Section 5 requires him to engage in compelled conspicuous speech on his property with those persons passing by his property. (*See, e.g.,* Dkt. No. 1, at ¶¶ 2-8, 140-47, 149, 162, 174, 178, 184, 198, 217 [Compl.]; Dkt. No. 1, Attach. 3, at ¶ 1 [Johnson Decl.]; Dkt. No. 1, Attach. 4, at ¶ 1 [Sloane Decl.]; Dkt. No. 1, Attach. 5, at ¶¶ 1, 25-29 [Leman Decl.]; Dkt. No. 1, Attach. 8, at ¶¶ 13-15, 17-19, 21 [Antonyuk Decl.]; Dkt. No. 1, Attach. 9, at ¶¶ 1, 12-13 [Mann Decl.]; Dkt. No. 1, Attach. 10, at ¶¶ 1, 17 [Terrille Decl.].)

This is particularly so for three of the six Plaintiffs: (1) Plaintiff Terrille, who currently lives as a tenant in an apartment complex that does not permit tenants to post signage outside their units; (2) Plaintiff Leman, who runs a small hotel/bed and breakfast for guests and faces a loss of patronage by the business of gun owners who wish to travel lawfully with their firearms if he does not post a sign (which he thus must do because, for him, "it is entirely impractical to provide person-by-person 'express consent' to each individual who stops by"); and (3) Plaintiff Antonyuk, who (due to the notoriety he has achieved in *Antonyuk I*) fears that if he posts the equivalent of a conspicuous "Guns Welcome" sign (there also being no way he can otherwise provide the required "express consent" to all license-holding visitors 24 hours a day 365 days a year under the CCIA) he will subject himself and his family to harassment, vandalism and

physical confrontation by "those who disagree" with his political views, as well as theft by burglars (due to the monetary value of firearms), and home invasion by violent criminals. (Dkt. No. 1, Attach. 10, at ¶ 17 [Terrille Decl.]; Dkt. No. 1, Attach. 5, at ¶¶ 25-29 [Leman Decl.]; Dkt. No. 1, Attach. 8, at ¶¶ 13-18 [Antonyuk Decl.].) *See, e.g, All for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 540 (S.D.N.Y. 2008) ("[T]he fact that the [plaintiffs] are required to speak the Government's message in exchange for the Leadership Act subsidy is a sufficient injury-in-fact.").

Moreover, with regard to privately owned property that is open for business to the public (which also appears to be covered by Section 5), two of the six Plaintiffs have sufficiently sworn that (1) they routinely visit "non-sensitive" privately owned properties that are open for business to the public (which would also be covered by Section 5 of the CCIA), and (2) they will continue to do so carrying their licensed handguns concealed, regardless of whether those properties lacks a conspicuous sign saying that Plaintiffs can do so (although they will not enter those premises carrying concealed if there is a sign saying they cannot do so). (*See, e.g.,* Dkt. No. 1, Attach. 3, at ¶ 18 [Johnson Decl., discussing visits to "gas stations, grocery stores, home improvement stores, [and] big box stores"]; Dkt. No. 1, Attach. 10, at ¶¶ 10, 12-13 [Terrille Decl., discussing frequency of visits to "First National Bank of Scotia" as well as "gas stations, grocery stores (such as Hannaford Supermarket and Price Shopper), home improvement stores, [and] big box stores" such as "Walmart, Walgreens and Target"]; *cf.* Dkt. No. 1, Attach. 8, at ¶¶ 6, 12 [Antonyuk Decl., discussing visits to a "gas station"].) Again, because the State Defendants waved their right to cross-examine Plaintiffs at the Preliminary Injunction Hearing on October 25, 2022, the Court takes Plaintiffs at their word. (Dkt. No. 58 [Stipulation].)

83

Based on the fact that Plaintiffs Johnson and Leman have sworn that they have frequently carried concealed in privately owned, open-to-the-public locations and will do so again soon (regardless of the absence of CCIA signage), the Court finds they have asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA. *See, e.g., Houston*, 733 F.3d at 1332-37. Moreover, based on the brazen nature of the intended defiance of that Plaintiffs Johnson and Leman and the fact of the recent publicization of the CCIA (including its sensitive-location provision) in New York State,[67] the Court finds that a sign of these Plaintiffs' "concealed" handguns is likely to both (1) occur and (2) result in a complaint from a concerned citizen.[68] With regard to the proper Defendants to this challenge, the Court finds that Defendants Nigrelli, Doran, Conway, Fitzpatrick, Cecile,[69] Soares, Oakes, Hilton, and Stanzione are proper Defendants because they are tasked with enforcing the CCIA (include Section 5) in the locations in which Plaintiffs live (and some of them in the privately owned, open-to-the-public locations in which Plaintiffs Johnson and Leman intend to carry concealed, regardless of the absence of CCIA signage), for the reasons stated above in this Decision.

In light of all of this evidence, the Court finds that each of the six Plaintiffs has shown (1) an injury in fact (i.e., the denial of his right to armed self-defense in public under the Second Amendment caused and/or the denial of his right to be free from compelled speech under the First Amendment, through a credible threat of enforcement of this regulation), (2) a sufficient

---

[67] *See, supra,* note 16 of this Decision.

[68] *See, supra,* note 17 of this Decision.

[69] The Court notes that, in his declaration, Plaintiff Johnson referred to Defendant Cecile as one of "the top law enforcement officials where I live" (i.e., the City of Syracuse). (Dkt. No. 1, Attach. 3, at ¶ 23 [Mann Decl.].)

causal connection between the injury and the conduct complained of (i.e., the fact that Defendants Nigrelli, Doran, Conway, Fitzpatrick, Cecile,  Soares, Oakes, Hilton, and Stanzione have sufficiently threatened to enforce Section 5 of the CCIA against one or more of these six Plaintiffs in accordance with their duty to do so), and (3) a likelihood that a favorable decision from this Court will cause the injury to be redressed by these four Defendants (who, again, each has the specific duty to enforce Section 5).

For all of these reasons, the Court finds that all six Plaintiffs have standing to challenge this regulation, and that Defendants Nigrelli, Doran, Conway, Fitzpatrick, Cecile,  Soares, Oakes, Hilton, and Stanzione are proper Defendants to that challenge.

### 4. Propriety of Defendant Hochul as a Party

None of the proper parties found above in Parts III.A.1. through III.A.3. of this Decision was Defendant Hochul. In *Antonyuk I,* the Court expressly acknowledged that "[a]uthority exists for the point of law that the Governor and Attorney General might not be proper defendants (regardless of whether they were named solely in his or her official capacity)." *Antonyuk I,* 2022 WL 3999791, at *14.  Granted, the Court

> question[ed] the applicability of th[ose] cases to proper-defendant determinations under the CCIA, given that . . . the CCIA has introduced a 'sensitive-location restriction and "restricted-location" restriction across the state . . . , and the Governor could simply replace a Superintendent who refuses to enforce the CCIA.

*Id*.  And, as a result, the Court stated that "it appears the list of proper defendants could conceivably include not simply the licensing officer, but the Governor . . . ."  *Id*. at *15.

However, the Complaint in this action alleges only as follows, in pertinent part:

> Governor Hochul (1) has openly criticized and expressed contempt for the Supreme Court's decision in *Bruen*, (2) took action to circumvent the

> Supreme Court's ruling by merely changing] the nature of the open-ended
> discretion" from proper cause to good moral character . . . , (3) pushed
> enactment of the CCIA through the legislature and (4) signed the bill into
> law, and (5) subsequently has acted as the interpreter-in-chief with respect
> to the CCIA's provisions. The Governor has opined on the statute's proper
> interpretation, and provided guidance and instructions to officials
> throughout the state of New York as to its implementation according to
> her desires. For example, Governor Hochul (1) has instructed that the
> CCIA's new licensing process applies even to those whose carry license
> applications are already submitted and pending prior to September 1,
> 2022; (2) has claimed that the 'good moral character' activity will involve
> door-to-door interviews of a person's neighbors; (3) has claimed that the
> CCIA's plain text should not apply to certain parts of the Adirondack Park
> in contradiction to the wishes of the bill's sponsors; and (4) has opined
> that the CCIA's 'restricted locations' provision creates a 'presumption …
> that they don't want concealed carry unless they put out a sign saying
> Concealed Carry Weapons Welcome Here. . . . Moreover, and again, the
> Superintendent, who is tasked with implementing and enforcing various
> provisions of the CCIA, is the Governor's underling . . . .

(Dkt. No. 1, at ¶ 9 [Compl.] [internal quotation marks, citations, and footnotes omitted].)

True as all this might be, it does not appear enough to render her a proper party to this

action under the case law cited in *Antonyuk I*. Plaintiffs have not alleged or shown how

Defendant Hochul could be properly found to have the specific legal duty to enforce the CCIA.

Granted, in New York State, a Governor has the ability to remove any elected sheriff or district

attorney. *See* N.Y. Const. Art. 13, § 13(a),(b) (" The governor may remove any elective sheriff .

. . [or] district attorney . . . within the term for which he or she shall have been elected; but before

so doing the governor shall give to such officer a copy of the charges against him or her and an

opportunity of being heard in his or her defense . . . . Any district attorney who shall fail

faithfully to prosecute a person charged with the violation in his or her county of any provision

of this article which may come to his or her knowledge, shall be removed from office by the

governor, after due notice and an opportunity of being heard in his or her defense."). Moreover,

here, it appears that, 49 days before being elevated to Acting Superintendent, Defendant Nigrelli

(in the middle of threatening to arrest the specific group of license holders intending to violate

the CCIA) paused to assure his boss of the concrete and particularized nature of his message:

> For those [license holders] who choose to violate this law … Governor, it's
> an easy message. I don't have to spell it out more than this. We'll have
> zero tolerance. If you violate this law, you will be arrested. Simple as that.
> Because the New York State Troopers are standing ready to do our job to
> ensure ... all laws are enforced.

(Dkt. No. 1, Attach. 9, at ¶ 22, n.5 [Mann Decl.].)  However, no suggestion has been made, or

evidence adduced, that Defendant Hochul's elevation of Defendant Nigrelli was connected to

this message (or any failure or refusal of Defendant Bruen to enforce the CCIA).

As a result, it is not clear to the Court how, to the extent that Plaintiffs were to ultimately

prevail on their claims, Defendant Hochul would be the individual who may provide them the

(legal) relief they seek.  *See Antonyuk I,* 2022 WL 3999791, at *11 ("[T]he question the Court

must ask itself is whether (and, if so, the extent to which), if ordered to do so by the Court, [the

relevant defendant] could provide Plaintiffs with the relief they seek.").  As Plaintiffs concede in

their Complaint, "[t]o be sure, Governor Hochul is not the official to whom the Legislature

delegated responsibility to implement the provisions of the challenged statutes."  (Dkt. No. 1, at

¶ 9 [Compl.] [internal quotation marks omitted].)

For all of these reasons, the Court dismisses Defendant Hochul as a party to this action.[70]

## B.  Substantial Likelihood of Success on the Merits

---

[70]    However, should evidence surface during the course of this litigation showing Defendant
Hochul's personal involvement in the enforcement of the CCIA through the exercise of her
authority under N.Y. Const. Art. 13, § 13, the Court would revisit this issue and entertain a
motion to amend the Complaint.

The Court begins its analysis of the merits of Plaintiffs' claims by explaining that it interprets the one-step, burden-shifting approach set forth in *NYSRPA* (described in more detail above in Part II of this Decision) as essentially requiring the Court, at least in the context of this action, to engage in the following analytical inquiry.[71]

The Court must first ask whether the conduct in question is covered by the plaint text of the Constitution.  If so, the burden shifts to the Government to demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  In deciding whether the Government has met this burden, the Court must ask (a) *why* and *how* the modern regulation being challenged burdens a law-abiding citizen's right to armed self-defense, (b) *why* and *how* the historical analogues relied on (to the extent they are part of the Nation's historical tradition of firearm regulation) burden a law-abiding citizen's right to armed self-defense, and (c) whether the modern regulation is *comparable* (or proportionate) to its historical analogues in that it imposes a comparable burden for a comparable reason or justification (understanding that, if it is not, then that fact could be evidence that the modern regulation is unconstitutional).

If there are *no* clear historical analogues, the Court must ask whether the modern regulation addresses a *general* societal problem that has persisted since the 18th century (understanding that, if it does, then the lack of a historical analogue is relevant evidence that the challenged regulation is inconsistent with the Second Amendment especially if a proposed historical analogue was rejected on constitutional grounds). Moreover, if there are no clear historical analogues *and* the modern regulation does *not* address a general societal problem that

---

[71]     Of course, before starting this inquiry, the Court will need to address the extent to which Plaintiffs have standing, which is a threshold issue. *Antonyuk I*, 2022 WL 3999791, at *10-25.

has persisted since the 18th century, then the Court must essentially go back and repeat the above-described analytical inquiry (because the Constitution *must* apply) using a "more nuanced" approach (essentially meaning broaden its conception of what constitutes an "analogue" and focus its attention on the justification for, and burden imposed by, it), with the understanding that generally the Court should not uphold a modern law that only remotely resembles its historical analogues.

As for the nature of the laws that the Court will consider, although it is not the Court's duty to find analogues for Defendants or "sift" through those analogues, the Court has (given the importance of the issues presented) tried to find analogous laws to the extent the State-Defendants may have not provided them.[72]  Finally, to the extent that the Court has (on some occasions) departed from its reasoning and conclusions in its Decision and Temporary

---

[72]     More specifically, in doing so, the Court has mostly relied on the results of (non-Boolean) word searches in the sole public database of such historical gun laws that it has found (on the Duke Center for Firearms Law's Repository of Historical Gun Laws, at https://firearmslaw.duke.edu/), and then obtained PDF copies of those laws with the grateful help of the Second Circuit librarian (because the Duke database does not contain such PDF copies). The Court notes also that future district courts deciding similar challenges (and counsel litigating them) would probably find it helpful to be able to access an online database (say, on Westlaw, Lexis, Bloomberg Law or the Duke Repository of Historical Gun Laws) that contains both (1) PDF copies of the historical laws so that they may be verified, and (2) text translations so that can be searched using Boolean logic.  As for how to interpret these laws, in this Court's experience, what would be most helpful in properly applying the *NYSRPA* standard is not a court-appointed expert historian under Fed. R. Evid. 706 (who the losing party might argue was more like a court-*anointed* expert historian). The State Defendants are fully capable of meeting their burden of producing analogues (especially when prodded to do so), and judges appear uniquely qualified at interpreting the meaning of statutes. What would be more helpful to this Court is the testimony of opposing historians with expertise in the time periods and regions that produced the laws.  Ours is an adversarial system, after all, and the Court imagines that reasonable minds may disagree about such issues as (1) the nature and extent of the then-existing societal problem that justified a historical law, and (2) the nature and extent of the burden imposed by the law at that time and place.

Restraining Order of October 6, 2022, the Court has generally done so based on its receipt of better briefing by the State Defendants and its further consideration of the historical laws obtained in light of the standard set forth in *NYRPA*.

### 1.    Application Requirements

The Court begins this analysis by finding that the Second Amendment's plain text covers the conduct in question: carrying (or applying for a license to carry) a concealed handgun in public for self-defense.  More specifically, the Court finds that (1) Plaintiff Sloane is part of "the People" protected by the amendment, (2) the weapons in question are in fact "arms" protected by the amendment, and (3) the regulated conduct (i.e., bearing a handgun in public for self-defense) falls under the phrase "keep and bear." *NYSRPA*, 142 S. Ct. at 2134-35; *see also D.C. v. Heller*, 554 U.S. 570, at 583-92 (2008) (analyzing meaning of "bear arms" at time of both 1791 and 1868).

The State Defendants argue that the Second Amendment's plain text does not cover the CCIA's "good moral character" requirement (and the other challenged aspects of the application process) because (1) the Second Amendment protects only *law-abiding, responsible* citizens' right to keep and bear arms, (2) Plaintiff Sloane cannot show himself to be a law-abiding, responsible citizen until he is of "good moral character" (and has satisfied the other aspects of the application process), and (3) thus, the "good moral character" requirement (and related aspects of the application process) are outside the scope of the Second Amendment. (Dkt. No. 48, at 36-38.) In so doing, the State Defendants attempt to avoid the impact of the burden-shifting rule set forth in *NYSRPA*.  They fail.

As stated in *NYSRPA*, the Supreme Court's one-step, burden-shifting approach consists of first determining whether the Second Amendment's plain text covers Plaintiffs' conduct, and then determining whether Defendants have met their burden of demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.  This is why "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls *outside* the Second Amendment's *unqualified* command."  *NYSRPA*, 142 S. Ct. at 2126 (emphasis added).  Thus, New York State's determination of whether Plaintiff Sloane is of "good moral character" does not *precede* the application of the Second Amendment, but *follows* it, because Sloane is seeking to obtain a license to carry a handgun concealed in public for self-defense (which the Supreme Court has already expressly found to be conduct covered by the Second Amendment).  *See NYSRPA*, 142 S. Ct. at 2126 ("We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.  We have little difficulty concluding that it does. Respondents do not dispute this.  See Brief for Respondents. Nor could they.  Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms.").  Indeed, the Supreme Court in *NYSRPA* specifically found that New York State's license application process is governed by the Second Amendment when it ruled that Brandon Koch and Robert Nash did not have to show a special need for self-protection distinguishable from that of the general community as part of that application process.  *NYSRPA*, 142 S. Ct. at 2156.

As a result, the Court finds that Defendants must rebut the presumption of protection against New York State's firearm regulation by demonstrating that the below-discussed aspects

91

of the CCIA's application requirements are consistent with this Nation's historical tradition of firearm regulation.

### a.  "Good Moral Character"

The Court begins its analysis by observing that in their opposition papers the State Defendants do not clearly state *why* this regulation (or any of the challenged regulations, for that matter) burdens a law-abiding citizen's right to armed self-defense.  (Dkt. No. 48, at 38-41.) However, because this statute is of great importance to New York State, the Court has liberally construed the State Defendants' opposition papers and attempted to state what it understands to be the strongest possible reason or justification for this regulation (and each of the challenged regulations).

The apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision* https://www.governor.ny.gov/news (July 1, 2022) ("Research has shown that violent crime involving firearms increases by 29 percent when people are given the right to carry handguns, caused in part by a 35 percent increase in gun theft and a 13 percent decrease in the rate that police solved cases. Today's legislative package furthers the State's compelling interest in preventing death and injury by firearms . . . .").[73]

---

[73]     Another possible reason for this regulation, and the CCIA in general, is to simply make it so much more difficult to obtain a concealed-carry license in New York State that the number of concealed-carry licenses issued each year remains the same as it was before the Supreme Court

The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a person from carrying a concealed handgun in public for self-defense unless he or she can persuade a licensing officer that he or she is of "good moral character," meaning that he or she would *never* use the weapon in a manner that would endanger oneself or others, pursuant to a standard that (1) involves *undefined* assessments of "temperament," "judgment" and "[]trust[]," and (2) lacks an express exception for actions taken in *self-defense*.

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) Massachusetts, Pennsylvania and Virginia laws from 1648 and 1763 forbidding the sale and trading of arms to Indigenous people; (2) a Virginia law from 1756 prohibiting weapons possession by Catholics who refused to take an oath of loyalty to the government; (3) a Massachusetts law from 1637 disarming a list of named followers of a dissident preacher named John Wheelwright; (4) an English law from 1662 allowing royal officials to "search for and seize all arms in the custody or possession of any person or persons whom the said Lieutenant or two or more of their deputies shall judge

---

issued its decision in *NYSRPA* when New York State licensing officers could require concealed-carry license applicants to show a special need for self-protection distinguishable from that of the general community. *See, e.g., Proclamation for Extraordinary Session* (June 24, 2022) ("I hereby convene the Senate and the Assembly … for the purpose of … [c]onsidering legislation I will submit with respect to addressing necessary statutory changes regarding firearm safety, in a way that ensures protection of public safety and health, after the United States Supreme Court decision in *NYS Rifle and Pistol Association, Inc. v. Bruen*."); *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision* (July 1, 2022) https://www.governor.ny.gov/news (last visited Nov. 1, 2022) ("As a result of this decision, the State has taken steps to address the consequences of the Supreme Court decision and the resulting increase in licenses and in the number of individuals who will likely purchase and carry weapons in New York State."). However, because that reason would appear aimed at merely frustrating the exercise of law-abiding, responsible citizens' right of armed self-defense in public in disregard of the Second Amendment, the Court will use the more generous reason stated above.

dangerous to the peace of the Kingdom"; (5) Massachusetts, Pennsylvania, Maryland, North

Carolina and Virginia laws from 1776 and 1777 disarming persons based on their reputation for

being disloyal or hostile to the new Nation until they took an oath of loyalty; (6) New York, New

Jersey and Pennsylvania militia statutes from between 1776 and 1822 disarming and punishing

those who showed up to muster and demonstrated their unfitness to bear arms; and (7) the

ordinances of nine cities (the District of Columbia, New York City, Brooklyn, Buffalo, Elmira,

Syracuse, Troy, Lockport, and Albany) from between 1878 and 1913 requiring a permit to carry

firearms in cities across the United States subject to the discretionary determination of an official

often regarding whether the individual was potentially dangerous. (Dkt. No. 48, at 41-47.)

Of course, to the extent these laws were from the 17th or 20th centuries, the Court has

trouble finding them to be "historical analogues" that are able to shed light on the public

understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868

(when a three-fourths supermajority of both the state and federal governments ratified those

amendments). *See NYSRPA*, 142 S. Ct. at 2136 ("Historical evidence that long predates or

postdates either [1791 or 1868] may not illuminate the scope of the right."). That is, after all, the

focus of the Court's inquiry.

Similarly, to the extent these laws come from a handful of cities, the Court has trouble

finding that they constitute part of this Nation's tradition of firearm regulation, because (setting

aside their geographical limitation to New York State and the District of Columbia), they do not

appear accompanied by similar laws from states. *See NYSRPA*, 142 S. Ct. at 2154 ("[T]he bare

existence of these localized restrictions cannot overcome the overwhelming evidence of an

otherwise enduring American tradition permitting public carry.").[74] The Court notes that in 1870 the population of the United States was about 38,558,371, while the populations of District of Columbia (109,199), New York City (942,292), Brooklyn (396,099), Buffalo (117,714), and Syracuse (43,051) amounted to only about 1,608,355, or only about 4.17 percent of the population of the United States. *See* Dept. of Interior, Compendium of Ninth Census: 1870, Tables I and VIII (1870).[75]

Granted, the State Defendants appear to also rely on a citation in the footnote of a book to what they call "ordinances from more than two dozen [other] cities, passed between the mid-19th century and early 20th century, requiring a permit to carry firearms in cities across the United States subject to the discretionary determination of an official." (Dkt. No. 48, at 46.) However, they do not adduce copies of those ordinances, as is their burden. *See NYSRPA*, 142 S. Ct. at 2150 ("Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). In any event, the Court has obtained copies of all of those pre-20th century ordinances with the help of the Second Circuit Librarian. They consist of licensing ordinances from nine cities from between 1888 and 1899 (Salt Lake City, UT,

---

[74] By "similar laws from states," the Court means laws imposing the safety-motivated gun-possession prohibitions on members of the *general population* (except members of law enforcement or the military) unless they have received a discretionary license.

[75] The Court notes that, by the time it passed its law in 1893, the District of Columbia's proportion of the national population had risen only slightly, from about 0.28 percent (109,199 out of 38,558,371) to about 0.37 percent (230,392 out of 62,622,250). *See* Dept. of Interior, Compendium of Eleventh Census: 1890, Table VI (1890). The Court notes also that Georgetown (which was added to the District of Columbia in 1891) had a population of only 12,578 in 1780. *See* Dept. of Interior, Census Bulletin No. 132 (Oct. 3, 1891).

Concordia, KS, Kansas City, MO, Oakland, CA, Stockton, CA, Wheeling, WV, St. Louis, MO,

Spokane, WA, and Ritzville, WA).[76]

---

[76]    *See* The Revised Ordinances of Salt Lake City, Utah (Salt Lake City: Tribune Jon Print, 1893), p.283, Sec. 14 (1888 ordinance providing that no "person who shall carry … any concealed deadly weapon, without the permission of the mayor first had and obtained"); "Offenses and Punishments: Ordinance No. 401," Concordia Blade (KS), December 20, 1889, p. 7, § 41 (Dec. 26, 1899) ("[I]t shall be unlawful for any person within the city of Concordia to carry upon his or her person any concealed pistol … or any deadly weapon unless he has a permit to do so from the Mayor of the city of Concordia."); An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264 (prohibiting concealed carriage unless the individual is a government official or has obtained "special permission from the Mayor"); Fred L. Button, ed., *General Municipal Ordinances of the City of Oakland, California* (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1 (1890 ordinance providing, "A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person"); Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240 (1891 ordinance making it unlawful for a person, with certain exceptions, "to wear or carry concealed about his person any pistol …, except he first have a written permit to do so from the Mayor of the City of Stockton"); Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206 (1891 ordinance requiring "a permit in writing from the mayor" to carry "any pistol, dirk, bowie knife or weapon of the like kind," as well as prohibiting certain concealed weapons); The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471 (1892 revised ordinance providing, "Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver … within the City of St. Louis, without written permission from the major …"); Rose M. Denny, ed., *The Municipal Code of the City of Spokane, Washington* (Spokane, WA; W.D. Knight, 1896), p. 309-10, Sec. 1 (1895 ordinance providing, "If any person within the City of Spokane shall carry about his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, … [he] shall be deemed guilty of a misdemeanor …; provided, that this section shall not apply to … persons having a special written permit from the Superior Court to carry weapons"); Charles H. Hamilton, ed., *The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix* (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25 ("It shall be unlawful for any person … to carry or wear concealed about his person, any pistol … within the limits of the city of Milwaukee; provided, however, that the chief of police of said city may upon written application to him made, issue and give a written permit to any person … to carry within the said city … when it is made to appear to said chief of police that it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon …."); "Ordinance No. 79," Adams County News (Ritzville, WA), June 14, 1899, p.2, Sec. 1 ("The following persons are hereby declared to be disorderly persons: … All persons …

For the sake of brevity, the Court will not linger on the diminished weight that is to be given to such late-19th century laws from cities (especially a city in a territory, like Salt Lake City was at the time). *See NYSRPA*, 142 S. Ct. at 2136, 2137, 2154 ("Historical evidence that long predates or postdates either [1791 or 1868] may not illuminate the scope of the right. . . . As we suggested in *Heller* . . . , late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence . . . [T]he bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry."). Even if the Court were to assume that such laws were sufficiently *established* (based on their number and geographical origins across the Nation), the Court could not find them *representative* of the Nation). This is because, according to the Census of 1890, the populations of those nine cities—even when combined with the populations of the five cities discussed earlier—totaled 3,646,906, which amount to only about 5.8 percent of the total United States population of about 62,622,250. *See* Dept. of Interior, Compendium of Eleventh Census: 1890, Table VI (1890).[77]

Although the Court does not suggest that the Supreme Court in *NYSRPA* did not envision the existence of competing strains of the American tradition of firearm regulation, the Court is

---

who shall carry about their persons any concealed weapon consisting of a revolver, pistol or other firearms (except by written permit from the Town Marshal ….").

[77] According to Tables VI and VIII of the Eleventh Census (1890), the populations were as follows: New York City (1,515,301), Brooklyn (806,343), St. Louis (451,770), Buffalo (255,664), District of Columbia (230,392), Kansas City (132,716), Syracuse (88,143), Oakland (48,682), Salt Lake City (44,843), Wheeling (34,522), Spokane (19,922), Stockton (14,424), and Concordia (3,184). *See* Dept. of Interior, Compendium of Eleventh Census: 1890 (1890), The data on Ritzville was not collected until 1900, when its population was 761. *See* Dept. of Interior, Compendium of Twelfth Census: 1900 (1900).

mindful of the fact that such open-ended discretionary licensing schemes did not burden 94

percent of Americans, which the Supreme Court would probably agree is "the overwhelming

weight" of the American population.  *See NYSRPA*, 142 S. Ct. at 2155 (using the term to refer to

99% of the population).  More plainly stated, although the Court in no way suggests that

America lacks a historical tradition of firearm-licensing schemes, it finds (based on the current

briefing of the parties) that America lacks a historical tradition of firearm-licensing schemes

conferring open-ended discretion on licensing officers.  *See NYSRPA*, 142 S. Ct. at 2123 ("But

the vast majority of States—43 by our count—are 'shall issue' jurisdictions, where authorities

must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements,

without granting licensing officials ***discretion*** to deny licenses based on a ***perceived*** lack of need

or suitability.") (emphasis added). Indeed, in his concurring opinion in *NYSRPA*, Associate

Justice Kavanaugh (joined by Chief Justice Roberts) stated as follows:

> As the Court explains, New York's outlier may-issue regime is
> constitutionally problematic because it grants ***open-ended discretion*** to
> licensing officials and authorizes licenses only for those applicants who
> can show some special need apart from self-defense. Those features of
> New York's regime—the ***unchanneled discretion*** for licensing officials
> and the special-need requirement—in effect deny the right to carry
> handguns for self-defense to many "ordinary, law-abiding citizens.' . . .
> Going forward, therefore, . . . the 6 States including New York potentially
> affected by today's decision may continue to require licenses for carrying
> handguns for self-defense so long as those States employ ***objective***
> licensing requirements like those used by the 43 shall-issue States.

*NYSRPA*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (emphasis added).

With regard to the remainder of the laws relied on by the State Defendants (i.e., the laws

of Virginia, Massachusetts, Pennsylvania, Maryland, North Carolina, New York and New Jersey

from between 1756 to 1822), generally, they appear to have been aimed at denying the

possession of guns to discrete groups of persons who were perceived to pose a danger to the public.  The way they burdened law-abiding citizens' right to armed self-defense was by either (1) altogether prohibiting possession based on rather obvious characteristics (their race, religion or demonstrated unfitness to bear arms during militia muster), or (2) conditioning possession based on the taking of an oath.

For the sake of argument, the Court will assume that this remainder of the laws constitute a tradition that was sufficiently established (based on their number and geographical origins across the Nation) and representative of the Nation at the time (based on the proportion of the national population to which they applied).  More important is that, even so, most of the laws relied on by the State Defendants (which were racially, religiously or politically motivated) were imposed on only *readily apparent* groups of people and often could be avoided by the *objective* act of taking an oath.  The CCIA's "good moral character" requirement is not so objective in nature (e.g., by requiring a finding of a *likelihood* of harm to self or others based the prior *conduct* of the applicant, and permitting one to avoid the restriction by taking an oath),[78] and does not even expressly recognize an exception for actions taken in self-defense.

---

[78]    *See, e.g.,* William Lair Hill, *Ballinger's Annotated Codes and Statutes of Washington* (Vol. 2, 1897), 1881 Flourishing Deadly Weapon ("Every person who shall in a manner *likely* to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor ….") (emphasis added); Bruce L. Keenan, *Book of Ordinances of the City of Wichita* Carrying Unconcealed Deadly Weapons, § 2 (1899) ("Any person who shall in the city of Wichita carry unconcealed, any fire-arms, slungshot, sheath or dirk knife, or any other weapon, which when used is *likely* to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars.") (emphasis added); *cf.* 1855 Ill. Criminal Code 365, Offenses Against the Persons of Individuals, Div. V, § 43 (proscribing instances in which a person "shall willfully and maliciously, or by agreement, fight a duel or single combat with any engine, instrument or weapon, the *probable* consequence of which might be the death of either party …").

As a result, based on a careful comparison of the burdensomeness of the CCIA's "good moral character" requirement (i.e., the burden imposed in light of its justification) to the burdensomeness of the relevant historical analogues (again, burden in light of justification), the Court finds the burdensomeness of the CCIA's "good moral character" requirement (which is imposed on *everyone* and can be avoided only through *open-ended discretionary* findings of "temperament," "judgment" and "[]trust[]" by licensing officials) is unreasonably disproportionate to the burdensomeness of the relevant historical analogues (which were imposed on only readily apparent groups of people and could often be avoided by the objective act of taking an oath).

This conclusion appears consistent with the majority of modern American firearm-licensing schemes, which require either likelihood of harm and/or a focus on the applicant's past conduct. *See Antonyuk II*, 2022 WL 5239895, at *9, nn.17-18 (collecting some of the modern state gun laws). This construction also appears consistent with *NYSRPA*: shouldering an applicant with the burden of persuading a license officer that he or she is of "good moral character" based on the officer's undefined assessments of "temperament," "judgment" and "[]trust[]" (in the face of a de facto presumption that he or she is *not*)[79] is akin to shouldering an applicant with the burden of persuading a license officer that he or she has a special need for

---

[79]    The need for an affirmative finding of "good moral character" (in the absence of which "[n]o license shall be issued") presumes a lack of it. This requirement also seems to depart from the historical statutes, which presumed a right to carry. *See, e.g., NYSRPA*, 142 S. Ct. at 2148 ("[T]he [mid-19th century] surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'") (emphasis added).

self-protection distinguishable from that of the general community (an equally mushy and subjective finding). The "good moral character" requirement is just a dressed-up version of the State's improper "special need for self-protection" requirement.

As one of their main defenses, the State Defendants repeatedly rely on the "no set of circumstances exists under which the regulation would be valid" standard governing facial challenges that was articulated in *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 184 (2d Cir. 2017). If there are such circumstances, they argue, the regulation must be left alone. Usually, the "circumstances" relied on by the State Defendants are circumstances in which the regulation is simply not enforced. (Dkt. No. 72, at 40-41 [Prelim. Inj. Hrg. Tr., in which counsel for the State Defendants argued that Defendant Doran "is fully capable of findings laws unconstitutional"].) It is difficult to see how Defendant Doran's finding the CCIA unconstitutional could constitute a "set of circumstances under which [the CCIA] would be valid."

In any event, even if the "no set of circumstances rule" applied, the Court would find that this regulation "lacks a plainly legitimate sweep." *See United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("In order to succeed in his facial challenge . . . , Decastro would need to show that no set of circumstances exists under which the statute would be valid, i.e., that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep") (internal quotation marks omitted). Moreover, even before *NYSRPA*, the Supreme Court appears to have created an exception to this general "no set of circumstances" rule.[80] To the extent that

---

[80]     More specifically, in 1992, a plurality of the Supreme Court in *Planned Parenthood of Southeastern Pa. v. Casey* allowed a facial challenge to a statute when the statute would unconstitutionally impact a fundamental right in "a large fraction" of the cases to which the

the Supreme Court did so, the Court finds that the "good moral character" requirement (as it is

currently defined) would unconstitutionally impact a fundamental right in "a large fraction" of

the cases to which it applies, due to (1) its bestowal of open-ended discretion on licensing

officers to deny licenses to applicants based on undefined assessments of "temperament,"

"judgment" and "[]trust[]," (2) its failure to confine those licensing officers' consideration to

whether, based on the applicant's *prior conduct* (which can, of course, include certain types and

forms of speech), the applicant is *likely* to use the weapon in a manner that would injure the

applicant or others, and (3) its failure to expressly remind the licensing officer to make an

exception for actions taken in *self-defense*.

    In any event, the Court need not rely on a pre-*NYSRPA* exception, because *NYSRPA* itself

appears to create one.  Under the standard set forth in *NYSRPA*, if Second Amendment covers the

plaintiff's conduct, and the government cannot "demonstrate that the regulation is consistent

with the Nation's historical tradition of firearm regulation," then the regulation is invalid. Period.

It would appear to defy this standard for this Court to find that such a law is inconsistent with

---

statute applies. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 895 (1992)
("The unfortunate yet persisting conditions we document above will mean that in a large fraction
of the cases in which § 3209 is relevant, it will operate as a substantial obstacle to a woman's
choice to undergo an abortion. It is an undue burden, and therefore invalid."), *abrogated on other
grounds*, *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). In 2010, the
Supreme Court observed that "the distinction between facial and as-applied challenges is not so
well defined that it has some automatic effect or that it must always control the pleadings and
disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S.
310, 331 (2010).  And, in 2016, the Supreme Court expressly adopted the *Casey* plurality's "large
fraction" framework. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016),
*abrogated on other grounds, Dobbs v. Jackson Women's Health Organization,* 142 S. Ct. 2228
(2022).

history and tradition, just to watch it be saved by the *one* possible application that makes it constitutional. As the Supreme Court explained in *Heller*,

> [T]he very enumeration of the [Second Amendment] right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. . . . A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, 554 U.S. at 634-35) (emphasis in original).

In sum, this Court has certainly found historical support for a modern law providing that a license shall be issued or renewed except for applicants who have been found, based on their past conduct, to be likely to use the weapon in a manner that would injure themselves or others (other than in self-defense). This standard is objective, easily applied, and finds support in numerous analogues that deny the right to carry to citizens based on their past conduct (including crimes, demonstrations of mental illnesses, and dangerous behavior). Unfortunately, this is not the law that the New York State Legislature passed.

For all of these reasons, the Court reconsiders its prior ruling on the issue in its Decision and Temporary Restraining Order of October 6, 2022, and grants Plaintiffs' motion for a preliminary injunction with regard to this regulation.

### b.      List of Four Character References

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. The way the regulation

burdens law-abiding citizens' right to armed self-defense is by prohibiting a person from carrying a concealed handgun in public for self-defense unless he or she provides a licensing officer with "four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others."

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Virginia law from 1756 that disarmed persons where "any two or more justice of the peace, . . . shall know, or suspect any person to be a Papist, or shall be informed that any person is . . ."; (2) a Massachusetts law from 1637 that disarmed named religious dissidents based on "just cause of suspition [sic]"; (3) English, Massachusetts, Pennsylvania, Maryland, North Carolina, Virginia and New York laws from 1662 to 1777 that disarmed individuals based on a reputation-based perception of the individuals' belonging to certain dangerous groups; and (4) a City of Omaha ordinance from 1881 that similarly limiting the concealed carrying of weapons to "well known and worthy citizens" and "persons of good repute." (Dkt. No. 48, at 52-53.)

Again, to the extent these laws were from the 17th century, the Court has trouble finding them able to shed much light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868. *See, supra,* Part III.B.1.a. of this Decision and Order. Similarly, to the extent these laws come from cities, the Court has trouble finding that they constitute part of this Nation's tradition of firearm regulation. *Id*.

With regard to the remainder of the laws, generally, they appear to have been aimed at denying the possession of guns to persons reputed, or publicly known, to be a danger to the

104

public or Nation.  Furthermore, generally, the way they burdened law-abiding citizens' right to armed self-defense was by disarming persons if they were "notoriously disaffected to the cause of the America," they "refuse[d] to associate to defend by Arms the United American Colonies," they refused to take an "oath or affirmation" of allegiance to the Nation, or they were known or suspected by two or more justices of the peace to be "Papists."

Granted, it seems overreactive (and a bit offensive) to literally analogize the need to regulate concealed-carry applicants to the need to regulate "groups deemed dangerous."  But, sentiment aside, the fact remains that, at the time of our Nation's founding, at least five of the thirteen colonies had gun laws based on a reputation-based perception of an individual (Pennsylvania, Maryland, North Carolina, Virginia and New York).  Furthermore, the Court has found three historical statutes (one from a state and two from cities) requiring an applicant to provide character references to be permitted to carry a gun.[81]  The Court finds that, together,

---

[81]    *See* 1832 Del. Laws 208, § 1 ("[I]f upon application of any such free negro or free mulatto to one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the *written certificate of five or more respectable and judicious citizens of the neighborhood*, that such free negro or free mulatto is a person of *fair character*, and that the circumstances of his case justify his keep and using a gun, then and in every such case it shall and may be lawful for such justice to issue a license or permit under his hand and authorizing such free negro or free mulatto to have use and keep in his posession [sic] a gun or fowling piece") (emphasis added); Ordinances of Jersey City, Passed By The Board Of Aldermen March 31, 1871, § 3 ("[I]n in all cases the court shall require *a written endorsement of the propriety of granting a permit from at least three reputable freeholder*s ….") (emphasis added); 1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York art. XXVII, § 265 ("[T]he officer in command at the station-house … shall give said person *a recommendation* to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent ….") (emphasis added). The Court notes that it reads *NYSRPA* as permitting consideration of city laws when they are not "bare," that is, when they are accompanied similar state laws, as here.  *Cf. NYSRPA*, 142 S. Ct. at 2154 ("[T]he *bare* existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry.") (emphasis added).

these eight laws (five of which came from states in 1777, including Virginia) were sufficiently established and representative to constitute a historical tradition of firearm regulation based on reputation (for example, by a reasonable number of character references). *Cf. NYSRPA*, 142 S. Ct. at 2142 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public-carry regulation.").[82]

Based on a comparison of the burdensomeness of the CCIA's "four character references" requirement (i.e., burden versus justification) to the burdensomeness of the relevant historical analogues (again, burden versus justification), the Court finds the burdensomeness of the "four character references" requirement is reasonably proportionate to the burdensomeness of the relevant historical analogues.

As a result, Plaintiffs' motion for a preliminary injunction is denied with regard to this regulation.

### c. List of Family and Cohabitants

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is to obtain the names of the applicant's cohabitants so that the licensing officer may (1) ask them if the applicant might pose a danger to themselves or

---

[82]     The Court notes that, according to the First Census (1790), the populations of the five states listed above exceeded 57 percent of the total American population. *See Return of the Whole Number of Persons Within the Several Districts of the United States: 1790* (Philadelphia 1793).

others, and/or (2) determine if they themselves pose such a danger by having "ready access to any firearm." (Dkt. No. 48, at 54-55.) The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a person from carrying a concealed handgun in public for self-defense unless he or she provides a licensing officer with the "names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home."

The State Defendants argue that historical analogues consist of those laws discussed above in Part III.B.1.b. of this Decision and Order. (Dkt. No. 48, at 54.) For the sake of argument, the Court will assume that these laws were sufficiently established and representative to constitute a historical tradition. The problem is that, while many of these laws were aimed at denying the possession of guns to persons who were *already* known *publicly* to be a danger, none of them required persons (who were otherwise unknown publicly to be a danger) to disclose the names of *non-character-references* who *may* know *privately* of such a danger or who may *themselves* constitute such a danger. As a result, it is difficult for the Court to conclude that the laws referenced by the State Defendants resemble this modern regulation more than "remotely." *See NYSRPA*, 142 S. Ct. at 2133 ("[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted.").

Even if the Court were to stretch this analogy to its limit, it would find that the burdensomeness of this modern regulation (i.e., burden versus justification) is unreasonably disproportionate to the burdensomeness of the purported "historical analogues." Setting aside

the fact that the licensing officer is already being provided with four character references, the fact remains that, as the State Defendants concede, this detailed "cohabitant" information is already "available" to the "public[]"—including to the licensing officer—due to its existence on such things as marriage licenses, children's birth certificates, guardianship forms, school forms, adoption paperwork, applications for driver's license or passport, and U.S. census forms. (Dkt. No. 48, at 54.) If so, why doesn't the State simply retrieve it? Is this burden on a constitutional right being imposed solely for the licensing officer's *convenience*? Such convenience may justify a burden on a mere privilege, such as the privilege of driving, but not on a right covered by the plain text of the Constitution in the absence of sufficient analogous historical support. Furthermore, the penalty for non-compliance (even if inadvertent) is harsh. As the State Defendants appeared to acknowledge during oral argument on Plaintiffs' motion for a Temporary Restraining Order, if the applicant were to be found to have omitted one of the details, a licensing officer would essentially be required to deny the application. (*See, e.g.,* Dkt. No. 23, at 28, 37 [Temp. Restrain. Order Oral Argument Tr.].)

The Court can find no such comparable burdensomeness in the purported "historical analogues." Simply stated, the Court finds that this is an example of what the Supreme Court warned against as an "exorbitant" requirement. *See NYSRPA*, 142 S. Ct. at 2138, n.9 ("That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.") (emphasis added).

For all of these reasons, Defendants are preliminarily enjoined from enforcing this regulation during the pendency of this litigation.

### d. List Social Media Accounts for Past Three Years

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is to enable the licensing officer to determine if the applicant has recently posted any statements online showing them to be a danger to themselves or others. (Dkt. No. 48, at 58-60.) *See, e.g., Antonyuk I*, 22-CV-0734, Amicus Brief of Dr. Jaclyn Schildkraut, Ph.D. (N.D.N.Y. filed Aug. 17, 2022) ("Research regarding the social media leakage by mass shooters is directly relevant to this issue because, among other reasons, mass shooters have applied for gun licenses, including concealed carry permits, before committing their violent offenses."). The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a person from carrying a concealed handgun in public for self-defense unless he or she provides a licensing officer with "a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants' character and conduct."

The State Defendants appear to argue that historical analogues consist of (1) those laws "disqualifying categories of people from the right to bear arms . . . when they judged that doing so was necessary to protect the public safety," and (2) the laws discussed above in Part III.B.1.b. of this Decision and Order. (Dkt. No. 48, at 54.) Again, for the sake of argument, the Court will

assume that these laws were sufficiently established and representative to constitute a historical

tradition.  However, with regard to the first set of laws, the Defendants have not specified them

and provided copies of them, and it is their burden to do so.  With regard to the second set of

laws, while generally those laws denied the possession of guns to persons based on reputation

(i.e., already existing *public* knowledge of their "disaffect[ion]" for America or "refus[al]" to

defend the emerging Republic or swear an oath to it), none of them required persons (who were

otherwise unknown publicly to be a danger) to disclose private information about themselves

*other than* character references.  Thus, it is difficult for the Court to conclude that they are

*analogues*.

    For more-analogous laws, the Court has searched for any laws requiring persons to

disclose, as a condition to carrying arms, information such as (1) any nicknames and/or aliases

used among friends or professionally (so that those nicknames or aliases could be investigated

further), or (2) any pseudonyms used in any published writings (so that those writings may be

reviewed for signs of danger).  Not surprisingly, the Court has found none.

    The State Defendants object that the latter such laws cannot be considered evidence of

Section 1's inconsistency with the Second Amendment, because they would be "historical

twin[s]" or "dead ringer[s]," which are not required by *NYSRPA*. *See NYSRPA*, 142 S. Ct. at

2133 ("[A]nalogical reasoning requires only that the government identify a well-established and

representative historical analogue, not a historical twin. So even if a modern-day regulation is not

a dead ringer for historical precursors, it still may be analogous enough to pass constitutional

muster.").  The Court disagrees.  A twin or dead ringer would be a historical law barring firearms

in libraries offered to support Section 4's restriction of firearms in libraries.  Or a historical law

barring firearms in theaters offered to support the restriction in theaters.  Or a historical law barring firearms in taverns offered in support of the regulation of restaurants.  (The State Defendants have offered no such laws by the way.)  The use of pseudonyms by authors of virulent political pamphlets by men who often carried firearms and sometimes dueled does not appear to be identical to the use of anonymous handles by authors of potentially violent social-media postings.  In other words, it seems worthy of at least some analysis in a thorough decision.

Certainly, during the years before and after 1791, persons published under pseudonyms controversial writings that, if identified as having been authored by them, could have indicated their likelihood do harm to themselves or others (other than in self-defense).  For example, in 1787 and 1788, the ratification of the U.S. Constitution was hotly debated by Federalists and Anti-Federalist in essays published under pseudonyms such as Brutus, Cato, Centinel, Cincinnatus, The Federal Farmer, A Landowner, and Publius.  Also during those time periods, dueling was practiced in many parts of the Nation.  For example, between 1778 and his death in during a duel with Aaron Burr in 1804, Alexander Hamilton was reportedly involved in approximately ten duels (seven of which as the primary and three of which as the second).  *See* Freeman, Joanne B., *Affairs of Honor: National Politics in the New Republic* (Yale University Press, 2002); Chernow, Ron, *Alexander Hamilton* (Penguin Press, 2004).[83]

---

[83]    The Court notes at least one of these duel appears to have been fought in 1790 against fellow founder Aedanus Burke, who (incidentally) seven years before had authored two pseudonymous pamphlets sharply criticizing the then-newly conceived Society of the Cincinnati. *See* Cassius, *An Address to the Freemen of South-Carolina* (Charlestown, Jan. 14, 1783); Cassius, *Considerations on the Society or Order of Cincinnati* (Charleston, Oct. 10, 1783).

These practices of anonymously publishing writings that indicated a possible danger to others and using firearms to resolve inter-personal disputes[84] may each reasonably be characterized (unfortunately) as "general societal problem[s] that ha[ve] persisted since the 18th century," *NYSRPA*, 142 S. Ct. at 2131,[85] although the problems of anonymously posted threats of physical violence to others and horrific mass shootings have certainly increased since the turn of the twenty-first century. However, based on the current record, the Court can find no sufficient relationship between these two societal problems for the Court to treat the absence of a historical legislative solution to the former problem (of anonymous threats of danger) as some evidence that a modern such legislative solution would be inconsistent with the Second Amendment. *See NYSRPA*, 142 S. Ct. at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

This regulation faces another problem, however. A comparison of this regulation's burdensomeness to that of any historical analogues depends, to some degree, on the extent that the burden imposed by the regulation is justified by the reason for the regulation. The Court has

---

[84]     *See, e.g.,* Saul Cornell, "The Lessons of a School Shooting—in 1853: How a now-forgotten classroom murder inflamed the national gun argument," politico.com (March 24, 2018) https://www.politico.com/magazine/story/2018/03/24/first-us-school-shooting-gun-debate-217704/ (last visited Nov. 1, 2022).

[85]     Nor have any historical laws been found disarming reputed duelists who have authored virulent political pamphlets. *See generally* C.A. Harwell Wells, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," 54:4 *Vanderbilt Law Review* 1805 (May 2001).

no doubt that there exist instances of shootings with handguns by persons who had indicated on social media a likelihood of danger to themselves or others.  But the Court has not been presented with sufficient evidence of the extent of this problem to warrant this regulation.  For example, to the extent that mass shootings have not involved a handgun that had been possessed by someone pursuant to a concealed-carry license, this regulation would not appear to be justified.  It is worth emphasizing that, even setting aside the act of collecting the information, the penalty for failing to comply with this regulation (even if that failure is inadvertent) is harsh.  (*See, e.g.,* Dkt. No. 23, at 28, 37 [Temp. Restrain. Order Oral Argument Tr.].)

Finally, the State Defendants have not supported their argument that providing one's social-media accounts is a modern-day requirement for a background check.  They cite no examples.  (*See generally* Dkt. No. 48, at 58-60.)  And the Court has not yet been able to find another license-application process that requires the applicant to turn over his or her social-media accounts.[86]  In any event, as stated above in Part III.B.1.c. of this Decision, such a burden may be imposed on a mere privilege, but not on a right covered by the plain text of the Constitution in the absence of sufficient analogous historical support.  A right ceases to be a right when impeded by such a burden.

For each of these reasons, the Court finds the burdensomeness of this modern regulation to be unreasonably disproportionate to the burdensomeness of any historical analogues, for purposes of the Second Amendment.

---

[86]     Rather, the Court has mostly found only instances in which this demand was (properly) made of *convicted sex offenders* while registering for a Sex Offender Registry.  Suffice it to say, the need to regulate convicted sex offenders has not been shown to be analogous to the need to regulate applicants for a concealed-carry license.

Even setting aside Second Amendment, the requirement that license applicants reveal their anonymous social-media handles (such as "@iluvgunz!" or "@bulletz&kittenz") may present First Amendment concerns resulting from an unfortunate combination of compelled speech and an exercise of the extraordinary discretion conferred upon a licensing officer (who would appear free to conclude that, "Based upon mature consideration of the application, and my resulting investigation, I find that the applicant simply does not possess the temperament and judgment necessary to be entrusted with a firearm"). The subjective and vague standard of "good moral character" could allow licensing officers to deny an application if they were to see reflected in a compulsively disclosed social-media handle any hobby, activity, political ideology, sexual preference, or social behavior that they personally deem to show bad "temperament" or "judgment." This requirement may also present Fifth Amendment concerns (e.g., "@iKilledHoffa" or a pseudonymous posting evidencing one's participation in a recent crime). Generally, such thorny constitutional concerns are to be avoided, especially where (as here) the anonymous social-media handles may be discovered through less-burdensome means such as (1) speaking with the applicant's four character references, (2) relying on New York State's recently expanded "Red Flag Law" (*see* 2022 NY Senate Bill S9113A), and (3) criminalizing the making of a threat of mass harm (including on social media) with the intent to intimidate a group of people or create public alarm (*see, e.g.,* 2022 NY Senate Bill S89B).[87]

For all of these reasons, Defendants are preliminarily enjoined from enforcing this regulation during the pendency of this litigation.

---

[87] Of course, some searches for a user's social-media accounts can be successfully conducted through reliance on the user's legal name, and do not require an anonymous handle or username.

**e.** **"Such Other Information Required by the Licensing Officer that is Reasonably Necessary and Related to the Review of the Licensing Application"**

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is the occasional lack of information on a completed license application necessary for a licensing officer to determine whether the applicant is a danger to themselves or others. The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a person from carrying a concealed handgun in public for self-defense unless the person provides a licensing officer with "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application."

Although the State Defendants do not expressly cite any purported historical analogues, they appear to implicitly rely on those laws discussed above in Part III.B.1.b. of this Decision and Order (regarding character references). (Dkt. No. 48, at 60-61.) Generally, those laws either (1) disarmed individuals based on a public knowledge about those individuals, or (2) required an individual to apply for a license (which necessarily involved, at the very least, identifying himself or herself).

In its Decision and Temporary Restraining Order of October 6, 2022, the Court found that it could imagine a set of circumstances in which this regulation were constitutionally valid: if the licensing officer were to require only minor follow-up information from an applicant (such

115

as identifying information). *Antonyuk II*. 2022 WL 5239895, at *12. Since then, the Court has been persuaded (for the reasons stated above in Part III.B.1.a. & n.90 of this Decision) that the Second Amendment demands that the Court reconsider that finding.

Upon closer examination, the Court finds that this regulation's burdensomeness on law-abiding responsible citizens (their subjection to the unbridled discretion of licensing officers to determine what information is "reasonably necessary and related to the review of the licensing application" without any limitation regarding whether that information is to be communicated orally as opposed to in writing) does not appear to be reasonably proportionate to the burdensomeness of the relevant historical analogues (which required merely a few character references), especially given the dearth of evidence adduced by the State Defendants for this unbridled discretion.

Moreover, this regulation's application would unconstitutionally impact a fundamental right in "a large fraction" of the cases to which it applies. Consider the unbridled discretion a licensing officer would have, under this regulation, to demand that an applicant, for example, (1) state the information set forth in the cohabitant provision and social-media provision that have been enjoined by this Decision, (2) provide documentation supporting the applicant's orally communicated list of cohabitants, (3) hand over the applicant's cell phone and show the licensing officer his or her anonymous social-media accounts, or (4) provide a urine sample based on something as subjective as an opinion about the applicant's appearance. Simply stated, an injunction of this open-ended provision goes hand in hand with an injunction of the others.

116

For all these reasons, the Court reconsiders its prior ruling on the issue in its Decision and Temporary Restraining Order of October 6, 2022, and grants Plaintiffs' motion for a preliminary injunction with regard to this regulation.

### f. Eighteen Hours of Firearm Training (and Associated Costs)

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is the danger that handguns pose to license applicants or others due to those applicants' general lack of sufficient familiarity with handguns. The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a person from carrying a concealed handgun in public for self-defense unless, on the person's license application, he or she certifies the completion of the following:

> [A] minimum of sixteen hours of in-person live curriculum approved by the division of criminal justice services and the superintendent of state police, conducted by a duly authorized instructor approved by the division of criminal justice services, and shall include but not be limited to the following topics: (i) general firearm safety; (ii) safe storage requirements and general secure storage best practices; (iii) state and federal gun laws; (iv) situational awareness; (v) conflict de-escalation; (vi) best practices when encountering law enforcement; (vii) the statutorily defined sensitive places … and the restrictions on possession on restricted places … ; (viii) conflict management; (ix) use of deadly force; (x) suicide prevention; and (xi) the basic principles of marksmanship; and (b) a minimum of two hours of a live-fire range training course. The applicant shall be required to demonstrate proficiency by scoring a minimum of eighty percent correct answers on a written test for the curriculum under paragraph (a) of this subdivision and the proficiency level determined by the rules and regulations promulgated by the division of criminal justice services and the superintendent of state police for the live-fire range training under paragraph (b) of this subdivision.

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) New York militia laws from 1780 and 1782 requiring training in the use of arms as part of a citizen's mandatory duty to serve in the local militia; (2) a federal militia act from 1792 requiring "[t]hat each and every free able-bodied white male citizen of the respective states" between the ages of 18 and 45 must "be enrolled in the militia," and that "it shall be the duty of the commanding officer at every muster . . . to cause the militia to be exercised and trained agreeably to the [] rules of discipline," and requiring every citizen to purchase all the materials required for service at his own expense; (3) a New Jersey law from 1806 requiring militia drill could last for a period "not exceeding six hours" each day; and (4) a New York law from 1792 requiring "every citizen" to purchase all the materials required for service "at his own expence [sic]."  (Dkt. No. 48, at 55-58.)  The State Defendants also rely on a Virginia militia statute from 1785 requiring that "there shall be a private muster of every company once in two months" (which they did not provide a copy of but which is quoted in *United States v. Miller*, 307 U.S. 174, 181 [1939]).  (Dkt. No. 48, at 56.)

Generally, the aim of these laws appears to be to deny the possession of a firearm to all militia members who, due to their unfamiliarity with a firearm, pose a danger to themselves or others.  The way they burden law-abiding citizens' right to armed self-defense is by prohibiting militia members from bearing firearms unless they complete required training.  Again, for the sake of argument, the Court will assume that these laws were sufficiently established and representative to constitute a historical tradition.

Of course, to the extent that the State Defendants' treat the right to keep and bear arms as coextensive with the training requirements of a militia (*see, e.g.,* Dkt. No. 48, at 55), the Court

must reject that argument for the reasons stated in *District of Columbia v. Heller*, 554 U.S. 570,

578 (2008) ("The [prefatory clause of the Second Amendment] does not limit the [operative

clause of the Second Amendment] grammatically, but rather announces a purpose. . . . The term

['keep and bear arms'] was applied, then as now, to weapons that were not specifically designed

for military use and were not employed in a military capacity.").  However, the Court does

recognize the analogousness of a historical requirement that those persons without familiarity of

firearms must become familiar with them if those persons are to exercise their right use firearms

to defend themselves in public.  In addition, as the Court stated in its Decision and Temporary

Restraining Order of October 6, 2022, it has been persuaded by Defendants that historically

Americans' familiarity with firearms was far more common than it is today.

   More troubling to the Court is the financial cost of this training to the applicant.  Plaintiff

Sloane has adduced evidence that the training would cost him "hundreds of dollars."  (Dkt. No.

1, Attach. 4, at ¶ 27 [Sloane Decl.].)  "Some facilities are charging upwards of $700 for the

class," he swore in his Declaration of September 19, 2022.  (*Id.*)  With the cost of "the

ammunition used at such a class, and also the other associated licensing fees charged," he

continued, "[t]he cost for me to obtain a permit could easily exceed $1,000 . . . ."  Plaintiff

Sloane's "[s]ome facilities" language and "other associated licensing fees" language are too

vague for the Court to find that he would have to pay between $700 and $1,000 to comply with

this regulation.[88]  Moreover, while the cost ultimately established in this litigation may well

---

[88]  Should Plaintiff Sloane provide evidence of such a number during the course of this case, the State Defendants are advised that the Court rejects their argument that such a cost cannot be attributable to the State because "licensing classes can[] be given pro bono."  (Dkt. No. 72, at 70 [Prelim. Inj. Hrg. Tr.].)

prove be "exorbitant" under footnote 9 of *NSRPA*,[89] at this point the Court remains mindful of the cost borne by militia members (and probably by non-militia members) in terms of training and practice (even though, again, those militia members apparently forewent certain constitutional protections when they swore their oaths).

Based on a comparison of the burdensomeness of the CCIA's firearms-training requirement (i.e., burden versus justification) to the burdensomeness of the relevant historical analogues, the Court finds the former is reasonably proportionate to the latter. As a result, Plaintiffs' motion for a preliminary injunction is denied with regard to this regulation.

### g. In-Person Meeting

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is the need of licensing officers to meet with an applicant in person to determine whether the person is likely to be a danger to themselves or others. The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a person from carrying a concealed handgun in public for self-defense unless the person "meet[s] in person with the licensing officer for an interview."

---

[89]     *See NYSRPA*, 142 S. Ct. at 2138, n.9 ("That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or ***exorbitant*** fees deny ordinary citizens their right to public carry.") (emphasis added).

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Massachusetts law from 1637 and a Virginia law from 1756 that disarmed what the State Defendants call "groups deemed dangerous" (followers of dissident preacher John Wheelwright and "Papists") while allowing individuals to prevent disarmament by appearing in person to proclaim their loyalty; (2) the laws of six Colonies (Massachusetts, Pennsylvania, Maryland, North Carolina, Virginia and New York) from 1776 and 1777 requiring individuals suspected of loyalty to the English monarchy to appear in person to take a loyalty oath or face disarmament; (3) the mustering laws of the federal government, the Colony of Massachusetts, and three states (New York, New Jersey and Pennsylvania), from between 1775 and 1822, which the State Defendants characterize as "requiring individuals to be assessed, in person, by military officials as part of being armed, and stripped of their firearms if they proved to be untrustworthy with a weapon"; and (4) the laws of eight cities (New York, Brooklyn, Buffalo, Albany, Troy, Syracuse, Lockport and Elmira), from between 1880 and 1913, which the State Defendants say "requir[e] an individual to appear *in person* in connection with firearms." (Dkt. No. 48, at 50-52) (emphasis added).[90]

For the reasons stated above in Part III.B.1.a. of this Decision, to the extent these laws were from the 17th or 20th centuries, the Court discounts their weight. Similarly, to the extent these laws come from a handful of cities in the last decade of the nineteenth century and do not

---

[90]     The Court also considers a Jersey City law from 1871. *See* Ordinances of Jersey City, Passed By The Board Of Aldermen March 31, 1871, § 3 ("All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders ...."). (emphasis added).

expressly say "in person" or "in open court,"[91] the Court must discount their weight (based on the current record, which lacks evidence that those laws required "in person" or "open court" appearances). With regard to the remainder of the laws, generally, they appear to have been aimed at either (1) denying the possession of guns to persons reputed, or publicly known, to be a danger to the public or Nation or (2) denying the possession of guns to incompetent milia members. Moreover, generally, they appear sufficiently established and representative to constitute a historical tradition.

Granted, again, it seems a stretch to analogize the modern need to regulate concealed-carry applicants to the historical need regulate "groups deemed dangerous." And the need to personally see that the members of one's military are competent to handle firearms during a time of war seems greater than the need to look all concealed carry applicants in the eye (and maybe exchanged a few words with them) after they have provided four character references and completed 18 hours of firearms training.

However, Plaintiff Sloane has not yet adduced evidence of the inconvenience he would incur as a result of such an in-person meeting. (*See generally* Dkt. No. 1, Attach. 4 [Sloane Decl.].) Conceivable examples of such evidence might include (1) the need to take time away from work or family to appear before a licensing officer, or (2) any delay experienced in having an appointment scheduled due to the CCIA's imposition of this requirement on *every* applicant.[92]

---

[91]     *Cf.* Ordinances of Jersey City, Passed By The Board Of Aldermen March 31, 1871, § 3. ("All applications for permits shall be made *in open court*, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders ….") (emphasis added).

[92]     To the extent that such evidence is adduced during the course of this litigation, the Court would be willing to revisit this finding.

Instead, Plaintiff Sloane has relied only on a possible infringement of his Fifth Amendment right to remain silent. (*Id.* at ¶ ¶ 5, 17-19.) The problem with this sole reliance is that, even setting aside the argument that an applicant is not "in custody" during such an in-person meeting, Plaintiff Sloane's Fifth Amendment injury stemming from an "interrogation" appears too speculative at this point in the litigation. Simply stated, without more evidence, the Court must find that the burdensomeness of this modern regulation appears proportionate to the burdensomeness of its historical analogues.

In this regard, based on better briefing by the State Defendants (and in the absence of testimony at the Preliminary Injunction Hearing), the Court reconsiders its prior ruling on this issue (in its Decision and Temporary Restraining Order of October 6, 2022), and denies Plaintiffs' motion for a preliminary injunction with regard to this regulation.

### 2. Prohibition in "Sensitive Locations"

In its below analysis of those paragraphs of Section 4 that Plaintiffs have established standing to challenge, the Court will separately analyze each paragraph in light of the historical laws submitted in support of it (while keeping an open mind regarding any other relevant historical laws that have been submitted in support of other paragraphs of Section 4).

### a. "[A]ny location providing . . . behavioral health, or chemical dependance care or services"

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public) except to the extent that the places at issue in this regulation (i.e., "any location providing health, behavioral health, or chemical dependance care or services") constitute places to which the public or a substantial group of

persons have not been granted access such as rooms designed for residence, and portions of a hospital wherein the usual functions of a hospital are carried out.

In rendering this finding, the Court relies on New York State licensing officers' understanding of the word "public,"[93] as well as New York State's definition of "public" places for purposes of its criminal law and civil rights law, which the Court finds to be instructive.  *See* N.Y. Penal Law § 240.20 ("A person is guilty of disorderly conduct when, with intent to cause *public* inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . 3. In a *public place*, he uses abusive or obscene language, or makes an obscene gesture; . . . or 6. He congregates with other persons in a *public place* and refuses to comply with a lawful order of the police to disperse . . . .") (emphasis added); N.Y. Penal Law § 240.00(1) ("'Public place' means a place to which the public or a substantial group of persons has access, and includes, but is not limited to, . . . community centers, and hallways, lobbies and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence."); N.Y. Civil Rights Law § 47 ("1. No person shall be denied admittance to and/or the equal use of and enjoyment of any *public facility* solely because said person is a person with a disability and is accompanied by a guide dog, hearing dog or service dog. 2. For the purposes of this section the term '*public facility*' shall include, but shall not be limited to, . . . buildings to which the public is invited or permitted, . . . and all other places of public . . . business to which the general public or any classification of persons therefrom is normally or customarily invited or permitted."); *see, e.g., Albert v. Solimon*, 684 N.Y.S. 375, 378 (N.Y. App. Div., 4th Dep't, 1998) ("While the

---

[93]     *See, e.g., NYSRPA*, 142 S. Ct. at 2125 ("[T]he [licensing] officer emphasized that the restrictions were 'intended to prohibit [Nash] from carrying concealed in ANY LOCATION typically open to and frequented by the general public.") (emphasis removed).

waiting room in a physician's office may be regarded as a public place in which the general public is normally invited or permitted to enter, the same may not be said of those areas of a physician's office where physical examinations are conducted. An examination room is restricted to the patient, the physician and the physician's staff."); *Perino v. St. Vincent's Med. Ctr. of Staten Island,* 502 N.Y.S.2d 921, 922 (N.Y. Sup. Ct., Richmond Cnty. 1986) ("While a hall in a hospital may be considered a public place . . . , as well as the hospital cafeteria or snack bar serving travelers . . . , the same cannot be said for other portions of the hospital wherein the usual functions of a hospital are carried out."); *New York v. Ennis,* 45 N.Y.S2d 446, 448 (Utica City Court, 1943) ("Nor can there be any question but that a hall in a hospital is a public place within the meaning of the statute [prohibiting disorderly conduct].").

For all of these reasons, the Court finds that Defendants must rebut the presumption of one's protection against this regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation.

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is to "protect vulnerable people" from potential gun violence at the three places in question (especially "persons with mental health issues" and "persons struggling with addiction"), because they are not "able to protect them[selves]" from having guns used against them, intentionally or inadvertently." (Dkt. No. 48, at 75-76, 81-84.) The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a licensed

person from carrying a concealed handgun in public for self-defense in "any location providing health, behavioral health, or chemical dependance care or services."

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Massachusetts militia law from 1837, a Maine milia law from 1837, and a Rhode Island milia law from 1843 that excluded persons with intellectual disabilities, mental illness, and alcohol addiction (e.g., "idiots," "lunatics," and "drunkards") from "the people" eligible to serve in the militia; and (2) unspecified historical laws protecting children, because, at the three places specified in this regulation, "significant numbers of children" receive health care and behavioral health services. (Dkt. No. 48, at 81-84, 97-98.)

Again, for the sake of brevity, the Court will assume that the laws were sufficiently *established* to constitute a historical tradition (even though the specified laws came from only three states in the northeast). More important is that the three specified laws do not appear to have been *representative* of the Nation. This is because, even assuming that they were still in effect in 1870, according to the 1870 census, the populations of Massachusetts, Maine and Rhode Island composed about 6.0 percent of the total American population at that time, with Massachusetts contributing about 3.8% (or 1,457,351 out of 38,558,371), Maine contributing about 1.6% (or 626,915 out of 38,558,371), and Rhode Island contributing about 0.6% (or 217,353 out of 38,557,371). *See* Dept. of Interior, Compendium of Ninth Census: 1870 (1870). For the reasons stated above in this Decision and Order, this number does not seem large enough to constitute a *representative* tradition. In any event, for the sake of thoroughness, the Court will assume it does and continue with its analytical inquiry.

Generally, the purpose of the first group of laws appears to have been to protect unstable persons from harming both themselves and others. Generally, the way the first group of laws burdened law-abiding citizens' right to armed self-defense was by denying the right to serve in the militia (which involved keeping and bearing arms) to groups of people who had intellectual disabilities, mental health issues and/or alcoholism. Both the purpose of the second group of laws, and the way they burdened law-abiding citizens' right to armed self-defense, are unclear due to a lack of a showing by the State Defendants. (Presumably, this second group of laws is intended to refer to laws prohibiting firearms in schools, which are collected in note 112 of this Decision.)

In any event, based on a comparison of the burdensomeness of this regulation (i.e., burden versus justification) to the burdensomeness of the relevant historical analogues (again, burden versus justification), the Court finds the burdensomeness of this regulation is not reasonably proportionate to the burdensomeness of its purported "historical analogues" for each of two reasons. First, there appears to have been more of a justification for (and less of a burden from)[94] taking firearms out of the hands of intellectually disabled, mentally ill and/or alcoholic male soldiers between ages 18 and 45 in the Northeast between 1837 and 1843 during the Aroostook War bordering Maine (and less than a decade before the looming Mexican-American War) than there appears now to do so to *all* license holders (who have provided four character

---

[94]  The Court notes that, historically, members of the military in this country (unlike civilians) have voluntarily suspended or curtailed many of their constitutional rights when swearing their oaths. *See Raderman v. Kaine*, 411 F.2d 1102, 1104 (2d Cir. 1969) ("If [Plaintiff] asks: Does being in the Army curtail or suspend certain Constitutional rights?, the answer is unqualifiedly 'yes'. On necessity, he is forced to surrender many important rights.").

references, completed numerous hours of firearms training, and satisfied the demands of a licensing officer) whenever they find the need to visit the *public* portion of a modern health facility (which has not separately posted a policy of there being no firearms allowed on the premises). Again, the State Defendants have not established a sufficient need.

Second, in any event, certainly the medical profession existed in 18th and 19th century America; and certainly gun violence existed in 18th and 19th century America. However, the State Defendants do not cite (and the Court has been unable to yet locate) any laws from those time periods prohibiting firearms in places such as "almshouses," hospitals, or physician's offices.[95] As the Court stated above in Part III.B.1.d. of this Decision, the Court has difficulty treating this omission as anything other than some evidence of this regulation's inconsistency with the Second Amendment. *See NYSRPA*, 142 S. Ct. at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

For each of these reasons, Defendants are preliminarily enjoined from enforcing this regulation during the pendency of this litigation to the extent that the regulation regards "any location providing . . . behavioral health, or chemical dependance care or services" (except to places to which the public or a substantial group of persons have not been granted access).

---

[95] Also absent from the State Defendants' papers is any showing that locations providing "health, behavioral health, or chemical dependance care or services" today contain a larger percentage of children than did "almshouses," hospitals, or doctor's offices in 18th and 19th century America. For this reason, the Court is unable to place much reliance on the State Defendants' unspecified historical laws protecting children (which, again, the Court assumes to be collected in note 112 of this Decision).

128

### b.    "[A]ny place of worship or religious observation"

The Court begins its analysis of this regulation by acknowledging that, recently, this regulation was preliminarily enjoined during the course of a litigation in the United States District Court for the Western District of New York.  *See Hardaway v. Nigrelli*, 22-CV-0771, 2022 WL 16646220, at *13-17 (W.D.N.Y. Nov. 3, 2022) (Sinatra, J.).  The Court has no reason to disagree with any portion of the Western District's cogent analysis of this regulation. *Hardaway*, 2022 WL 16646220, at *13-17.  The Court therefore includes the below analysis only as an alternative ground on which to base its support of its decision to preliminarily enjoin this regulation during the pendency of this litigation.

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public in "any place of worship or religious observation") for the reasons stated above in Part III.B.2.a. of this Decision.  Again, in rendering this finding, the Court relies on New York State licensing officers' understanding of the word "public,"[96] as well as New York State's definition of "public" places for purposes of its criminal law and civil rights law, which the Court finds to be instructive.  *See* N.Y. Penal Law § 240.00(1) ("'Public place' means a place to which the public or a substantial group of persons has access, and includes, but is not limited to, . . . community centers . . . ."); N.Y. Civil Rights Law § 47 ("2. For the purposes of this section the term '*public facility*' shall include, but shall not be limited to, . . . buildings to which the public is invited or permitted . . . ."); *see also Young v. Hawaii*, 992 F.3d 765, 813 (9th Cir. 2021) (finding that "public places" for purposes of the

---

[96]      *See, supra,* note 93 of this Decision.

Second Amendment include "churches"), *vacated on other grounds by NYSRPA v. Bruen*, 142 S.
Ct. 2111 (2022).

As a result, the Court finds that Defendants must rebut the presumption of protection
against this regulation by demonstrating that it is consistent with this Nation's historical tradition
of firearm regulation.

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation
is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether
in the home or outside the home) that is caused in some way by the possession or use of a
handgun by someone who also possesses a concealed-carry license. The State Defendants do not
provide a more specific reason than that for this regulation. (*See generally* Dkt. Nos. 18, 38.)
Presumably, the specific reason is to prevent a repeat of any of the mass shootings that have
occurred in places of worship or religious observation in the United States since the turn of the
21st century (to the extent that mass shooters used a handgun that had been possessed by
someone pursuant to a concealed-carry license). The way this regulation burdens law-abiding
citizens' right to armed self-defense is by prohibiting a licensed person from carrying a
concealed handgun in "any place of worship or religious observation."

The State Defendants argue that this regulation's historical analogues consist of the
following laws, of which they have provided copies: (1) a Georgia statute from 1870 prohibiting
deadly weapons in "any place of public worship"; (2) a Texas statute from 1870 prohibiting the
carrying of guns into "any church or religious assembly"; (3) a Virginia statute from 1877
prohibiting "carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any
place of worship while a meeting for religious purposes is being held at such place"; (4) a

Missouri statute from 1883 prohibiting the carrying of "any deadly or dangerous weapon" in "churches"; (5) an Arizona statute from 1889 banning guns in "any church or religious assembly"; and (6) an Oklahoma statute from 1890 prohibiting carrying weapons into "any church or religious assembly, . . . or other place where persons are assembled for public worship."  (Dkt. No. 48, at 63-64, 69-70.)

Again, to the extent the laws come from territories near the last decade of the 19th century (i.e., the 1889 Arizona law and 1890 Oklahoma law), the Court discounts their weight, because of their diminished ability to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868.

With regard to the remaining four laws (i.e., the laws of Georgia, Texas, Virginia and Missouri from between 1870 and 1883), again for the sake of brevity, the Court will assume that these laws constituted a tradition that was sufficiently *established* under *NYSRPA* (coming from four states across the south).  Even if the Court did so, it would have difficulty finding these four laws to be *representative* of the Nation's laws, given that they came from states that contained only about 12.9 percent of the national population. According to the Census of 1870, Georgia contained about 3.1 percent of the national population (1,184,109 out of 38,558,371), Texas about 2.1 percent (818,579 out of 38,558,371), Virginia about 3.2 percent (1,225,163 out of 38,558,371), and Missouri about 4.5 percent (1,721,295 out of 38,558,371). *See* Dept. of Interior, Compendium of Ninth Census: 1870 (1870).[97]

---

[97]    The Court notes that Missouri's percentage had dropped to about 4.3 (2,168,880 out of 50,155,783) by the time it passed its law in 1883.  *See* Dept. of Interior, Compendium of Tenth Census: 1880 (1880).

Moreover, even if the Court were to find 12.9 percent sufficient to establish a representative tradition, the Court would find that tradition inconsistent with this modern regulation. Generally, the purpose of these laws appears to have been to protect religious assemblies from disturbance. Generally, the way they burdened law-abiding citizens' right to armed self-defense was by prohibiting the carrying of firearms in such religious assemblies with certain exceptions: (1) for those bound by "duty" to bear arms at the place of worship;[98] (2) for those serving as "peace officers" at the place of worship;[99] and (3) for those for whom the place of worship is "his own premises."[100] The Court has also found a similar historical law containing an exception for those possessing "good and sufficient cause" to carry a gun on a Sunday "at any place other than his own premises."[101]

---

[98]    *See* 1870 Tex. Laws 63 ("[T]his act shall *not apply to any person or persons whose duty it is to bear arms* on such occasions in discharge of duties imposed by law.").

[99]    *See* The Statutes of Oklahoma, 1890, § 7 ("It shall be unlawful for any person, *except a peace officer*, to carry into any church or religious assembly ... any of the weapons designated in sections one and two of this article.") (emphasis added); *cf.* The Revised Ordinances of the City of Huntsville, Missouri, of 1894, § 2 ("The … preceding section [prohibiting concealed carry any church or place where people have assembled for religious worship] shall not apply to … persons whose duty it is to … *suppress breaches of the peace* ….") (emphasis added).

[100]    *See* 1877 Va. Acts 305, Offenses Against The Peace, § 21 ("If any person carrying any gun, pistol, … or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place *other than his own premises*, shall be fined not less than twenty dollars.").

[101]    *See* 1877 Va. Acts 305, Offenses Against The Peace, § 21 ("If any person carrying any gun, pistol, … or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place*, or without good and sufficient cause therefor*, shall carry any such weapon on Sunday at *any place other than his own premises*, shall be fined not less than twenty dollars.") (emphasis added); *cf.* The Revised Ordinances of the City of Huntsville, Missouri, of 1894, § 2 ("[I]it shall be good defense to the charge of carrying such weapon [in any church or place where people have assembled for religious worship], if the defendant shall show

Based on a careful comparison of the burdensomeness of this regulation (again, burden versus justification) to the burdensomeness of its historical analogues, the Court finds the burdensomeness of this regulation to be disproportionately burdensome compared to its historical analogues for three reasons. First, this regulation does not contain an exception for persons who have been tasked with the duty to keep the peace at the place of worship (particularly when the place of worship can fairly be characterized as those persons' "own premises").[102] The State Defendants do not present evidence justifying this omission. (*See generally* Dkt. No. 48.) Nor is any such evidence presented in the five amicus briefs that the Court has accepted in *Antonyuk I* and *Antonyuk II*, including the briefs of the Giffords Law Center to Prevent Gun Violence and Dr. Jaclyn Schildkraut, Ph.D. *See generally Antonyuk I*, 22-CV-0734, Amicus Brief of the Giffords Law Center to Prevent Gun Violence (N.D.N.Y. filed

---

that he has been threatened with great bodily harm, or had *good reason* to carry the same in the necessary *defense* of his home, *person or property*.").

[102]    The Court is not persuaded by the State Defendants' argument that, in Paragraph d(3)" of Section 4, the CCIA already creates this exception by making an exception for "security guards." (Dkt. No. 72, at 78-79 [Prelim. Inj. Hrg. Tr.].) It does not appear that Plaintiff Mann's "church security team" would qualify as "security guards" under New York State law. *See* N.Y. Gen. Bus. Law § 89-f(6) ("'Security guard' shall mean a person, other than a police officer, **employed by a security guard company** to principally perform one or more of the following functions within the state: a. protection of individuals and/or property from harm, theft or other unlawful activity; b. deterrence, observation, detection and/or reporting of incidents in order to prevent any unlawful or unauthorized activity including but not limited to unlawful or unauthorized intrusion or entry, larceny, vandalism, abuse, arson or trespass on property; c. street patrol service; d. response to but not installation or service of a security system alarm installed and/or used to prevent or detect unauthorized intrusion, robbery, burglary, theft, pilferage and other losses and/or to maintain security of a protected premises."). Certainly, that is not how Plaintiff Mann interprets this undefined term in the CCIA. (Dkt. No. 1, Attach. 1, at ¶ 10 [Mann Decl., swearing that, "since [Fellowship Baptist Church is] a small church, [it is] unable to afford to pay for private security who might be exempt from the CCIA"].)

133

Aug. 17, 2022); *Antonyuk I*, 22-CV-0734, Amicus Brief of Dr. Jaclyn Schildkraut, Ph.D. (N.D.N.Y. filed Aug. 17, 2022).[103]

Second, this regulation appears to expressly apply to Plaintiff Mann when he is overseeing "Bible studies, meetings of elders, and other church gatherings" in his parsonage (which is part of the same structure that encloses his church). (Dkt. No. 1, Attach. 9, at ¶¶ 12-13 [Mann Decl.].)  Again, the State Defendants (and amicus curiae) do not present evidence justifying this intrusion into the home.

Third, this regulation treads too close to infringing on one's First Amendment right to participate in congregate religious services.  *See Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989) (holding that included in a prisoner's First Amendment protection is the right to participate in congregate religious services), *cert. denied*, 492 U.S. 909 (1989); *cf. Hardaway v. Nigrelli*, 22-CV-0771, 2022 WL 11669872, at *12-16 (W.D.N.Y. Oct. 20, 2022) (temporarily restraining this regulation because of inconsistency with the Nation's historical tradition of analogous firearm regulation under the Second Amendment).

Although in its Decision and Temporary Restraining Order of October 6, 2022, the Court was willing to rely on a mere order to construe this regulation as if it contained an exception for

---

[103]    Unless the Court is mistaken, there have been at least three instances of handguns being effectively used in self-defense in churches in the United States since the turn of the 21st century: (1) at the Colorado Springs New Life Church on December 9, 2007; (2) at the Antioch (Tennessee) Burnette Chapel Church of Christ on September 24, 2017; and (3) at the West Freeway Church of Christ in Texas on December 29, 2019.  *See* Kirk Johnson, "Colorado: Gunman Killed Himself," *The New York Times* (Dec. 12, 2007); Natalie O'Neill, "Usher hailed for preventing massacre: Deadly church gunfire," *The New York Post* (Sept. 25, 2017); "Man who shot church gunman gets highest Texas civilian honor," *Athens Daily Review* (Jan. 16, 2020).

persons who have been tasked with the duty to keep the peace at the place of worship, the Court has been persuaded for the foregoing reasons (as well as for the reasons stated above in Part III.B.1.a. and note 80 of this Decision) that the Second Amendment demands that this entire regulation be preliminarily enjoined. In this way, the Court reconsiders its prior ruling on the issue in its Decision and Temporary Restraining Order of October 6, 2022, and grants Plaintiffs' motion for a preliminary injunction with regard to this regulation.

### c.　　"[P]ublic playgrounds, public parks, and zoos"

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in "public playgrounds, public parks, and [the public portions of] zoos") for the reasons stated above in Part III.B.2.a. of this Decision. Again, in rendering this finding, the Court relies on New York State licensing officers' understanding of the word "public,"[104] as well as New York State's definition of "public" places for purposes of its criminal law and civil rights law, which the Court finds to be instructive.  *See* N.Y. Penal Law § 240.00(1) ("'Public place' means a place to which the public or a substantial group of persons has access, and includes, but is not limited to, . . . parks . . . [and] playgrounds . . . ."); N.Y. Civil Rights Law § 47 ("2. For the purposes of this section the term '*public facility*' shall include, but shall not be limited to, . . . all . . . places of public accommodations, . . . resort, [or] entertainment . . . to which the general public or any classification of persons therefrom is normally or customarily invited or permitted.").

---

[104]　　*See, supra,* note 93 of this Decision.

As a result, the Court finds that Defendants must rebut the presumption of protection against this regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation.

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is the common presence and activities in these locations of "children and vulnerable people" and "confined and distracted crowds," and the need to preserve the places given that they "provid[e] important public services." (Dkt. No. 38, at 79.) The way this regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a licensed person from carrying a concealed handgun in "public playgrounds, public parks, and zoos."

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Texas law from 1870 prohibiting firearms in "place[s] where persons are assembled for educational, literary or scientific purposes"; (2) a Missouri law from 1883 prohibiting the carrying of firearms in places where people are assembled for "educational, literary or social purposes" and "any other public assemblage of persons met for any lawful purpose"; (3) an Arizona law from 1889 prohibiting the carrying of firearms in any "place where persons are assembled for amusement or for educational or scientific purposes"; (4) an Oklahoma law from 1890 prohibiting firearms in any place "where persons are assembled . . . for amusement, or for educational or scientific

136

purposes"; (5) ordinances of four cities (New York City, Philadelphia, St. Paul, and Detroit),

from between 1861 and 1895, prohibiting firearms in public parks; and (6) ordinances of four

additional cities (Chicago, Salt Lake City, St. Louis, and Pittsburgh), from between 1881 and

1897, prohibiting firearms in public parks.  (Dkt. No. 48, at 79-80.)  In addition, the State

Defendants rely on all historical laws prohibiting firearms in schools. (Dkt. No. 48, at 79-80.)

Of course, to the extent the laws come from territories (i.e., Salt Lake City in 1888,

Arizona in 1889, and Oklahoma in 1890), the Court affords them little weight.  *See NYSRPA*,

142 S. Ct. at 2154-55 (finding the statutes of territories deserving of "little weight" because they

were "localized," "rarely subject to judicial scrutiny" and "short lived").

Similarly, to the extent the laws come from the last decade of the 19th century (i.e., the

1893 Pittsburgh law and 1895 Detroit law), the Court discounts their weight, because of their

diminished ability to shed light on the public understanding of the Second Amendment in 1791

and/or of the Fourteenth Amendment in 1868.  *See NYSRPA*, 142 S. Ct. at 2136 ("Historical

evidence that long predates or postdates either [1791 or 1868] may not illuminate the scope of

the right.").

Moreover, the Court discounts the weight of the city laws to the extent they are not

accompanied by laws from states that are sufficiently *similar* in nature (i.e., laws regarding

"public parks" regardless of population density instead of the more-amorphous "public

assemblage[s]" for "amusement," "educational," and "scientific" purposes).  *See NYSRPA*, 142

S. Ct. at 2154 ("[T]he bare existence of these localized restrictions cannot overcome the

overwhelming evidence of an otherwise enduring American tradition permitting public carry.").

With regard to the remainder of the laws (i.e., the 1870 Texas law, the 1883 Missouri law, and to a lesser extent the 1861 New York City law, 1868 Philadelphia law, 1881 Chicago law, 1883 St. Louis law, and 1888 St. Paul law), the Court will discuss in more detail the extent they are established and representative below. But for now the Court observes that the general purpose of these laws appears to have been to protect people from the danger and disturbance that may accompany firearms. The general way they burdened law-abiding citizens' right to armed self-defense was by prohibiting the carrying of firearms (1) where people are assembled for educational or literary purposes, or (2) to a lesser extent, when people frequent an outdoor location for purpose of recreation or amusement (or travel through such a location), especially when there are children present.

### i.      "Public Playgrounds"

This ban (which also finds at least some support by the 1883 Missouri law prohibiting the carrying of firearms in places where people are assembled for "social purposes") finds support in the laws of five cities from around the time of adoption of the Fourteenth Amendment banning guns in "public parks" (i.e., the 1861 New York City law, 1868 Philadelphia law, 1881 Chicago law, 1883 St. Louis law, and 1888 St. Paul law). According to the 1890 census, these five cities comprised about 6.8 percent of the American population, with New York City contributing about 2.4 percent (or 1,515,301 out of 62,622,250), Philadelphia contribution about 1.7 percent (or 1,046,964 out of 62,622,250), Chicago contributing about 1.8 percent (or 1,099,850 out of 62,622,250), St. Louis contributing about 0.7 percent (or 451,770 of 62,622,250), and St. Paul contributing about 0.2 percent (or 133,156 out of 62,622,250). *See* Dept. of Interior, Compendium of Eleventh Census: 1890 (1890).  As a result, although the number and

geographic origins of these laws may be enough to make them to *established*, these laws do not appear to be *representative* of the Nation.

However, this ban also finds support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children. *See, infra,* note 112 of this Decision and Order (collecting citations to laws banning firearms in schools). The Court finds those laws to be particularly analogous here given that, generally, adults (at least when they are not supervising children) do not frequent playgrounds as much as children do.

Based on a comparison of the burdensomeness of this regulation on "public playgrounds" (again, burden versus justification) to the burdensomeness of its historical analogues, the Court finds this regulation to be reasonably proportionate to its historical analogues.

### ii.    "Public Parks"

The State's regulation in "public parks" does not fare as well. The Court will begin with the state laws (from Texas in 1870 and Missouri in 1883). Even setting aside the fact that these two lonely states from the South do not represent a national tradition that was sufficiently *established*, the laws (by themselves) were not *representative* of the Nation. This is because, in 1870, Texas and Missouri combined contained only about 6.6 percent of the American population, with Texas contributing about 2.1 percent (818,579 out of 38,558,371), and Missouri contributing 4.5 percent (or 1,721,295 out of 38,558,371). *See* Dept. of Interior, Compendium of Ninth Census: 1870 (1870).

Moreover, the extent these two laws both prohibit firearms in places where persons are assembled for "educational" purposes, they would not appear to apply to those modern parkgoers

139

who are there to *take a break from* education, not further pursue it.[105]  Granted, this appears to be less the case to extent that the 1870 Texas law regards "scientific purposes."  However, neither law used the term "public parks." Presumably, Texas and Missouri contained at least *some* public parks in 1870 and 1883 respectively (although the State Defendants have not adduced evidence of that fact).[106]  If so, and if a general societal problem existed resulting from the carrying or usage of firearms there (e.g., because of hunting game), the omission of a reference to "public parks" in the statutes could constitute some evidence of this regulation's inconsistency with the Second Amendment. Also omitted from the historical record thus far presented to the Court by the State Defendants (or discovered by the Court) are historical statutes (from the relevant period) banning the *carrying* of guns from older-named places such as "commons" or "greens."[107]

Similarly, at most, the city laws support a historical tradition of banning firearms in public parks *in* a city (where the population density is generally higher), not public parks *outside*

---

[105]     *See, e.g.,* New York State Office of Parks, Recreation and Historic Preservation, "State Parks" https://parks.ny.gov/parks/ (last visited Nov. 1, 2022) ("From the shores of Long Island to the mighty Niagara Falls, New York's 180 state parks offer countless opportunities to explore your natural environment, *escape from the grind of the everyday* and experience exciting new adventures. Beaches, boat launches, hiking trails, campsites, and golf courses all await you!") (emphasis added).

[106]     Certainly, public parks existed in New York City in 1861, in Philadelphia in 1868, in Chicago in 1881, and in St. Louis in 1883.

[107]     *Cf.* 1812 Del. Laws 329, An Act to Prevent the Discharging of Fire-Arms Within the Towns and Villages, and Other Public Places Within this State, and for Other Purposes, §1 (prohibiting the "*fir[ing] or discharge[ing]* [of] any gun ordnance, musket, fowling piece, fusee or pistol within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State …") (emphasis added).

*of* a city (where people are generally free to roam over vast expanses of mountains, lakes, streams, flora and fauna).[108]  This distinction (between the permissibility of possessing a gun for self-defense in a city and the permissibility of possessing a gun for self-defense outside a city) also finds some support in the historical analogues permitting the possession of firearms while "on a journey."[109]

---

[108]    The Court takes judicial notice of the fact that, according to the Adirondack Park Agency, the Adirondack Park "encompasses approximately 6 million acres, nearly half of which belongs to the people of New York State."  *See* Adirondack Park Agency, "The Adirondack Park" https://apa.ny.gov/about_park/index.html (last visited Nov. 1, 2022).

[109]    *See, e.g.,* 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1 ("[A]ny person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined …."); Robert Looney Caruthers, A Compilation of the Statutes of Tennessee (1836), An Act of 1821, § 1 ("Every person so degrading himself by carrying … belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence …: Provided, that nothing herein contained shall affect any person that may be on a journey to any place out of his county or state."); Josiah Gould, A Digest of the Statutes of Arkansas, All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly 381-82 (1837) ("Every person who shall wear any pistol … concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor."); 1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4 ("Everyone who shall hereafter carry concealed about his person, a … pistol or any species of firearms, or air gun, unless such person shall … be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars …."); 1844 Mo. Laws 577, An Act To Restrain Intercourse With Indians, ch. 80, § 4 ("[N]o person shall … give … to any Indian … any … gun … unless such Indian shall be traveling through the state …."); 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons ("[T]his section shall not be so construed as to … prohibit persons traveling in the State from keeping or carrying arms with their baggage …."); 1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, § 1 ("[A]ny person not … traveling (not being a tramp) or setting out on a long journey … , who carries concealed, in whole or in part, any … pistol, … shall be deemed guilty of a misdemeanor …."); Charters and Ordinances of the City of Memphis, from 1826 to 1867 ("Any person who … gives to any minor a pistol …, except a … weapon for defense in traveling, is guilty of a misdemeanor."); 1899 Annotated Statutes of the Indian Territory (Oklahoma), Carrying Weapons, § 1250 ("[N]othing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey …."); General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218,

In any event, even if the number and geographical origins of these city laws (when combined with the two state laws previously mentioned) were sufficient to constitute a tradition that was *established*, they do not constitute a tradition that was *representative* of the Nation. As explained earlier in this Decision, as of 1890, the five cities in question (New York City law, Philadelphia law, Chicago law, St. Louis law, and St. Paul law) comprised about 6.8 percent of the American population. *See* Dept. of Interior, Compendium of Eleventh Census: 1890 (1890). As of 1870, the two states in question (Texas and Missouri) contained only about 6.6 percent of the American population. *See* Dept. of Interior, Compendium of Ninth Census: 1870 (1870). The Court need not go back and recalculate the numbers so that they both come from the same census: it is confident that, under reasoning conduct in *NYSRPA*, the resulting percentage of less than 15 would not suffice to be representative of the Nation.

As a result, for the reasons stated in the foregoing four paragraphs, based on a comparison of the burdensomeness of this regulation in "public parks" (again, burden versus justification) to the burdensomeness of its historical analogues, the Court finds the burdensomeness of this regulation to be unreasonably disproportionate to that of its historical analogues.[110]

### iii. "Zoos"

---

Sec. 1 (1890 ordinance providing, "It shall be unlawful for any person in the City of Oakland, not being a public officers or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit … any pistol ….").

[110]    *See, e.g.,* "The Oldest Zoos in the United States," *World Atlas* https://www.worldatlas.com/articles/the-oldest-zoos-in-the-united-states.html (last visited Nov. 1, 2022).

Somewhere between the child-covered jungle gyms of a public playground and the open expanse of a public park lies the zoo.  No historical statutes have been cited by the State Defendants (or located by the Court) expressly prohibiting firearms in "zoos" from the late-19[th] century, despite the fact that, between 1864 and 1883, zoos appeared to have opened in cities such as New York City, Chicago, Providence, Philadelphia, Cincinnati, Buffalo, Baltimore, and Detroit.[111]

The State Defendants argue that three of these zoos (in New York City, Chicago and Philadelphia) were located *inside* public parks that were protected from firearms by city laws, and that such a fact supports this regulation.  (Dkt. No. 72, at 82 [Prelim. Inj. Hrg. Tr.].)  The Court begins by observing that such an argument works against the State Defendants as much as it does for them: just as much as it shows the (hardly surprising) fact that zoos enjoyed their surrounding parks' protections, it shows that zoos were in need of no more protection than the parks in which they were located (for example, in need of a prohibition of firearms in the zoo when the surrounding park did not have such a prohibition, or in need of a prohibition on knives in the zoo above and beyond the prohibition of firearms in the surrounding park).  Indeed, the Court can imagine some of the more trepid zoogoers of the time *demanding* to be armed in the presence of the more dangerous creatures.  In any event, the fact that only some of these zoos were protected by the parks in which they were located tells the Court that all the other ones that existed were not.  Finally, the Court has already deemed to be untraditional the State Defendants'

---

[111]    Indeed, when Chicago passed its law banning guns in public parks in 1881, its Lincoln Park Zoo appeared to have been open for about 13 years.  Lincoln Park Zoo, "Our History" https://www.lpzoo.org/about-the-zoo/history/ (last visited Nov. 1, 2022).  Yet the 1881 Chicago law did not expressly refer to a "zoo" in its statute.

laws prohibiting firearms in "public parks" (as explained in Part III.B.2.d. of this Decision); so the fact that some zoos were located in them in insufficient to establish a tradition of firearm regulation in zoos.

The State Defendants also liken zoos to playgrounds. The Court finds the regulation in zoos more burdensome than the regulation in playgrounds, because adults more commonly frequent zoos without children than they frequent playgrounds without children. Furthermore, the burden on law-abiding responsible citizens who have already obtained a license to carry concealed appears even more unjustified when one considers that zoos are more than capable of instituting policies prohibiting concealed carry themselves. Simply stated, the Court finds that, based on the analogues provided by the State Defendants (and located by the Court thus far), this state-imposed ban in "zoos" is disproportionately burdensome as compared to its relevant historical analogues.

For all of these reasons, Defendants are preliminarily enjoined from enforcing this regulation with regard to "public parks" and "zoos" during the pendency of this litigation. However, Plaintiffs' motion for a preliminary injunction is denied to the extent that it regards "libraries" and "public playgrounds."

### d.    "[N]ursery schools [and] preschools"

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public in "nursery schools [and] preschools") for the reasons stated above in Part III.B.2.b. of this Decision.

As a result, the Court finds that, to the extent this regulation applies to "[n]ursery schools" and "preschools," Government must rebut the presumption of protection against it by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation.

It appears that the Supreme Court has already recognized the permissibility of this restriction as it applies to "schools." *See Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as . . . schools . . . ."). If so, the Court can see why this is so, based on the historical analogues that have been either presented to it by the State Defendants are discovered by the Court.[112] Moreover, the Court finds, from these historical analogues that the

---

[112]     *See, e.g.,* 1870 Tex. Laws 63 ("That if any person shall go into ... any school room or other place where persons are assembled for educational, literary or scientific purposes, ... and shall have about his person ... fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars...."); 1883 Mo. Laws 76 ("If any person shall ... go ... into any school-room or place where people are assembled for educational, literary or social purposes, ... having upon or about his person any kind of firearms, ... he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than five days or more six months, or by both such fine and imprisonment."); 1889 Ariz. Sess. Laws 16-17 ("If any person shall go into … any school room, or other place where persons are assembled for amusement or for educational or scientific purposes … and shall have or carry about his person a pistol or other firearm… he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person."); The Statutes of Oklahoma, 1890, § 7 ("It shall be unlawful for any person, except a peace officer, to carry into any ... any school room or other place where persons are assembled for ... for educational ... purposes ... any of the weapons designated in sections one and two of this article."); *cf.* 1878 Miss. Laws 175, § 4 ("[A]ny *student* of any university, college or school who shall carry concealed, in whole or in part, any weapon of the kind or description in the first section of this Act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any *student or pupil*, shall be deemed guilty of a misdemeanor …") (emphasis added); *The Minutes of the Senatus Academicus 1799-1842*, at 86 (Aug. 9, 1810) ("And be it further ordained that no *student* shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case

apparent justification for this historical tradition regarding "schools" applies to schooling done in modern "[n]ursery schools" and "preschools." Finally, the Court finds that the burdensomeness of this regulation (i.e., its burden versus its justification) appears proportionate to the burdensomeness of its historical analogues.

As a result, Plaintiffs' motion for a preliminary injunction is denied with regard to the places set forth in this regulation.

### e.  "[A]viation transportation," "airports" and "buses"

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public in places used for "aviation transportation," "airports," "buses" and vans) for the reasons stated above in Part III.B.2.b. of this Decision. Therefore, the Court finds that, to the extent this regulation applies to "aviation transportation," "airports," "buses" and vans (which the State Defendants have not shown to be sufficiently distinct from "buses," and which in any event may be reasonably considered to be "vehicle[s] used for public transportation"), Defendants must rebut the presumption of protection against this regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation.

As stated above in Part III.B.1.a. of this Decision, the apparent reason for this regulation is to reduce non-self-defensive handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a

---

whatsoever.") (transcription available at University of Georgia Libraries); Univ. of Va. Bd. of Visitors Minutes (Oct. 4-5, 1824) ("No *student* shall, within the precincts of the university ... keep or use weapons or arms of any kind, or gunpowder.") (emphasis added).

handgun by someone who also possesses a concealed-carry license. More specifically, the apparent reason for this regulation is to reduce the threat of gun violence that results "where the public congregates in large numbers while distracted or in confined spaces," especially when children are present. (Dkt. No. 38, at 86-88.) The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting, without exception, a license holder from carrying a concealed handgun in any of the numerous places specified in the regulation.

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Virginia law from 1786 banning firearms in a "fair[] or market[]"; (2) a Tennessee law from 1869-70 banning firearms in a "fair, race course, or other public assembly of the people"; (3) an 1870 Texas law banning firearms in a "ball room, social party or other social gathering composed of ladies and gentlemen"; (4) an 1889 Arizona law banning firearms in a "place where persons are assembled for amusement . . . or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"; and (5) an 1890 Oklahoma law banning firearms in a "circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering." (Dkt. No. 48, at 85, 87-88.) The State Defendants also rely on the historical laws permitting regulation on government property (because, they argue, "airports, subways, and buses are all government property"), and the historical laws banning firearms in schools to protect children (because, "[a]s any New York commuter knows, every MTA bus is a school bus in the mornings"). (*Id*.)

Generally, to the extent the laws come from territories in late in the 19th century (i.e., the 1889 Arizona law and 1890 Oklahoma law), the Court affords them little weight, because of their diminished ability to reflect a judicially tested rule that governed more than a relatively

147

small portion of the population, and thus shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868. *See NYSRPA,* 142 S. Ct. at 2136, 2154 ("Historical evidence that long predates or postdates either [1791 or 1868] may not illuminate the scope of the right. . . . [T]he bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry.").

With regard to the remainder of the laws, generally, they appear to have been aimed at protecting people from the danger and disturbance that may accompany firearms. Generally, the way they burdened law-abiding citizens' right to armed self-defense was by (1) banning firearms on government property, or (2) banning firearms in locations containing dense populations of children (and dense populations of persons present for social purposes).

The Court begins its weighing of these laws by finding that it is least persuaded by the three historical laws banning firearms in locations containing dense populations of persons present for "social" purposes. The Court renders this finding for two reasons: (1) the fact that there was only one such law from a state during the relevant time period (i.e., the 1870 Texas law); and (2) the fact that this sole law (even if it were somehow deemed to be both *established* and *representative* in light of the 1889 Arizona law and 1890 Oklahoma law) cannot justify this modern regulation to the extent that "aviation transportation," "airports," "buses" and vans are not densely populated by persons present for "social" purposes.

Next least persuasive to the Court are the historical laws banning firearms in locations containing dense populations of children: they cannot justify this modern regulation to the extent

148

that "aviation transportation," "airports," "buses" and vans are not densely populated by children.

Only slightly more persuasive to the Court are laws permitting regulation on government property: historically, it appears those laws were aimed at essentially protecting the operation of the three branches of government, not the regulation of a public service (such as transportation in public).  Of course, public roads existed in the 19th and 18th century, and many laws that banned firearms made explicit exceptions for travel (especially the further away from home the person traveled).  *See, supra,* note 109 of this Decision (collecting 10 such historical laws).

Moreover, examining these 10 historical laws more closely, the Court perceives the following two patterns in five of them: (1) the longer the journey, the greater the right to carry a firearm in self-defense (note the laws using the words "a *long* journey," "a journey to any place *out of his county or state*," "traveling *through* the state," "*engaged in making* a journey," and "traveling, or *setting out on* a journey") (emphasis added);[113] and (2) *generally*, the less dense the population, the greater the right to carry a firearm in self-defense (given that then, as now, people resided with their families if not in communities, which by definition have a greater population density than non-communities).

Applying these traditions to the facts presented, the Court finds that the burdensomeness of the modern law is unreasonably disproportionate to the burdensomeness of the relevant historical analogues when it comes to persons setting out on a *long* journey (particularly out of

---

[113]    The Court notes that the five laws referenced in the above parenthetical come from Tennessee in 1836, Alabama in 1841, Missouri in 1844, Mississippi in 1878, and Oakland in 1890.  *See, supra,* note 109 of this Decision.

state).  The modern law contains no exception for such persons.  Moreover, the historical laws appear in no way conditioned on either (1) how densely populated the mode of transportation was (whether it be a "coach and four" or later a train), or even (2) whether the traveler used a facility owned and maintained by the government (such as a public road).[114] Indeed, even some of the city laws relied on by the State Defendants in other contexts contain a reasonable exception for travel (e.g., for travel to and from work or to and from a repair shop).[115]

Finally, the State Defendants have adduced no evidence persuading the Court that there is even a comparable need for this restriction (e.g., evidence regarding the number of times concealed-carry possession in a public airport has resulted in a non-self-defensive shooting, particularly when the gun is unloaded, locked, stored inside a piece of luggage and declared in compliance with Federal Aviation Administration regulations).  (*See generally* Dkt. No. 48.)[116]

---

[114]    The Court notes that, although Metropolitan Transportation Authority buses are not an issue in this action, it is persuaded by the State Defendants' argument regarding them during the period before school.  (Dkt. No. 48, at 87.)

[115]    *See, e.g.,* Champion S. Chase, ed., *Compiled Ordinances of the City of Omaha* (Omaha: Gibson, Miller and Richardson, 1881), p. 70 ("The foregoing provisions shall not apply to … worthy citizens, or persons of good repute, who may carry arms for their own protection in going to and from their place of business, if such business be lawful."); 1892 Federal Act to Prevent Deadly Weapons in the District of Columbia, Chap. 159 ("[N]othing contained in . . . this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again ….").

[116]    Indeed, during the Preliminary Injunction Hearing, counsel for the State Defendants acknowledged that, "[h]ere in New York, we are lucky to live in a state with the fifth lowest rate of death by firearm according to the CDC."  (Dkt. No. 72, at 95.)  To the extent that such a ranking was achieved before this provision of the CCIA went into effect, the achievement appears to suggest a lack of need for the provision.

And the Court has not found any such evidence indicated in any of the five amicus briefs that it has accepted in *Antonyuk I* and *Antonyuk II*, including the briefs of the Giffords Law Center to Prevent Gun Violence and Dr. Jaclyn Schildkraut, Ph.D. *See generally Antonyuk I*, 22-CV-0734, Amicus Brief of the Giffords Law Center to Prevent Gun Violence (N.D.N.Y. filed Aug. 17, 2022); *Antonyuk I*, 22-CV-0734, Amicus Brief of Dr. Jaclyn Schildkraut, Ph.D. (N.D.N.Y. filed Aug. 17, 2022).  Simply stated, even setting aside the burden on Plaintiff Mann (who wants to protect his congregation when traveling), the burden law-abiding license holders like Plaintiff Terrille (who merely want to bring their unloaded, locked, stored and declared firearm into the airport in a soon-to-be *checked* luggage bag in compliance with Federal Aviation Administration regulations) is comparably more burdensome than any historical analogue provided.

As a result, Defendants are preliminarily enjoined from enforcing this regulation during the pendency of this litigation with regard to (1) "aviation transportation" and "airports" to the extent the license holder is complying with all federal regulations there, and (2) "buses" and vans.  Otherwise, Plaintiffs' motion for a preliminary injunction is denied with regard to this regulation.

### f. "[A]ny establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed"

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public in "any establishment issued a license for on-premise consumption pursuant to . . . the alcoholic beverage control law where alcohol is consumed") for the reasons stated above in Part III.B.2.b. of this Decision.  As a result, the Court finds that the Government must rebut the presumption of protection against this

151

regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation.

According to the State Defendants, the reason for this regulation is to reduce the threat of gun violence that results from intoxicated persons gathered in large groups in confined spaces. (Dkt. No. 38, at 89-90.)  The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a licensed person from carrying a concealed handgun in establishments licensed to alcohol (and establishments licensed for on-premise consumption of cannabis).

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Kansas law from 1867 prohibiting the carrying of firearms by "any person under the influence of intoxicating drink"; (2) a Missouri law from 1881 prohibiting the carrying of firearms by any person "when intoxicated or under the influence of intoxicating drinks"; (3) a Wisconsin law from 1889 providing that "[i]t shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver"; (4) a Mississippi law from 1878 prohibiting any person to sell "any weapon . . . or any pistol cartridge" to "any . . . person intoxicated, knowing him to be . . . in a state of intoxication"); (5) an Oklahoma law from 1890 prohibiting "any public officer be found carrying such arms while under the influence of intoxicating drinks"; (6) a Texas law from 1870 barring firearms in "a ball room, social party or other social gathering composed of ladies and gentlemen"; (7) an Arizona law from 1889 barring firearms in any "place where persons are assembled for amusement . . . or into a ball room, social party or social gathering"; and (8) an Oklahoma law from 1890 (the same

one as stated above) barring firearms in "any ball room, or to any social party or social gathering." (Dkt. No. 48, at 88-89.)

Again, to the extent these laws come from territories (i.e., the Arizona and Oklahoma laws), and/or come from near the last decade of the 19th century (i.e., the Wisconsin law), the Court affords them little weight. *See NYSRPA*, 142 S. Ct. at 2136, 2154-55 (explaining that "[h]istorical evidence that long predates or postdates either [1791 or 1868] may not illuminate the scope of the right," and finding the statutes of territories also deserving of "little weight" because they were "localized," "rarely subject to judicial scrutiny" and "short lived").

With regard to the remainder of the laws, generally, they appear to have been aimed at denying the possession of guns to persons who were likely to pose a danger or disturbance to the public. The way they burdened law-abiding citizens' right to armed self-defense was by denying the possession of firearms to persons who were either (1) intoxicated or (2) likely to disturb those attending a social party or social gathering.

Again, for the sake of argument (and brevity), the Court will assume that these laws (i.e., the laws of Kansas, Missouri, Wisconsin, Mississippi and Texas from between 1867 and 1889) were both sufficiently established and sufficiently representative. The problem is that the modern regulation is not limited to persons who have been served and/or who are consuming alcohol in such establishments. Nor is it even limited to persons who are intoxicated in such establishments. Rather, it broadly prohibits concealed carry by license holders such as Plaintiffs Johnson and Terrille, who will be merely eating at the establishments with their families. Moreover, the State Defendants adduce no evidence of the approximate number of disturbances to "social gathering[s]" at restaurants that are caused each year by those licensed individuals who

carry concealed there. (*See generally* Dkt. No. 48.) Nor is such evidence indicated in any of the five amicus briefs that the Court has accepted, in *Antonyuk I* and *Antonyuk II*, including the briefs of the Giffords Law Center to Prevent Gun Violence and Dr. Jaclyn Schildkraut, Ph.D. *See generally Antonyuk I*, 22-CV-0734, Amicus Brief of the Giffords Law Center to Prevent Gun Violence (N.D.N.Y. filed Aug. 17, 2022); *Antonyuk I*, 22-CV-0734, Amicus Brief of Dr. Jaclyn Schildkraut, Ph.D. (N.D.N.Y. filed Aug. 17, 2022).

With regard to the extent to which this regulation governs license holders who may visit the bar (or restaurant containing a bar) *and* consume alcohol there, while the Court certainly acknowledges the historical support for a law prohibiting becoming intoxicated while carrying a firearm (and the Court certainly acknowledges the sensibility of a modern law criminalizing such conduct), Paragraph "o" of Section 4 of the CCIA did not criminalize becoming intoxicated while carrying a firearm. It criminalized a license holder's *mere presence* at an establishment licensed for the on-premise consumption of alcohol while carrying concealed—regardless of whether he or she is consuming alcohol there. In other words, it governs places instead of behavior. This overbreadth in the regulation would be particularly burdensome on (1) those license holders who, for whatever reason (such as a severe allergy to alcohol), never consume alcohol at restaurants, or (2) those license holders who are simply not drinking because they have charge of their grandkids at the time such as Plaintiff Terrille. (Dkt. No. 1, Attach. 10, at ¶ 19 [Terrille Decl.].)

The State Defendants have not provided sufficient historical analogues to establish an American tradition of prohibiting the carrying of a firearm in such a location. Nor have the State Defendants (or amicus curiae) provided sufficient evidence of a justification for this restriction.

Simply stated, the burdensomeness of this regulation is unreasonably disproportionate to the burdensomeness of its relevant historical analogues. As a result, Defendants are preliminarily enjoined from enforcing this regulation during the pendency of this litigation with regard "any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed."

### g.    "[T]heaters," "conference centers," and "banquet halls"

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public in "theaters," "conference centers," and "banquet halls") for the reasons stated above in Part III.B.2.b. of this Decision.  As a result, the Court finds that the" Government must rebut the presumption of protection against this regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation.

According to the State Defendants, the reason for this regulation is similar to the reason for the regulation addressed above in Part III.B.2.o. of this Decision: to reduce the threat of gun violence that results from persons gathered in large groups in confined spaces. (Dkt. No. 38, at 89-90.)  The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a licensed person from carrying a concealed handgun in any of these locations, without exception.

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Virginia law from 1786 barring persons from "go[ing] []or rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the county"; (2) a Tennessee law from 1869-70 barring the carrying of

155

firearms in "any fair, race course, or other public assembly of the people"; (3) a Texas law from 1870 barring the carrying of firearms in "a ball room, social party or other social gathering composed of ladies and gentlemen"; (4) an Arizona law from 1889 barring the carrying of firearms in any "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"; and (5) an Oklahoma law from 1890 barring the carrying of firearms in any "any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering." (Dkt. No. 48, at 90-91.)

Again, to the extent these laws come from territories near the last decade of the 19th century (i.e., the Arizona and Oklahoma laws), the Court affords them little weight. *See NYSRPA*, 142 S. Ct. at 2136, 2154-55 (explaining that "[h]istorical evidence that long predates or postdates either [1791 or 1868] may not illuminate the scope of the right," and finding the statutes of territories also deserving of "little weight" because they were "localized," "rarely subject to judicial scrutiny" and "short lived").

With regard to the remainder of the laws, generally, they appear to have been aimed at denying the possession of guns to persons who were likely to pose a danger or disturbance to the public. The way they burdened law-abiding citizens' right to armed self-defense was by denying the possession of firearms to persons who were either (1) riding "in terror of the county," or (2) likely to disturb those attending a gathering of people (usually but not always outdoors) containing a dense population (e.g., a fair, market, racecourse, ball room, social party, or other public assembly).

The Court begins by observing that the State Defendants are analogizing the modern need to regulate law-abiding New York State citizens wishing to exercise their license to carry concealed in "theaters," "conference centers," and "banquet halls" (earned after supplying four character references, completing numerous hours of firearms training, and satisfying the demands of a licensing officer) to the historical need to regulate horseback-riding "terror[ists]" through fairs or markets. Setting aside the fact that the armed horseback riders referenced in the Virginia law were, by definition, *brandishing* arms and not carrying them *concealed*, the modern regulation is not limited to instances in which the concealed carry licensees are "terrorizing" others (or doing so while traveling through necessarily congested areas). As a result, the Court must reject that analogy, and discount the weight of the 1789 Virginia law.[117]

With regard to the remaining two laws (of Tennessee from 1869-70 and of Texas from 1870), the Court finds they are simply not enough to render those laws either *established* or *representative*. With regard to the laws' representativeness, in 1870 the population of Tennessee constituted only about 3.3 percent of the American population (1,258,520 out of 38,558,371), and the population of Texas constituted only about 2.1 percent (818,579 out of 38,558,371). *See* Department of Interior, Compendium of Ninth Census: 1870 (1870). The resulting percentage of 5.4 is simply not enough to constitute part of the American tradition of firearm regulation. *See, supra,* Part III.B.1.a. of this Decision.

---

[117]  For similar reasons (i.e., the lack of a reasonable analogy to terroristic behavior such as riding on horseback through a fair or market while armed), the Court reaches the same conclusion regarding a fourth law located by the Court (and uncited by the State Defendants), from North Carolina in 1792. *See* Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60-61 (Newbern 1792) ("[N]o man great nor small ... except the King's servants in his presence ... be so hardy to ... ride armed by night nor by day, in fairs [or] markets ....").

In any event, even if these two laws were considered together with the two earlier (discounted) laws of Virginia and North Carolina and the two later (also discounted) laws of Arizona and Oklahoma, the Court would reach the same conclusion about this regulation's inconsistency with the Second Amendment.

This is not because it seems somewhat of a stretch to liken the need to regulate jet-lagged conference attendees waiting sleepily in a buffet line for a tray of salmon in some banquet hall to the need to regulate throngs of people jostling each other while trying to reach the best cut of meat in an 18th century market, or to liken mesmerized moviegoers separated by arm rests in a modern theater to dozens of pairs of ladies and gentlemen twirling across a 19th century ball room floor. Nor is it because the Court somewhat doubts that 18th and 19th century fairs, markets or dances had weekly showings at 3:00, 5:00 and 9:00 (with matinees at 12:00 and 2:00 on Saturdays) with the equivalent of a mall security guard milling about in the lobby. (The Court is more than willing to stretch an analogy to shed light on what people understood the words "keep and bear arms" meant in 1791 and 1868.) Nor is it because of the complete dearth of historical laws that have been produced regulating firearms in either theaters or amphitheaters (which existed in America in both 1791 and 1868) or places like taverns, inns, public houses, "tippling houses," "victualing houses," or "ordinaries" (which also existed and might be considered analogous to modern banquet halls). If there was a history of gun violence in such places, this dearth of law would suggest this regulation's inconsistency with the Second Amendment.

The reason the Court would reach the same conclusion is the lack of a sufficient showing by the State Defendants that the modern need for this regulation is comparable to the need for its purported historical analogues. It bears repeating that license holders restricted by this regulation

have provided four character references, completed numerous hours of firearms training, and satisfied the demands of a licensing officer.

Simply stated, the burdensomeness of this regulation is unreasonably disproportionate to the burdensomeness of the relevant historical analogues with regard to licensed persons carrying concealed in "theaters," "conference centers," and "banquet halls." As a result, Defendants are preliminarily enjoined from enforcing this regulation during the pendency of this litigation with regard to licensed persons carrying concealed there.

### h. "[A]ny gathering of individuals to collectively express their constitutional rights to protest or assemble"

The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public) for the reasons stated above in Part III.B.2.b. of this Decision. As a result, the Court finds that the" Government must rebut the presumption of protection against this regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation.

According to the State Defendants, the reason for this regulation is to prevent the presence of firearms in places where they "would destroy the exercise of other constitutionally-protected rights." (Dkt. No. 38, at 71-72.) The way the regulation burdens law-abiding citizens' right to armed self-defense is by prohibiting a license holder from carrying a concealed handgun in any gathering of individuals whose purposes is "to collectively express their constitutional rights to protest or assemble."

The State Defendants argue that this regulation's historical analogues consist of the following laws, of which they have provided copies: (1) a Tennessee law from 1869-70 providing that "it shall not be lawful . . . for any person attending any . . . ***public assembly*** of the

people, to carry about his person, concealed or otherwise, any pistol . . .”; (2) a Georgia law from 1870 providing that “no person in said State of Georgia be permitted or allowed to carry about his or her person any ... pistol, or revolver . . . to . . . any . . . ***public gathering*** in this State, except militia muster-grounds”; (3) a Texas law from 1870 providing that “if any person shall go into . . . any . . . ***public assembly***, and shall have about his person . . . fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor  . . . ”); (4) a Missouri law from 1883 prohibiting anyone from “having upon or about his person any kind of firearms” in areas including “any other ***public assemblage*** of persons met for any lawful purpose other than for militia drill . . .”; (5) an Arizona law from 1889 prohibiting “any person shall go into . . . any . . . ***public assembly*** . . . and shall have or carry about his person a pistol or other firearm,”; and (6) an Oklahoma law from 1890 prohibiting “any person, except a peace officer, to carry into any . . . any political convention, or to any other ***public assembly***, . . . any of the weapons designated in sections one and two of this article.”  (Dkt. No. 38, at 71-72.)

Again, to the extent the laws come from territories near the last decade of the 19th century (i.e., the 1889 Arizona law and 1890 Oklahoma law), the Court discounts their weight, because of their diminished ability to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868.[118]

---

[118]     *See NYSRPA*, 142 S. Ct. at 2136, 2154-55 (“Historical evidence that long predates or postdates either [1791 or 1868] may not illuminate the scope of the right. . . .  [Moreover,] [t]he very transitional and temporary character of the American territorial system often permitted legislative improvisations which might not have been tolerated in a permanent setup. . . . [B]ecause these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality.”) (internal quotation marks omitted).

With regard to the remaining four laws (from Tennessee in 1869-70, Georgia in 1870, Texas in 1870, and Missouri in 1883), they appear to have been sufficiently established, being four in number and coming from across the South.  However, their proportional populations at the time were as follows, according to the Census of 1870: (1) Tennessee about 3.3 percent (1,258,520 out of 38,558,371); (2) Georgia about 3.1 percent (1,184,109 out of 38,558,371); (3) Texas about 2.1 (818,579 out of 38,558,371);  and (4) Missouri about 4.5 percent (1,721,295 out of 38,558,371). *See* Dept. of Interior, Compendium of Ninth Census: 1870 (1870).[119] Based on this total of about 13.0 percent, the Court finds that these four laws do not appear to be representative of the Nation's firearm regulations in or around 1868.

Even if the Court were to find an established and representative tradition here, it would find one less burdensome than this modern law.  Generally, the purpose of these laws appears to have been to protect (from distraction, intimidation or interference) public gatherings of individuals whose purpose was to collectively deliberate over or exercise their constitutional rights, or perform a public duty pursuant to those rights.

In support of this latter finding, the Court relies on the fact that five of the six laws cited by the State Defendants all expressly regard "public assembl[ies]" or "public assemblage[s]." Today, "public assembly" is often a legal term with various meanings, ranging from "parade[s]" and "picket[s]" to "a hundred or more persons" in a "moving picture house[s]  *See Antonyuk II*, 2022 WL 5239895, at *19 & n.41.  The Court has not yet been able to find a definition of the

---

[119]     The Court notes that the proportional population of Missouri ten years later was about 4.3 percent (2,168,880 out of 50,155,783), according to the Census of 1880.  *See* Dept. of Interior, Compendium of Tenth Census: 1880 (1880).

term in 18th and 19th century dictionaries.  *Id.* at \*19 & n.39.  In its Decision and Temporary Restraining Order, the Court indicated that it construes the term as appearing to "involve a focus on one's constitutional rights."  *Id.* at \*19.  What the Court meant by that statement was that, in four of the six historical laws cited, a "public assembly" (or "public gathering") appears to be likened to assemblies involving the deliberation or exercise of one's constitutional rights, or the performance of a public duty pursuant to those rights (such as "vot[ing]," "muster[ing]," or "perform[ing] any other public duty").[120]  Granted, in the remaining two laws, the term "public assembly" is also likened to "race course[s]," "circus[es]," "ball room[s]," and "place[s] where intoxicating liquors are sold."[121]  However, those four restrictions (in "race courses," "circuses,"

---

[120]    *See* 1870 Texas Gen, Laws 63, § 1 (prohibiting carry at "any ***church*** or religious assembly, any ***school*** room or other place where persons are assembled for educational, literary or scientific purposes, or into a ***ball room***, social party or other social gathering composed of ladies and gentlemen, or to any ***election precinct*** on the day or days of any election, where any portion of the people of this State are collected to ***vote at any election***, or to any other place where people may be assembled to ***muster*** or to ***perform*** any other public duty, or any ***other*** public assembly  . . ."); 1883 Mo. Laws 76 (prohibiting carry at "any ***church*** or place where people have assembled for religious worship, or into any ***school room*** or place where people are assembled for educational, literary or social purposes, or to any ***election precinct*** on any election day, or into any ***court room*** during the sitting of court, or into any ***other*** public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state"); 1889 Ariz. Sess. Laws 16-17 (prohibiting carry at "any ***church*** or religious assembly, any ***school room***, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any ***circus***, show or public exhibition of any kind, or into a ***ball room***, social party or social gathering, or to any ***election precinct*** on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to ***perform any other public duty***, or to any ***other*** public assembly"); *cf.* 1870 Ga. Laws 421 (prohibiting carry at "any ***court of justice***, or any ***election ground or precinct***, or any ***place of public worship***, or any ***other*** public ***gathering*** in this State, except militia muster-grounds").

[121]    *See* 1869-70 Tenn. Pub. Acts 23-24 (prohibiting carry at "any ***fair***, ***race course***, or ***other*** public assembly of the people); 1890 Okla Stat. 496, Ch. 25, § 7 (prohibiting carry at "any ***church*** or religious assembly, any ***school*** room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any ***circus***,

"ball rooms" and saloons) appear to be what the Supreme Court would find to be "outliers." *NYSRPA*, 142 S. Ct. at 2133.  They were neither established nor representative.

In any event, this paragraph of Section 4 does not use the term "public assembly." As stated earlier, it uses the words "any gathering of individuals to collectively express their constitutional rights to protest or assemble."  This certainly could include assemblies involving the deliberation or exercise of one's constitutional rights, or the performance of a public duty pursuant to those rights.  However, it could also include more.

For example, the term could also apply to Plaintiff Terrille's gun shows and Plaintiff Mann's expressive religious assemblies.  After all, "one of [Plaintiff Terrille's] main reasons for attending [the gun show at the Polish Community Center] is [his] conversations with fellow gun owners, which invariably includes discussion of New York State's tyrannical gun laws." (Dkt. No. 1, Attach. 10, at ¶ 16 [Terrille Decl.].)  Moreover, various of the individuals in Plaintiff Mann's small congregation collectively assemble for morning and evening services every Sunday (with evening services every Wednesday) to express, and indeed to *exercise*, their First Amendment right to practice their religious.  (Dkt. No. 1, Attach. 9, at ¶ 8 [Mann Decl.].)

Beginning with the latter first, the Court agrees with Plaintiff Mann that, as a literal matter, the regulation does in fact apply to his expressive religious assemblies. The Court also agrees that such a regulation is not historically justified based on the analogues in question (which were previously considered by the Court before deciding to enjoin the prohibition in "any place of worship or religious observation" as contained above in Part III.B.2.b. of this Decision).

---

show or public exhibition of any kind, or into any ***ball room***, or to any social party or social gathering, or to any ***election***, or to any ***place where intoxicating liquors are sold***, or to any ***political convention***, or to any ***other*** public assembly").

The Court finds that this fact alone serves as an adequate ground on which to preliminarily enjoin this regulation, which does not distinguish between *religious* "gathering[s] of individuals to collectively express their constitutional rights to protest or assemble" and *non-religious* such gatherings. But the Court will proceed with its analysis for the sake of thoroughness.

As for Plaintiff Terrille's gun show, upon closer examination, the Court finds itself in a paradox created by a regulation that prevents a license holder from possessing a handgun while gathering with individuals to collectively express their right to protest the regulation by possessing handguns. Levity aside, the Court does not understand how barring Plaintiff Terrille from carrying concealed at a gun show at a Polish Community Center would further this regulation's purpose of avoiding the "destr[uction] [of] the exercise of [someone else's] constitutionally-protected rights." The Court could be wrong but it will hazard a guess that the Center probably does not lease space to opposing expressive groups at the same time.

In other words, the burdensomeness of this regulation appears unreasonably disproportionate to the burdensomeness of its historical analogues.

The Court would reach this conclusion even if it were to consider a differently analogous 1786 law from Virginia (a state that contained over 20 percent of the national population at the time, presenting a credible case for representativeness).[122] The law barred persons "from "go[ing] []or rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the county." This law is not expressly relied on by the State Defendants to support this

---

[122]    In 1790, Virginia contained about 20.9 percent of the total American population (747,610 out of 3,569,100). *See* Return of the Whole Number of Persons Within the Several Districts of the United States: 1790 (Philadelphia 1793).

regulation, but the Court has considered it anyway given the particular importance of this issue to our civil society. The Court finds this historical law to be analogous to the extent that modern onlookers feel intimidated in the presence of a group of protesters known (albeit not seen) to be armed. However, after more carefully examining this issue, the Court finds this historical law (which sought to prevent **open carry** by what we would now call terrorists) to be relevantly *dissimilar* to unmasked adults carrying **concealed** handguns while they stroll down Main Street brandishing only photocopies of their city Permit to Assemble (at least before the CCIA).

The Court notes it would reach this conclusion also even if it were to consider the interesting law review article cited by the State Defendants,[123] which discusses the history of the right of the people to peaceably assemble and speak in "the *public square*" (emphasis added). A public square was (and remains) a *fixed* location that the Court finds to be relevantly *dissimilar* to the unpredictably moving and sometimes masked phenomenon that is the modern "protest." Under this vague regulation, a law-abiding responsible license holder such as Plaintiff Terrille might suddenly find himself with his grandkids in the middle of a protest that has come to his location, and from which he would have to instantly flee lest the protesters render him a felon, which would appear to be a novel rule in America.

Simply stated, while the Court certainly acknowledges the historical tradition of (and current justification for) a law barring gun-wielding individuals from voluntarily traveling to and opposing another protest (their right being, after all, one of self-*defense*), this regulation was not so narrowly drawn. It must be enjoined, and it is so for the pendency of this litigation. In this

---

[123] (Dkt. No. 48, at 71-72 [citing Darrell A.H. Miller, "Constitutional Conflict and Sensitive Places," 28 Wm. & Mary Bill of Rights L.J. 459, 475-78 (Dec. 2019)].)

regard, the Court reconsiders its contrary ruling on this issue in its Decision and Temporary Restraining Order of October 6, 2022. *See Antonyuk II*, 2022 WL 5239895, at *19 & n.39.

### 3. Prohibition in "Restricted Locations"

The Court begins its analysis of Section 5 of the CCIA by observing that it covers the following two locations: (1) not only people's homes but *all* privately owned property that is *not* open for business to the public (and that is not a "sensitive location" under Section 4 of the CCIA); *and* (2) all privately owned property that *is* open for business to the public (and that is not a "sensitive location" under Section 4 of the CCIA). This is because, in its entirety, Section 5 of the CCIA provides as follows:

> A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in *private property* where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent.

Section 5 does not (explicitly or implicitly) limit the "private property" in question to homes or residences. By extending to *all* "private property," it extends (in part) to privately owned property that is open to the public for business.[124] In New York State (as in the rest of the United States), privately owned commercial establishments that are open to the public (e.g.,

---

[124] *See, e.g., Black's Law Dictionary* at 1254 (8th ed. West 2004) (defining "*private property*" as property that is "protected from public appropriation – over which the owner has exclusive and absolute rights," while defining "*public property*" as "State or community-owned property not restricted to any one individual's use or possession") (emphasis added); N.Y. Penal Law § 49.19 ("The term 'public place' as used in this Chapter [regarding Disorderly Conduct] shall mean . . . any place of business or assembly open to or frequented by the public, . . . including . . . *private property* which is *open to the public* view, or to which the *public has access*.").

stores) often own or lease the private property on which they are located. As a result, by covering "private property," Section 5 criminalizes a license holders' entrance into, or remaining on, those retail commercial establishments in New York State that (1) have not been deemed "sensitive locations" by Section 4, (2) operate on privately owned property, and (3) are unable for whatever reason (such as time constraints) to give express consent to *each* license holder on their doorstep other than by posting a sign containing a controversial message that must (by definition) be visible to all persons passing by (including potential "anti-gun" customers). The Court finds this to present some troubling issues under the Second Amendment and (as the Court will discuss momentarily) the First Amendment.

### a. Second Amendment Analysis

Section 5's imposition of a state-wide restriction on concealed carry on all private property that is ***open for business to the public*** finds little historical precedent. In support of it, the State Defendants rely on eight laws from seven states, which they argue are "analogous": (1) a Maryland law from 1715; (2) a Pennsylvania law from 1721; (3) a New Jersey law from 1722; (4) a New York law from 1763; (5) a New Jersey law from 1771; (6) a Louisiana law from 1865; (7) a Texas law from 1866; and (8) an Oregon law from 1893. (Dkt. No. 48, at 95-97.)

Even setting aside the remoteness of the 1893 law, six of these eight laws appear to be what are called "anti-poaching laws," aimed at preventing hunters (sometimes only hunters who are convicted criminals) from taking game off of other people's lands (usually enclosed) without the owner's permission, which was a pernicious problem at the time: (1) the Maryland law from 1715 (barring those persons "convicted of [certain crimes], or other crimes, or . . . of evil fame, or any vagrant, or dissolute liver," from "shoot[ing], kill[ing], or ***hunt[ing]***, or . . . carry[ing] a

gun, upon any person's **land**, whereon there shall be a seated **plantation**, without the owner's leave") (emphasis added); (2) the Pennsylvania law from 1721 (barring persons from "carry[ing] any gun or **hunt[ing]** on the improved or **inclosed lands** of any **plantation** other than his own, unless he have license or permission from the owner of such lands or **plantation**") (emphasis added); (3) the New Jersey law from 1722 (barring persons from "carry[ing] any Gun, or **hunt[ing]** on the improved or the improved or **inclosed Lands** in any **Plantation**, other than his own, unless he have License or Permission from the Owner of such **Lands** or **Plantation**") (emphasis added); (4) the New York law from 1763 (barring persons from "carry[ing], shoot[ing] or discharge[ing] any Musket, **Fowling-Piece**, or other Fire-arm whatsoever, into, upon, or through any **Orchard**, **Garden**, **Corn-Field**, or other **inclosed Land** whatever, within the City of New-York, or the Liberties thereof, without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor") (emphasis added); (5) the Texas law from 1866 (barring persons from "carry[ing] firearms on the **inclosed** premises or **plantation** of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of civil or military duty"); and (6) the Oregon law from 1893 (barring persons, "other than an officer on lawful business, [from] being armed with a gun, pistol, or other firearm, [and going] or trespass[ing] upon any **enclosed** premises or **lands** without the consent of the owner or possessor thereof." (Dkt. No. 48, at 95-97.)[125]

---

[125]    Based on the texts of these six historical laws, and in the absence of contrary case law, the Court must find that the *main* reason or justification for these six historical laws was poaching, not the exclusion of armed persons from buildings that are open for business to the public.  *See Antonyuk I*, 2022 WL 3999791, at *35 & nn.46, 48 (citing state cases from between 1818 and 1911 indicating what was meant by "inclosed" lands); *cf. Miller v. Chicago & N.W.R. Co.*, 113 N.W. 384, 387 (Wis. 1907) ("It cannot be fairly denied that the term 'inclosure'

168

For the sake of brevity, the Court will not expound on why it finds that barring *some* people from *openly* carrying rifles on other people's farms and lands in 19th century America is hardly analogous to barring *all* license holders from carrying *concealed* handguns in virtually *every commercial building* now. Even if the *way* the historical and modern regulations burdened one's Second Amendment right were the same, the State Defendants' attempt to analogize these six laws to Section 5 of the CCIA would stumble over the second of the Supreme Court's two "central" metrics: "*why* the regulations burden a law-abiding citizen's right to armed self-defense." *NYSRPA*, 142 S. Ct. at 2132-33 (stating that the first such metric was "how . . . the regulations burden" that right) (emphasis added).

Rest assured, none of the six Plaintiffs in this action has alleged that he has been injured by not being able to hunt turkey and deer (with his handgun) inside commercial establishments on privately owned property that is open for business to the public. Rather, the State Defendants' proffered reason or justification for Section 5 is "to ensure that property owners and lessees can make an informed decision." (Dkt. No. 48, at 92-93.) The analogy struggles. Poaching was a specific and pernicious problem in each of these states when they passed these laws. Lacking an ability to make "an informed decision" has not been shown to be a specific and pernicious problem in New York State now. *See, infra,* note 137 of this Decision. This is especially so for commercial establishments such as Plaintiff Leman's small hotel/bed and breakfast, which operates on privately owned property and seeks to draw the business of *all* concealed-carry license holders (relieving them of the fear that they will be criminals if they

---

commonly means a particular space surrounded by a *barrier* of some sort . . . . [A]ll lexical definitions of such term are in harmony to that effect.") (emphasis added).

enter without "express consent"), but are unable to give "express consent" to all of them other than through a conspicuous sign bearing a controversial message that turns away the business of "anti-gun" customers.  (Dkt. No. 1, Attach. 5, at ¶¶ 25-29 [Leman Decl.].)  Simply stated, the need to restrict fowling-piece-wielding poachers on fenced-in farms in 18th and 19th century America appears of little comparable analogousness to the need to restrict law-abiding responsible license holders in establishments that are open for business to the public today.

 To illustrate what a departure Section 5 is from our Nation's historical tradition of firearm regulation, the Court draws the reader's attention to the fact that, of the five modern laws that the State Defendants rely on to support this provision (Alaska, Connecticut, Louisiana, South Carolina, and the District of Columbia), four are expressly limited to "residen[ces]" or "dwelling[s]";[126] only one conceivably extends to commercial establishments on privately owned property (and it is limited to "assault weapons" and does not extend to licensed concealed handguns as does Section 5).[127] And two do not even require "express" authorization or

---

[126]     *See* Alaska Stat. § 11.61.220(a)(1)(B) (providing that a person may not carry a concealed weapon "within the ***residence*** of another person unless the person has first obtained the express permission of an adult residing there to bring a concealed deadly weapon within the residence") (emphasis added); D.C. Code § 7-2509.07(b)(1) (providing that the carrying of a concealed pistol "on private ***residential*** property shall be presumed to be prohibited unless otherwise authorized by the property owner or person in control of the premises and communicated personally to the licensee in advance of entry onto the ***residential*** property") (emphasis added); La. Rev. Stat. Ann. § 1379.3(O) ("No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private ***residence*** of another without first receiving the ***consent*** of that person.") (emphasis added); S.C. Code Ann. § 23-31-225 ("No person . . . may carry a concealable weapon into the ***residence or dwelling*** place of another person without the express permission of the owner or person in legal control or possession, as appropriate.") (emphasis added).

[127]     *See* Conn. Gen. Stat. § 53-202d(f)(1) (providing that ***assault weapons*** may only be carried "on ***property*** owned by another person with the owner's express permission") (emphasis added).

consent.[128] Simply stated, Section 5's burdensomeness (burden versus justification) is unreasonably disproportionate to that of six of the eight historical laws that the State Defendants rely on.

Returning to an analysis of the State Defendants' eight historical laws, only two of them may fairly be characterized as being anything more than mere anti-poaching laws: (1) the New Jersey law from 1771 (broadening its statute from 1722 so as to bar persons from "carry[ing] any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in writing from the Owner or Owners or legal Possessor"); and (2) the Louisiana law from 1865 (barring persons from "carrying fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order").  (Dkt. No. 48, at 95-97.)

Even if these two lonely state laws could somehow be reasonably viewed as evidencing an *established* tradition (which the Court doubts they could), they cannot be reasonably viewed as evidencing a *representative* one.   According to the First Census, in 1790, New Jersey contained a population of 184,139, which was only about 5.2 percent of the national population of 3,569,100.  *See Return of the Whole Number of Persons Within the Several Districts of the United States: 1790* (Philadelphia 1793).  Moreover, in 1870, Louisiana contained a population

---

[128]     *See* D.C. Code § 7-2509.07(b)(1) (providing that the carrying of a concealed pistol "on private residential property shall be presumed to be prohibited unless otherwise ***authorized*** by the property owner or person in control of the premises and ***communicated personally*** to the licensee in advance of entry onto the residential property") (emphasis added); La. Rev. Stat. Ann. § 1379.3(O) ("No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the ***consent*** of that person.") (emphasis added).

171

of 726,915, which was only about 1.9 percent of the national population of 38,558,371. *See* Dept. of Interior, Compendium of Ninth Census: 1870, Tables I and VIII (1870). Even if one were to assume the New Jersey law were still in effect in 1870 (when New Jersey would have contained a population of 906,096 or 2.3 percent of the Nation), the two states would have represented only about 4.2 percent of the national population, not a fair representation of the Nation.

Indeed, this restriction appears to be a thinly disguised version of the sort of impermissible "sensitive location" regulation that the Supreme Court considered and rejected in *NYSRPA*:

> In [Respondents'] view, 'sensitive places' where the government may lawfully disarm law-abiding citizens include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.' ... It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*NYSRPA*, 142 S. Ct. at 2133-34.[129]

---

[129] The Court notes that it suspects that the sum total of commercial property open to the public for business from which concealed-carry license holders are restricted by Section 5 in the rest of New York State (absent "express permission" or a conspicuous and contentious message from the property owner or lessee) exceeds in size the approximate 34-square-area that constitutes Manhattan. *See NYSRPA*, 142 S. Ct. at 2134 ("There is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department.").

Finally, with regard to the extent to which this regulation restricts concealed carry on privately owned property that is *not open to the public* (including other persons' homes), the Court has been persuaded by the State Defendants that the Second Amendment is not the best place to look for protection from that restriction, because thus far the Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's *own* home or in *public*. Rather, what appears to protect against this restriction—and the restriction that applies to privately owned property that *is* open to the public (including privately owned commercial establishments)—is the First Amendment.

### b.    First Amendment Analysis

The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Fourteenth Amendment applies the First Amendment to the states.

"'At the heart of the First Amendment' is the principle 'that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.'" *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 170 (2d Cir. 2020) (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 [2013]). "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to *refrain from speaking at all*." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (emphasis added).  As observed by Associate Justice Robert H. Jackson in 1943,

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943).

Since *Barnette*, the Supreme Court has consistently "prohibit[ed] the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 61 (2006). This prohibition is not limited to ideological messages; it extends equally to compelled statements of fact. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc*., 487 U.S. 781, 797-98 (1988) ("These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech.").

In compelled-speech cases, courts may apply strict or intermediate scrutiny depending on whether the statute is "content based." Strict scrutiny "looks to whether a law is narrowly drawn to serve a compelling governmental interest." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 (2d Cir. 2014). Intermediate scrutiny "looks to whether a law is no more extensive than necessary to serve a substantial governmental interest." *Evergreen Ass'n, Inc.,* 740 F.3d at 245.

"Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). "[The Supreme Court] therefore consider[s] [laws mandating speech]" to be "content-based regulations" subject to strict or exacting scrutiny. *Riley*, 487 U.S. at 795; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as laws that "suppress, disadvantage, or impose differential burdens upon speech because of its content."). Content-based regulations on speech "'are presumptively unconstitutional and may be justified only if the

government proves that they are narrowly tailored to serve compelling state interests.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

Generally, to prevail on a compelled-speech claim under the First Amendment, a plaintiff must prove three elements: (1) speech, (2) to which the speaker objects or disagrees, (3) which is compelled by governmental action that is regulatory, proscriptive, or compulsory in nature. *Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977); *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *Barnette*, 319 U.S. at 642. The Court believes that Section 5 presents compelled-speech issues with regard to both (1) privately owned property that *is not* open to the public (including other persons' homes), and (2) privately owned property that *is* open to the public (including privately owned commercial establishments). However, the Court will focus its analysis (in this last section of its already lengthy Decision) on the second issue because it presents a clearer problem.

The first two elements of a compelled-speech claim appear present here, regardless of whether the speech were deemed factual and not ideological in nature, and regardless of whether the speaker agreed with the truth of the message and just disagreed with having to speak it.[130]

---

[130]    The equivalent of a "Guns Welcome" sign may in some parts of America be purely a factual statement, but in New York State it appears to be at least partly an ideological statement (and, Plaintiffs would probably argue, a political statement). Among other things, these words call to mind a moral message about crime and the proper way to defend oneself against it. *Cf. Doe 1 v. Marshall*, 367 F. Supp.3d 1310, 1324 (M.D. Ala. 2019) ("Yet the words here ['CRIMINAL SEX OFFENDER'] call to mind philosophical and moral messages about crime, victims, retribution, deterrence, and rehabilitation. And even if they did not–even if the words here were purely factual with no ideological implications–the compelled speech doctrine would still apply."). As the Fourth Circuit has explained, "While it is true that the words the state puts into the [speaker's] mouth are factual, that does not divorce the speech from its moral or ideological implications. Context matters." *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014) (considering statute that required physicians to perform ultrasound, display sonogram, and describe fetus to women seeking abortions).

As for how the government is *compelling* the speech, the Court acknowledges that Plaintiffs may again face another issue of standing if they start complaining about having to help make "criminals" out of license-holders who (inconsiderately) come upon their property without first having acquired either actual or constructive knowledge of Plaintiffs' express consent to carry concealed there. Generally, such an injury is not to Plaintiffs but the other license holders, under the law.

But the Section 5 appears to compel Plaintiffs' speech another way: by ***coercing*** them, as busy store owners, to conspicuously speak the state's controversial message (visible to neighbors and passersby on the sidewalk or street) if (1) they want to welcome onto their property all license-holding visitors who the State has spooked with a felony charge,[131] but (2) they are otherwise unable to give express consent to those visitors for some reason (say, because as small-business owners they do not enjoy the luxury, or possess the superhuman endurance, of being able to sit at the front entrance to their property twenty-four hours a day, seven days a week, twelve months a year). (Dkt. No. 23, at 33.)

The Court does not use the word "coerce" lightly. It acknowledges the State Defendants' response that Section 5 gives such property owners another choice: giving "other[] . . . express consent." The problem is those property owners (specifically the owners of small business that are open to the public) ***cannot possibly*** avail themselves of that "other[] . . . express consent" (and thus must avail themselves of the state-authorized message). This is because, again, they do

---

[131]    These license-holding visitors could include customers, door-to-door solicitors, unannounced overnight guests who want to travel with their firearm, or the discourteous "repairman" imagined by counsel for the State Defendants during oral argument in *Antonyuk I.*

not have the time to do so as small business owners (as evidenced by Plaintiff Leman, who swears he is too busy to stand at the front door of his small hotel/bed and breakfast 24 hours a day 365 days a year).  (Dkt. No. 1, Attach. 5, at ¶¶ 25-29 [Leman Decl.].)[132]

But the old rule required speech too, the State Defendants argue: the new rule law just flips the "default" from speech that *excludes* concealed carry to speech that *permits* concealed carry.  (Dkt. No. 23, at 33.)  Of course, the old rule (which finds its roots in centuries of English property law that America inherited at the time of its Founding) regarded "inclosed" land (e.g., neighbors' fenced-in farms), not privately owned property that *is open for business to the public*.[133]

For this reason, four out of the five modern "informed consent" laws on which the State Defendants rely (Alaska, Louisiana, South Carolina, and the District of Columbia) expressly limit the restriction to "residence[s]" or "dwelling[s]," and are thus not (as the State Defendants'

---

[132]    The Court suspects that the need of these small-business owners to communicate a green light to potential license-holding customers (and thus the coercion inflicted on them by the State to conspicuously speak its controversial message) has only been intensified by any shortage of license-holding shoppers that Section 5 has created.  It is not difficult to imagine license holders not shopping as much due to the fact that many stores have, for whatever reason (whether it be lack of time or an aversion to posting controversial messages), not bothered to post "Guns Welcome" signs since September 1, 2022, when the CCIA took effect.  (*See, e.g.,* Dkt. No. 1, Attach. 1, at ¶ 7 [Antonyuk Decl., swearing that "I have changed where I eat and get takeout meals. I have stopped shopping at certain stores that have not posted signs welcoming firearms."].)

[133]    *See, e.g., Entick v. Carrington*, 2 Wils. K.B. 275, 95 Eng. Rep. 807, 817 (K.B. 1765) ("[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."); *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (explaining that *Entick v. Carrington* was a case that was "undoubtedly familiar" to "every American statesman" at the time of our Founding); *Black's Law Dictionary* at 271 (8th ed. 2004) (defining "close" as "[a]n enclosed portion of land").

argue) the "same" as Section 5. *See, supra,* note 126 of this Decision (citing four laws). Indeed, two of those four laws do not even require "express" authorization or consent: they require a license-holder to have only (1) personally communicated "authoriz[ation]" of the property owner or person in control of the premises,[134] or (2) "consent" of the resident.[135] Moreover, the sole law that is not expressly limited to "residence[s]" or "dwelling[s]" applies only to "assault weapons" (not licensed concealed handguns possessed by individuals who have supplied four references, completed numerous hours of firearm training, and satisfied a licensing officer). *See, supra,* note 127 of this Decision (citing Connecticut law).

Finally, all five laws (properly) leave open the channel of required communication, whether that be (1) conspicuous signage, (2) inconspicuous signage (e.g., not visible from the street or sidewalk),[136] (3) a phone call, (4) a text message, or (5) a prior word at the front door. None of these five laws spells out the substance and "clear and conspicuous" mode of a controversial message that property owners are *coerced* to speak to all persons passing by their door (a statement "indicating that the carrying of firearms, rifles, or shotguns on their property is

---

[134]     *See* D.C. Code § 7-2509.07(b)(1) (providing that the carrying of a concealed pistol "on private residential property shall be presumed to be prohibited unless otherwise ***authorized*** by the property owner or person in control of the premises and ***communicated personally*** to the licensee in advance of entry onto the residential property") (emphasis added).

[135]     *See* La. Rev. Stat. Ann. § 1379.3(O) ("No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the ***consent*** of that person.") (emphasis added).

[136]     The Court notes that, although the Boolean circle that surrounds all things in the world that are "express" may certainly overlap the Boolean circle that surrounds all things in the world that are "conspicuous," they do not do so perfectly: a distinction exists between the definition of the word "express" and the definition of the word "conspicuous" (a fact recognized by every purchaser who argues that the limited warranty was certainly express enough but it was just not conspicuous enough to be seen).

permitted") if those property owners want to welcome all concealed-carry license holders onto their property but are unable to otherwise give express consent to them for some reason.

In this sense, all five modern laws on which the State Defendants rely appear less restrictive, and more narrowly tailored, than Section 5 of the CCIA (even if Section 5 were pursuing a compelling or even a mere substantial state interest, which it does not appear to be doing, based on the dearth of relevant evidence before the Court).[137]

The Court acknowledges that this First Amendment issue presents a closer call than do the others. But, on the record before it (which includes Plaintiff Leman's declaration and which lacks evidence of an adequate justification from the State Defendants), the Court must find that Plaintiffs have established a strong likelihood of success on their First Amendment challenge to Section 5. The Court hastens to add that, even if its First Amendment analysis were flawed, the

---

[137]   With regard to private property that is *not* open to the public (e.g., homes), the Court notes that the State Defendants adduce no evidence of the approximate number of acts of violence that occur each year in New York State caused by license holders who have (inconsiderately) entered that property carrying concealed without having the prior express permission of the owner.  (*See generally* Dkt. No. 48.)  Nor is such evidence indicated in any of the five amicus briefs that the Court has accepted, in *Antonyuk I* and *Antonyuk II*.  The Court can only assume that this is because the number is so small.  (The licensed handgun is, after all, concealed, and the license holders did supply four character references and go through a background check before receiving their license.)  Simply stated, based on the current record, the Court finds that the State of New York does not appear to be plagued by this sort of silent epidemic.  The Court's finding is not changed by a 2020 nation-wide survey of 2,000 individuals cited by the State Defendants, which shows at most that, *if there were such a silent epidemic*, 54.6 percent of those in the Northeast would favor a "no carry" default rule.  *See* Ian Ayres & Spurthi Jonnalagadda, "Guests with Guns: Public Support for No Carry Defaults on Private Land," 48 *J.L. Med. & Ethics* 183, 186 (Winter 2020) (reporting that 45.4 percent of respondents disagreed with the statement that "[c]ustomers should be allowed to bring gun in business without permission").  Of course, setting aside the fact that the survey in no way shows that there *is* such a silent epidemic, the survey's use of the words "allowed . . . without permission" suggests that the ancient common law rule that owners may exclude others from their property has been or will be repealed (which it has not been and will not be).

Court's prior Fourth Amendment analysis would and does serve as an independent ground on which to preliminary enjoin *all* of Section 5, which does not distinguish between privately owned property that is open to the public and privately owned property that is closed to the public. (The Court heeds the State's request to not rewrite its hurried statute.)

For all of these reasons, the Court preliminarily enjoins all of Section 5 of the CCIA for the pendency of this litigation.[138]

### C.    Strong Showing of Irreparable Harm

Plaintiffs have made a strong showing that they will likely experience irreparable harm if the Preliminary Injunction is not issued for the reasons stated in their motion papers and declarations, and the reasons stated in the Court's Decision and Order in *Antonyuk I*, 2022 WL 3999791, at *36.

### D.    Balance of Equities and Service of Public Interest

Plaintiffs have also made a strong showing that balance of equities tips in their favor and that the public interest would not be disserved by the Court's granting of their motion for a Preliminary Injunction for the reasons stated in their motion papers and declarations, and in the Court's Decision and Order in *Antonyuk I,* 2022 WL 3999791, at *36.

### E.    Security

---

[138]    In this sense, the Court reconsiders its ruling on this issue in its Decision and Temporary Restraining Order of October 6, 2022 (which permitted this regulation to stand to the extent it regarded fenced-in farmland owned by another or fenced-in hunting ground owned by another).

Plaintiffs should be, and are, excused from giving security because there has been no proof of any "costs and damages" that would have been sustained by any Defendant "found to have been wrongfully enjoined or restrained" under Fed. R. Civ. P. 65(c).[139]

### F.    Scope and Stay

As they did with regard to a Temporary Restraining Order, the State Defendants have requested that any Preliminary Injunction that is issued by the Court be (1) either limited in scope to Plaintiffs or the Northern District of New York, and (2) stayed for three business days pending appeal.  (Dkt. No. 48, at 115-16.)

After carefully considering the matter, the Court denies this request for the reasons stated by Plaintiffs in their reply papers and during oral argument, and for the reasons stated recently by U.S. District Judge John L. Sinatra in *Hardaway v. Nigrelli*.   (Dkt. No. 69, at 54 [Plfs.' Reply Memo. of Law]; Dkt. No. 71, at 107-08 [Prelim. Inj. Tr.].)  *See also Hardaway v. Nigerelli*, 22-CV-0771, 2022 WL 16646220, at *18-19 (W.D.N.Y. Nov. 3, 2022).  To those reasons, the Court adds the fact that five of the nine Defendants in this action have not even opposed Plaintiffs'

---

[139]      *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir.1997) (affirming district court decision to not require a franchisor-plaintiff to post a bond for either of its injunctions because the franchisee-defendants "would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("Defendants have not shown that they will likely suffer harm absent the posting of a bond by [Plaintiff]."); *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir.1976) ("[B]ecause, under Fed. R. Civ. P. 65[c], the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond."); *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir.1961) ("[The phrase 'in such sum as the court deems proper'] indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm, or where the injunctive order was issued "to aid and preserve the court's jurisdiction over the subject matter involved.").

motion to preliminarily enjoin the below-enjoined provisions of this patently unconstitutional law. *See, supra,* Part I of this Decision.  Although the Court has not considered that *de facto* consent in evaluating the merits of Plaintiffs' claims,[140] the Court does find it relevant in evaluating any possible injury to the public that would be caused by this Preliminary Injunction if, on appeal, this Court's Decision were to be held to be in error.

For all of these reasons, the Court denies the State Defendants' request for a limitation and stay.

**ACCORDINGLY**, it is

**ORDERED** that Defendant Hochul is **DISMISSED** from this action as a party; and it is further

**ORDERED** that Plaintiffs' motion for a Preliminary Injunction (Dkt. No. 6) is **GRANTED** **in part** and **DENIED** **in part** in accordance with this Decision; and it is further

**ORDERED** that Defendants, as well as their officers, agents, servants, employees, and attorneys (and any other persons who are in active concert or participation with them) are **PRELIMINARILY ENJOINED** from enforcing the following provisions of the Concealed Carry Improvement Act, 2022 N.Y. Sess. Laws ch. 371 ("CCIA"):

       (1) the following provisions contained in Section 1 of the CCIA:

              (a) the provision requiring "good moral character";

              (b) the provision requiring the "names and contact information for the applicant's current spouse, or domestic partner, any other adults

---

[140]      Ordinarily, in this District, when a properly filed motion is unopposed, the movant's burden on that motion is lightened to having to show only that their motion possesses facial merit.  N.D.N.Y. L.R. 7.1(a)(3).

residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home";

(c) the provision requiring "a list of former and current social media accounts of the applicant from the past three years"; and

(d) the provision contained in Section 1 of the CCIA requiring "such other information required by review of the licensing application that is reasonably necessary and related to the review of the licensing application";

(2) the following "sensitive locations" provision contained in Section 4 of the CCIA:

(a) "any location providing . . . behavioral health, or chemical dependance care or services" (except to places to which the public or a substantial group of persons have not been granted access) as contained in Paragraph "2(b)";

(b) "any place of worship or religious observation" as contained in Paragraph "2(c)";

(c) "public parks, and zoos" as contained in Paragraph "2(d)";

(d) "airports" to the extent the license holder is complying with federal regulations, and "buses" as contained in Paragraph "2(n)";

(e) "any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic

183

beverage control law where alcohol is consumed" as contained in

Paragraph "2(o)";

      (f) "theaters," "conference centers," and "banquet halls" as

contained in Paragraph "2(p)"; and

      (g) "any gathering of individuals to collectively express their

constitutional rights to protest or assemble" as contained in Paragraph

"2(s)"; and

    (3) the "restricted locations" provision contained in Section 5 of the

CCIA; and it is further

**ORDERED** that Plaintiffs are **EXCUSED** from giving security; and it is further

**ORDERED** that the State Defendants' request for a limitation in the scope of this

Preliminary Injunction and for a stay of it pending appeal (Dkt. No. 48, at 115-16) is **<u>DENIED</u>**.

Dated: November 7, 2022
      Syracuse, New York

Glenn T. Suddaby
U.S. District Judge