```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STEVEN GOLDSTEIN, et al.,

               Plaintiffs,

          v.                        22 Civ. 8300 (VSB)

KATHY HOCHUL,  et al.,

               Defendants.

------------------------------x
                               New York, N.Y.
                               October 29, 2022
                               10:15 a.m.

Before:

               HON. VERNON S. BRODERICK,

                               District Judge

                    APPEARANCES

LAW OFFICES OF CORY H. MORRIS
BY:  CORY H. MORRIS
     – AND –
BENNO & ASSOCIATES P.C.
BY:  AMEER N. BENNO
     Attorneys for Plaintiffs

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
     Attorneys for Defendant Kathy Hochul
BY:  MATTHEW LAWRENCE CONRAD

NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendant Keechant Sewell
BY:  NICHOLAS ROBERT CIAPPETTA

OFFICE OF THE COUNTY ATTORNEY
     Attorneys for Defendant Louis Falco, III
BY:  PATRICK JOHN FISCHER
```

1              (Case called)

2              THE COURT:  Okay.  If I could ask counsel to please

3    identify themselves for the record.

4              MR. BENNO:  For the plaintiffs, Ameer Benno, Ameer N.

5    Benno, Benno & Associates P.C., 30 Wall Street, 8th Floor, New

6    York, NY 10005.

7              THE COURT:  Good morning.

8              MR. MORRIS:  Good morning, your Honor.  Also for the

9    plaintiffs, Cory Morris, Law Offices of Cory H. Morris, 300 E.

10   Rabro Drive, Suite 126, Hauppauge, NY 11788.  Good morning.

11             THE COURT:  Good morning.

12             MR. CONRAD:  Good morning.  Representing the state

13   departments, Matthew Conrad, New York State Office of the

14   Attorney General, 28 Liberty Street, 15th Floor, New York, New

15   York, 10005.

16             MR. CIAPPETTA:  Good morning, your Honor.

17   Representing the city defendants, Nicholas Ciappetta, assistant

18   corporation counsel, 100 Church Street, New York, New York.

19             MR. FISCHER:  Good morning, your Honor.  Representing

20   Defendant Sheriff Louis Falco, III, of Rockland County and

21   District Attorney Thomas Walsh, II, also of Rockland County,

22   Patrick Fischer, Rockland County Attorney Law Department, 11

23   New Hempstead Road, Suite 3rd Floor, New City, New York, 10977.

24             THE COURT:  All right.  Thank you.

25             So first, just in terms of how I envision proceeding

1   this morning, I apologize for the evening email of my order.

2   I've been tied up on some other things during the week.

3          What I would say, other than the legal questions in

4   here, with regard to the factual questions, they are mainly I

5   think, or maybe exclusively, from plaintiffs.  I would request

6   supplemental declarations from the plaintiffs themselves with

7   regard to those questions.

8          I understand that, in particular, those would be the

9   more difficult questions for the parties to put together

10  basically in less than overnight, for plaintiffs to put

11  together in less than overnight.

12         And also, since they are factual-related things, I

13  want to make sure that I -- obviously if you have answers

14  today, I'll hear them.  But I want to make sure that the

15  plaintiffs have an opportunity to -- they may have not even

16  seen them.  But to the extent they have -- an opportunity to

17  figure out, from their own recollections, calendars, or

18  whatever, some of those things.

19         With regard to the legal questions, I think some of

20  them I would oppose obviously without an order.  So I think we

21  should be able to go through those.  So my intention would be

22  to go through the questions that I posed in the order.  Since

23  that time, I've come up with some additional questions.  I'll

24  pose those.

25         And then I would open it up for the parties to either

1    emphasize certain parts of their arguments or, if there are

2    other things that either of the parties want to bring to my

3    attention, you can do so.  I do not anticipate today having a

4    decision:

5           Let me ask, Mr. Morris, Mr. Benno, if that makes sense

6    from your perspective.

7           MR. MORRIS:  Yes, your Honor.  We did have the

8    opportunity -- we thank the Court for that opportunity -- to

9    ask those questions.  We also have the licenses for order.

10          THE COURT:  Have you provided them to your

11   adversaries?  Do you have any copies for your adversaries?

12          MR. MORRIS:  I believe so.

13          THE COURT:  All right.  If you could hand them up.  If

14   you could provide copies to your adversaries, that would be

15   great.

16          I'm not going to enter them into the record without --

17   I would imagine that there may be redactions and other things

18   that should be made to them.  I just wanted to be able to see

19   them to have a sense of what they say.

20          MR. BENNO:  Your Honor, if I may, we will certainly

21   circulate them and hand them up and then give them to counsel.

22   But perhaps if we could attach them to the supplemental

23   declaration.

24          THE COURT:  That's fine.  I will take them now, and if

25   you could attach them to the supplemental declarations.  Seek

 1    leave to make those redactions.

 2              Obviously to the extent they fall within the typical

 3    things that get redacted under the local rules and the like or

 4    that are referenced in my individual rules, you should feel

 5    free to make those redactions.

 6              If you don't have them now, that's fine.  If you do

 7    have copies by the end of today's proceedings, if we could grab

 8    copies of those.

 9              MR. BENNO:  Your Honor, may I approach?

10              THE COURT:  You may.

11              MR. BENNO:  If I may, your Honor, just so it's clear

12    to your Honor, we have a copy of Meir Ornstein's license.  We

13    have a copy of Steven Goldstein's license.

14              With respect to Steven Goldstein's license, I just

15    want to point out to your Honor, you'll see that the expiration

16    date is August 28, 2022.  He has an email from the state.

17              What happens is when you make an application, they

18    send you a provisional license he has to keep with him in paper

19    form to say that your license is still valid until they

20    ultimately render a decision.  So I just wanted to make clear

21    that that's what that is.  His license is still valid.

22              So I'm going to include with this a copy of the email

23    that he received from the licensing division of the NYPD.

24              THE COURT:  You can hand them to my law clerk.  That's

25    fine.  If you could provide -- if you have copies, if you could

1    provide them to your adversaries.

2           The first series of questions are, again, factual

3    questions.  And I'm not sure if plaintiffs' counsel has the

4    answers today.  I should be clear.  Even if you provide an

5    answer today, I expect that the supplemental declaration will

6    include answers to the questions that are in the order.  I

7    don't expect that the supplemental declaration will -- it's

8    not opportunity to add a surreply and things like that, in

9    other words, add additional information.

10          If you feel the need to add additional information,

11   you should make an application and just tell me why you believe

12   it would be appropriate or just let me know which paragraphs

13   are not directly responsive to those but what you've added.

14          What I'll do is I'll consider them.  And by "consider

15   them," I mean I'll decide whether or not I'm going to ignore

16   them.  But rather than have you seek advance permission, you

17   can file them.

18          I'll give your adversaries an opportunity, for the new

19   stuff, to basically object.  I don't anticipate, unless it's

20   somehow closely related to some of the questions I've asked, I

21   just can't imagine that -- I'll just leave it at that.

22          So with regard to the first question, which is when

23   did Plaintiff Goldstein obtain his license to possess a firearm

24   on the premises of Congregation -- I apologize.

25          How do you pronounce the name?

```
 1              MR. BENNO:  Your Honor, can we remain seated?

 2              THE COURT:  That's fine.  That applies to all counsel.

 3    I would ask if you're going to speak, to just pull the

 4    microphone closer to you.

 5              MR. BENNO:  It's Bnei Matisyahu.

 6              THE COURT:  I will say in advance that I am probably

 7    going to massacre various names throughout this proceeding.

 8    And I apologize in advance.

 9              So with regard to that question --

10              Are you going to be addressing that?

11              MR. MORRIS:  Yes.  Good morning, your Honor.  Cory

12    Morris for the plaintiffs.

13              I've had the opportunity, and can we thank the Court

14    for that opportunity -- last evening to speak to both

15    plaintiffs at length.  We actually consulted a rabbi who

16    actually joined us here today.

17              The simple answer is that Plaintiff Goldstein obtained

18    his firearm license approximately ten years ago.  Plaintiff

19    Goldstein participated in religious activities four times a

20    week at Bnei Matisyahu and six times a week elsewhere.

21              THE COURT:  This may be out of order.

22              When did Plaintiff Goldstein start attending Bnei

23    Matisyahu?

24              When did he start attending that synagogue?

25              MR. MORRIS:  I believe he started attending that
```

1   synagogue at its inception, since it started.

2           THE COURT:  I can't remember.  Was that the 11 years?

3   I don't remember whether it was that congregation or

4   Congregation Zemach that has been in existence for 11 years.

5           MR. BENNO:  I believe it's Bnei Matisyahu, your Honor.

6           THE COURT:  So he obtained the license when that

7   congregation was formed, and also he started going there at the

8   time.

9           MR. MORRIS:  Yes, your Honor.  I believe he started

10  going there, and then he obtained the firearm license about ten

11  years ago.

12          THE COURT:  So that answers the second part of that

13  question, prior to obtaining his license, did Plaintiff

14  Goldstein participate in religious activities.

15          So prior to attending Bnei Matisyahu, was there

16  another -- because I understand, during the time period, say

17  for the past 11 years, is the answer four times at Bnei

18  Matisyahu and six times at other shuls?

19          MR. MORRIS:  I believe so, your Honor.  To be clear,

20  visiting a physical location, a house of worship.

21          THE COURT:  Yes.

22          MR. MORRIS:  But as my colleague and rabbi would say

23  in the audience, since his bris, he's been engaged in religious

24  observation.

25          THE COURT:  Sure.  There are going to be obviously

1    some additional questions I have with regard to that, the

2    places of worship versus the language in the statute basically.

3              When did Plaintiff Ornstein obtain his license to

4    carry a concealed handgun?

5              MR. MORRIS:  So Plaintiff Ornstein obtained his

6    license in 2009.

7              Should I continue with the answer?

8              THE COURT:  Yes.

9              MR. MORRIS:  He participated in religious observation

10   and activities nearly every day.  Plaintiff had his license,

11   Ornstein, prior to participating at religious services and

12   observations through congregation Zemach David because he did

13   not live in the area prior to 2009.

14             THE COURT:  So he obtained his license somewhat after

15   he moved into the area?  Is that accurate?

16             MR. MORRIS:  I believe it was the same year.

17             THE COURT:  And prior to that, did he have a license

18   to carry in the location where he previously lived?  Do you

19   know?

20             MR. MORRIS:  I do not believe so.

21             THE COURT:  And I guess if that could be confirmed in

22   the supplemental declaration.

23             In the answer to the question that he attended

24   services every day, was that in connection with the

25   congregation Zemach David?  Or that's generally?

1              MR. MORRIS:  It's in connection with Congregation

2       Zemach David.  But, your Honor, services also extend, for

3       instance, minyan, which could occur even in a business place or

4       home.

5              THE COURT:  So in connection with in paragraph 13 --

6       this is question 3 of Plaintiff Ornstein's declaration.  He

7       states that he no longer attends Zemach David or any other shul

8       with as much frequency as he did before the law went into

9       effect.

10             So these questions, I'm just trying to figure out what

11      that means, in other words, what is the delta between pre the

12      law, September 1, 2022, and then post the law's going into

13      force.

14             MR. MORRIS:  So, your Honor, after speaking with

15      Plaintiff Ornstein, he's made clear that he carried that

16      firearm without limitation and he engaged in several religious

17      observations.  As of last night, he just gave some examples,

18      inclusive of:  Tzamullah class, minyan, Shabbat, services,

19      social events, kiddush, bar mitzvah, bris, vach nacht, selling

20      hummus to fill in prayers.

21             So prior to this law going into effect, he carried

22      that firearm without limitation.

23             THE COURT:  When you say "without limitation," so when

24      he would leave his house, he was constantly carrying the

25      firearm?

```
 1              MR. MORRIS:  Yes, your Honor.

 2              THE COURT:  Go ahead.

 3              MR. MORRIS:  He also, as per our conversation --

 4              THE COURT:  I'm sorry.  Since 2009?

 5              MR. MORRIS:  I believe so, your Honor.

 6              THE COURT:  And, again, if it turns out that it's

 7    different earlier on, that could be included in the

 8    supplemental declaration.

 9              Go ahead.

10              MR. MORRIS:  And I should say, your Honor, both

11    plaintiffs are standing by.  If it please the Court, we could

12    seek that information and give it to the Court as soon as

13    possible.

14              THE COURT:  Okay.

15              MR. MORRIS:  Prior to September 1, 2022, he engaged in

16    services several times a week and various religious

17    observations with Congregation Zemach David every day multiple

18    times a day.

19              THE COURT:  In which he would have his firearm?

20              MR. MORRIS:  Indeed, your Honor, yes.

21              THE COURT:  And after September 1?

22              MR. MORRIS:  Your Honor, consulting my client in the

23    limited contact we've had, at this point, basically we don't

24    think it's prudent for him to state.  He will essentially

25    exercise his Fifth Amendment Rights.  If the defendants here
```

1   will say that they're not going to prosecute him, then we're

2   more than glad to --

3          THE COURT:  What I should say in connection with that

4   is the following:  You should meet and confer with the

5   defendants about that.

6          Obviously in asking that question -- and it occurred

7   to me after I asked it -- that might be the case if in fact

8   there had been situations where either plaintiffs were carrying

9   their firearms.

10          Maybe we can break it down this way.  I want to

11   separate out places of worship, therefore, Zemach David and

12   Bnei Matisyahu -- I want to separate those locations out from

13   the places of religious observation.

14          In other words, from what I understand what the

15   plaintiffs have said, or at least part of the argument, is when

16   they're at work and they have a meeting or when they're at

17   places and they do other things, in their mind, is that a place

18   of religious observation?  So let's separate out those two.

19          Is it fair for me to say, at this time, with regard to

20   both of those definitions, that the plaintiffs would exercise

21   their Fifth Amendment rights at this stage?

22          And I understand because there's a statute that's on

23   the books.  And then the parties can meet and confer about that

24   and figure that out.

25          MR. MORRIS:  So, your Honor, to be clear,

1   Plaintiff Ornstein is not taking that firearm into a shul, not

2   after September 1, 2022.  That's why he's limited going to the

3   shul.

4          I think we should meet and confer.  We'd be more than

5   glad to do that.  We can take the entire day today.  Again,

6   both plaintiffs are available.  We even have an ordained rabbi

7   in the audience here in case we need to consult religiously.

8          THE COURT:  So it sounds as if it's really with regard

9   to the places of religious observation to which

10  Plaintiff Ornstein would, at least at this time, assert his

11  Fifth Amendment right.  Because the answer, as I understand it,

12  with regard to Congregation Zemach David or any other shul, is

13  that he did not carry this firearm, if he attended.

14         MR. MORRIS:  Into a place of worship, absolutely.

15  There was no carrying of a firearm.

16         THE COURT:  So let me ask:  In terms of -- and I think

17  you gave the breakdown of attendance prior to September 1,

18  2022.  As I said, if it differs at any point between the 2009

19  time frame, if there's somehow some difference over the years,

20  you can indicate that in the supplemental declaration.  So

21  after September 1.

22         Why don't we right now just deal with the places of

23  worship.

24         MR. MORRIS:  In response to your Honor's question of

25  3B, Plaintiff Ornstein is attending the physical shul,

1   Congregation Zemach, once a week after September 1, 2022.  So

2   he's reduced his attendance.

3          THE COURT:  With regard to other shuls?

4          MR. MORRIS:  Going on to your Honor's question C,

5   plaintiff attended, prior to September 1, 22, other shuls one

6   to two times a week.  After Plaintiff Ornstein obtained his

7   firearm license and prior to September 1, 2022, he consistently

8   carrying his firearm while engaging in various religious,

9   observation inclusive of attendance at other shuls.

10          To the extent, again, your Honor asked about carrying

11   the firearm to the shul after September 1, 2022, he did not do

12   that, again, with the limitation that we should probably meet

13   with counsel.

14          THE COURT:  Sure.  About the places of religious

15   observance.

16          Let me ask:  How often did he attend other shuls after

17   September 1, 2022?

18          Again, if you know at this time.  Otherwise, since I

19   expect to get the supplemental -- the supplemental declarations

20   should have answers to all of the questions, even if you

21   provide them here today.

22          MR. MORRIS:  Your Honor, I just want to make sure.  I

23   don't have the answer at my fingerprints here today.

24          THE COURT:  Sure.

25          MR. MORRIS:  I know Plaintiff Ornstein had limited his

1    attendance at the physical shul.  And I should note for

2    your Honor that the congregation, although meeting at the

3    physical shul at times, meet also in other places.  So although

4    it's a congregation, that doesn't mean it's necessarily

5    confined to a building or any specific place.

6              THE COURT:  I think that's going to come down to, in

7    my mind, sort of the places-of-worship issue.  So we can deal

8    with a little bit of that on a definitional standpoint, and

9    I'll have questions for both sides relating to that.

10             I'm sorry.  You said that he limited his attendance at

11   other shuls after September 1.

12             Do you have a sense of what does that mean compared to

13   prior to -- I apologize.  I don't remember the exact number you

14   had indicated that prior to September 1 Plaintiff Ornstein

15   attended other shuls.

16             MR. MORRIS:  So prior to September 1, he would attend

17   other shuls one to two times a week.  Your Honor, I think

18   possibly most prudent, we could call him and just get that

19   answer.

20             THE COURT:  Rather than interrupt the argument here

21   today, I'm fine with just providing the answer.  Again, because

22   I've requested supplemental declarations, I'm fine with waiting

23   to get that answer.

24             MR. MORRIS:  Prior to September 1, 2022, he attended

25   Congregation Zemach David several times a week and engaged in

1   religious observations with other members and other Jews every

2   day multiple times a day.

3           THE COURT:  Did you say "several" or "seven"?

4           MR. MORRIS:  Several.

5           THE COURT:  Again, you can clarify it in the

6   supplemental declaration and also indicate whether that's sort

7   of on average or what it is, if it's not consistent.

8           But do you know:  What does "several" mean?

9           MR. MORRIS:  Several times a day typically for a

10  religious Jew, minyan, the morning, wrap tefillin.  Usually

11  these things would take place.  Especially, for instance,

12  Plaintiff Goldstein is very similar to Plaintiff Mann in the

13  *Antonyuk* case.  The shul is literally right across the street.

14          These just so matter of factually occur every day.  It

15  could be in excess of three to five.

16          THE COURT:  Just so that I understand, with regard to

17  Zemach David that Plaintiff Ornstein attended prior to

18  September 1 every day multiple times a day.

19          MR. MORRIS:  Your Honor, that could be wearing kippah,

20  wrapping tefillin, wearing a yarmulke, putting on tzitzit.  All

21  of these acts of religious observance occur at different points

22  throughout every day.  And minyan could occur

23  morning/afternoon.  If there is any sort of kiddush special

24  occasion or just regular prayer, your Honor -- before a meal,

25  after a meal.

1           THE COURT:  Again, my question was limited to places

2   of worships.  I understand that many of the things you just

3   mentioned could happen in a places of worship but don't

4   necessarily have to happen with regard to a place or worship,

5   at least with regard to that specific question.

6           With regard to Plaintiff Goldstein now, I think I've

7   covered the questions with regard to Plaintiff Ornstein.  If I

8   haven't, obviously as you go through this with your clients and

9   craft the supplemental declarations, you can fill in the gaps

10  of things that I may have missed or clarify what was said

11  today.

12          So in paragraph 21 of his declaration,

13  Plaintiff Goldstein states that he no longer attends Bnei

14  Matisyahu with as much frequency as he did before the law went

15  into effect.

16          So I guess the first question I have is:  How

17  frequently prior to September 1 did Plaintiff Goldstein attend

18  Bnei Matisyahu?

19          MR. MORRIS:  Plaintiff Goldstein attend approximately

20  four times a week prior to September 1, 2022.  Each time prior

21  to September 1, 2022, he carried a firearm.

22          THE COURT:  Okay.  I think that answers the second

23  question.  In other words, every time he would attend, he would

24  go to Bnei Matisyahu, after he obtained his license, he would

25  carry his firearm.

1          MR. MORRIS:  Yes, your Honor.

2          THE COURT:  All right.

3          MR. MORRIS:  And I think your Honor is going to ask

4    after September 1, 2022.

5          THE COURT:  Correct.

6          MR. MORRIS:  With the same caveat, Plaintiff Goldstein

7    would attend Bnei Matisyahu once every other week after

8    September 1, 2022.

9          THE COURT:  With regard to the same question, with

10   regard to the question now, I'm just talking about Bnei

11   Matisyahu.

12          In the once a week after September 1, are you saying

13   he did not carry his firearm?

14          MR. MORRIS:  Your Honor, he remained religious, but

15   yes.  He complied with the law.  He did not carry a firearm.  I

16   should note that he's in Florida now.  He's got a license to

17   carry in Florida.  He'll be in shul today, and he'll observe

18   Sabbath into tomorrow carrying a weapon.

19          THE COURT:  So he has a license in Florida also?

20          MR. MORRIS:  He does, your Honor.

21          THE COURT:  Does he live part time in Florida?

22          MR. MORRIS:  I think he visits.

23          THE COURT:  How many licenses does he have?

24          MR. MORRIS:  I'm aware of at least two, so the

25   New York and the Florida one.  But I believe he might have

1    another carry.

2        THE COURT:  Okay.  In connection with the supplemental

3    declaration, I'd like to know how many licenses

4    Plaintiff Goldstein has.

5        Similarly, with regard to Plaintiff Ornstein, do you

6    know whether Plaintiff Ornstein -- besides the New York

7    license, does Plaintiff Ornstein have other firearms from other

8    jurisdictions?

9        MR. MORRIS:  I do not believe so, your Honor.

10       THE COURT:  Okay.  Again, if you can just confirm that

11   in the supplemental declaration.

12       So with regard to Plaintiff Goldstein, how many times

13   a week did he attend other shuls and, when he would go to those

14   other shuls, would he carry his firearm?

15       MR. MORRIS:  So when we spoke to him last night, he

16   did attend other shuls at various degrees because his license

17   was limited to the premises of Bnei Matisyahu.

18       THE COURT:  Okay.  So Plaintiff Goldstein's license is

19   limited to carry into Bnei Matisyahu.

20       Plaintiff Ornstein's license, is it a general conceal

21   carry permit and not limited to Congregation Zemach David?

22       MR. MORRIS:  Yes, your Honor.

23       THE COURT:  So after September 1 -- I apologize.  You

24   may have answered this.

25       So after September 1 of 2022, how many times a week

1    did Plaintiff Goldstein attend other shuls?

2           MR. MORRIS:  He didn't provide an exact number.  But

3    in varying degrees, he visited other shuls.  Again, sometimes

4    the congregation is in another building.  Right now he's in

5    Florida, for instance.  He'll be in other shul.  I'm not sure

6    if that's geographically limited.  Like I said, your Honor,

7    both plaintiffs are available.  I'd love for them to address

8    the Court, if possible.

9           THE COURT:  Sure.  If I was going to take testimony, I

10   would want them here.  I would want to be able to observe them.

11   Doing it on the phone is not efficient in my view.

12          In terms of Plaintiff Goldstein, you don't know

13   exactly how many times a week he would attend other shuls.

14          Do you have a sense?  Was it more than once a week?

15          MR. MORRIS:  So, your Honor, to be clear, he's limited

16   his attendance at his shul and other shuls.  To the extent that

17   he can carry, like in Florida, he's continued to go to shuls.

18   My understanding is it's diminished as to before September 1,

19   2022.  But certainly we're going to provide that to your Honor.

20          THE COURT:  Okay.  Also do you know when he attends

21   other shuls, when he attends shuls in Florida -- obviously this

22   wasn't one of the questions.  I didn't know he had a firearms

23   license in Florida -- does he always carry his gun?

24          MR. MORRIS:  In shul, yes.  He carries a weapon.  A

25   firearm I should say.

```
1            THE COURT:  So whenever he goes to shul in Florida, he
2    carries his firearm?
3            MR. MORRIS:  That was my understanding.  It was a
4    little late.  He had gotten off the plane around 1:00.
5            THE COURT:  With regard to that, since we hadn't
6    really discussed it, you can follow up with him on that and how
7    long he's had the Florida license.  And if you could attach a
8    copy with the same sort of instructions with regard to
9    redaction and stuff like that, of the Florida license.
10           I guess I would ask that to the extent there are
11   other -- it sounds like it just may be New York and Florida.
12   To the extent there are other ones, if the supplemental
13   declaration could address that.  I think that covers the
14   questions for Plaintiff Goldstein.  As I said, if not, I'll get
15   the answers in the supplemental declaration.
16           With regard to Congregation Zemach David, when did
17   that congregation open?
18           MR. MORRIS:  Congregation Zemach David was established
19   prior to 2012.  Plaintiff Ornstein began attending after he
20   moved in 2012 to the immediate area.
21           THE COURT:  And I apologize.  Remind me again when he
22   obtained his license.
23           MR. MORRIS:  I believe it was 2009.  It is.
24           THE COURT:  Okay.  Do you know whether prior to 2012,
25   between 2009 and 2012, in the shul that Plaintiff Ornstein was
```

1    attending, did he carry his firearm during that time period?

2    Do you know?

3         MR. MORRIS:  Yes, your Honor.  My understanding, as

4    per my conversation with plaintiff, is he carried the weapon

5    everywhere, unless he was, of course, restricted.

6         THE COURT:  Let me ask, and this is in regard to both.

7    I just want to be clear.

8         Were there any occasions where either

9    Plaintiff Ornstein or Plaintiff Goldstein attend places of

10   worship that weren't shuls?

11        In other words, at times folks, who are in a

12   particular congregation or otherwise, may go to other places of

13   worship.

14        Did that happen?

15        MR. MORRIS:  So, your Honor, they went to places like

16   office buildings.  But I think your Honor is asking maybe they

17   went to a wedding of another faith.

18        Is that your question?

19        THE COURT:  And I don't know.  Or visited a clergy in

20   a church or in a mosque or had meetings where they attended

21   such things.  That's what I'm talking about.

22        MR. MORRIS:  So religious observation occurred

23   regularly within the home, within various office settings.  I

24   don't have knowledge -- I know we asked them about mosques

25   among other things.  And they've never been to such a thing,

1    aside from the court case referenced that was referenced by the

2    Court.

3             So I'd have to follow up with anything on other

4    religions.  But certainly the worship occurred in the home,

5    outside the home, in office buildings, and other places.

6             THE COURT:  To be clear, I'm just saying physically

7    going to another places of worship.  I'm not necessarily saying

8    they were going there and engaging in any aspect of their

9    religions.  What I'm saying is just physically visiting those

10   locations.  If so, when they went to those locations, did they

11   carry their firearms.

12            In paragraph 43, it says:  "Congregation Bnei

13   Matisyahu is a membership-based Jewish congregation composed of

14   approximately 25 families."

15            So the question I was:  How many folks is that?  In

16   essence, adults and children and the like.

17            MR. MORRIS:  So Plaintiff Goldstein submits that there

18   are 30 to 40 adult members of Bnei Matisyahu.

19            THE COURT:  And also in paragraph 43, it states that

20   the Congregation Bnei Matisyahu -- that the existence depends

21   on contribution from its members, the 30 to 40 folks you just

22   mentioned.

23            Does Bnei Matisyahu receive contributions from

24   individuals or entities that are not members of the

25   congregation?

 1              MR. MORRIS:  We asked him this question.

 2   Plaintiff Goldstein submits that, to his knowledge, Bnei

 3   Matisyahu does not receive contributions or donations from

 4   individuals or entities that are not members of the

 5   congregation.

 6              THE COURT:  Okay.  Does that include governmental

 7   entities?

 8              MR. MORRIS:  I believe so, your Honor.

 9              THE COURT:  Okay.  Again, if that requires

10   clarification in the supplemental declaration -- by "that" I

11   mean sort of any sort, whatever it may be, including COVID

12   relief funds, for example.

13              Now, are plaintiffs arguing that places of worship do

14   not have a right to exclude individuals who are carrying

15   firearms?

16              MR. MORRIS:  No, your Honor.  I conferred with them,

17   and under Penal Law Article 265, the place or worship is a

18   private entity which has the right to exclude guests from

19   carrying firearms.

20              But as the case of *Antonyuk*, 22 CV 00986, docket entry

21   27, a recent case, said, there are exceptions.  But it's

22   unheard of that the government would regulate private property

23   in this manner, private property owners.  So we're not saying

24   that.

25              THE COURT:  I guess I'm asking a little bit of a

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

 1    different question.  I'm not going about government regulations

 2    of that.

 3              I'm just asking, whether the plaintiffs are making the

 4    argument now or even intend to make it in the future, that they

 5    have a right to carry a firearm into a place or worship that

 6    may have a different view of allowing people to carry firearms

 7    in their place or worship.

 8              MR. BENNO:  Your Honor, no, they're not.  Obviously

 9    all places of worship are private.  There's establishment

10    clause issues if they were public.  Private entities can

11    exclude weapons possession.  They can set whatever terms that

12    they wish, as long as they're not discriminatory, to allow

13    people to come in or to exclude them from coming in.

14              And individuals have to abided by that.  Otherwise,

15    they'll be trespassing.  If they trespass, then they can avail

16    themselves of whatever criminal statutes exist to enforce the

17    trespassing laws.  So these lead to the private entities that

18    can decide for themselves.

19              THE COURT:  Just in connection with the plaintiffs'

20    attendance at other shuls and to the extent they carried

21    firearms to those other shuls, did those shuls either know they

22    were carrying a firearm or did they inquire about whether those

23    other shuls had any regulations on the folks bringing firearms

24    into the shul?

25              MR. MORRIS:  Your Honor is referring to prior to the

1   September 1, 2022, day.  Is that right?

2           THE COURT:  Yes.  But to the extent -- yes, because,

3   as I understand it -- again, I think after September 1, with

4   regard to places of worship and with regard to shuls, neither

5   defendant, as I understand it, carried their firearm.  In part

6   like Plaintiff Goldstein, as I understand it, could only carry

7   a firearm to Bnei Matisyahu.  But neither one carried a firearm

8   to other, as I understand it.  So, yes.  I'm referring to prior

9   to September 1.

10          MR. MORRIS:  So Plaintiff Ornstein carried without

11  restriction, your Honor.  My understanding is that it was

12  known.  One of the questions that your Honor asked was were

13  other members carrying.  It was known that persons carried.  I

14  assume there was an inquiry, but I don't have that information.

15          THE COURT:  Okay.

16          MR. MORRIS:  Again, your Honor, it skirts very close

17  to the Fifth Amendment rights of my clients, again because they

18  fear prosecution.  I would love to have a full, open record for

19  this Court.  If we could get a stipulation from defendants

20  today, I'd be glad to do that.

21          THE COURT:  Just to be clear, the question is, with

22  regard to prior to September 1, to the extent

23  Plaintiff Ornstein carried his weapon to other shuls or places

24  of worship, did those places of worship either know that he was

25  carrying a weapon and/or had he, prior to going, had he already

1    determined that they did not have restrictions on folks

2    carrying firearms into their place or worship?

3            MR. MORRIS:  I believe that was a discussion.  In

4    terms of the carry-on, it's prominent.  You could see the

5    attachment at one's hip of the firearm.  We could certainly

6    clarify, but I believe it was communicated and all knew that

7    the firearm was there.

8            Just to be clear, that was just Ornstein.  That's just

9    Ornstein because, again, Goldstein was limited to the premise

10   of Bnei Matisyahu.

11           MR. BENNO:  Your Honor, if I may.

12           THE COURT:  Yes.

13           MR. BENNO:  I believe the answer to that question is

14   in the declaration of Meir Ornstein in paragraph 6 where he

15   avers:  "Whenever I attended Zemach David, I carried my

16   concealed handgun."  If your question was limited to Zemach

17   David.  I don't know if your Honor was referring to other

18   places.

19           THE COURT:  No.  I actually was asking about other

20   places.

21           MR. BENNO:  Forgive me.  I misunderstood.

22           THE COURT:  That's okay.  Although I think I had

23   previously -- counsel, I think you're right.  I previously

24   asked that question.  Paragraph 6 does say that

25   Plaintiff Ornstein carried his handgun when he would go to

1   Zemach David prior to September 1 of 2022, each time he would

2   go.

3          All right.  So I think we've sort of dealt with 9A and

4   B.  And I think there is still some information that plaintiffs

5   need to round out to complete those answers.

6          I guess Plaintiff Goldstein, as I understand it, has

7   not because his carry permit was always limited to Bnei

8   Matisyahu.  So he did not carry his weapon, as I understand it.

9   But, again, you can clarify as needed.

10          Now, I think I know the answer to number 10 is --

11          So is the permit for Plaintiff Goldstein that he can

12   carry his gun, prior to September 1, 2022, when he's going to

13   and from Bnei Matisyahu?

14          In other words, I know he could carry in there.  I'm

15   assuming it also means to and from he could carry.

16          MR. MORRIS:  When he spoke to him, he says he only has

17   a premise license.  He's only allowed to carry the weapon at

18   Bnei Matisyahu.  Right now, he can't carry his gun at Bnei

19   Matisyahu, even if the building is empty.

20          THE COURT:  I don't know what the rules are in terms

21   of whether that means when he's transporting the weapon.  Let's

22   say he's in his car, whether he has to have it in a lockbox or

23   whether he can have it on his hip so to speak.  I don't know

24   what the limitations of that are.

25          MR. MORRIS:  Your Honor, it's a curious circumstance

 1    that unfortunately citizens of New York City have had to face

 2    for quite some time now.

 3              THE COURT:  I'm not sure exactly what you're saying.

 4              Are you saying that citizens of New York, that

 5    everybody can't get a permit?

 6              Is that what you're saying?

 7              MR. MORRIS:  The permitting in general, your Honor,

 8    the nest of regulations here that people are supposed to figure

 9    out and comply with here, your Honor.

10              THE COURT:  Okay.  You're here for the specific case

11    that you've brought.  To the extent you have some other agenda,

12    in other words, that's separate, and you'll bring other cases.

13              So I understand what you were saying, but I guess one

14    step at a time is what I would say.

15              I'm sorry.  Mr. Benno, did you have something?

16              MR. BENNO:  Yes, your Honor.  As far as that question

17    as to whether the law permits him, even though the license to

18    possess is only on the property of Bnei Matisyahu, whether he's

19    allowed to transport it and, therefore, go off the premises, we

20    can inquire about that and include that in a supplemental.

21              THE COURT:  That's fine.  I'm sure it's somewhere in

22    the regulations because I assume there are folks who have

23    licenses to go to ranges and targets and certain things.  They

24    probably know how they need to transport it.  That would be

25    fine.

1          So to question 11 for Plaintiff Ornstein, it sounds

2     like we have an answer to that, that prior to September 1,

3     2022, he would carry his gun whenever he would leave his home.

4     If there is some distinction, that's fine.  You can let me know

5     later on.

6          So what specific terms do plaintiffs allege are vague

7     in the statute at issue?

8          I say "statute at issue."  The plaintiffs, as I

9     understand it, it's really with regard to -- well, let me just

10    ask that.

11         What are the phrases or words that are at issue?

12         MR. BENNO:  Your Honor, boiled down, to Penal Law

13    265.01-e(2)(c), that specific statute, the vague wording are

14    "places of worship" or "religious observation."

15         So we submit that "places" modifies both the word

16    "worship" and "religious observation."  And they're separated

17    about a disjunctive, the "or."  So that phrase, in and of

18    itself, is, in total, ambiguous and, even broken down into its

19    constituent parts, doesn't give guidance.  "Places of worship"

20    is ambiguous and vague.  So is "places of worship."

21         THE COURT:  So let's take those one at a time, first

22    places of worship.

23         How is it that the terms "places of worship" are

24    vague?

25         MR. BENNO:  Well, as my co-counsel had mentioned

1   before, your Honor, a "place or worship" is, I would submit,

2   different than a "house of worship."  Somebody might understand

3   a "house of worship" could be -- the heartland would be a

4   synagogue, a church, a mosque.

5          A "place or worship" could be an office building.  It

6   could be if somebody is on the street with wearing a prayer

7   shawl walking to their synagogue.  There are any number of

8   places.

9          For instance, in the holidays that just passed, Jews

10  will congregate by a body water, oftentimes at a park and in a

11  public place to engage in a ceremony called Tashlich which is

12  the casting of breadcrumbs into the water symbolic of sins.

13  That is a place or worship.

14         There are any number events in the Jewish life cycle

15  and in the Jewish day where there are ritual observances that

16  would fall into the category "worship" that do not occur within

17  the four walls of a structure like a synagogue or a church.

18         THE COURT:  I think though, at least in my view, that

19  seems to be conflating places of worship with places of

20  religious observation.

21         This goes to the construction.  If you go to the

22  dictionary, we can look up "places of worship," and I think we

23  could find a definition of "places of worship."

24         Now, I haven't looked at the definition for "house of

25  worship."  You raised the issue.

1              How is "house of worship" in your argument, different

2       than a "place or worship"?  And have you compared what the

3       dictionary may say about each of those?

4              MR. BENNO:  I have not compared to the dictionary,

5       your Honor.  I would submit that a "house" would connote a

6       physical structure.  I would submit that a "place" is a much

7       broader definition than a "house," and the contours of that are

8       really undefined.

9              I do agree, to the extent we made this argument in our

10      papers, that the second half of the statute, "religious

11      observation," is exponentially more vague than "place or

12      worship."

13             But I don't concede that "place or worship" is

14      sufficiently defined to put people on notice of what is

15      encompassed by or to put those who enforce the law on notice of

16      when somebody traverses the law.

17             THE COURT:  Let me ask:  In connection with either

18      preparing your papers or in connection with preparing here, did

19      you look, either electronically or in hard copy, at

20      dictionaries to determine what the definition of "place or

21      worship" might be and what the definition of "house of worship"

22      might be?

23             MR. MORRIS:  Your Honor, I'm looking right now, with

24      the advent of technology.  According to Wikipedia, a "place of

25      worship" is:  "A 'place of worship' is a specifically designed

1    structure or space where individuals or a group of people, such

2    as a congregation, come to perform acts of devotion,

3    veneration, or religious study.  A building constructed or used

4    for this purpose is sometimes called a 'house of worship.'"

5              THE COURT:  Sometimes.

6              MR. MORRIS:  Sometimes.  Just the other week -- was it

7    the other week? -- we had Sukkot.

8              THE COURT:  That definition though seems to

9    communicate that it's sort of reverse of what you're arguing;

10   in other words, that "place of worship" is a structure like a

11   church, synagogue, mosque.  And then there is some subset that

12   is part of a "house of worship."

13             In other words, I don't know what that would

14   necessarily be.  Again, this is Wikipedia.  But I was thinking

15   more in terms of.

16             MR. BENNO:  *Webster's*.

17             THE COURT:  Ideally *Black's Law Dictionary* or

18   something like that.  Again, what I'm driving at is:  Are you

19   saying that I shouldn't apply the normal process of statutory

20   construction here?

21             MR. BENNO:  Your Honor, I think that "place of

22   worship," to answer the first part of your question, does go

23   well beyond the physical structure.

24             As my colleague was just saying, Sukkot is an example.

25   There was this structure, these huts, where Jews observe the

```
 1   holiday.  It's an outdoor hut where they have to be able to see
 2   the stars.  They pray in there.
 3         But I don't think that if we had a dictionary
 4   definition that they would define a Sukkot, which is the hut,
 5   as being a "house of worship," which is, if you even look at
 6   the -- well, that being said, I also mention where we have
 7   individuals assembling for prayer in office buildings, as they
 8   frequently do, that becomes a place of worship, a devotion.
 9   But it is not a synagogue.
10         So to answer the second part of your question --
11         THE COURT:  Is that a common use of the term?  I
12   understand that as a matter of argument, in particular where
13   someone is extremely devout, folks may pray and do religious
14   acts in various places and, therefore, wherever they are -- is
15   the argument, wherever they are, that's a place of worship?
16         If so, how is that different than -- I guess I come
17   back to the "house" versus "place."
18         Has there been a distinction in the law with regard to
19   "house of worship" versus "place of worship"?
20         MR. BENNO:  I don't recall researching that particular
21   issue, Judge.  So I don't the cases to be able to provide to
22   you that would say whether there is or there is not.  But I
23   would say that in this particular -- you asked about whether
24   you can apply traditional rules of statutory construction to
25   this.
```

1       And I would respectfully submit the answer is no

2  because -- we are somewhat I guess skipping now.  This is the

3  vagueness argument.  The standard here has to be "readily

4  susceptible."  The ambiguous wording has to be "readily

5  susceptible" to a narrowing construction that would make it

6  constitutional.

7       Here, it's a bit of a knot because there is no

8  construction of this statute that will ever make it

9  constitutional.  Even if you were to say that a "place of

10  worship" means what we all think of a "house of worship" being,

11  a church or a synagogue, a building, an edifice where prayer

12  occurs, that would not obviate the First Amendment problems

13  that we have with the statute.  Nor would it eliminate the

14  Second Amendment issues.  Nor would it eliminate the Fourteenth

15  equal protection issues.  So there is no narrowing

16  construction, even if you did apply this, that could in any way

17  save the statute.

18       That being said, the Supreme Court has been very clear

19  that where there is a disjunctive, the two terms are different.

20  So even if your Honor were to find that a "place of worship" is

21  a synagogue or a church and can interpret it that way, that

22  wouldn't save the second half of the statute.

23       THE COURT:  Are you saying that I can apply the

24  statutory construction rules but that, if I apply then, the

25  statute fails?

1           MR. BENNO:  No.

2           THE COURT:  Or are you just saying you don't even get

3    to statutory construction?

4           MR. BENNO:  I'm saying that -- well, thank you.  I

5    should have clarified this.

6           You can't apply statutory construction here for the

7    reason I just said, because there is no constitutional way to

8    interpret this statute.  So you don't have to construct it a

9    particular way at all.

10          But second, if you did apply that, you would be doing

11   exactly what the Supreme Court proscribed in *Virginia v.*

12   *American Booksellers* where it says that a court may not rewrite

13   a law to conform it to constitutional requirements.

14          So if there is some way to interpret this that you can

15   see that we don't -- I don't think there is one -- but you'd be

16   essentially rewriting a law, which would be legislation.  And

17   the Supreme Court has said no.

18          So you can't rewrite it.  You can't construe it in a

19   way that comports with the construction.  And I point out *Reno*

20   *v. ACLU* is very clear.  Where the wording is open-ended, as

21   this one is -- we've spent a few minutes now discussing all of

22   the different permutations of what a "place of" worship is and

23   whether it is the same as a "house of worship" and what is the

24   difference between that and a religious observation.  That

25   underscores and highlights the fact that this is ambiguous.

1          And the court in that case, in *Reno*, said that the

2    open-ended character of the statute that was being challenged

3    there provides no guidance whatsoever for limiting its

4    coverage.  The same is true here.  There is no guidance in the

5    statute as to what was intended by this.  The wording itself

6    sheds no light.

7          THE COURT:  Okay.  Let me ask:  In terms of the

8    argument plaintiffs are making, is the claim that if someone

9    prays in a location that's not a synagogue, that, wherever that

10   is, is a place of worship?

11         MR. BENNO:  That appears to be what they've written

12   into law.

13         THE COURT:  So if a student prays in school, that

14   becomes a place of worship?

15         MR. BENNO:  It does.  But the interesting thing with

16   that example, your Honor, is that they've chosen to include

17   schools in their list of sensitive places, separate and apart

18   from -- there is a separate category dedicated exclusively to

19   places of worship and religious observation.  It's not one set

20   of terms separated by commas in a serial set of terms.

21         So there is another exclusion for sensitive-place

22   designation for schools.  So nobody is allowed to bring a gun

23   under this statute into a school anyway, regardless of this.

24         But, yes, there is an overlap.  If you pray in a

25   school -- for instance, the *Bremerton* case where the coach took

a knee on the field of the football field after the game, most

certainly it's a place of worship and religious observation.

And as you correctly noted, it would present not only

the free exercise and the ambiguity issues under the Fourteenth

Amendment and Second Amendment issues, but it would present an

establishment clause violation as well.

THE COURT:  Let me ask.  So similarly, is the claim

also that every time someone prays in a place, it really

becomes a place of religious observation?

MR. BENNO:  How can it not?

THE COURT:  And so, in your argument, the two terms,

"place of religious observation" and a "place of worship," are

both ambiguous and would cover the same thing?  In terms of

outside a shul for example.

MR. BENNO:  I submit, your Honor, that we don't know

where those boundaries are, and nobody knows where those

boundaries are.  That is the problem.

But "worship" connotes -- maybe I'd have to resort to

the dictionary for this.  But I would think a common

understanding of "worship" is some sort of prayer activity.

By the way, *Employment Division v. Smith* specifically

says this.  The Supreme Court, religious exercise includes not

only actions such as wearing a kippah or wearing a tallit or

devotion or taking communion, to take it out of the Jewish

context, but abstentions as well.

1          If you refrain from eating certain dietary food, if

2     you refrain from taking certain modes of transportation, those

3     are the terms that *Smith* pointed-out.  That's religious

4     exercise.

5          I can't see a world where "religious exercise" is

6     different, because that was the phrase that they were

7     analyzing, is different than "religious observation."  So here,

8     there is an endless list of activities that fall under

9     "religious observations" that would not fall under the category

10    of "worship."

11         THE COURT:  Let me turn to the defendants.

12         How do you define a "place of religious observation"?

13         MR. CONRAD:  First off, I do want to briefly address

14    "place of worship."  We would ask if they were contending that

15    that is vague, and I think they said that they were.  I do want

16    to note that their papers don't seem to have made that

17    argument.  So I think their papers simply focuses on the

18    religious observation.  So I just want to point out that I

19    think that is not something that we heard before from them.

20         THE COURT:  Go ahead.

21         MR. CONRAD:  With respect to "religious observation,"

22    the two parts of this section here inform the other.  I think,

23    when you look at it, the core of section is clearly things like

24    synagogues and churches and places like that.

25         I don't think we need to reach edge cases here today,

 1   and I don't think the existence of edge cases renders a statute

 2   facially vague.  But I think it's enough to say that,

 3   for example, not every religion might use the term "place of

 4   worship."  You can think of places that might not strictly be

 5   places of worship but have the same character.

 6            THE COURT:  Let me ask, because if we're going to --

 7   first of all, is there an example of a religion -- again,

 8   because "place of worship" it's in a statute.  So it's a

 9   secular definition.

10            MR. CONRAD:  Yes.

11            THE COURT:  So I guess the first question I have,

12   because you had made the statement that there may be some

13   religions that don't refer to "place of worship."

14            Is there something that comes to mind?

15            MR. CONRAD:  I'm not an expert on any of these

16   religions but maybe something like a Christian Science reading

17   room or something like that or a monastery, something like

18   that, places where the term "worship" might not be perfect.

19            Your Honor, I would also want to note that under a

20   common sense reading here, we're not talking about someone's

21   house when they're observing Shabbat or on the street when

22   they're wearing religious garb.

23            I think, for the purposes of the vagueness analysis,

24   it's very clear what the law covers.  What the law doesn't

25   cover, the kind of things I just said, is also clear.  And the

```
 1   fact that there might be edge cases between that does not

 2   render the law facially vague.  It just means that at some

 3   point there might have to be "as applied" challenges.

 4        THE COURT:  What is the difference that the defendants

 5   would draw between a "place of worship" and a "place of

 6   religious observation"?

 7        MR. CONRAD:  Well, I don't know that, again, I can

 8   answer every edge case as we sit here today.

 9        THE COURT:  I'm not even talking about edge cases.

10   I'm saying:  What is, as part of the statute from the

11   defendants' view -- what is -- because they are, or are they

12   not separate terms in the statute?

13        MR. CONRAD:  They're separate, but I think one informs

14   the other.  And I think, again, maybe the best way to look at

15   it is that the "place of religious observation" is just meant

16   to fill in gaps where "place of worship" might not be the exact

17   term.

18        THE COURT:  Isn't that the problem?

19        In other words, you say "fill in gaps."  That's what

20   I'm trying to figure out, what are those gaps.  Let's tack a

21   step back.

22        In terms of "places of religious observation," in

23   connection with preparation of your papers, did you look in the

24   dictionary?  Or it's all Wikipedia?  Is that defined anywhere?

25        MR. CONRAD:  I haven't found much actually for the
```

1    term specifically "place of religious observation."  But,

2    again, I think it's supposed to refer to places of the same

3    character.  It's not supposed to refer to places like someone's

4    home or on the street.  And I think that's clear.

5            THE COURT:  Why is that clear?

6            MR. CONRAD:  As a matter of a common-sense reading, I

7    don't think that this is meant to cover someone's private house

8    when they're observing Shabbat or they're observing some other

9    kind of religious observation when they're in their house.

10            THE COURT:  The intention, I understand that.

11            Was there any discussion about what the difference

12   would be between a "place of worship" and a "place of religious

13   observation"?  Again, inside the legislature, outside the

14   legislature, whatever it may be.

15            MR. CONRAD:  In terms of the drafting of the

16   legislation and things like that, I'm sorry.  I don't

17   specifically know.

18            THE COURT:  And you mentioned that "places of

19   religious observation" would -- I think you said "fill in the

20   gaps" or something like that.

21            Do you have something in mind?  In other words, what

22   would that be?  You mentioned I guess other religions that

23   might not be defined, the Christian Science reading room or

24   something like that.

25            So wouldn't that cover, to the plaintiffs' point --

1            I apologize.  Was it the structure created on Sukkot?

2            MR. MORRIS:  Yes, your Honor.

3            THE COURT:  So wouldn't a "place of religious

4    observation" include that?

5            MR. CONRAD:  I'm not sure that can be answered in the

6    abstract without more facts about where it's located or

7    anything like that.  I think that might be the kind of case

8    that could be the subject of a future as-applied challenge but

9    not the case that we have here I don't think.

10           THE COURT:  You raised the Christian Science reading

11   room off the top of your head.  And I recognize that -- again,

12   I'm trying to, in my own mind, figure out what the distinction

13   is between the "place of worship" is and the "place of

14   religious observation."

15           I guess I sort of asked already.

16           Do you claim that a "place of religious observation"

17   has a common meaning?

18           MR. CONRAD:  I think it is just a question of common

19   sense.  I mean, again, I think you look at something like

20   someone's personal house, and that's not intended to be covered

21   by that.  I think that's just as a matter of common sense.

22           THE COURT:  You say "not intended."  So it's the

23   intention of the legislature or the executive that proposed the

24   legislation.

25           But what about the party, the public?  In other words,

1     in reading the statute and notice to the members of the public.

2            MR. CONRAD:  I've been saying "not intended."  I think

3     that also would include "not interpreted."  I think a

4     common-sense interpretation, there would be the same answer.

5            THE COURT:  Okay.

6            MR. CONRAD:  I also want to point out something I

7     noticed.  Apologies if I'm getting too far afield on the

8     vagueness issue here.  But even in the plaintiffs' reply

9     brief -- I think it's --

10           THE COURT:  Just take your time.  You can slow down.

11           MR. CONRAD:  In footnote 7 of the reply brief, it's a

12    quotation from a case.  But they are applying it to themselves.

13    They say:  "There is no question as to how the statute will be

14    applied."

15           So I think there is even some inconsistency from the

16    plaintiffs as to whether they are interpreting this as vague.

17           MR. BENNO:  May I respond to that briefly, Judge?

18           THE COURT:  Sure.

19           MR. BENNO:  Very briefly.  What we're getting at here

20    is that our clients will be arrested and prosecuted.  That's

21    what we mean.  There is no question that if they're in a Sukkot

22    or they're outside, whatever, they're going to be in violation

23    of this law, and they'll be arrested and prosecuted.  That's

24    the as-applied challenge.  It's not that we're saying that

25    there is an understanding as to what the parameters are of

 1    these terms.

 2            MR. MORRIS:  Your Honor, just to be clear, an edge

 3    case means my client gets arrested.  That gun is removed from

 4    him.  And it's the most debilitating process of which there is

 5    no coming back from.  It's irreparable.

 6            My colleague teaches at Touro Law.  I was lucky enough

 7    to go there.  If you go there on Sukkot, there will be a

 8    structure on the side of the building.  And inside the school,

 9    there is a shul, there is a Torah, and ten men congregate

10    what's called a minyan.

11            So the idea that one edge case or, if they decide to

12    arrest all ten of them, it will be an edge case, my client

13    should not have to suffer or even worry about such a thing that

14    would chill his First Amendment rights.

15            THE COURT:  Let me ask defendants a question which

16    relates.  I'm not sure if it's something I wrote down.

17            Do defendants have a current intention, in light of

18    the several cases, the case in the Northern District, the case

19    in the Western District, to enforce the section or the

20    subsection at issue in the case?

21            MR. CONRAD:  Your Honor, I don't think my clients are

22    the ones directly responsible for on-the-ground enforcement

23    decisions.  So I'm not sure I have an answer to that.

24            But I would just say that I think that it's fair to

25    presume that these laws will be enforced by reasonable people

```
1   in a reasonable way.

2              THE COURT:  You mean law enforcement.

3         So let me turn then to counsel for the city.

4         Is the NYPD going to be enforcing this particular

5   portion of the law?

6              MR. CIAPPETTA:  I'm not aware of any enforcement to

7   date, your Honor.  We are not taking the position that what's

8   happened in the other districts of the state prevent that

9   enforcement from happening.

10             THE COURT:  Okay.  In the briefing, there is an

11  argument that's made -- let me sort of flip it on the

12  plaintiffs -- to say they haven't shown that they are in danger

13  of being arrested for this.

14        But here, you've indicated that in terms of

15  enforcement, the NYPD -- it's like a statute on the books for

16  anything else; in other words, it will be enforced.

17             MR. CIAPPETTA:  I can't say it will be, but it may be

18  enforced.  We're not taking the position that the stay applies

19  to us and that we're staying ourselves for lack of a better

20  word.

21             THE COURT:  Okay.

22             MR. CIAPPETTA:  But I do want to note our argument was

23  a little different on that.  I think part of why we're saying

24  there is not a danger of enforcement action is because the

25  plaintiffs in their declarations -- at least one of them said
```

1     that because of the law, they are not carrying the firearm into

2     the shul.  So if they are not carrying the firearm into the

3     shul or elsewhere, there could be no enforcement action because

4     they haven't violated the law.

5            THE COURT:  I guess the issue, yes, because they're

6     trying to abide by the law.  If they did, they would be in

7     violation of law subject to arrest.

8            MR. CIAPPETTA:  Potentially, yes.  But there are

9     standing cases that say you have to -- and there have been

10    cases where they've been dismissed recently.

11           THE COURT:  That you have to be arrested?

12           MR. CIAPPETTA:  Well, that you have to state an

13    intention to engage in proscribed conduct.

14           THE COURT:  Let me ask the plaintiffs:  Do you know

15    whether your clients have an intention to, in essence, carry --

16    at some point in the future, in other words, let's say this

17    drags on for however long, do they have an intention to carry a

18    firearm into a place of worship, a shul?

19           MR. BENNO:  If I may, your Honor.  I'd first like to

20    say I think that --

21           THE COURT:  You don't believe that's the standard?

22           MR. BENNO:  No, because they are giving up -- there's

23    a tradeoff here:  They're carrying their firearm as they have a

24    constitutional right to do; they're giving up some religious

25    exercise.  If they're engaging in a religious exercise, they

 1    have to give up their firearm.

 2          There is a sacrifice there of changing their

 3    behaviors.  So there is standing.  There is a constitutional

 4    harm here where they say, I am going to go into a synagogue

 5    with my gun or not.

 6          THE COURT:  Let me ask Mr. Fischer a similar

 7    enforcement question in terms of the clients that you

 8    represent.

 9          MR. FISCHER:  Judge, to date, there has been no

10    enforcement in the county of Rockland.  I don't believe it's

11    been a conscious decision.  I just think no incidents touching

12    upon the statute have occurred.

13          Speaking to my clients right now, we're not taking any

14    position on the controversies of this case.  So I would imagine

15    there would be no enforcement until this Court decided the

16    ultimate issues, Judge.

17          THE COURT:  Okay.  I'll just ask, again, on that

18    narrow issue, if you could supplement the record to indicate

19    that the position that you've taken in your papers covers that

20    your clients will not be enforcing and what the parameters of

21    that is.

22          MR. CONRAD:  Your Honor, I don't know if you want to

23    save it for argument time or to address any other vagueness

24    issues from our perspective.

25          THE COURT:  Sure.  In a moment.  I just had a

 1    follow-up question for all parties.

 2          Is anyone aware of enforcement anywhere in the state

 3    of New York of this statute when it comes to places of worship

 4    or places of religious observation?

 5          First, the defendants.

 6          You have to answer out loud.

 7          MR. CONRAD:  I am not aware of any.

 8          MR. CIAPPETTA:  I'm not aware of any, your Honor.

 9          MR. FISCHER:  I'm not aware of any, your Honor.

10          THE COURT:  Plaintiffs?

11          MR. MORRIS:  Your Honor, the only thing I'm aware of

12    is the Western District of New York enjoining the statute.

13          THE COURT:  I don't know the answer to this.  But was

14    that in connection with an individual who had been arrested

15    after the enactment of the statute?

16          MR. BENNO:  It wasn't an arrest.  It was a

17    pre-enforcement challenge.  And the judge found on almost

18    identical circumstances.  They were not Jewish, those

19    plaintiffs.  They were pastors.

20          But they found that there is standing because,

21    specifically because, there is a credible threat of prosecution

22    because the law presumes that when there is a reason why at

23    least, on the books, a criminal law, that the state is going to

24    enforce it.

25          We've already gone through it in the papers.  So I'll

1    rely on those.  But there have been numerous statements by both

2    the governor, by the state police, that they intend to enforce

3    this law.

4         So, you know, I think the *Hardaway* case, which is the

5    Western District, goes into that in some detail.

6         MR. MORRIS:  Your Honor, we're not aware of a felony

7    prosecution, but that's what's at stake here.  It's a felony.

8         THE COURT:  Again, I'm just trying to understand where

9    things currently stand and whether or not there's been

10   enforcement to date.

11        MR. BENNO:  By the way, Judge, on that I would just

12   say that the *Babbitt* case, the Supreme Court from '79, we just

13   heard defense counsel say that -- they have not disavowed any

14   intention of enforcing this.  And that's the standard in the

15   Supreme Court.  If they haven't disavowed, then there's a

16   credible threat.

17        THE COURT:  Let me ask defendants this because the

18   argument is that plaintiffs haven't shown that they're in

19   danger of having this enforced against them.

20        Why isn't it sufficient that it's a statute that's on

21   the books, a criminal statute that's on the books, even if it

22   has not yet to be enforced?

23        Why isn't that sufficient for standing purposes?

24   Anybody.  Maybe it's for the city I guess.

25        MR. CIAPPETTA:  I mean, the case law seems to go

1   beyond that.  We cited to the recent *Frey* decision that is in

2   the Southern District as well.  It was involving a penal law

3   statute.  And there they said it just wasn't enough and

4   some-day intention is not enough to establish the intent part

5   of it.

6           Secondly, there has to be more.  It can't just be a

7   statute on the books.  It has to be that that person was either

8   enforced against previously or somebody specifically told that

9   person.

10          THE COURT:  What about a person who previously had

11  carried a firearm to a place of worship, to a shul, and has,

12  since the enactment of it, because they don't want to be

13  subject to arrest, stopped?

14          Why isn't that enough?

15          MR. CIAPPETTA:  I don't think it would be.

16          THE COURT:  But why?  In other words, specifically --

17  again, without getting into whether or not use of a firearm or

18  having a firearm is somehow tied to their religious

19  observation, if what they've stopped doing or they've least

20  curtailed in some degree, is going to the shul, which is what

21  the statute basically says it proscribes.

22          MR. CIAPPETTA:  Right.

23          THE COURT:  So why isn't that enough for standing

24  purposes?

25          MR. CIAPPETTA:  Also just to back up a little bit.

```
 1                  THE COURT:  Sure.

 2                  MR. CIAPPETTA:  We asserted a very limited standing

 3     argument.  We're not saying they don't have standing for any of

 4     their claims here.

 5                  We were asserting standing issues only with respect to

 6     the Second Amendment claim because on there, we feel that there

 7     is very solid case law, the Frey case and then the recent

 8     Second Circuit case.  I believe it's John Does 1 through 3 v.

 9     Suffolk County.

10                  So to my, in those particular areas, it's a very tough

11     test, and I think it requires a lot.  It's very demanding of

12     standing.

13                  THE COURT:  Okay.

14                  MR. CIAPETTA:  While it might make sense, the change

15     of behavior, from a layperson's perspective, the cases seem to

16     require more, at least with respect to the Second Amendment

17     argument.  We haven't asserted standing with respect to First

18     Amendment or equal protection or the other issues.

19                  THE COURT:  Let me ask question 15, just so we can get

20     through.

21                  Prior to September 1, did any members of Bnei

22     Matisyahu carry firearms, other than one of the plaintiffs?

23                  MR. MORRIS:  Plaintiff Goldstein says no, no one else

24     except for him.

25                  THE COURT:  Similarly, prior to September 1, 2022, is
```

1   any members of Congregation Zemach carry firearms into

2   Congregation Zemach?

3        MR. MORRIS:  Plaintiff Ornstein stated yes.  There are

4   other members who did.

5        THE COURT:  Do you have a sense of how many folks

6   we're talking about?  That's okay, because I didn't ask the

7   question.  If you could determine -- again, that is only

8   obviously within your clients', in the plaintiffs' knowledge,

9   of how many folks.

10        Also I don't think I asked.  How many members are

11   there of -- since Plaintiff Ornstein joined the congregation of

12   the Congregation Zemach, how many members are there of the

13   congregation?

14        You may not know that.  If you could just, again, in

15   the supplemental declaration, just include that, just so that I

16   have a sense of that.

17        Now let me ask:  Are plaintiffs arguing that the

18   carrying of a firearm is an integral part of the practice of

19   their religion?

20        MR. CIAPPETTA:  I'm sorry, your Honor, to interrupt.

21   I just wanted to -- I wasn't sure of the sequence of today's

22   argument.  We did have other points we would like to address on

23   vagueness.  I don't know if we'll be arguing separately after

24   the questions.

25        THE COURT:  I'll allow, after we finish the questions,

1    an open period.  In all likelihood, we'll probably take a break

2    in a few moments and then come back to complete the argument.

3              MR. CIAPPETTA:  Okay.  Thank you.

4              THE COURT:  With regard to the question, are the

5    plaintiffs arguing that a concealed carry -- that carrying a

6    firearm is an integral part of their religion?

7              Question 18.

8              MR. MORRIS:  Your Honor, after conferring with the

9    plaintiffs, we submit that Jews are not allowed to engage in

10   religious worship while carrying a firearm.  If you carry a

11   firearm, you cannot exercise your religion.

12             THE COURT:  So what happens when the plaintiffs carry

13   their firearms into the shul?  Do they have a lockbox that they

14   put the firearm in while they pray?  Before September 1 of

15   2022.

16             MR. MORRIS:  Your Honor, no.  They carried.

17   Unfortunately, the circumstances that gave rise to their

18   carries, they carried on them.

19             THE COURT:  I'm sorry.  Could you repeat what you said

20   then.  I think I misheard then.

21             MR. MORRIS:  So Jews are not allowed to engage in

22   religious worship while carrying a firearm at this point.

23             THE COURT:  At this point.  My question is though:

24   Let's say before September 1 of 2022.  It's also as a general

25   matter.

1          Is the carrying of a firearm somehow integral to their

2     practice of religious?

3          MR. BENNO:  Before September 1, 2022, your Honor, we

4     would submit that for our plaintiffs, yes, because the precepts

5     of the religion dictate that they have to -- they're obligated

6     in fact to -- protect life.  They're obligated to protect not

7     just their own lives but other peoples' lives.

8          And given the circumstances of the anti-Jewish hate

9     attacks, Zemach David shul is literally a stone's throw away

10    from the Chabad house where a madman went in with a knife and

11    killed the rabbi and stabbed other people a couple years ago.

12         Yes.  So this is a community that's been targeted.  So

13    for them to protect life, that is a religious obligation on

14    them.  So to the extent that, yes, carrying a gun advances that

15    religious obligation, it is part and parcel of their religious

16    practice.

17         THE COURT:  As a general tenant of many religions,

18    there is this idea that you are to protect life.  That means,

19    everybody, everybody should be able to carry a gun.  Right?

20         MR. BENNO:  I'm not a Rabbinic scholar on that, your

21    Honor.  It is certainly not something sacramental, if that's

22    your question, is it on the same level.

23         THE COURT:  It is.  So let's take it a step back from

24    the self-protection or protecting others.  And I understand

25    that tenant.

```
1              But is it part -- as you said, part of the religion.
2              MR. BENNO:  If the question is:  Is it part of the
3    sacrament, is it part of the liturgy, is it part of that, then
4    the answer is no, it is not.  But we submit that it does
5    further the broader objectives and tenants of the religion.
6    Either way, the fact is they can't practice their faith while
7    armed now.
8              MR. MORRIS:  Your Honor, just to add to that --
9              THE COURT:  But they have.  They both have.
10             MR. BENNO:  Perhaps at risk of being arrested and
11   prosecuted.  But after September 1, 2022 --
12             THE COURT:  No.  After September 1, 2022, my
13   understanding is both plaintiffs have attended shul without
14   their firearms.
15             MR. BENNO:  Right.  What my statement was -- maybe I
16   didn't articulate it clearly.  It was they are not allowed to
17   practice their faith while armed.  So they have to be disarmed
18   in order to do it.  So that is a free exercise violation.
19             THE COURT:  Okay.
20             MR. MORRIS:  And, your Honor, I interject.  Since
21   your Honor -- and thank you for the opportunity to evaluate
22   this.  There is actually a rabbi in the audience now.
23             I conferred with the rabbi about this, and he does
24   have some legal background.
25             THE COURT:  What does that mean?
```

1          MR. MORRIS:  He does have some legal background.  I

2     believe he's pending admission to the bar.

3          THE COURT:  I see.  Okay.

4          MR. MORRIS:  Religious Jews are obligated to protect

5     life in a different manner than we would ordinarily assume.

6     The duty is different.  For instance, a lifeguard has a duty to

7     rescue someone who is drowning in the water.  But a passerby, a

8     Jew, has an obligation to protect life even without that duty.

9     Arguably, in our civil law, we could watch that person drown if

10    we're not the lifeguard.  A religious Jew doesn't have that

11    opportunity.

12         We have several examples of the hatzalah and other

13    services that are required to be rendered if you are a

14    religious Jew.  And there are varying degrees, and there are

15    different types of Jews that essentially are allowed and are

16    not allowed to perform certain services.

17         But I think what my colleague is getting at -- and

18    after a debate that could probably go on for several days

19    amongst Jewish scholars, I think the consensus is clear that,

20    yes.  This carrying is required to fulfill some of these

21    duties.

22         THE COURT:  Do the duties that you're describing, in

23    terms of what you're saying, do they extend to all persons, not

24    just folks who are of the Jewish faith?

25         MR. MORRIS:  I believe -- to use the drowning example,

1   I don't think a Jew, a devout Jew, could watch somebody drown.

2   No.  It would be volitive of their religion.

3          THE COURT:  So for lack of a better term, if someone

4   is in need or in danger, the obligation -- again, I understand

5   the spectrum of what we're talking about.  You say devout Jews.

6          If you could provide a more specific definition of

7   that, in other words, there are folks who are reformed,

8   conservative, orthodox.

9          I guess what I'm trying to figure out is:  Is that a

10  general tenant of Judaism?  In other words, it may be a general

11  tenant but that certain folks who practice Judaism don't

12  necessarily adhere or subscribe to this general idea.

13         I'm just trying to figure out exactly what that, from

14  a definitional standpoint, what we're talking about here.

15         Or is it easier just to say people in plaintiffs'

16  position?

17         MR. MORRIS:  Your Honor beat me to the punch.

18  Certainly orthodox.  But there are likely more.  I would defer.

19  There is a rabbi 10 feet behind me.  So I would defer to him.

20  Perhaps after, I could provide more of a concrete example.

21         But, for example, hatzalah was the example we spoke

22  about yesterday.  And in Boro Park, Brooklyn, not far from

23  here, they are required to respond.  And their first responder

24  times are between one and two minutes, because not only they're

25  so effective, but because it's a duty.  They are duty bound to

1    do this.

2          THE COURT:  Let me ask, in terms of this, just a

3    followup to this, and then we'll take a quick break, which is

4    the integral part of the practice of their religion.

5          With regard to the *Roman Catholic Diocese of Brooklyn*

6    *v. Cuomo*, is there an argument -- or are you making an

7    argument? -- that the carrying of -- that in terms of important

8    religious traditions in the orthodox Jewish faith, that

9    carrying a gun is akin to sort of the communion that was argued

10   in the *Roman Catholic Diocese of Brooklyn* case?

11         MR. MORRIS:  So I believe the quote your Honor is

12   referring to is the one about remote viewing not being the same

13   as communion.  And there are important religious traditions in

14   the orthodox Jewish faith that require personal attendance.

15         THE COURT:  And I should point out -- and it may not

16   be -- in my experience, it may be somewhat different.

17         I know that sacraments can be delivered, certainly to

18   an Episcopal religion, to individuals who are unable to make it

19   to a house of worship, to a church.  That can be done in

20   someone's home.

21         I don't know whether that was considered in the

22   *Roman Catholic Diocese of Brooklyn v. Cuomo*.  I don't know.

23   Quite frankly, I would imagine.  Although I don't know, whether

24   in Catholicism, that is something that is permitted.  That's

25   not the case obviously in front of me.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          But I think as a factual matter, at least with regard

2     to communion, that in some aspects of Christianity, it does

3     happen outside.  It may be that within the canons of a

4     particular religion, that there is that protection for when

5     sacraments can be delivered.

6          My question is a little bit different here.  It is

7     whether with the plaintiffs are arguing that the canon

8     regarding this is sort of akin to the taking of communion that

9     was at issue in the *Roman Catholic Diocese of Brooklyn* case.

10          MR. MORRIS:  Your Honor, I believe the concept is in

11    tandem because the Catholics in this case were compared to the

12    orthodox Jews in this case.  So I believe what your Honor is

13    asking -- and the answer, I hope -- is that it is not a

14    religious right, the carrying of a firearm.

15          THE COURT:  It's now a little after noon.  We've been

16    going for two hours.  I do have some more questions to get

17    through.  And then I'll allow the parties to end their

18    discussion.

19          But I'm going to pick up the pace I think for the

20    latter part of our discussion.  So why don't we come back in

21    about ten minutes, and then we'll continue the argument.

22          MR. MORRIS:  Thank you, your Honor.

23          MR. BENNO:  Thank you, Judge.

24          (Recess)

25          THE COURT:  Question 20 relates to the city defendants

1    stated that there may be individuals that are fearful of going

2    to their houses of worship because they're fearful of attending

3    service where any person is permitted to carry a firearm.

4        So if feeling safe is the litmus test for barriers to

5    practice religion, is allowing someone to carry a concealed

6    weapon in church potentially violative of other folks' rights

7    in that church.

8        I think this has sort of been answered.  It will be

9    answered by the question I had about the ability, whether the

10   plaintiffs were arguing that they should be permitted to carry

11   firearms into places of worship, even if those places of

12   worship, the private places of worship, basically don't allow

13   that or prohibit that.

14       But let me hear.  I think that what I heard was that

15   you're not making the argument that the plaintiffs -- the

16   plaintiffs are not making the argument they should be permitted

17   to do that.

18       MR. BENNO:  Correct, your Honor.  Churches,

19   synagogues, mosques -- they are free to set whatever rules they

20   wish.  Again, I would just point out that that argument, by the

21   way, was not moored to any data, statistics.  It was pure

22   speculation.

23       THE COURT:  I'm not sure what sort of data or

24   statistics.

25       What sort of data did you have in mind?

 1              MR. BENNO:  They're saying that people might be afraid

 2      of going to a synagogue because they know that somebody is

 3      carrying a gun there is speculative.

 4              If they had some sort of data, however they compiled

 5      the data, of people saying, I don't go to a house of worship if

 6      there is a congregant with a gun because that makes me fearful,

 7      that would one thing.

 8              We would still push back on it I'm sure.  But that

 9      would still be grounded in some data.  This is maybe just some

10      hypothetical situation where somebody is feeling scared.  It's

11      not real.

12              What is real is our clients' declaration when they say

13      that the people who attend Bnei Matisyahu and Zemach David feel

14      more safe knowing that people are carrying a concealed weapon

15      and that encourages them to participate in religious life.

16              THE COURT:  But there are shuls and synagogues that

17      don't allow firearms into the shul or synagogue.

18              Is that right?

19              MR. BENNO:  A hundred percent right.  If somebody in

20      the congregation doesn't like that their particular synagogue

21      has that rule, they're free to go to another synagogue that has

22      a different rule.  But that's I guess the beauty of the

23      marketplace of religious houses of worship.

24              THE COURT:  Let me ask:  With regard to either of the

25      congregations, have they ever had either -- had they ever

 1    employed armed guards at any point in time?

 2            MR. BENNO:  Well, I know that at least with Bnei

 3    Matisyahu, I believe, your Honor, they have not because they

 4    don't have the financial resources to do that.

 5            THE COURT:  Again, in the supplemental declaration,

 6    let me ask you to just confirm that.

 7            With regard to Plaintiff Ornstein, do you know

 8    whether -- is it Congregation Zemach? -- whether they had armed

 9    guards?

10            MR. BENNO:  Other than the congregants you're saying.

11            THE COURT:  Yes.  Other than the congregants.

12            MR. BENNO:  You mean a contracted company or

13    something.

14            THE COURT:  Something like that, yes.

15            MR. BENNO:  I don't know the answer to that, Judge.

16            THE COURT:  And similarly -- and there are times when

17    certain places of worship in the city have members of the

18    police who are stationed outside.

19            I don't know whether -- I assume some of that is the

20    police department's decision -- but I don't know -- as opposed

21    to they're hiring NYPD folks to guard it.

22            Do you know whether at any point in time either

23    congregation have had a police presence, putting aside separate

24    contractors?

25            MR. BENNO:  I haven't presented that question to

64

1    either of the plaintiffs.

2         THE COURT:  Okay.  If you could.  I was just curious.

3    It just came to mind.

4         Question 21 talks in terms of the *Bruen* case and

5    specifically I guess the quote that I think sets the standard

6    that the *Bruen* case had set forth.

7         Let me ask.  And this is a question I think for

8    probably both parties.

9         Do you view the historical tradition of firearm

10   regulations as referred to in Bruen as static?

11        Or is it something that changes and evolves over time?

12   First I'll ask the plaintiffs that question.

13        MR. BENNO:  So the understanding of the scope of the

14   Second Amendment is pegged to 1791.  *Bruen* makes that clear.

15   *Caetano* makes that clear.

16        THE COURT:  Just 1791?  Whatever was there?

17        MR. BENNO:  Maybe give or take a window of time on

18   either side of the year, around the time of the ratification in

19   the founding era.  They've been clear.  The Supreme Court has

20   explicitly stated in all three cases that have dealt with what

21   the scope is -- and that's *Heller*, *Caetano*, and *Bruen* -- they

22   have said that.  They have said that.  So now we know what the

23   scope is of the Second Amendment.

24        If there is going to be a legislative tearing back of

25   the right, the Second Amendment right -- just to give a

1    hypothetical, say, somebody who is a convicted felon or

2    somebody who has psychiatric issues who is no longer allowed to

3    possess a weapon -- that's a legislative enactment that scales

4    back the scope of the Second Amendment.

5           In order to determine whether or not the legislature

6    acted within its powers to do that and that's constitutional or

7    not, then we look to history and tradition.  This is what *Bruen*

8    has articulated.

9           *Bruen* says that you "look to history and tradition in

10   the colonial and founding era," and they've pegged it to the

11   1791 era.  "To the extent we look at the 19th century -" there

12   will be times they look to the 19th century "-- it is never to

13   overrule the founding era understanding.  It is only used --"

14   this is the word of Justice Thomas in the majority of *Bruen* --

15   "is to confirm," "to confirm the understanding, as it was, at

16   the founding era.  If there is a complete tension between

17   them --" so in 1868, when the Fourteenth Amendment was

18   ratified, somehow there is a completely different hypothetical,

19   a different understanding, than there was in 1791 "-- then 1791

20   governs."  But they do look -- it confirms to determine whether

21   there is a historical tradition, but there has to be a

22   confirmation.  So they never say we don't look to the 19th

23   century.  But the operative, concrete, theory is going to be

24   upon ratification.

25           THE COURT:  I'm curious.  This is a sort of an aside

1    because there were a lot of folks in 1791 and otherwise that

2    the Second Amendment didn't apply to that were in this country.

3         We don't need to go down that aside.  I think what

4    bears out is somewhat of a -- and I guess maybe intellectually

5    or as a legal matter, they would say that later on, the Second

6    Amendment was broadened to allow people of color and other

7    folks to be able to have firearms.  But certainly it wasn't

8    rooted in this notion that everybody could have a firearm.

9         That was really the idea of whether it's static or

10   whether it's something you look at.  And you said "era."  And

11   the Supreme Court itself in *Bruen* looked beyond just that

12   timeframe.

13        Maybe it's setting up how to view the Second

14   Amendment.  Because I note that there is sort of a disagreement

15   between the parties about what timeframe do you look at.  The

16   way I look at it is that each party is viewing the timeframe

17   depending upon what was occurring at that time that's

18   advantageous to their particular argument.

19        Let me ask this because, whether it's statutes that

20   require people to have guns in places of worship or whether

21   it's statutes and legislation that restricts firearms, in both

22   circumstances, isn't that a recognition that there is a place

23   for the government to regulate firearms in places of worship?

24        MR. BENNO:  No.  Again, it's because the understanding

25   of the scope is going to be -- I used 1791.  Understand that

1    I'm not saying rigidly that year from January to December, but

2    I'm saying in that general timeframe.  It understood that it

3    applied to everybody.

4            By the way, to your point, because you mentioned it,

5    the Fourteenth Amendment, one of the moving forces and reasons

6    why it was ratified, was in order to ensure that freed slaves

7    did get the right to all of their Bill of Rights, including the

8    Second Amendment, so that their Second Amendment rights would

9    not be taken away.  That's one of the driving forces behind it.

10           You did ask a question in your order about who it

11   encompasses, and *Heller* answers that question very clearly.  It

12   says that:  "People -- " as understood in the Second

13   Amendment's wording "-- refers to all Americans.  I'm reading

14   from *Heller*.  It refers to "a class of persons who are part of

15   a national community or who have otherwise developed sufficient

16   connection with this country to be considered part of that

17   community."  That's what *Heller* determined it to be.  Our

18   plaintiffs fit into that very comfortably.

19           But to answer your question, it is the defendants'

20   burden -- and this is *Bruen*.  They made it very clear about

21   this.  It is their burden to prove that there is a historical

22   tradition to impose a restriction on the Second Amendment.  It

23   is not the plaintiffs' burden to show anything.  They haven't

24   met their burden.  Prima facia they haven't met their burden.

25           THE COURT:  I guess my question is a little bit

1    different.  It's one thing to say that the Second Amendment

2    allows folks to care weapons into places of worship.  It's

3    another thing -- because the statutes that I think you cite in

4    the plaintiffs' papers are basically saying people are required

5    by statute to carry it.

6            Doesn't the very fact that the executive branch

7    basically felt that they had the power to basically require

8    that, that they're advancing, in the tradition of the

9    government, regulating firearms in places of worship?

10           MR. BENNO:  No.  Again, I think, to the extent that

11   those statutes are raised, it's to show that there is not a

12   tradition of restricting firearms in places of worship.

13           I will point that to the extent that -- I don't want

14   to jump the gun, but I think it's going to -- that the

15   defendants collectively have listed a variety of municipal

16   county ordinances or some state statutes or maybe a case here

17   or there -- first of all, the paucity of cases, when you think

18   about, at the time that they're looking and the reconstruction,

19   37/38 states -- I don't know how many cities and towns and

20   counties.  But they denominator gets large and their numerator

21   is very small.

22           And *Bruen* was very clear that this kind of -- I think

23   the *Hardaway* case called it "spasmodic" instances here and

24   there.  There is a case that says you have to -- you're

25   prohibited from carrying in church doesn't establish a national

1    tradition.

2         But even the cases and laws that they do cite don't

3    apply to create a historical tradition in our country for a

4    variety of reasons:  First, they applied to confederate states

5    and territories, and the southern states were trying to take

6    guns away and rights away from freed slaves.

7         And the reason the Second Amendment was under martial

8    law was that they were trying to take guns away from everybody

9    so they couldn't subjugate the freed African-Americans.  That

10   was the reason for it.  It was a unique circumstance in that

11   era in our nation's history.  It doesn't establish a national

12   tradition.

13        THE COURT:  But the second was created at a time --

14        Do you think the folks who wrote the Second Amendment,

15   would you say that they intended to have, whether folks who

16   were enslaved or folks who were freed, to have guns?

17        MR. BENNO:  Well, their intent is beside the point

18   because the Supreme Court has been clear that the scope of the

19   Second Amendment applies to everybody.

20        THE COURT:  Again, it's sort of a deeper -- and I

21   recognize what the Supreme Court has said -- a deeper concern

22   that somehow the talisman is looking at historically what was

23   going on back at a time when many people, not only people of

24   color, but people who were Jewish and people of other stripes,

25   didn't have those rights.  Women also didn't have those rights.

1            That's just rhetorical.  I just am questioning

2    necessarily how -- I think there may be a limited utility to

3    looking at that.  I recognize the Supreme Court has directed

4    that that's where you look.  And obviously I will do so in

5    connection with this case.

6            I just think when both sides are able to point me to

7    flip sides of the coin basically, I'm not sure how necessarily

8    helpful it will be at the end of the day.

9            I'm sorry.  Go ahead.

10           MR. BENNO:  I will point because you mentioned

11   suffrage.  The Fourteenth Amendment obviously and beyond, the

12   Nineteenth Amendment for suffrage and the Fifteenth Amendment,

13   those are going to be evaluated at the time of the

14   ratification.

15           But the Bill of Rights, every single time the

16   Supreme Court has determined the scope of the Bill of Rights --

17   the First Amendment, now the Second Amendment, the Fourth

18   Amendment, the Fifth Amendment, the Sixth Amendment, the Eighth

19   Amendment -- all of those, the Seventh Amendment not because it

20   applies to federal.  But all of them the court has said, we've

21   determined the scope of, the boundaries of, that right as of

22   the time of the ratification of the Constitution.

23           And the Supreme Court has been clear.  The Second

24   Amendment is not a second-class right.  It is on the same level

25   as the First Amendment and all of the others I just listed.

 1          So if they are pegged, as the Supreme Court has been

 2   clear and as Justice Thomas listed in *Bruen* -- he cited to

 3   these cases.  The Fourth Amendment clearly didn't apply to

 4   slaves.

 5          But now the Supreme Court has been very clear that the

 6   understanding of it applies back in 1791.  So too the

 7   understanding applies to the Second Amendment for the scope in

 8   1791.

 9          And I don't agree with the premise, your Honor,

10   respectfully, that it's two sides of the coin because we have

11   shown that there are statutes that compel bringing guns to

12   church.  And the reason we said is very clear.  Those

13   worshipers felt imperiled by, whether it was --

14          THE COURT:  By black people.

15          MR. BENNO:  Perhaps.  Perhaps also by native tribes.

16   There is a variety of reasons.  It is not just though.  But

17   today, our clients --

18          THE COURT:  But it wasn't because -- it wasn't

19   necessary to practice their religion.  In other words, the

20   reason why they had guns and they were directing men to bring

21   their guns was in case -- again, whether it's native Americans

22   or those that they feared at the time, whether they be freed or

23   enslaved folks, that's why they had their guns, not because of

24   their religion.

25          MR. BENNO:  Correct.  They're not saying that the guns

1    were a part of their religion.  I agree with you on that, your

2    Honor.

3          But I will also say that there is no regulation of

4    guns in a place of worship.  The regulation, what they're

5    talking about in *Bruen* about history and tradition are

6    restrictions on the Second Amendment.  A restriction is taking

7    away, a prohibition, not saying you must exercise your right.

8    You must bear arms.  That's a mandate.

9          What history and tradition and *Bruen* is talking

10   about --

11         THE COURT:  You're saying that the statutes that they

12   passed requiring -- so on the one hand, you're saying I guess

13   that the Second Amendment, just as written, doesn't require

14   people to bring guns.

15         But the government -- you're saying that when they

16   legislated that, that you must bring a gun -- that, in other

17   words, it was just a direction that if someone didn't bring a

18   gun, they could be --

19         MR. BENNO:  It was a recognition that there is no

20   barrier, there is no prohibition, on having a gun in a church.

21   So they're telling you, you must bring it for the collective

22   security of the community.

23         If there had been an understanding that churches were

24   sensitive places, then they would never have been able to do

25   that.

1          THE COURT:  Wait.  Wait.  Wait.  First of all, the

2    "sensitive places" is a term of art that has come up more

3    recently.

4          MR. BENNO:  Yes.

5          THE COURT:  But since you mentioned, why isn't a place

6    of worship a sensitive place?

7          MR. BENNO:  First of all, again, to show that

8    something is a sensitive place, we get back to *Bruen*.  There's

9    a roadmap in *Bruen*, and it says that we start with the

10   presumption.

11         If our clients fall within the text of the Second

12   Amendment, then it's unqualified command.  They are protected.

13   That's what we start with.  And I don't think that any of the

14   defendants dispute that.

15         And then the burden shifts to the defendants to show

16   that a restriction is consistent with our nation's history and

17   tradition.  That's the formulation.  So what I am submitting on

18   behalf of my clients is that the defendants have not shown

19   that.

20         THE COURT:  Let me ask:  In terms of "sensitive

21   places," how is a polling place, a school, the places listed I

22   think by the "such as" I think listed by Justice Kavanaugh, how

23   are places of worship different than the places that are

24   enumerated in *Bruen*?

25         MR. BENNO:  Well, so, a few different reasons.  I go

1   through them in my reply and in my primary, in my principal,

2   memo.

3           First, the First Amendment specifically explicitly

4   protects the exercise of religion.  So it sets religious

5   locations apart from polling places, legislative assemblies,

6   courthouses.  *Bruen* listed those --

7           THE COURT:  I'm sorry.  You listed polling places.

8   The right to vote is part and parcel.  Right?

9           Isn't that part of the Constitution also?

10          MR. BENNO:  It is.  The thing with the polling

11  places -- but I'm talking about the free-exercise clause.  So

12  when I was talking about the First Amendment, that's what I was

13  referring to.

14          As I put into my reply, what seems to be the common

15  denominator -- we're moving away from -- and I'm happy to do

16  so.  But we're moving away from the defendants' litany of cases

17  that I showed how they don't apply.  So I'll be happy to get

18  back to you if you wish.

19          THE COURT:  Right now I'm turning to, as I understand

20  your argument then, that a place of worship is not a

21  sensitive -- and I apologize -- is not considered --

22          MR. BENNO:  A sensitive place.  That's right.  The

23  reason is -- and the only thing that the defendants argue is --

24  well, it's a place of congregation.  That is not -- *Bruen* is,

25  again, explicit.

 1          Merely being a place of congregation does not qualify
 2     you under the label "sensitive place."  So what we've seen is
 3     schools, places where minors are, like a K-through-12 school,
 4     kindergarten through 12 school.
 5          THE COURT:  So a college would not be considered a
 6     sensitive place under your theory?
 7          MR. BENNO:  I'm saying this is actually coming from
 8     legal scholarship.  I cited it in my reply memo.  This is what
 9     these academics have determined, and they said K through 12.  I
10     don't take a position as to whether or not colleges are or not.
11          But "if their location is one that concentrates
12     adversarial conflict and can generate passionately angry
13     emotions," and that's where they point out polling places.  We
14     just need at look at today and see how people are so passionate
15     on whatever side of the aisle they are.
16          THE COURT:  All right.  People are also passionate
17     about their religion.
18          MR. BENNO:  But religious places also, courthouses.
19     In fact, the city points out that places where religion is
20     exercised, synagogues, are places of peace and tranquility and
21     sanctuary, not places of conflict or where conflict can erupt.
22          THE COURT:  I actually take issue with this argument
23     that polling places are places of conflict.  There are polling
24     places that have been regulated and you can't electioneer
25     within a certain distance.

1        But it's certainly not the tradition of this country

2   that that is the case.  In other words, that what is written

3   into the Constitution is that people have a right to the

4   franchise and they can exercise that franchise.  So this notion

5   or this ingrafting I think of this idea of conflict is

6   something that I think isn't part of the tradition of this

7   country.

8        So is that what you think Justice Kavanaugh meant when

9   he said "polling places" and that's why?

10        MR. BENNO:  No.  Again, the sensitive location, when

11   they talk about polling places, goes back to 1791, not

12   contemporary.  And in 1791, what they were talking about, were

13   there were laws that forbid the mustering of militias in close

14   proximity to the polling place because it would either

15   intimidate people from voting or it would make people fearful;

16   that if they voted a particular way, that they would be

17   reprisals.

18        So there were laws that limited back then, in 1791 and

19   before, that stopped militias on election day and in the

20   location of the polling place.  So they said there is a

21   historical tradition.

22        I'm only saying what one academic is trying to find

23   the common theme between the places that Justice Kavanaugh

24   listed, and this is what that particular journal article is

25   saying.

1          So I'm trying to explain to you why, when you asked

2    about the First Amendment and how people exercised their

3    rights, how it's different from a church.

4          THE COURT:  So in terms of sensitive places, is the

5    reading of "sensitive places" that you believe -- again, that

6    it's a sensitive place and it's only in reference to the 1791

7    era?

8          In other words, if it wasn't something that at that

9    time there hadn't been regulation relating to it, then it

10   cannot be considered a sensitive place now?

11         MR. BENNO:  It has to be consistent with what was an

12   area where the Second Amendment was regulated in an analogous

13   fashion at the time of the founding.  And if we can find

14   confirmation in the later part of the 19th century, then, sure.

15   We can look to those for confirmation.  But they're not

16   primary.

17         I would also just point out, Judge, the journal

18   article says the other place that is deemed sensitive are

19   government buildings containing officials who are at risk of

20   assassination.

21         In all of these places -- the schools, the polling

22   places, the courthouses, the legislatures, the government

23   buildings -- those are all civic- and government-run

24   establishments.

25         The very important distinction between a synagogue and

1     a church is that it is a private location.  So therefore it

2     unequivocally falls outside of those categories.

3            THE COURT:  Okay.  So a place like let's say a nursing

4     home, that wouldn't be a sensitive place?

5            MR. BENNO:  Again, that's not this case, Judge.

6            THE COURT:  I'm asking in terms of -- I recognize it's

7     not this case.  I'm just trying to figure out the parameters.

8            So any place -- I guess what you're saying is any

9     place that wasn't considered or for which there hadn't been a

10    regulation relating to the Second Amendment back in 1791 cannot

11    be considered a sensitive place based upon how you read *Bruen*.

12           MR. BENNO:  Nursing homes, by the way -- I didn't even

13    look at that.  Maybe there are regulations on hospitals or on

14    places for the infirmed or some sanitariums where a court would

15    say there is an analogy to be drawn there.

16           But we didn't look at that obviously.  We're focused

17    on places of worship.  What I can say also -- I don't want to

18    forget to mention this -- to the extent we've been talking

19    about churches and synagogues and places of worship, there is

20    undeniably -- and the defendants make no effort to argue

21    against this in any of their papers.

22           There is no regulation at any point in time in our

23    nation's history restricting weapons possession, gun

24    possession, the Second Amendment, and places of religious

25    observation.  I think that is a very important point to make.

1            MR. MORRIS:  Judge, just to add, Judge Sinatra in the

2    western district of New York at page 12 of his decision -- I

3    quote him:  "For all of history until now, the right to carry

4    for self-defense encompassed New York places of worship."  A

5    determination has been made in this regard but not in the

6    First Amendment regard.

7            MR. BENNO:  Just to finalize it, even if your Honor

8    were to look and say, well, history and tradition -- you

9    actually started out by saying is it static.  I would just come

10   back to that and say, well, even if your Honor were to

11   determine -- I think it would be incorrect.  But you can look

12   at 1868, an era around the ratification of the Fourteenth

13   Amendment, for history and tradition.

14            It's unnecessary to do it in this case because the

15   cases and the statutes that they have provided, all of the

16   defendants, are all so distinguishable.  They didn't, by the

17   way, prohibit -- maybe one or two prohibited guns in a church

18   the way that this statute does.

19            But some of them you are prohibited from caring a gun

20   in a church if there is an assembly in the church, not a

21   categorical ban.  If our plaintiffs are alone in their

22   synagogues with their gun, they violated the law.

23            Some of the statute says you are allowed to publicly

24   carry but not concealed carry because, back then, what was the

25   concern was concealed carry.  But open carry was not a problem.

1      So they didn't forbid guns in the church if it was

2  open.  And yet other ones say you are forbidden from carrying a

3  gun in a church if you are doing so to terrify the parishioners

4  who are there.

5      So there are all these caveats in the statutes that

6  they have that don't exist with the New York statute and that

7  present them as non-analogous to this particular statute.

8      THE COURT:  All right.  Let me ask the defendants:  In

9  connection with "sensitive places," how do you define the

10  parameters of a "sensitive place" as that term is used in

11  *Bruen*?

12      MR. CONRAD:  Well, I think part of the problem here is

13  that under plaintiffs' reading of *Bruen*, it sounds like the

14  only sensitive space restrictions that would ever be permitted

15  are those specifically mentioned in that case, so basically, I

16  guess, just schools and government facilities.

17      I don't think that can possibly make sense as an

18  initial matter.  If the only permissible sensitive locations

19  were those that were explicitly mentioned in *Bruen*, then why

20  would *Bruen* not just have said that.

21      THE COURT:  Let's start from the premise that that's

22  not the case.  In other words, I'm not sure, but I think it was

23  listed as a "such as."

24      So why, in your view, should places of worship be

25  considered part of that?

1          MR. CONRAD:  Well, in the terms of *Bruen*, I think

2    because it's clear that there is a deep historical tradition of

3    considering religious facilities to be sensitive places.

4          In our briefing, we point to multiple state

5    legislatures and multiple state courts that felt that way

6    during the formation of our Second Amendment tradition.

7          I think it's also important to note that these are in

8    addition to states.  The statutes and the cases we cite are

9    also in addition to cases that have broader restrictions.  So

10   it didn't even need to specifically designate religious

11   facilities as "sensitive."

12         I know plaintiffs have relied a lot on last week's

13   *Hardaway* decision out of the Western District.  And I think

14   that's actually one thing that the *Hardaway* court wrong, is

15   that they ignored this context that some states didn't

16   necessarily have these exact laws because they already had a

17   broader one in place.

18         THE COURT:  Let me ask this though in terms of

19   sensitive places, do you read the sensitive places and the

20   reference in *Bruen* that I am directed to look to the timing, in

21   other words, the consideration, of a place as a "sensitive

22   place" back in either the passage of the Second Amendment or

23   the Fourteenth Amendment and what was considered a "sensitive

24   place" vis-à-vis carrying a weapon?

25         MR. CONRAD:  Well, I think that we cited quite a lot

1    of statutes and cases from the era of the Fourteenth Amendment

2    that do exactly this.  I think plaintiffs at one point, when

3    they were disputing, had mentioned that we had maybe cited one

4    case out of a large denominator of cases.  I don't think that's

5    true at all.

6              I think we actually cited four cases from state high

7    courts.  That obviously doesn't even include the many cases

8    that might have been from lower courts.  And these cases, from

9    the era that's relevant here, had a lot to say about this.

10             For example, the Georgia case from 1874 that we cite

11   said that:  "The practice of carrying arms at courts,

12   elections, and places of worship is a thing so improper in

13   itself, so shocking to all sense of propriety, so wholly useful

14   and full of evil, that it would be strange if the framers of

15   the Constitution had used words broad enough to give it a

16   constitutional guarantee."

17             That's one example of the four that we cite, again,

18   all from the highest courts of states of the states that had

19   these specific restrictions on places of worship because they

20   didn't have broader restrictions.

21             So I think as far as "sensitive places" go, I think

22   it's pretty clear that there were quite a few states at that

23   time that considered places of worship to fall into this

24   category.

25             THE COURT:  Let me ask this in terms of the scope of

1   the *Hardaway* injunction.

2         My reading of it is that it applies to the defendants

3   in that case and that it's not an injunction that applies

4   outside of the defendants who were named in that case.

5         Do the parties agree that that is the scope of

6   *Hardaway*?

7         MR. CONRAD:  That's my understanding of it.

8         THE COURT:  Plaintiff?

9         MR. MORRIS:  Your Honor, I believe this was enjoined.

10  I've got the decision in front of me.  So I'm going to refer to

11  it.  "Ordered:  Defendants' agents, servants, employees are

12  enjoined, effective immediately, from enforcing all New York

13  Penal Law 265.01-e(2)(c)."

14        THE COURT:  The defendants in that case -- and I

15  apologize, although I do have it here somewhere.  The

16  defendants --

17        MR. MORRIS:  There is a footnote, your Honor, that

18  says:  "The states's request to limit any TRO to the individual

19  plaintiffs is denied as untenable.  Either the exclusion

20  applies or it does not."

21        THE COURT:  I'm sorry.  What footnote?

22        MR. MORRIS:  Footnote 24 on page 40, your Honor.

23        THE COURT:  Footnote 24?

24        MR. MORRIS:  Yes, your Honor.  On the last page, your

25  Honor.

 1            THE COURT:  Okay.  I was looking at the Westlaw cite.

 2    It doesn't have a 24.

 3            If you could read that to me again.

 4            MR. MORRIS:  Absolutely, your Honor.  At the end of

 5    the quote that I just mentioned.  It's footnote 24:  "The

 6    state's request to limit any TRO to the individual plaintiffs

 7    is denied as untenable.  Either the exclusion applies or it

 8    does not."

 9            THE COURT:  No.  I guess what I was referring to is it

10    that it applies to only the defendants in that case?

11            In other words, do you read it to apply to Steven

12    Nigrelli, the acting superintendent of the state police; Brian

13    Seaman, the DA in Niagara County; and John Flynn, the DA in the

14    county of Erie?

15            MR. MORRIS:  Your Honor, the language is broad.  It

16    says:  "All persons in concert or in participation who received

17    notice of this temporary restraining order."

18            We're here.  We've submitted this on the record.  If

19    you're asking me if it applies, it should.  If it doesn't, we

20    have more than ample grounds under the First and Second

21    Amendment to make sure it applies.

22            THE COURT:  No.  What I'm asking is it sounds like

23    what you're saying is that you believe it's a statewide

24    injunction.

25            In which case then, what is the emergent need here?

1    In other words, what's the emergency here if you believe that

2    that is a statewide injunction?

3            MR. BENNO:  First, it's a TRO.  So there's a

4    preliminary injunction hearing.  It doesn't apply to the

5    defendants that we -- there are state defendants here to be

6    sure, Steven Nigrelli.  And I think the others may be district

7    attorneys up in the counties where this was brought.  Steven

8    Nigrelli is the deputy superintendent of the New York State

9    Police.

10           The defendants have asserted they don't believe -- and

11   they've said it a couple times now.  They don't believe that it

12   applies to them.  They're not refraining from arresting people

13   because of it.  They've said that earlier today.

14           We take the position that to the extent it applies, it

15   would apply only to the state defendants, and therefore, the

16   New York City defendants, the Rockland County defendants, it's

17   at least questionable.  And they seem to have answered how

18   they're resolving that question in their minds.

19           THE COURT:  Okay.  I will allow some brief arguments.

20   I don't have any additional questions.  But I'm going to

21   truncate any additional argument.  But I know that the

22   defendants wanted to make a point about the vagueness issue.

23   Yes.

24           MR. CIAPPETTA:  Your Honor, may I address the last

25   aspect?

1           THE COURT:  Yes.

2           MR. CIAPPETTA:  Thank you, Judge.  I think you had

3      heard from the state on the Second Amendment with respect to

4      sensitive places.  So we'd like to be heard on that as well.

5           THE COURT:  Yes.

6           MR. CIAPPETTA:  Two issues.  The first question was

7      21(A), whether it's static or it evolved.  And I think that the

8      amicus brief that was put in by Everytown Law is very helpful

9      on that regard.  They're not here today.

10          But they have quotes from *Bruen* that say that the

11     question of 1868 or 1791 is undecided.  The Supreme Court could

12     have very well decided that, if they wanted to, at the time of

13     *Bruen*, and they did not.  So we say it's static.  Of course

14     we're not saying it can change in the 1980s or the 1970s.  But

15     between those periods of time -- that's the relevant period of

16     time.

17          Indeed, if you look at what's presented in this case,

18     the plaintiffs cite to a 1770 statute from Georgia requiring

19     firearms to be brought at places of worship or houses of

20     worship.  But then, by 1870, Georgia repealed that.  Obviously

21     they thought better than that and that was not a place where

22     firearms should be.

23          THE COURT:  Or they thought better that they had the

24     authority to restrict the carrying of firearms to --

25          Well, it was just repealing that you have to have it.

1    Right?

2              MR. CIAPPETTA:  Right.  Well, I think they went

3    further.  I think it became a prohibition then.  They repealed

4    it, and they prohibited it.  In then in the Supreme Court

5    decision cited by the state, they said, a few years later "It's

6    unthinkable to have them there."

7              THE COURT:  That is the quote that I just read.

8              MR. CIAPPETTA:  It's a sea change.  So to say you're

9    only locked into what happened in 1791 when the Fourteenth

10   Amendment applied the Second Amendment against the states,

11   that, to me, would be illogical.

12             Back to the second half of this discussion on what are

13   "sensitive places" and how to interpret them, the city

14   defendants address that in two areas:

15             First, we look at the sensitive places identified by

16   the court in *Bruen*.  If you look at *Bruen, Heller*, and

17   *McDonald*, there are certain presumptively lawful regulations

18   that don't require you to run through the text and tradition

19   tests.  I think that's pretty clear.

20             And the court said, with respect to one of those

21   presumptively lawful regulations, is sensitive places.  And

22   they say, as you note, "such as, polling places, legislative

23   buildings, government buildings, education" or schools.

24             So we first argue in our brief that houses of worship

25   and religious institutions, they fit within that.  So they're

1  the "such as."  And, such as there, you don't need to go

2  through the history and tradition test.  That's very clear from

3  the language itself.  It says:  "Such as similar or analogous

4  and new places."  So the court was not limiting it to that.

5       If you follow the plaintiffs' argument, they would

6  say, well, that list is only places of conflict, which to me

7  doesn't make sense because I don't think many of those places

8  have traditionally been places of conflict, certainly not

9  educational institutions.  And I'm not aware of courthouses

10  becoming a bed of violence.

11       THE COURT:  I guess until folks -- again, not unlike

12  polling places, until people decide that it is time to start

13  banning books in school.  That's more tonnage than anything.

14       Go ahead.

15       MR. CIAPPETTA:  So you have that list there.  And, to

16  me, you have to say, okay.  What ties those things together to

17  find new and analogous places.  The presence of conflict is not

18  what ties them together.  The city defendant argues that those

19  are classic historical institutions that have all been, in one

20  way or the other, part of the bedrock of this country's

21  tradition and founding, first.

22       And second, we argue that those are all places,

23  interestingly, where there is other First Amendment or other

24  constitutional happening within.  So educational institutions,

25  for example, are free-speech hubs.  Students are learning the

marketplace of ideas.  Polling places are Fifth Amendment

places.  You're casting your right to vote.  Legislative

buildings, also you're expressing your right to associate,

perhaps, and certainly to speak in a public session.  And

houses of worship, likewise, you're exercising your free

exercise rights therein.

          So, to us, the ties that bind are twofold:  It's one:

That all of those institutions are classic institutions that

are critical to the foundation of this country -- whether it's

the right to vote; whether it's the right to educate, which our

founders have said that education is necessary for a

constitutional republic.  And without education, you can't

inform the citizens of any of their rights and even their

obligations under our democracy.

          And then, second, those places in that *Bruen* list

promote other constitutional rights, specifically those in the

Bill of Rights.

          So that, to me, are the ties that tie it together, not

the scholarly cites that the plaintiff has offered, that it's

either a place of conflict or it's a places where minors are.

Well, that would only involve one of that list there.

          That list has to have some kind of coherence to it.

And we submit that that coherence is that they are bedrock

American institutions, one; and secondly, that constitutional

rights are being promoted and safeguarded there within.

```
 1              THE COURT:  All right.  I'm going to cut off argument
 2    there.  I do have one more question just to confirm.  And I
 3    believe it was Plaintiff Goldstein who is in Florida now.
 4              Is that correct?
 5              MR. MORRIS:  He is.
 6              THE COURT:  Plaintiff Goldstein isn't moving to
 7    Florida, is he?
 8              MR. BENNO:  No.
 9              THE COURT:  In other words, he has a license down
10    there, and he's able to carry.  I'm just trying to make sure
11    that, in terms of his status here, that he's not changing his
12    domicile.  He's still here.
13              MR. MORRIS:  It is.  He's here.
14              THE COURT:  All right.  I know I was going to open it
15    up, but we've been going for long enough I think.  So I'm going
16    to cut off argument there.  I do expect to get the supplemental
17    declarations.
18              How much time would you need to put those together?
19              MR. BENNO:  Well, your Honor, we're running up against
20    the Jewish sabbath.
21              THE COURT:  I have a suggestion.  You don't have to
22    give me an answer now.  Why don't you confer with your clients
23    and your adversaries and propose a date to me when you would
24    intend to submit the supplementation.
25              MR. BENNO:  Certainly, your Honor.  I would make one
```

```
 1    request, if I may.

 2              THE COURT:  Yes.

 3              MR. BENNO:  Obviously we feel that there is an urgency

 4    to this, and we want to get this to you right away.  I

 5    understand wanting to have the full and robust record, and

 6    we're going to do everything to get that to you as

 7    expeditiously as possible.

 8              I would request respectfully that pending the decision

 9    on this preliminary injunction motion, I'd like to at this time

10    renew our application for the TRO.  We can do it on an

11    accelerated basis to get you those materials so that you have

12    them to review.

13              But there is an eminence to this.  There is an urgency

14    on our end.  It is for all of the reasons that we've said

15    today, for all of the constitutional grounds.

16              THE COURT:  I'm going to adhere here to my prior

17    ruling.  What you have here, in essence -- if you're asking

18    that, between now and the time that I ultimately issue a

19    decision, I restrict the statute, I'm not going to do that.

20              Having said that, I'll get your papers, review it, and

21    we will have a decision.  Because my sense is, in the end, that

22    it's not going to end with me.

23              Well, let me ask:  Is *Hardaway* being appealed?  Does

24    anybody know?

25              MR. BENNO:  I believe they filed a notice of appeal.
```

1    Actually, no.  They have a TRO.

2         THE COURT:  So they have to wait for the PI.

3         MR. CONRAD:  It's my understanding that the TRO has

4    not been because their PI is pending.

5         THE COURT:  Is there going to be an evidentiary

6    hearing?

7         In other words, are there going to be witnesses

8    testifying at that hearing?

9         MR. CONRAD:  I don't know the answer to that.  I'm

10   sorry.

11        THE COURT:  So as I mentioned, I'm going to adhere to

12   my prior ruling in my TRO.

13        MR. CIAPPETTA:  Your Honor, I just wanted to note our

14   objection to the filing of the declaration of Professor Joyce

15   Lee Malcolm.  That was put in in reply.

16        And there is case law.  I don't have it in front of

17   me, but I did research the issue where it says that those

18   issues should not be put on reply.  A declaration should only

19   come in for the first time with the principal moving papers.

20        THE COURT:  Okay.  With the understanding that I will

21   look at -- I haven't focused on that declaration, and I will

22   consider it as such.  So I will look at it with an eye towards

23   the argument that you're objecting to its submission, because

24   it was done on reply.

25        MR. CIAPPETTA:  I'm sorry.  Just one other issue.  On

the supplemental declaration, to the extent that it's going

beyond any of the issues set forth in your order from last

night, we do reserve our right to maybe put in something short,

if there is something new there that is going beyond these

questions.

THE COURT:  As I said, if there's something new that's

in there, it will be subject to the same case law that applies

to the reply.

MR. CIAPPETTA:  Okay.

THE COURT:  But if you see something that you believe

is new in there and you wish the opportunity to respond, you

should submit a letter to me making the request.

MR. CIAPPETTA:  Okay.

THE COURT:  Other than what was discussed here and the

additional questions that I discussed here, that it would be

limited to that.

What I would ask though is if there is going to be

something the plaintiff is going to put in in the declaration,

you will meet and confer.  And if you can agree that they will

have an opportunity to respond to something new, including what

is in the supplemental declarations, I'm fine with that so that

there isn't a battle back and forth.  But if there isn't, then

I'll resolve whatever the dispute is.

MR. CONRAD:  One quick procedural question,

your Honor.  As you noted, it's probably likely that both

1    parties might appeal, if there was an adverse decision here.

2              So I would just ask that whatever the decision is,

3    you consider staying the effectiveness of any order for maybe

4    three days, just so that whichever party would like to appeal

5    can do so without having to run into an emergency stay.

6              THE COURT:  I would consider that.  In three days.  I

7    might give you a few more days obviously, if it's going to be

8    appealed.  And I'll also be mindful.

9              MR. CIAPETTA:  Okay.

10             THE COURT:  Thank you.  Thank you very much, Counsel,

11   for coming in.  It was a very helpful argument.  I look forward

12   to getting the supplemental declarations.  We'll stand

13   adjourned.  Thank you.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25